NO. 20-40359

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

PRISCILLA VILLARREAL,

*Plaintiff - Appellant*

v.

THE CITY OF LAREDO, TEXAS; WEBB COUNTY, TEXAS; ISIDRO R. ALANIZ; MARISELA JACAMAN; CLAUDIO TREVINO, JR.; JUAN L. RUIZ; DEYANRIA VILLARREAL; ENEDINA MARTINEZ; ALFREDO GUERRERO; LAURA MONTEMAYOR; DOES 1-2,

*Defendants – Appellees*

## BRIEF OF APPELLANT PRISCILLA VILLARREAL

On Appeal from the United States District Court for the Southern District of Texas, Laredo Division, Civil Action No. 5:19-CV-48

JT Morris
JT MORRIS LAW, PLLC
1105 Nueces Street, Suite B
Austin, TX 78701
Telephone: (512) 717-5275

Attorney for Plaintiff-Appellant Priscilla Villarreal

# CERTIFICATE OF INTERESTED PARTIES

The cause number and style of the case is No. 20-40359, *Priscilla Villarreal v. City of Laredo, Texas, et al.* (USDC Civil No. 5:19-CV-48, Southern District of Texas).

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

## Plaintiff-Appellant

Priscilla Villarreal

## Attorneys for Plaintiff-Appellant

JT Morris
Ramzi Khazen
JT MORRIS LAW, PLLC
1105 Nueces Street, Suite B
Austin, TX 78701
Telephone: (512) 717-5275

## Past Attorneys for Plaintiff-Appellant

Jose Salvador Tellez II
1000 Washington Street, # 1
Laredo, Texas 78040
Telephone: (956) 717-8200

## Defendants-Appellees

1. The City of Laredo, Texas;

2. Webb County, Texas;

3. Isidro R. Alaniz;

4. Marisela Jacaman;

5. Claudio Trevino, Jr.;

6. Juan L. Ruiz;

7. Deyanria Villarreal;

8. Enedina Martinez;

9. Alfredo Guerrero;

10. Laura Montemayor; and

11. Does 1-2, each alleged to be or to have been an elected or appointed official, employee, servant, or agent of the City of Laredo, Texas or Webb County, Texas.


**Attorneys for Defendants-Appellees Webb County, Texas; Isidro R. Alaniz; and Marisela Jacaman**

J. Eric Magee
ALLISON, BASS & MAGEE, LLP
A.O. Watson House
402 W. 12th Street
Austin, Texas 78701
Telephone: (512) 482-0701

Philip Barr Arnold
BICKERSTAFF HEATH DELGADO ACOSTA LLP
3711 S. Mo-Pac
Building One, Suite 300

Austin, TX 78746
Telephone: 512-472-8021

**Attorneys for Defendants-Appellees The City of Laredo, Texas; Claudio Trevino, Jr.; Juan L. Ruiz; Deyanria Villarreal; Enedina Martinez; Alfredo Guerrero; Laura Montemayor; and Does 1-2**

William M. McKamie
Alicia K. Kreh
TAYLOR OLSON ADKINS SRALLA & ELAM LLP
13750 San Pedro Ave., Suite 555
San Antonio, Texas 78232
Telephone: (210) 546-2122

Respectfully Submitted,

/s/ JT Morris
JT Morris
Attorney for Plaintiff-Appellant

## STATEMENT REGARDING ORAL ARGUMENT

This appeal involves important questions about qualified immunity and the First Amendment, including whether officials have no qualified immunity after they investigate and arrest someone for no more than using routine reporting techniques to gather and publish the news. This appeal also asks the Court to examine how a First Amendment speaker meets her pleading burden on a selective enforcement claim. The opportunity to address details about these questions at oral argument will aid the Court's decision-making process.

Another reason for oral argument is the Supreme Court's recent decision *Nieves v. Bartlett*, which examines probable cause and selective enforcement in the First Amendment context. How *Nieves* relates to the questions on appeal is something oral argument may enlighten.

For these reasons, Villarreal requests oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES.....................................ii

STATEMENT REGARDING ORAL ARGUMENT.............................v

TABLE OF CONTENTS.................................................................vi

TABLE OF AUTHORITIES.............................................................x

JURISDICTIONAL STATEMENT.....................................................1

STATEMENT OF ISSUES.............................................................2

STATEMENT OF THE CASE.......................................................... 4

SUMMARY OF THE ARGUMENT................................................14

ARGUMENT..............................................................................17

I.   Standard of review............................................................17

II.   Officials get no qualified immunity if they deliberately criminalize a person's exercise of clearly established First Amendment rights.......18

   A. Qualified immunity generally. ........................................18

   B. Reliance on a statute is not an unconditional excuse for constitutional violations.......................................................19

   C. The government cannot investigate or arrest someone only for exercising First Amendment rights.......................................21

   D. Deliberate acts merit no deference in the qualified immunity context.............................................................................23

III.   Because the Individual Defendants have no qualified immunity for arresting Villarreal, the Court should reverse the dismissal of her First Amendment arrest claim........................................................24

   A. The First Amendment prohibits arrests made to retaliate against

protected speech. .....................................................................................25

B. Villarreal showed Defendants arrested her for no more than routine reporting protected under the First Amendment. ...............................27

    1. The First Amendment protects routine reporting activities on matters of public concern. .................................................................27

    2. Defendants arrested Villarreal for using routine reporting techniques. .......................................................................................29

C. No reasonable official could have found probable cause to arrest Villarreal under any statute. ...............................................................31

    1. The exercise of a clearly established First Amendment right cannot support even arguable probable cause. ...................................31

    2. There was no arguable probable cause, let alone actual probable cause, to arrest Villarreal for anything. ...........................................32

    3. The district court erred in its view of *Daily Mail* and *Florida Star* ..........................................................................................34

D. There was no probable cause even considering the elements of Tex. Penal Code § 39.06(c).............................................................................35

E. Three more factors highlight the depth of Defendants' objective unreasonableness ..................................................................................38

F. Villarreal suffered a chilling injury from Defendants targeting her reporting. ................................................................................................40

    1. Defendants caused Villarreal injuries that would chill one of ordinary firmness. ...........................................................................40

    2. Defendants investigated and arrested Villarreal intending to silence her. .......................................................................................41

IV. The Court should reverse the dismissal of Villarreal's Fourth Amendment wrongful arrest claim............................................................42

V. The Court should reverse the dismissal of Villarreal's selective enforcement claim. ...................................................................44

   A. Selective enforcement violates the Equal Protection Clause and the First Amendment. ................................................................44

   B. Probable cause does not bar a selective enforcement claim...........45

   C. Villarreal met her pleading burden for selective enforcement......46

VI. The Court should reverse the dismissal of Villarreal's First Amendment retaliatory investigation claim. .........................................49

   A. A bad-faith investigation targeting protected speech violates the First Amendment. ...............................................................50

   B. The district court erred overlooking Villrreal's allegations that Defendants' decision to investigate violated the First Amendment...52

   C. Defendants' investigation was objectively unreasonable because there was no legitimate law enforcement purpose for an investigation...............................................................................53

VII. The Court should reverse the dismissal of Villarreal's claim that her arrest interfered with her First Amendment rights. ..............................54

VIII. The Court should reverse the dismissal of Villarreal's civil conspiracy claim......................................................................................55

IX. The Court should reverse the dismissal of Villarreal's municipal liability claim against the City. .............................................................56

   A. Villarreal detailed an official City policy aimed at stopping her journalism. ............................................................................57

   B. Villarreal showed a nexus between the City's policy or custom and a final policymaker. ..............................................................59

      1. Villarreal did not have to identify the specific policymaker behind the alleged City policy. .....................................................59

2. Villarreal did not need to show a final policymaker directly deprived her of constitutional rights. ................................................. 59

3. Villarreal showed a policy fairly attributable to the City. .......... 60

C. Villarreal showed the City's policy was the moving force behind violations of her constitutional rights. ................................................. 61

X. Villarreal may pursue declaratory relief. ......................................... 61

CONCLUSION ........................................................................................... 62

CERTIFICATE OF SERVICE ............................................................... 64

CERTIFICATE OF COMPLIANCE .................................................... 65

ADDENDUM ....................................................................... ADD-1

Texas Penal Code § 39.06 ............................................... ADD-2

Texas Penal Code § 1.07(a)(7) ........................................ ADD-4

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Creighton*, 483 U.S. 635 (1987)……………….………...18, 19

*Bartnicki v. Vopper*, 522 U.S. 514 (2001)……………………………....34

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)…………………….…17

*Branzburg v. Hayes*, 408 U.S. 665 (1972)………………….…….…...51, 54

*Bryan v. City of Madison*, 213 F.3d 267 (5th Cir. 2000)………...….…45

*Carey v. Nevada Gaming Control Bd.*, 279 F.3d 873 (9th Cir. 2002)….20

*Carrasca v. Pomeroy*, 313 F.3d 828 (3d Cir. 2002)………………....…...46

*Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285 (5th Cir. 2004)
………………………………………………….……………....…………...17

*Chrissy F. ex rel. Medley v. Miss. Dep't of Pub. Welfare*, 925 F.2d 844
(5th Cir. 1991)……………………………………………………...….........62

*Colle v. Brazos County,* 981 F.2d 237 (5th Cir. 1993)…………...…….…57

*Colson v. Grohman,* 174 F.3d 498 (5th. Cir. 1999)………….……...….…51

*Coszalter v. City of Salem,* 320 F.3d 968 (9th Cir. 2003)……………..…51

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975)……………..………..…36

*Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273 (5th Cir. 2002)……24

*Culbertson v. Lykos*, 790 F.3d 608 (5th Cir. 2015)……………….…......57

*Davidson v. City of Stafford*, 848 F.3d 384 (5th Cir. 2017)…………18, 31

*Davis v. Scherer*, 468 U.S. 183 (1984)…………………………………………24

*Florida Star v. B.J.F*, 491 U.S. 524 (1989)………………….…..………passim

*Groden v. City of Dallas*, 826 F.3d 280 (5th Cir. 2016)……………56, 59

*Harlow v. Fitzgerald*, 457 U.S. 800 (1981)…………..………......18, 19, 24

*Hartman v. Moore*, 547 U.S. 250 (2006)…………………………..………51

*Heaney v. Roberts*, 846 F.3d 795 (5th Cir. 2017)…………….…..……24

*Hope v. Pelzer*, 536 U.S. 730 (2002)……………………………………19

*Innovative Database Sys. v. Morales*, 990 F.2d 217 (5th Cir. 1993)……36

*Izen v. Catalina*, 398 F.3d 363 (5th Cir. 2005)………………………….50

*Keenan v. Tejeda*, 290 F.3d 252 (5th Cir. 2002)………...22, 25, 26, 40, 41

*Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004)……….……………….26

*Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012)……..….…42, 48

*Lawrence v. Reed,* 406 F.3d 1224 (10th Cir. 2005)………..………….39

*Leonard v. Robinson*, 477 F.3d 347 (6th Cir. 2007)………………..…22

*Lozman v. City of Riviera Beach,* 138 S. Ct. 1945 (2018)……….…....22

*Malley v. Briggs*, 475 US 335 (1986)……………………..…………....43

*Mangieri v. Clifton,* 29 F.3d 1012 (5th Cir. 1994)………………….…43

*McLin v. Ard,* 866 F.3d 682 (5th Cir. 2017)………………..…………21, 43

*MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118 (2007)…….……..62

*Mink v. Knox*, 613 F.3d 995 (10th Cir. 2010)...............................20, 21

*Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)..................20

*Monroe v. Pape*, 365 U.S. 167 (1961)..................................................20

*Morrow v. Washington*, 672 F. App'x 351 (5th Cir. 2016)....................56

*Mullenix v. Luna*, 136 S. Ct. 305 (2015)...........................................23

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019)................................passim

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)..............................53

*Pearson v. Callahan*, 555 U.S. 223 (2009).......................................18

*Peavy v. WFAA-TV, Inc.,* 221 F.3d 158 (5th Cir. 2000).......................34

*Oklahoma Pub. Co. v. District Court of Oklahoma*, 430 U.S. 308 (1977).....................................................................................34

*Oyenik v. Corizon Health, Inc.,* 696 F. App'x 792 (9th Cir. 2017).........60

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)....................57, 60

*Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001)..............56

*Pfannstiel v. City of Marion*, 918 F.2d 1178 (5th Cir. 1990)...............55

*Price-Cornelison v. Brooks,* 524 F.3d 1103 (10th Cir. 2008)..............20

*Rehberg v. Paulk,* 611 F.3d 828 (11th Cir. 2010).............................51

*Reichle v. Howards*, 566 U.S. 658 (2012)......................................21

*Rolf v. City of San Antonio*, 77 F.3d 823 (5th Cir. 1996)...................26

*Ryburn v. Huff*, 565 U.S. 469 (2012)................................................23

*Sandhul v. Larion*, 119 F.3d 1250 (6th Cir. 1997).................20, 21, 31

*SCLC v. Supreme Court*, 252 F.3d 781 (5th Cir. 2001).....................17

*Shulman v. Grp. W Prods., Inc.*, 955 P.2d 469 (Cal. 1998)............29, 34

*Smith v. Daily Mail Pub. Co.*, 443 U.S. 97 (1979)......................passim

*Spencer v. Staton*, 489 F.3d 658 (5th Cir. 2007)..............................43

*Turner v. Driver*, 848 F.3d 678 (5th Cir. 2017)...............................52

*Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000)..........................45

*Wayte v. United States*, 470 U.S. 598 (1985)..................................21

*Whren v. United States,* 517 U.S. 806 (1996)..................................46

*Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000)...........................51

**Statutes**

28 U.S.C. § 1291...............................................................1

28 U.S.C. § 1331...............................................................1

28 U.S.C. § 1335...............................................................1

28 U.S.C. § 2201...............................................................62

42 U.S.C. § 1983..........................................................passim

Tex. Gov. Code § 552.001.....................................................38

Tex. Penal Code. § 1.07(a)(7)……………………………………………8, 36

Tex. Penal Code. § 39.06(c)…………………………………………..passim

**Rules**

Fed. R. Civ. P. 12(b)(6)………………………………………….…4, 17, 44

**Other Authorities**

"La Gordiloca: The Swearing Muckraker Upending Border Journalism,"
New York Times Online, Mar. 10, 2019……………………………………4

## JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1291 because Villarreal appeals the district court's order and final judgment dismissing her claims. ROA.423-482. Villarreal filed her notice of appeal within 30 days of the district court's final judgment. ROA.483.

## STATEMENT OF ISSUES

1. The First Amendment protects using routine reporting techniques, like asking law enforcement for information, to gather and publish the news. Defendants arrested Villarreal even though their only basis for probable cause was that Villarreal asked for and learned facts from a police officer as part of her regular reporting on local news. Did this arrest violate the First and Fourth Amendments and leave Defendants without qualified immunity?

2. The Equal Protection Clause bars selectively enforcing laws because of hostility toward a person's exercise of constitutional rights. Villarreal alleged that because Defendants disliked her reporting, they arrested her under a neglected statute never enforced against others who also asked police for information as part of routine news reporting. Did she establish a selective enforcement claim?

3. The First Amendment prohibits official retaliation, such as a bad-faith investigation, against protected speech. Villarreal alleged how Defendants agreed to manufacture an investigation just because they wanted to hit back against her candid reporting. Did she show a distinct First Amendment violation?

4. A municipality is liable under 42 U.S.C. § 1983 if it adopts a policy that causes constitutional injury. Villarreal detailed a City of Laredo policy retaliating against her reporting, reflected in her arrest and several other adverse acts of City personnel including the City's police chief. Did this show a Section 1983 claim against the City?

## STATEMENT OF THE CASE

This is an appeal of the district court's grant of Defendants' Rule 12(b)(6) motions to dismiss Villarreal's Section 1983 claims. Villarreal's claims and allegations centered on government officials enforcing a law not for any legitimate purpose, but to retaliate against a plucky citizen journalist.

### Villarreal becomes Laredo's most conspicuous journalist.

Villarreal, known as "Lagordiloca," has been a citizen journalist around Laredo, Texas since 2015. ROA.158-59 [¶¶24, 31]. Villarreal reports on matters of public interest on her Facebook page "Lagordiloca News Laredo Tx." ROA.158 [¶28]. For example, she records and shows video of local crime and traffic scenes. *Id.* And she publishes information and colorful commentary about newsworthy local issues ROA.159 [¶¶32-33]; ROA.161. In turn, citizens often discuss these issues in the comments section on Villarreal's Facebook page. ROA.160 [¶38].

So as *The New York Times* put it, "[Villarreal] is arguably the most influential journalist in Laredo. . . ."[1] Indeed, Laredo citizens consider her

---

[1] "La Gordiloca: The Swearing Muckraker Upending Border Journalism," New York Times Online, Mar. 10, 2019, *available at* https://www.nytimes.com/2019/03/10/us/gordiloca-laredo-priscilla-villarreal.html (last accessed Aug. 28, 2020).

a principal source of information on local crime and government, often praising her authentic reporting. ROA.160 [¶¶37-39]. To that end, over 120,000 users follow the "Lagordiloca" Facebook page. ROA.160. [¶ 37].

On the other hand, Villarreal has her share of critics owing to her gritty style of journalism. Villarreal's video of crime and traffic scenes sometimes show Laredo Police Department ("LPD") officers in controversial situations. ROA.161. And while Villarreal has sometimes praised LPD, she has not shied from criticizing it. ROA.161 [¶46]. Nor has she shied from criticizing other local officials. ROA.161-162 [¶¶ 47-50].

A prime example is Villarreal reporting about animal abuse at a local property. After she reported about the abuse, law enforcement found more abused animals at the property. ROA.161-162 [¶¶48-50]. Villarreal then learned the property belonged to a relative of Defendant Marisela Jacaman, the chief assistant district attorney in Webb County. ROA.161-162. Soon after, Villarreal publicly criticized the district attorney's decision to recall an arrest warrant for Jacaman's relative. ROA.162 [¶50].

## Defendants decide to harass Villarreal.

The district attorney, Defendant Isidro Alaniz, noticed Villarreal's criticism. In fact, Alaniz took Villarreal behind closed doors to let her know he disliked her criticism of his office. ROA.162 [¶54]. But that was not the limit of local officials harassing Villarreal because of her journalism.

Over a short period, Villarreal endured regular harassment from LPD. ROA.162-63. For instance, officer Laura Montemayor threatened to seize Villarreal's camera while Villarreal was filming a public crime scene. ROA.163 [¶ 54]. Or take the occasion officer Alfredo Guerrero tried to force Villarreal off her day job site, and then harassed her even more after Villarreal started filming Guerrero. ROA.163 [¶ 54]. And another time officer Enedina Martinez told other LPD officers that Villarreal is a five-time felon despite knowing Villarreal is not a felon. ROA.163 [¶ 54].

And even though Laredo's police chief Defendant Claudio Treviño knew of this harassment, he encouraged it rather than stop it. ROA.165 [¶61]; ROA.174 [¶110]. The City Council did the same. ROA.165 [¶62]; ROA.196 [¶222]. So one thing became clear—these officials and the City intended to stifle Villarreal's reporting. *E.g.*, ROA.163-64 [¶¶55-59].

**Defendants agree to investigate and arrest Villarreal.**

In 2017, Treviño, Alaniz, and Jacaman, along with Defendants Juan Ruiz, Deyanira Villarreal ("DV"), and two Doe Defendants (collectively "Individual Defendants") agreed to investigate and arrest Villarreal. ROA.165-167 [¶¶ 64-66, 69-70]; ROA.173 [¶¶101-02]. Their goals were simple. They wanted to retaliate against Villarreal for criticizing LPD and Alaniz's office and force her into self-censorship. ROA.166-67; ROA.173.

And so the Individual Defendants targeted two Facebook posts Villarreal made in spring 2017 ("Targeted Publications"). ROA.165-66 [¶¶64-66]. In one of these posts, Villarreal reported the name and occupation of a border agent who committed suicide jumping off a Laredo overpass. ROA.166 [¶65]. And in the other, she published information about a family involved in a fatal traffic accident. ROA.166[¶ 66].

In each instance, Villarreal first learned the information she published from private citizens. ROA.166. Like any sensible journalist, she wanted to confirm her facts. And so Villarreal verified the facts with details she asked for and learned from LPD officer Barbara Goodman. ROA.166 [¶¶65-66]; ROA.170 [¶89]. Indeed, like other local journalists,

Villarreal regularly asked LPD officers about newsworthy events and published what LPD officers provided. ROA.166 [¶67]; ROA.174 [¶106]; ROA.187 [¶¶177-78].

**Defendants dig up a statute to enforce against Villarreal.**

Intent on criminalizing Villarreal's reporting, Alaniz, Jacaman, and the other Individual Defendants hunted for a pretextual statute that "fit" the Targeted Publications. ROA.167; ROA.174 [¶109]; ROA.175 [¶113]. And they found one—Texas Penal Code § 39.06(c). ROA.167. Under § 39.06(c), a person committed a felony if she "solicits or receives from a public servant information that. . . has not been made public." Tex. Penal Code § 39.06(c). In turn, "not been made public" meant "information to which the public does not generally have access, and that is prohibited from disclosure" under the Texas Public Information Act ("TPIA"). *Id.*

What is more, the statute required that the defendant solicit or receive information "with intent to obtain a benefit…" *Id.* To that end, the Texas Penal Code defines "benefit" as "anything reasonably regarded as economic gain or advantage." Tex. Penal Code § 1.07(a)(7).

No local official had enforced § 39.06(c) against local journalists or any other citizen in the 23 years of its existence. ROA.181-82 [¶141].

Even though, of course, the Individual Defendants knew local journalists regularly asked for and learned information from LPD officers. ROA.174 [¶106]; ROA.187 [¶¶177-78]. But still, Defendants decided to enforce the statute against Villarreal for using these same everyday reporting methods.

## Defendants cause Villarreal's arrest.

The Individual Defendants knew the First Amendment protected Villarreal asking Officer Goodman for information, learning that information from Goodman, and publishing it accurately. *E.g,* ROA.174 [¶¶106-107]. Yet months after Villarreal posted the Targeted Publications, the Individual Defendants manufactured arrest warrants under § 39.06(c) against Villarreal. ROA.169-171; ROA.174-76.

As part of this, Jacaman approved investigatory subpoenas targeting Villarreal's reporting, with Alaniz's support. ROA.176 [¶114]. And Ruiz provided statements in support of the arrest warrants under the direction and approval of Treviño, Alaniz, and Jacaman, who wanted to silence Villarreal for her candid reporting about their offices. ROA.170 [¶¶86, 88], ROA.174-75 [¶109-110]; ROA.176 [¶115].

In his statements, Ruiz claimed an unnamed source told Defendant

DV that Officer Goodman was communicating with Villarreal. ROA.170 [¶88]. Then he asserted Villarreal asked for or received information from Goodman about the incidents reported in the Targeted Publications, and that this information "had not been made public." ROA.170 [¶89]. For all that, Ruiz did not mention any TPIA exception within which he believed Officer Goodman's information fell, even though § 39.06 defined "not been made public" as information "prohibited" from public records disclosure. ROA.170-71 [¶90].

Ruiz also claimed that Villarreal's "release of the information before other news outlets gained her popularity in Facebook." ROA.170 [¶89]. But he did not detail why Villarreal gained any financial or other economic benefit from publishing the information Goodman gave to her. ROA.171. Nor did he address Villarreal's intent in asking for or receiving the information. ROA.171 [¶94].

Jacaman approved Ruiz's warrant statements with Alaniz's backing. ROA.176 [¶114]. And so two arrest warrants issued against Villarreal. ROA.172. Villarreal soon learned of these warrants and turned herself in. ROA.172. When she arrived at booking, she found several LPD officers mocking her, including Martinez, Guerrero, and

Montemayor. ROA.172 [¶97]. Law enforcement then detained Villarreal at the Webb County jail. ROA.177.

## Villarreal wins her habeas petition.

Soon after posting bond, Villarreal filed for a writ of habeas corpus arguing § 39.06(c) was facially invalid. ROA.178 [¶124]. The Texas trial court granted the writ through a bench ruling, in which it found the statute unconstitutionally vague. ROA.179 [¶127]. Although the state did not appeal, Alaniz claimed officials would not drop the investigation, and instead would keep looking into who was supplying Villarreal with information. ROA.179 [¶129].

## Villarreal files this lawsuit.

Villarreal sued Defendants under 42 U.S.C. § 1983 seeking damages, a declaratory judgment, and an injunction. ROA.12-57; ROA.152-206. Her claims focused on the investigation, arrest, and other harassment she endured because of her journalism. ROA.152-206. In particular, she sued for First Amendment and Fourth Amendment violations, along with an Equal Protection clause violation for selective enforcement of § 39.06(c). ROA.179-89.

Based on these violations, Villarreal also included a civil conspiracy

claim against the individual Defendants, and a supervisory liability claim against Treviño. ROA.189-94. Finally, she sued both the City of Laredo and Webb County for § 1983 municipal liability. ROA.194-201.

**The district court grants Defendants' motions to dismiss.**

Defendants moved to dismiss Villarreal's First Amended Complaint. ROA.212-30; ROA.232-49. In their motions, the Individual Defendants raised qualified immunity. ROA. 219-224; ROA.237-42. Alaniz and Jacaman also raised absolute prosecutorial immunity. ROA.216-19.

The district court granted the motions to dismiss. While it denied Alaniz and Jacaman absolute immunity, it found they and the other Individual Defendants had qualified immunity on Villarreal's claims about her arrest. ROA.435-46. At the same time, the district court did not address Villarreal's distinct First Amendment claim for a retaliatory investigation. *E.g.*, ROA.441-46.

The district court dismissed Villarreal's other claims. It entered final judgment for Defendants on May 8, 2020. ROA.482.

**Villarreal's appeal.**

Villarreal appeals the district court's dismissal of these claims:

1. First Amendment retaliatory arrest against Alaniz, Jacaman, Treviño, Ruiz, DV, and Does 1-2 ("Individual Defendants");[2]

2. Fourth Amendment wrongful arrest against the Individual Defendants;

3. Selective enforcement under the Equal Protection Clause against the Individual Defendants;

4. First Amendment retaliatory investigation against the Individual Defendants;

5. First Amendment interference based on her arrest and detention against the Individual Defendants;

6. Civil conspiracy against the Individual Defendants;

7. Municipal liability against the City of Laredo; and

8. Declaratory relief.

---

[2] Villarreal is not appealing the dismissal of her claims for Defendants Montemayor, Guerrero, Martinez, and Webb County, her supervisory liability claim against Treviño, or her request for injunctive relief.

## SUMMARY OF THE ARGUMENT

Effective self-government depends on the press and other citizens seeking and publishing information about public matters—including asking officials for information and publishing what they volunteer. That is why the First Amendment demands officials not misuse state law to harass reporters just doing their job. And that is also why the First Amendment demands officials not misuse state law to stifle their critics.

With that in mind, Defendants' investigation and arrest of Villarreal violated the First Amendment. After all, they chose to target Villarreal under a derelict Texas law only because a City police officer volunteered facts about a public suicide and a fatal car accident after Villarreal asked the officer about these incidents as part of her regular news reporting. This is as close as it gets to an obvious First Amendment violation.

And at any rate, Supreme Court decisions establish Villarreal's arrest violated the Constitution. The Supreme Court decades ago recognized the First Amendment protects using routine reporting methods, like asking law enforcement about matters of public concern to obtain and accurately publish news. *Smith v. Daily Mail Pub. Co.*, 443

U.S. 97 (1979). To this, the Supreme Court later confirmed the First Amendment almost always bars punishing someone who truthfully published newsworthy information that officials volunteered. *Florida Star v. B.J.F*, 491 U.S. 524 (1989).

Still, the district court found the Individual Defendants had qualified immunity because there was arguable probable cause to arrest Villarreal under Texas's "misuse of official information" criminal statute. This was reversable error.

Above all, qualified immunity is unavailable for an officer who arrests someone for no more than exercising a clear First Amendment right. And given the First Amendment rights established in *Daily Mail* and *Florida Star*, no reasonable official under the circumstances would have decided to arrest Villarreal under any statute, let alone the one Defendants enforced. All the more because Defendants had months to deliberate about the legality of arresting Villarreal, yet still chose to retaliate against Villarreal for her candid reporting.

These reasons show why the Court should reverse the district court's finding that qualified immunity bars Villarreal's First and Fourth Amendment claims. And because Defendants have no qualified

immunity, the Court should also reverse the dismissal of Villarreal's civil conspiracy claim.

Likewise, the Court should reverse the dismissal of Villarreal's selective enforcement claim because the district court erred construing Villarreal's allegations. At their core, her allegations showed Defendants dug up a 23-year-old law to enforce against Villarreal. But no local official had ever enforced this law, let alone against others who used routine reporting methods with local police as part of reporting the news—just like Villarreal. These allegations showed textbook selective enforcement.

Villarreal's allegations also showed a City of Laredo policy targeting her First Amendment rights. In fact, she highlighted this with several examples of Laredo officials carrying out that policy over a short period. But it was error for the district court to suggest Villarreal needed to specify the final policymaker behind the policy and an act of this policymaker that directly injured Villarreal. And so Court should reverse the dismissal of Villarreal's Section 1983 claim against the City.

Finally, the Court should reverse the dismissal of Villarreal's claim for declaratory relief because the real possibility of future retaliation makes declaratory judgment suitable.

# ARGUMENT

## I. Standard of review.

An appeals court reviews a Rule 12(b)(6) dismissal de novo. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004) (citation omitted). On a motion to dismiss a Section 1983 suit, "the focus should be whether the complaint properly sets forth a claim of a deprivation of rights, privileges, or immunities secured by the Constitution or laws of the United States caused by persons acting under color of state law." *SCLC v. Supreme Court*, 252 F.3d 781, 786 (5th Cir. 2001) (internal quotation omitted). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks, brackets, and citations omitted). Even so, a court must examine the allegations in the light most favorable to the plaintiff and with every reasonable inference resolved in the plaintiff's favor. *Causey*, 117 F.3d at 247.

## II. Officials get no qualified immunity if they deliberately criminalize a person's exercise of clearly established First Amendment rights.

### A. Qualified immunity generally.

When an official violates a citizen's constitutional rights, "an action for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1981) (citations omitted). Still, the Supreme Court has found "the need to shield officials from harassment, distraction and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). And so "[q]ualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Davidson v. City of Stafford*, 848 F.3d 384, 391 (5th Cir. 2017) (quotation and internal citation omitted).

In turn, the "clearly established" prong focuses on the "objective legal reasonableness" of the action assessed in light of clearly established law. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (quoting *Harlow*, 457 U.S. at 818-19). So to defeat the defense of qualified immunity, a

plaintiff must point out authority showing "the contours" of the asserted right are "sufficiently clear that a reasonable official would have understood that what he is doing violates that right." *Id.,* 483 U.S. at 640. But this does not require authority showing "the very action in question has previously been held unlawful." *Id.*

Instead, it merely asks for authority that would have given a reasonable official "fair warning" the defendant's conduct violated a constitutional right. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). This "fair warning" standard tracks the rule that "a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 819. To that end, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope,* 536 U.S. at 740-41.

## B. Reliance on a statute is not an unconditional excuse for constitutional violations.

Simply put, it is not objectively reasonable to enforce a state or local law if doing so would violate a clearly established constitutional right. Indeed, courts routinely deny qualified immunity under this principle. For example, the Sixth Circuit refused qualified immunity for an officer who enforced a local disorderly conduct law against a man for little more

than swearing in public. *Sandhul v. Larion*, 119 F.3d 1250, 1256-57 (6th Cir. 1997). Other decisions have arrived at similar results. *E.g.*, *Carey v. Nevada Gaming Control Bd.*, 279 F.3d 873, 882 (9th Cir. 2002) (refusing qualified immunity for an officer who enforced a state statute against the Fourth Amendment right not to identify oneself during a *Terry* stop); *Mink v. Knox*, 613 F.3d 995, 1009-10 (10th Cir. 2010) (rejecting qualified immunity when no reasonable officer would have applied the state's criminal libel statute to a school newspaper's editorials.)

These decisions highlight a chief purpose of Section 1983—confronting action under state law that upends constitutional guarantees. *See Monroe v. Pape*, 365 U.S. 167, 172-73 (1961), overruled in part on other grounds, *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). By contrast, allowing officials to cloak violations of clearly established rights in a state statute would incapacitate Section 1983. For that reason, if a defendant had fair warning he could not enforce a state law under the circumstances without violating the Constitution, the defendant has no qualified immunity. *See, e.g.*, *Price-Cornelison v. Brooks,* 524 F.3d 1103, 1115 (10th Cir. 2008).

## C. The government cannot investigate or arrest someone only for exercising First Amendment rights.

Applying the above principle to the First Amendment context, it is not objectively reasonable for an officer to determine probable cause only on protected speech. Or for that matter, investigate someone only because of their First Amendment activity. And this holds even if an official applies an authorizing criminal statute against that person. *See* pp. 19-20, *supra*.

For instance, this Court determined that because "speech criticizing the official conduct of public officials is protected by the First Amendment," no reasonable officer could have believed such speech supported probable cause for a violation of Louisiana's criminal defamation statute. *McLin v. Ard,* 866 F.3d 682, 695 (5th Cir. 2017). Likewise, having observed the First Amendment had long protected use of profanity, the Sixth Circuit held that "protected speech cannot serve as the basis for a violation of any [local] ordinances at issue." *Sandhul*, 119 F.3d at 1256. So too have other decisions reached similar conclusions. *E.g.*, *Mink*, 613 F.3d at 1003-04 ("a government official may not base her probable cause determination on an 'unjustifiable standard,' such as speech.") (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985));

*Leonard v. Robinson*, 477 F.3d 347, 361 (6th Cir. 2007) ("it cannot be seriously contended that any reasonable peace officer, or citizen, for that matter, would believe that mild profanity while peacefully advocating a political position could constitute a criminal act.")

Above all, in each of these decisions the officer criminalized no more than protected speech. And this is a key distinction from situations requiring "split-second" judgments about factors like a speaker's body language or "the manner of a suspect's speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1723-24 (2019) (citing *Reichle v. Howards*, 566 U.S. 658, 668 (2012) and *Lozman v. City of Riviera Beach,* 138 S. Ct. 1945, 1953 (2018)). In these latter situations, where officers show a legitimate ground independent of protected speech on which to charge criminal conduct, they might avoid liability. *See Keenan v. Tejeda*, 290 F.3d 252, 261-62 (5th Cir. 2002).

But at the same time, there is no legitimate law enforcement objective in charging criminal conduct against no more than speech a reasonable official would understand the First Amendment protects. Even if the acting official relies on an authorizing criminal statute. Any other rule would undermine the First Amendment. Just consider Justice

Gorsuch's recent observation: "criminal laws have grown so exuberantly and come to cover so much previously innocent conduct that almost anyone can be arrested for something. If the state could use these laws not for their intended purposes but to silence those who voice unpopular ideas, little would be left of our First Amendment liberties. . ." *Nieves*, 139 S. Ct. at 1730 (Gorsuch, J., concurring in part and dissenting in part).

## D. Deliberate acts merit no deference in the qualified immunity context.

Often in the qualified immunity context, objective reasonableness turns on an "on-the-spot" decision. These decisions include, for instance, urgent judgments about warrantless action or the use of force. *E.g.*, *Ryburn v. Huff*, 565 U.S. 469 (2012); *Mullenix v. Luna*, 136 S. Ct. 305 (2015); *see also Nieves*, 139 S. Ct. at 1723-24  To that end, the Supreme Court has "cautio[ned] about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Ryburn,* 565 U.S. at 477.

But this deference should not extend to constitutional violations resulting from deliberate decisions. In other words, when an official has time to assess the circumstances and authority controlling his actions, he does not face the conflict from "act[ing] swiftly and firmly at the risk that

action deferred will be futile or constitute virtual abdication of office."
*Davis v. Scherer*, 468 U.S. 183, 196 (1984) (citation omitted); *see also*
*Heaney v. Roberts*, 846 F.3d 795, 804 (5th Cir. 2017) (distinguishing an
officer who "had ample time and reasons to conclude that he was carrying
out an illegal act" from an officer who carried out an order on-the-spot)
(citing *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273 (5th Cir. 2002))
By contrast, the official has a chance to consider whether the
Constitution compels him to refrain from certain conduct. And where
that deliberation would suggest to a reasonable official "that certain
conduct would violate statutory or constitutional rights, he should be
made to hesitate; and a person who suffers injury caused by such conduct
may have a cause of action." *Harlow*, 457 U.S. at 819.

## III. Because the Individual Defendants have no qualified immunity for arresting Villarreal, the Court should reverse the dismissal of her First Amendment arrest claim.

No reasonable official could have believed probable cause existed to
arrest Villarreal merely for using routine reporting techniques like
asking a police officer for information about a public suicide and a fatal
traffic accident. Nor would any reasonable official have believed he could
arrest Villarreal for intending to publish that information so others

would read it. Especially if the reasonable official had months to consider the unconstitutionality of such an arrest.

But the Individual Defendants did not act like reasonable officials. Instead, Villarreal's allegations show that over months they conceived and caused Villarreal's arrest based on no more than something responsible journalists do every day—investigate leads, verify information, and publish that of interest to the public. And these Defendants acted because they disliked Villarreal's journalism and wanted to muzzle it. Qualified immunity cannot shield them from liability for this First Amendment violation. And so the Court should reverse the district court's dismissal of Villarreal's First Amendment retaliatory arrest claim.

## A. The First Amendment prohibits arrests made to retaliate against protected speech.

"[I]f government officials were permitted to impose serious penalties in retaliation for an individual's speech, then the government would be able to stymie or inhibit his exercise of rights in the future and thus obtain indirectly a result that it could not command directly." *Keenan,* 290 F.3d at 258 (citations omitted). And so "government retaliation against a private citizen for exercise of First Amendment

rights cannot be objectively reasonable." *Id.* at 261 (citing *Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996)); *see also Kinney v. Weaver*, 367 F.3d 337, 358 (5th Cir. 2004) (en banc).

In other words, government officials are liable if they retaliate against a citizen for exercising established First Amendment rights. To make out this First Amendment violation, a plaintiff must show three things: (1) she was "engaged in constitutionally protected activity, (2) the defendants' actions caused [her] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct." *Keenan*, 290 F.3d at 258 (citations omitted).

To that end, the Supreme Court recently confirmed two situations in which a retaliatory arrest violates the First Amendment. First, the Supreme Court determined in *Nieves v. Bartlett* what this Court has followed for years—a plaintiff can sustain a retaliatory arrest claim by showing no probable cause. 139 S. Ct. at 1725; *Keenan*, 290 F.3d at 261-62. In effect, the *Nieves* decision treats probable cause as a gatekeeper. The plaintiff must show its absence. If she does, she then moves forward

to show her speech motivated the arrest. *Nieves*, 139 S. Ct. at 1725.

And second, the Supreme Court also held in *Nieves* that "the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 1727. Put differently, probable cause does not excuse officials who selectively enforce a statute against a speaker.

## B. Villarreal showed Defendants arrested her for no more than routine reporting protected under the First Amendment.

### 1. The First Amendment protects routine reporting activities on matters of public concern.

In 1979, the Supreme Court held the First Amendment forbid a state to "punish the truthful publication of an alleged juvenile delinquent's name lawfully obtained by a newspaper." *Daily Mail Pub. Co.*, 443 U.S. at 105-06. And "lawfully obtained" in *Daily Mail* meant using "routine newspaper reporting techniques" like "simply [] asking various witnesses, the police, and an assistant prosecuting attorney…" *Id.* at 99. In the end, the Supreme Court found that using "routine reporting techniques" to learn information from officials deserved no less First Amendment protection than learning it from an official government

release, because "a free press cannot be made to rely solely upon the sufferance of government to supply it with information." *Id.* at 103-04.

And the Supreme Court later expanded on this in *Florida Star v. B.J.F,* holding that the First Amendment bars the government from punishing those who obtain and truthfully publish information an official released, absent a state interest of the "highest order." *Florida Star*, 491 U.S. at 536 (finding state could not punish newspaper for publishing rape victim's name obtained from a police report left in the police department's pressroom). In other words, "where the government has made certain information publicly available, it is highly anomalous to sanction persons other than the source of its release." *Id.* at 535.

In effect, the Supreme Court in *Florida Star* put the burden on the government to handle the consequences of releasing information in its possession. 491 U.S. at 534-35. Indeed, the government has more tools to "forestall or mitigate"[3] any private injury if it mishandles the

---

[3] The district court suggested this "forestall or mitigate" language means the government has more power to punish those who obtain and truthfully publish information released by officials. ROA.445. This was error. Instead, the Supreme Court reasoned even more "[w]here information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts." *Florida Star*, 491 U.S. at 534.

information. *Id.* at 534. And so the Supreme Court reasoned that citizens should be able to rely on officials' "implied representations of the lawfulness of disseminat[ing]" information those officials provide without fear of reprisal. *See id.* at 535-36.

The bottom line is that it is long-established the First Amendment protects asking officials for newsworthy information as part of gathering and publishing the news, even if it results in officials volunteering private information. *Daily Mail*, 443 U.S. at 103-04, 106; *see also Shulman v. Grp. W Prods., Inc.*, 955 P.2d 469, 494 (Cal. 1998) ("routine . . . reporting techniques, such as asking questions of people with information (including those with confidential or restricted information) could rarely, if ever, be deemed an actionable intrusion.") (internal quotations omitted). And that is why Villarreal's regular use of this routine reporting technique was lawful.

### 2. Defendants arrested Villarreal for using routine reporting techniques.

Part of Villarreal's citizen journalism involved asking for and getting information about local issues from Laredo police officers. ROA.166 [¶67]; ROA.187 [¶178]. In turn, she often published this information. ROA.166 [¶67]; ROA.187 [¶178]. Villarreal's use of these

lawful routine reporting techniques was the basis of her arrest.

Indeed, the Individual Defendants fashioned arrest warrant affidavits on no more than Villarreal's routine reporting. For instance, Ruiz, with help from the other Individual Defendants, stated in his affidavits Villarreal asked for or received from Officer Goodman basic details about a suicide victim and a traffic accident. ROA.170 [¶89]. Despite Goodman giving the details to Villarreal, Ruiz claimed the information had "not been made public." ROA.170 [¶89]. And he declared that Villarreal's "release of the information before other news outlets gained her popularity on Facebook"—in other words, Villarreal published the newsworthy information Goodman gave her. ROA.170 [¶89].

But that was it. None of these Defendants suggested Villarreal did anything different from what the reporters did in *Daily Mail*. For instance, none of them suggested that Villarreal threatened Officer Goodman or coerced her into disclosing information. *See, e.g.*, ROA.171-72 [¶94]. In short, the Individual Defendants knew the only information available to assess probable cause was Villarreal asking for and learning information from Goodman about two public incidents, then publishing it. ROA.170-72.

## C. No reasonable official could have found probable cause to arrest Villarreal under any statute.

### 1. The exercise of a clearly established First Amendment right cannot support even arguable probable cause.

Officials have no qualified immunity for a retaliatory arrest if "there was no actual probable cause for the arrest and the officers were objectively unreasonable in believing there was probable cause for the arrest." *Davidson,* 848 F.3d at 391 (citation omitted). "Probable cause means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* (quotation omitted).

And as explained, law enforcement cannot base probable cause on the exercise of a First Amendment right, even under the excuse of an presumptively valid criminal statute. *See* pp. 21-23, *supra.* So to the extent that the district court suggested an officer can rely on a statute unless a reasonable officer would know the statute is facially unconstitutional, it was error. ROA.443-44; *see Sandhul*, 119 F.3d at 1256 (rejecting officer's argument that the plaintiff could not prevail without challenging the validity of the arresting statute). Such a harsh

standard departs from the principle that an official cannot immunize constitutional violations simply by pointing to a statute still on the books.

### 2. There was no arguable probable cause, let alone actual probable cause, to arrest Villarreal for anything.

If a reasonable officer under the circumstances would understand a person simply exercised a clearly established First Amendment right, he would know there is no probable cause to arrest that person under any law. Here, a reasonable officer would have understood that the First Amendment protected Villarreal asking for and learning newsworthy facts from Officer Goodman. And so no reasonable officer could have found probable cause to arrest Villarreal under *any* statute, let alone Tex. Penal Code § 39.06(c).

Indeed, *Smith v. Daily Mail* alone would have given a reasonable officer fair warning he could not arrest Villarreal. There, the Supreme Court held the state could not punish a newspaper that accurately published a juvenile defendant's name after it learned the name "simply by asking various witnesses, the police, and an assistant prosecuting attorney…" 443 U.S. at 99. That mirrors what Villarreal did when she accurately published details about two newsworthy incidents after she confirmed those details simply by asking Officer Goodman. ROA.166

[¶¶65-66]; ROA.170 [¶89]. So if anything, *Daily Mail* would have given a reasonable officer fair notice that what Villarreal did was lawful. *See* 443 U.S. at 103-04.

And *Florida Star v. B.J.F.* also highlights the lack of arguable probable cause to arrest Villarreal. That is because *Florida Star* would have given a reasonable official fair warning that he could not punish Villarreal just because Officer Goodman volunteered newsworthy information that Villarreal intended to report, even if a reasonable official could believe the information was "not public." *Id.* at 534-35 ("Where information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts."). In fact, *Florida Star* would have confirmed to a reasonable official that he could not arrest Villarreal because she had a right to rely on Officer Goodman giving out information, without fearing reprisal. *Id.* at 536.

In short, *Daily Mail* and *Florida Star* provided fair warning that Defendants could not arrest Villarreal under any law for using routine reporting techniques to obtain information from the government. Other decisions underscore this fair warning. *E.g.*, *Oklahoma Pub. Co. v.*

*District Court of Oklahoma*, 430 U.S. 308, 311-12 (1977) (finding an injunction unconstitutional because it forbid reporters from publishing information about a juvenile suspect they learned at a court hearing); *Shulman*, 955 P.2d at 494; *c.f. Bartnicki v. Vopper*, 522 U.S. 514, 534-35 (2001) (finding that the First Amendment protected publication of newsworthy information a person other than the publisher obtained illegally). So too showing this fair warning are decisions that would have distinguished unprotected conduct like illicit wiretapping. *E.g.*, *Peavy v. WFAA-TV, Inc.,* 221 F.3d 158, 189-90 (5th Cir. 2000).

### 3. The district court erred in its view of *Daily Mail* and *Florida Star*.

The district court did not address how *Daily Mail* establishes First Amendment protection for routine reporting techniques, even though Villarreal pointed this out. ROA.418-420; ROA.444-46. Nor did it recognize that Villarreal—just like the reporters in *Daily Mail*—confirmed the information she published by asking law enforcement. ROA.444-46. These omissions alone show why the district court erred.

The district court also erred in its view of the Supreme Court's cautions about the scope of *Daily Mail* and *Florida Star*. These cautions centered on not taking those cases as establishing an absolute right for

truthful publication or for broad press access. *Florida Star*, 491 U.S. at 532, 541; *Daily Mail*, 443 U.S. at 106. But those cautions do not diminish First Amendment protection for using routine reporting techniques to seek, learn, and truthfully report information about public matters. *Daily Mail*, 443 U.S. at 103-104.

In sum, clearly established law shows it was objectively unreasonable to arrest Villarreal for routine reporting under any statute. That is why the Individual Defendants have no qualified immunity for arresting Villarreal.

## D. There was no probable cause even considering the elements of Tex. Penal Code § 39.06(c).

Even if the specific elements of § 39.06(c) matter, it does not change the result. There was no actual or arguable probable cause, let alone actual probable cause, to arrest Villarreal. The district court made three errors finding otherwise.

***First, there was no probable cause that Villarreal intended to benefit***. The district court found probable cause for the "intent to benefit" element of § 39.06 because Villarreal acknowledged that grateful readers sometimes give her a free meal or small fee for promoting a local business. ROA.437. But this was error. Nothing in the record suggested

Defendants knew this when they caused Villarreal's arrest. *E.g.*, *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (per curiam) (finding that "[f]acts an officer learns after the incident ends" are not relevant to qualified immunity).

By contrast, the only basis on which the Individual Defendants claimed Villarreal intended to benefit was "gaining popularity on Facebook." ROA.170 [¶89]. In other words, they determined probable cause for this element only on Villarreal's intent to publish the information Goodman provided (if not the actual publications). But a reasonable official would have known that he could not arrest someone who accurately published newsworthy information to attract readers. *Fla. Star*, 491 U.S. at 536; *Innovative Database Sys. v. Morales*, 990 F.2d 217, 221-22 (5th Cir. 1993) ("The Supreme Court has repeatedly held that states may not prohibit the commercial publication of matters of public record.") (*citing Fla. Star*, *Daily Mail*, and *Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975)).

To that end, no reasonable official would regard accurately publishing the news to "gain popularity" as "economic gain or advantage" *See* Tex. Penal Code § 1.07(a)(7) (defining "benefit"). Otherwise, officials

would have an excuse to arrest every publisher who obtains information simply from asking police officers.

**_Second, the First Amendment barred using the pretext of "not public" for probable cause._** The district court also erred concluding probable cause existed because § 39.06 "punishes the obtaining of information from a governmental entity which has _not_ been released to the public." ROA.445 (emphasis in record). Yet this overlooked _Florida Star's_ finding that if an official gives a citizen information about a matter of public interest, the government cannot turn around and punish the citizen without violating the First Amendment. 491 U.S. at 535. What is more, the states in _Daily Mail_ and _Florida Star_ both tried to justify punishing use of the released information based on some privacy interest. _Daily Mail,_ 443 U.S. at 104-05; _Florida Star_, 491 U.S. at 531-32, 540-41. But the Supreme Court rejected this argument both times. _Id._

So in the end, no reasonable officer could have found probable cause just because Officer Goodman gave Villarreal information before Defendants would have preferred. And in any event, a reasonable official could not reconcile how facts a police officer freely released to a known reporter were not effectively "released to the public." Especially because

a reasonable official would have known Villarreal, like every other local reporter, often published information she asked for and learned from LPD officers. ROA.166 [¶67]; ROA.187 [¶177-78].

**Third, whether Villarreal made a formal TPIA request did not matter**. The district court erred in suggesting Defendants could arrest Villarreal under § 39.06(c) because she "did not follow the TPIA's process for requesting the information in her reports." ROA.440. But the First Amendment right to gather information using routine reporting techniques does not waiver just because a reporter does not make a written request to a designated public information officer. To that, the TPIA adds a presumption that Texans are entitled to information about the affairs of government and its officials. Tex. Gov. Code. § 552.001. And so no reasonable officer could have found probable cause just because Villarreal did not follow the City's preferred method for seeking information from its officials.

## E. Three more factors highlight the depth of Defendants' objective unreasonableness.

**Defendants acted deliberately**. Unlike "heat-of-the-moment" acts, deliberate acts merit no deference in the qualified immunity context. *See* pp. 23-24, *supra.* Here, there was no warrantless arrest,

imminent threat, or other situation requiring a split-second decision. By contrast, the Individual Defendants had months to consider whether it was lawful to target Villarreal. Yet they chose to investigate and arrest her for no more than what the reporters did in *Daily Mail*. ROA.166 [¶¶65-66]; ROA.170-72. The Individual Defendants' deliberate choices in the face of clearly established law stress why they do not have qualified immunity.

***Defendants chose a forgotten statute to enforce***. Indeed, a reasonable official having the chance to deliberate would have discovered that no one had locally enforced § 39.06 in the statute's 23-year history. ROA.187 [¶177]. And so he would have hesitated to enforce it against a journalist's reporting. *See Lawrence v. Reed,* 406 F.3d 1224, 1231 n.3 (10th Cir. 2005) ("whether the statute has fallen into desuetude" is a factor for assessing the objective reasonableness of applying a statute). Still Defendants enforced the statute as an excuse to criminalize Villarreal using lawful routine reporting techniques. ROA.169 [¶¶84-85].

***The statute targets expressive conduct***. A reasonable official also would have observed that § 39.06(c) focuses on expressive conduct, giving him even more reason to hesitate in enforcing the statute. This

also shows why Villarreal's arrest was objectively unreasonable.

## F. Villarreal suffered a chilling injury from Defendants targeting her reporting.

Because Villarreal showed there was no probable cause to arrest her, she only needed to show two more things to complete her retaliatory arrest claim. First, that Defendants caused her injury that would chill an ordinary person's speech. And second, that Defendants intended to retaliate against and discourage Villarreal's exercise of First Amendment rights. *Keenan*, 290 F.3d at 258. Villarreal met both these elements.

### 1. Defendants caused Villarreal injuries that would chill one of ordinary firmness.

Injury for First Amendment retaliation means one "that would chill a person of ordinary firmness from continuing to engage in that [First Amendment] activity." *Keenan*, 290 F.3d at 258. But this does not require that a plaintiff stop exercising First Amendment rights. *Id*. at 259-60.

To this end, Villarreal detailed several chilling injuries. For instance, she explained how the arrest has caused her to fear more official retaliation against her citizen journalism. ROA.183 [¶147]. And she noted how the investigation and arrest caused her to lose sleep and harmed her reputation. ROA.182 [¶146].

These injuries would chill a person of ordinary firmness from criticizing local government or using routine reporting techniques to obtain and publish information from officials. For instance, that person might self-censor his criticism of officials. Or he might avoid asking his local officials questions for fear of arrest if the answer reveals information the government may later view as "not public." In short, Villarreal met her burden to show a chilling injury.

### 2. Defendants investigated and arrested Villarreal intending to silence her.

Villarreal also met her burden to show "defendants' adverse actions were substantially motivated against [Villarreal's] exercise of constitutionally protected conduct." *Keenan*, 290 F.3d at 258. For one thing, the Individual Defendants targeted no more than Villarreal's exercise of her First Amendment rights. And Villarreal also explained these Defendants decided to investigate and arrest her because they disliked and wanted to silence her often unflattering reporting on LPD, the district attorney, and other government affairs. ROA.162-63; ROA.166-67 [¶68-69]; ROA.173 [¶¶101-02]. What is more, she gave examples of the hostility preceding that decision—including Alaniz scolding Villarreal behind closed doors. ROA.163 [¶54].

These facts parallel those in *Lacey v. Maricopa County*, in which the Ninth Circuit reversed a district court's dismissal of Section 1983 claims for First Amendment retaliation, wrongful arrest, and selective enforcement. 693 F.3d 896, 940 (9th Cir. 2012) (en banc). In particular, the plaintiff in *Lacey* alleged the county sheriff and various prosecutors investigated and arrested him because they wanted to silence his critical reporting on the sheriff and other officials. *Id.* at 916-917, 922. So too here Villarreal described how Defendants aimed to silence her because they disliked critical reporting. In other words, but for her candid reporting, Defendants would not have decided to arrest her.

In the end, Villarreal met her pleading burden for First Amendment retaliatory arrest. And because qualified immunity is never available for officials who misuse laws to violate First Amendment rights, the Court should reverse the district court's dismissal of this claim.

## IV. The Court should reverse the dismissal of Villarreal's Fourth Amendment wrongful arrest claim.

Because no actual or arguable probable cause existed to arrest Villarreal, the district court also erred dismissing Villarreal's Fourth Amendment wrongful arrest claim. It was clearly established that citizens have the right to be free from arrest without probable cause.

*Mangieri v. Clifton,* 29 F.3d 1012, 1016 (5th Cir. 1994). And although Villarreal turned herself in, this Court established that a voluntary surrender to an arrest warrant is a Fourth Amendment seizure. *McLin*, 866 F.3d at 693-94.

What is more, the Individual Defendants cannot avoid liability for causing Villarreal's arrest just because a magistrate approved the arrest warrants. That is because there is no qualified immunity if a reasonable officer under the circumstances "would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley v. Briggs*, 475 US 335, 345 (1986); *see also Spencer v. Staton*, 489 F.3d 658, 661 (5th Cir. 2007), vacated on unrelated grounds, 2007 U.S. App. LEXIS 17897 (5th Cir. Jul. 26, 2007).

To that end, no reasonable officer would have applied for warrants to arrest Villarreal. As established, the Individual Defendants assembled warrant affidavits showing only that Villarreal used routine reporting techniques to learn information from an official and then published it. *See* pp. 29-30, *supra*. But no reasonable officer could have believed this established probable cause. That is because he would have known the First Amendment protected Villarreal using routine reporting

techniques on matters of public concern. And he also would have recognized the lack of evidence on any economic benefit.

On those grounds, the reasonable officer would have known there was no basis to apply for an arrest warrant. And that is why the Court should reverse the dismissal of Villarreal's wrongful arrest claim.

## V. The Court should reverse the dismissal of Villarreal's selective enforcement claim.

Villarreal's allegations not only showed the Individual Defendants wrongfully arrested her for everyday reporting, but also that they selected a derelict statute under which to arrest her. The bottom line is that no other local official had enforced § 39.06(c) in its 23-year history, let alone against others who used the same routine reporting techniques as Villarreal. That is textbook selective enforcement. And at the pleadings stage, Villarreal's allegations were more than enough to survive Defendants' Rule 12(b)(6) motions.

### A. Selective enforcement violates the Equal Protection Clause and the First Amendment.

When Defendants investigated and arrested Villarreal, it was established that selective enforcement of a statute violates the Equal Protection Clause. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000);

*Bryan v. City of Madison*, 213 F.3d 267, 277 (5th Cir. 2000). A plaintiff can make out a claim for selective enforcement by showing "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. 562, 564 (2000). And a plaintiff must also show the defendant selectively enforced a law because of "improper considerations, such as [ ] the desire to prevent the exercise of a constitutional right." *Bryan*, 213 F.3d at 277. To that end, the Supreme Court held in *Nieves* that selective enforcement of a law to arrest a speaker also violates the First Amendment. 139 S. Ct. at 1727.

The district court erred dismissing Villarreal's claim of selective enforcement of § 39.06 for two reasons. First, the district court erroneously suggested probable cause matters for selective enforcement. And second, the district court strayed from Rule 12(b)(6) standards by defining the class of similarly situated persons too rigidly rather than taking the allegations and permissible inferences in the light most favorable to Villarreal.

## B. Probable cause does not bar a selective enforcement claim.

The district court found that Villarreal's selective enforcement

"allegation ignore[d] the grounds for probable cause to arrest Plaintiff." ROA.453. Of course, that was error because there was no probable cause to arrest Villarreal.

But even if there were probable cause, it was error to consider it on Villarreal's selective enforcement claim. *Whren v. United States,* 517 U.S. 806, 813 (1996); *see also Carrasca v. Pomeroy*, 313 F.3d 828, 836 (3d Cir. 2002) (observing "the fact that there was no Fourth Amendment violation does not mean that one was not discriminatorily selected for enforcement of a law") (internal quotation omitted). This is especially true in the First Amendment context, as selective enforcement of a law against expressive activity is an exception to the no-probable cause rule for a retaliatory arrest. *Nieves*, 139 S. Ct. at 1727 (giving the example of police arresting a vocal critic for jaywalking at an intersection where other citizens often jaywalk but rarely face arrest). And so the district court erred when it considered probable cause on Villarreal's selective enforcement claim.

## C. Villarreal met her pleading burden for selective enforcement.

The district court also erred finding that Villarreal "has not plausibly alleged that she was treated differently than other similarly situated persons…" ROA.455. By contrast, Villarreal's allegations

showed the Individual Defendants singled her out for arrest under § 39.06. As just one example:

> 177. LPD and WCDA had never before arrested, detained, or prosecuted any other person under TEXAS PENAL CODE § 39.06, let alone any person similarly-situated to Villarreal, during the 23 years the operative version of the statute had been in effect.[6] These similarly-situated persons include (a) those who had asked for or received information from local law enforcement officials, and (b) persons who published truthful and publicly-accessible information on a newsworthy matter. Examples include local professional newspaper journalists, local professional broadcast journalists, and citizens who published on matters of local public concern.

ROA.187.

Nor do the allegations stop there. Villarreal detailed how the Individual Defendants knew that like Villarreal, other local media asked for and learned information from LPD officials about matters like crime scenes, investigations, and traffic accidents. ROA.174 [¶106]; ROA.187 [¶178]. And she also explained the Individual Defendants knew the First Amendment protects this routine reporting. ROA.174 [¶106]. What is more, Villarreal described several incidents of harassment and other details showing the Individual Defendants singled her out under § 39.06 to hit back against her reporting. ROA.162-63; ROA.169-70 [¶¶84-85]; ROA.187-89. Finally, Villarreal suggested how the Individual

Defendants understood it was irrational to apply § 39.06 against those who publish information to gain readers. ROA.174 [¶107].

Taking these allegations as true, Defendants treated Villarreal differently from others similarly situated because of hostility towards Villarreal's protected reporting. But the district court did not take Villarreal's allegations and reasonable inferences in the light most favorable to her. Instead, it perceived the similarly situated class too rigidly. For example, the district court focused on whether local journalists asked about or learned information only from Officer Goodman or LPD spokesperson Joe Baeza. ROA.442; ROA.454. Likewise, it fixed on whether others received information that "had not been made public." ROA.454.

But this was error, because "similarly situated" does not mean every detail must be in common within the class. *E.g.*, *Lacey*, 693 F.3d at 921 (rejecting narrowing criteria for defining a similarly situated class). Rather, Villarreal only needed to allege some anecdotal facts on which Defendants selectively enforced the statute. *Id.* at 920. Villarreal met this burden alleging how the Individual Defendants knew others regularly used routine reporting methods to obtain and publish information from

LPD officers, but never enforced § 39.06(c) against these others. ROA.174 [¶106]; ROA.187 [¶¶177-78].

That is why the district court erred in not construing the similarly situated class as others who routinely sought, received, and published information from LPD officers. All the more because that was all the Individual Defendants arrested Villarreal for under § 39.06(c).

Finally, no reasonable official would have enforced § 39.06(c) against Villarreal under the circumstances. Especially knowing no local official had ever enforced the law, let alone against other persons who routinely sought information from LPD officers. ROA.187 [¶177]. So taking Villarreal's allegations as true, they showed the Individual Defendants are not entitled to qualified immunity because they were objectively unreasonable in singling out Villarreal under § 39.06(c).

For these reasons, the Court should reverse the district court's dismissal of Villarreal's selective enforcement claim.

## VI. The Court should reverse the dismissal of Villarreal's First Amendment retaliatory investigation claim.

Villarreal's claims were not limited to her wrongful arrest—she also distinctly claimed that the Individual Defendants' deliberate decision to investigate her at all violated the First Amendment. ROA.179-80 [¶132].

Indeed, taking Villarreal's allegations as true, they showed Defendants manufactured a criminal investigation of Villarreal for nothing other than Villarreal's exercise of her First Amendment rights. And given those circumstances, a reasonable official would have known he lacked any objective law enforcement purpose to start the criminal process against Villarreal.

But the district court passed over these allegations. This was error, and so the Court should reverse.

## A. A bad-faith investigation targeting protected speech violates the First Amendment.

"Any form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." *Izen v. Catalina*, 398 F.3d 363, 367 n.5 (5th Cir. 2005) (per curiam) (quotations omitted). So for instance, this Court recognized in *Izen* that "subjecting an attorney to criminal investigation and prosecution with the substantial motivation of dissuading him from associating with and representing clients opposing the IRS would violate the First Amendment." *Id.* at 367; *but c.f. Colson v. Grohman,* 174 F.3d 498, 512 (5th. Cir. 1999) (finding no First Amendment violation where

employment investigation did not lead to adverse action). The Supreme Court has yet to determine whether a bad-faith criminal investigation violates the First Amendment. *Hartman v. Moore*, 547 U.S. 250, 262 n.9 (2006). But like this Court, other circuits have observed that a bad-faith investigation can violate the First Amendment. *E.g.*, *Coszalter v. City of Salem,* 320 F.3d 968, 976 (9th Cir. 2003); *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000); *but see Rehberg v. Paulk,* 611 F.3d 828, 850-51 & n.24 (11th Cir. 2010) (declining to recognize a First Amendment claim for retaliatory investigation).

And this is the right approach, because it adheres to First Amendment protection for reporters and other citizens against law enforcement action lacking a reasonable law enforcement purpose. *E.g,* *Branzburg v. Hayes*, 408 U.S. 665, 707-08 (1972) ("Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification"). Simply put, law enforcement violates the First Amendment if it chooses to investigate a speaker not for any legitimate objective, but instead to harass a speaker or silence his exercise of First Amendment rights.

### B. The district court erred overlooking Villrreal's allegations that Defendants' decision to investigate violated the First Amendment.

Villarreal's allegations showed the Individual Defendants deliberately chose to investigate Villarreal because they disliked her reporting. ROA.173-75 [*e.g,*. ¶¶109, 112]. For example, Villarreal explained how Defendants devised and carried out the decision to criminalize Villarreal's routine reporting of the news in the Targeted Publications. ROA.166-67 [¶¶69-70]. This led Defendants to search for a statute as pretext for a criminal investigation. ROA.166-67 [¶¶69-70]; ROA.175 [¶113]. And they unearthed § 39.06(c).

And what is more, Villarreal also explained a deeper motivation that drove the Individual Defendants' decision to investigate—her reporting often was unflattering to Defendants. This included hostility toward Villarreal filming Laredo police in public and criticizing local officials. ROA.162-63; ROA.174 [¶110]; ROA.176 [¶115]. Both these First Amendment rights were clearly established. *Turner v. Driver*, 848 F.3d 678, 687-90 (5th Cir. 2017) (holding that the First Amendment protects filming public police activity); *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 269-271 (1964) (explaining the First Amendment protects the "prized

American privilege to speak one's mind, although not always with perfect good taste, on all public institutions.") (quotation marks omitted). Yet to retaliate against Villarreal's exercise of these rights, the Individual Defendants determined to force her through the criminal process. And this led to chilling injuries. ROA.182-83 [¶¶146-47].

Villarreal summed up her bad-faith investigation claim in the lower court: "[Defendants] never should have targeted Villarreal for criminal investigation and arrest." ROA.321; ROA.283. Still the district court passed over this distinct claim. Instead, it considered only probable cause and the arrest. ROA.441-446.

In any event, this Court should correct the district court's error and allow Villarreal to proceed with her retaliatory investigation claim. And this holds even if the Court considers Defendants' assertion of qualified immunity because they had no objective reason to target Villarreal.

## C. Defendants' decision was objectively unreasonable because there was no legitimate law enforcement purpose for an investigation.

If a reasonable official knows he has no basis to investigate independent of the exercise of protected speech, he will not start an investigation. *See, e.g.*, *Branzburg*, 408 U.S. 708; *Izen*, 398 F.3d 363 n. 9;

*see also* pp. 21-23, *supra*. But Defendants could point to no conduct independent of Villarreal's First Amendment activity on which to target her for the criminal process. For example, Defendants had no arguable basis to believe that Villarreal learned information through an illegal wiretap or by extorting Goodman. *See* ROA.169-72. Nor did they have any basis to believe Villarreal interfered with police operations or veered away from public areas when filming Laredo police. ROA.161 [¶43]. So at the very least, Villarreal's allegations showed a reasonable inference that the Individual Defendants had no facts on which a reasonable official could have decided to investigate.

Finally, the Individual Defendants choosing § 39.06(c) as a pretext for the investigation embodied "us[ing] [ ] laws not for their intended purposes but to silence those who voice unpopular ideas..."*Nieves*, 139 S. Ct. at 1730 (Gorsuch, J., concurring in part and dissenting in part). So too did these Defendants' bad-faith motive. And so the Court should reverse and remand on Villarreal's retaliatory investigation claim.

## VII. The Court should reverse the dismissal of Villarreal's claim that her arrest interfered with her First Amendment rights.

Because Villarreal showed Defendants arrested and detained her without probable cause, the district court erred in dismissing her claim

for direct interference with her First Amendment rights. Indeed, there are few acts that more forcefully deprive a citizen's ability to exercise First Amendment rights than arrest and detention. For that reason, the Court should reverse the dismissal of this claim.

## VIII. The Court should reverse the dismissal of Villarreal's civil conspiracy claim.

"To allege a civil conspiracy under § 1983, a plaintiff must establish "(1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990). Villarreal's conspiracy claim is straightforward. The Individual Defendants wanted to retaliate against Villarreal and force her to stop publishing unfavorable things about them and other officials. ROA.166-167 [¶69]; ROA.169-170 [¶¶85-86]; ROA.191 So they agreed to harass her in retaliation. ROA.162-164; ROA.191. And then they agreed to search for a law they could use to criminalize Villarreal's regular local reporting. ROA.166-167 [¶¶69-70]; ROA.173 [¶102]; ROA.191.

These allegations show the Individual Defendants agreed under the color of law to deprive Villarreal of her First, Fourth, and Fourteenth Amendment rights—which they did. And Defendants do not have

qualified immunity on Villarreal's Section 1983 civil conspiracy claim because they do not have qualified immunity for any of those constitutional violations. *See Morrow v. Washington*, 672 F. App'x 351, 355 (5th Cir. 2016). In the end, Villarreal met her pleading burden for a Section 1983 civil conspiracy claim. And so the Court should reverse the district court's dismissal of this claim.

## IX. The Court should reverse the dismissal of Villarreal's municipal liability claim against the City.

For a Section 1983 claim against a municipality, a plaintiff must prove a final policymaker adopted or ratified an official policy or custom that was the moving force behind a constitutional violation. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). But at the pleadings stage, a plaintiff needs only to "allege facts that show an official policy, promulgated or ratified by the policymaker, under which the municipality is said to be liable." *Groden v. City of Dallas*, 826 F.3d 280, 284 (5th Cir. 2016). Put differently, it is enough for a plaintiff to detail the unconstitutional policy and the associated events leading to a deprivation of a constitutional right. *E.g.*, *Colle v. Brazos County,* 981 F.2d 237, 245 (5th Cir. 1993) (reversing dismissal of a Section 1983 municipal liability claim because the complaint "cited with excruciating

detail" a county's policies and underlying events leading to a constitutional injury.) And because Villarreal met this burden, the Court should reverse the dismissal of her claim against the City.

## A. Villarreal detailed an official City policy aimed at stopping her journalism.

A policy creating Section 1983 liability "may be officially promulgated by the governing body, by an official to which policy-making authority has been properly delegated, or by officials or employees of the municipality through a persistent, widespread practice that is so common and well settled as to constitute a custom that fairly represents municipal policy." *Culbertson v. Lykos*, 790 F.3d 608, 628 (5th Cir. 2015) (internal quotations omitted). A policymaker's single decision to adopt a particular action can also subject a municipality to liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-483 (1986).

The district court erred holding that Villarreal "fails to allege facts showing that any such official policy exists." ROA.475. Because taking Villarreal's allegations as true, they detail an official City policy aimed at retaliating against her because of her citizen journalism:

216. Specifically, the City's unconstitutional policy was and remains a decision to intimidate, retaliate against, and punish Villarreal for (a) recording and publishing law enforcement activities occurring in public and (b) lawfully gathering and publishing accurate information and commentary about matters of local public interest, including that critical of or otherwise unfavorable to city government affairs and city officials.

217. The City's unconstitutional policy also was and remains a decision to restrict and interfere with Villarreal's citizen journalism, with the intent that (a) she stop gathering and publishing information and commentary critical of or otherwise unfavorable to the Laredo government, and (b) she stop encouraging and providing a forum for other citizens to do the same.

ROA.195. And that is not all. In fact, Villarreal details how city officials, including members of LPD and the city council, singled out Villarreal for harassment many times over a short period. ROA.158 [¶24]; ROA.162-163; ROA.166 [¶68]. This included LPD officers directly interfering with her reporting. ROA.163-164 [¶¶54, 58-59].

And it all led to the culmination of the City's policy—the unconstitutional investigation and arrest of Villarreal. ROA.177 [¶120]; ROA.195-96 [¶220-221]. When Villarreal turned herself in, LPD officers mocked her. ROA.172 [¶97]. Each of these incidents reflected the City policy of retaliating against Villarreal's reporting to force her into self-censorship. At bottom, Villarreal alleged enough to meet her pleading burden on the City's official policy.

## B. Villarreal showed a nexus between the City's policy or custom and a final policymaker.

The district court found that in effect, Villarreal did not show a nexus between the alleged policy and the City's final policymakers. But this was error for two reasons: *first*, Villarreal did not have to allege a specific policymaker; and *second*, Villarreal was not limited to a *Pembaur* "single decision" theory for her claim.

### 1. Villarreal did not have to identify the specific policymaker behind the alleged City policy.

The district court suggested Villarreal had the burden to identify the correct final policymaker for her municipal liability claim. ROA.473. But this Court rejected that approach in *Groden*. 826 F.3d at 283-84. And so it was error to place any burden on Villarreal to identify the correct policymaker.

### 2. Villarreal did not need to show a final policymaker directly deprived her of constitutional rights.

The district court focused on Villarreal not showing that a final policymaker "performed the specific act that forms the basis" of Villarreal's claim. ROA.468; ROA.476-77. In effect, the Court concentrated only on whether Villarreal showed liability under *Pembaur's* "single decision" principle. *Id.*; *see also Pembaur*, 475 U.S. at,

481-483. But this was error.

Indeed, as the district court discussed, *Pembaur*'s "single decision" principle is just one way a plaintiff can show an unlawful policy attributable to a city. ROA.465. And there was no basis to limit Villarreal to a "single decision" theory just because she asserted a "policy against one." ROA.468. Villarreal is unaware of any authority limiting "policy against one" claims to a "single decision" theory.[4]

### 3. Villarreal showed a policy fairly attributable to the City.

Villarreal's allegations revealed a nexus between the alleged policy and the City's final policymakers. For instance, Villarreal detailed Chief Treviño's supervision and approval of LPD officers harassing Villarreal and his participation in Villarreal's investigation and arrest. ROA.165 [¶61]; ROA.174 [¶109-110]; ROA.196-197 [¶¶223, 226]. Although Treviño may not have been a final policymaker, his decisions and actions as the City's head of law enforcement reflected City policy. In other words, Treviño is like the city spokesperson in *Groden* who made statements revealing a city policy. 826 F.3d at 285-86.

---

[4] *See, e.g., Oyenik v. Corizon Health, Inc.,* 696 F. App'x 792, 794 (9th Cir. 2017) ("There is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual")

Villarreal also alleged how the city council and city manager encouraged Villarreal's investigation and arrest. ROA.195 [¶220]. And she alleged city council members knew of and endorsed the harassment she faced from LPD officers. ROA.165 [¶62]; ROA.196 [¶222]. Viewing these details in the light most favorable to Villarreal, they show a plausible nexus between a final policymaker and the alleged policy.

### C. Villarreal showed the City's policy was the moving force behind violations of her constitutional rights.

Finally, Villarreal showed the alleged City policy was the moving force behind depriving her of her First, Fourth, and Fourteenth Amendment rights. ROA.165, 196. Put differently, her allegations showed the City policy drove the harassment and retaliation because of her protected activity. This includes, for example, Treviño's participation in the several acts targeting Villarreal and her citizen journalism. ROA.165 [¶61]; ROA.174 [¶109-110]; ROA.196-197 [¶¶223, 226].

In short, Villarreal's allegations and favorable inferences were enough at the pleadings stage to show a Section 1983 claim against the City. That is why the Court should reverse the dismissal of this claim.

## X. Villarreal may pursue declaratory relief.

The district court erred dismissing Villarreal's request for

declaratory judgment on her First Amendment and selective enforcement claims and her claim against the City. Villarreal's allegations showed a case or controversy suitable for declaratory relief. *See, e.g., MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 (2007). For instance, Villarreal alleged she continues to engage in citizen journalism but fears Defendants will retaliate against her again. ROA.183; ROA.202. This shows a possibility of future harm making declaratory judgment suitable.

What is more, Villarreal showed serious constitutional violations. So even if the Court affirms the finding of qualified immunity, a declaratory judgment on these violations will provide an important remedy for Villarreal. *E.g., Chrissy F. ex rel. Medley v. Miss. Dep't of Pub. Welfare*, 925 F.2d 844, 849 (5th Cir. 1991) (qualified immunity does not bar declaratory relief); *see also* 28 U.S.C. § 2201 (a court may "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.") And declaratory relief would also advance Section 1983's purpose of correcting constitutional violations made under color of state law.

## CONCLUSION

There is no qualified immunity for officials who misuse state law to

criminalize the exercise of First Amendment rights. Including when those officials dig up a law to single out and arrest a speaker they dislike. That is why Defendants have no qualified immunity for investigating and arresting Villarreal for doing what other reporters do every day—ask officials for information as part of accurately reporting the news.

Villarreal asks that the Court reverse the district court's dismissal and judgment on her Section 1983 claims for violations of the First, Fourth, and Fourteenth Amendments; her Section 1983 civil conspiracy claim; her Section 1983 claim against the City; and her request for declaratory relief.

Dated: August 31, 2020          Respectfully submitted,

<u>/s/ JT Morris</u>
JT Morris
JT Morris Law, PLLC
1105 Nueces Street, Suite B
Austin, TX 78701
Telephone: (512) 717-5275
Fax: (512) 582-2948
E-mail: jt@jtmorrislaw.com

Attorney for Plaintiff-Appellant
Priscilla Villarreal

## CERTIFICATE OF SERVICE

I certify that on August 31, 2020, a copy of this brief was served through the court's electronic filing system upon counsel for all parties to this proceeding:

J. Eric Magee
e.magee@allison-bass.com
ALLISON, BASS & MAGEE, LLP
A.O. Watson House
402 W. 12th Street
Austin, Texas 78701
Telephone: (512) 482-0701

Attorneys for Defendants-Appellees Webb County, Texas; Isidro R. Alaniz, and Marisela Jacaman

William M. McKamie
mmckamie@toase.com
Alicia K. Kreh
akreh@toase.com
TAYLOR OLSON ADKINS SRALLA & ELAM LLP
13750 San Pedro Ave., Suite 555
San Antonio, Texas 78232
Telephone: (210) 546-2122

Attorneys for Defendants-Appellees the City of Laredo, Texas; Claudio Trevino, Jr.; Juan L. Ruiz; Deyanria Villarreal; Enedina Martinez; Alfredo Guerrero; Laura Montemayor; and Does 1-2

/s/ JT Morris
JT Morris

# CERTIFICATE OF COMPLIANCE

## With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,422 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Local Rule 32.2.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Local Rule 32.1 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14-point Century Schoolbook font for text, and 12-point Century Schoolbook font for footnotes.

<u>/s/ JT Morris</u>
JT Morris
Attorney for Plaintiff-Appellant
Priscilla Villarreal
Dated: August 31, 2020

# ADDENDUM

## Table of Contents

| Description | Page |
|---|---|
| Tex. Penal. Code 39.06 | ADD-2 |
| Tex. Penal Code § 1.07(a)(7) | ADD-4 |

Texas Penal Code

Title 8. Offenses Against Public Administration

Chapter 39. Abuse of Office

Sec. 39.06.  MISUSE OF OFFICIAL INFORMATION.  (a)  A public servant commits an offense if, in reliance on information to which the public servant has access by virtue of the person's office or employment and that has not been made public, the person:

> (1)  acquires or aids another to acquire a pecuniary interest in any property, transaction, or enterprise that may be affected by the information;
>
> (2)  speculates or aids another to speculate on the basis of the information; or
>
> (3)  as a public servant, including as a school administrator, coerces another into suppressing or failing to report that information to a law enforcement agency.

(b)  A public servant commits an offense if with intent to obtain a benefit or with intent to harm or defraud another, he discloses or uses information for a nongovernmental purpose that:

> (1)  he has access to by means of his office or employment; and

(2) has not been made public.

(c) A person commits an offense if, with intent to obtain a benefit or with intent to harm or defraud another, he solicits or receives from a public servant information that:

(1) the public servant has access to by means of his office or employment; and

(2) has not been made public.

(d) In this section, "information that has not been made public" means any information to which the public does not generally have access, and that is prohibited from disclosure under Chapter 552, Government Code.

(e) Except as provided by Subsection (f), an offense under this section is a felony of the third degree.

(f) An offense under Subsection (a)(3) is a Class C misdemeanor.

Texas Penal Code

Title 1. Introductory Provisions

Chapter 1. General Provisions


Sec. 1.07.  DEFINITIONS.  (a)  In this code:

. . .

(7)  "Benefit" means anything reasonably regarded as economic gain or advantage, including benefit to any other person in whose welfare the beneficiary is interested.