Case No. 20-40359

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

PRISCILLA VILLARREAL,
*Plaintiff – Appellant*

v.

THE CITY OF LAREDO, TEXAS; WEBB COUNTY, TEXAS;
ISIDRO R. ALANIZ; MARISELA JACAMAN; CLAUDIO TREVINO, JR.;
JUAN L. RUIZ; DEYANRIA VILLARREAL, ENEDINA MARTINEZ;
ALFREDO GUERRERO; LAURA MONTEMAYOR; DOES 1-2,
*Defendants – Appellees*

---

On Appeal from the United States District Court
Southern District of Texas, Laredo Division
Civil Action No. 5:19-CV-48
The Honorable John A. Kazen, United States Magistrate Judge

---

**DEFENDANT-APPELLEES ALANIZ AND JACAMAN'S
PETITION FOR REHEARING *EN BANC***

---

J. Eric Magee
SBN: 24007585
**ALLISON, BASS & MAGEE, L.L.P.**
A.O. Watson House
402 W. 12th Street
Austin, Texas 78701
(512) 482-0701 telephone
(512) 480-0902 facsimile
Email: e.magee@allison-bass.com
*Counsel for Appellees Alaniz and Jacaman*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| | |
|---|---|
| Priscilla Villarreal<br>*Plaintiff – Appellant* | JT Morris<br>JT Morris Law, PLLC<br>1105 Nueces Street, Ste B<br>Austin, Texas 78701<br>(512)-717-5275<br>jt@jtmorrislaw.com |
| Webb County, Texas<br>Isidro R. Alaniz<br>Marisela Jacaman<br>*Defendants – Appellees* | J. Eric Magee<br>ALLISON, BASS & MAGEE, L.L.P.<br>402 W. 12th Street<br>Austin, TX 78701<br>(512) 482-0701 *telephone*<br>(512) 480-0902 *facsimile*<br>e.magee@allison-bass.com |
| City of Laredo, Texas<br>Claudio Trevino, Jr.<br>Juan L. Ruiz<br>Deyanria Villarreal<br>Enedina Martinez<br>Alfredo Guerrero<br>Laura Montemayor<br>Does 1-2<br>*Defendants – Appellees* | William M. McKamie<br>Alicia K. Kreh<br>TAYLOR OLSON ADKINS SRALLA<br>& ELAM LLP<br>13750 San Pedro Ave., Suite 555<br>San Antonio, Texas 78232<br>(210) 546-2122 *telephone*<br>(210) 546-2130 *facsimile*<br>mmckamie@toase.com<br>akreh@toase.com |

## *Amici Curiae*

Institute for Justice
*Amicus Curiae*

Jaba Tsitsuashvili
Caroline Grace Brothers
Anya Bidwell
Patrick Jaicomo
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
jtsitsuashvili@ij.org

Arif Panju
INSTITUTE FOR JUSTICE
816 Congress Avenue, Suite 960
Austin, TX 78701
(512) 480-5936
apanju@ij.org

Texas Press Association
Texas Association of Broadcasters
Freedom of Information Foundation of
Texas
Brechner Center for Freedom of
Information
News Leaders Association
Society of Professional Journalists.
*Amici Curiae*

Laura Lee Prather
Catherine L. Robb
Haynes and Boone, LLP
600 Congress Avenue, Suite 1300
Austin, Texas 78701
(512) 867-8400 *telephone*
laura.prather@haynesboone.com
catherine.robb@haynesboone.com

*/s/ J. Eric Magee*
J. Eric Magee

## RULE 35(B)(1) STATEMENT

In my professional judgment, the questions presented by this petition satisfy the criteria of Federal Rule of Appellate Procedure 35(b)(1). Because of the importance of qualified immunity to society as a whole and the necessity for clarity in this area of jurisprudence, I believe that the panel decision conflicts with U.S. Supreme Court and Fifth Circuit Court precedent and requires review by the full Court.

The majority opinion erred in its application of the proper qualified immunity analysis. The majority opinion creates confusion and is inconsistent concerning whether a First and/or Fourth Amendment violation was "obvious" as it determines that Texas Penal Code §39.06(c) is not an obviously unconstitutional statute and yet imposes liability upon officials for its enforcement. Further, the majority opinion failed to properly apply the independent intermediary doctrine.

# TABLE OF CONTENTS

DEFENDANT-APPELLEES ALANIZ AND JACAMAN'S PETITION FOR REHEARING EN BANC ....................................................................................1

CERTIFICATE OF INTERESTED PERSONS .......................................................2

RULE 35(B)(1) STATEMENT ...............................................................................4

TABLE OF CONTENTS .........................................................................................5

TABLE OF AUTHORITIES.....................................................................................6

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................................7

STATEMENT OF THE COURSE OF PROCEEDINGS ........................................7

I.     District Court proceedings .................................................................7

II.    Panel decision ...................................................................................8

III.   Petition for Rehearing En Banc ......................................................10

STATEMENT OF RELEVANT FACTS...............................................................10

ARGUMENT ........................................................................................................12

Issue 1 -- The panel majority opinion creates confusion related to when a First and/or Fourth Amendment violation is "obvious" for purposes of qualified immunity and erred in conducting the proper qualified immunity analysis ..................................13

Issue 2 -- The panel majority opinion erred in denying qualified immunity by ignoring the independent intermediary doctrine contradicting Supreme Court and Fifth Circuit precedent ...........................................................................................20

PRAYER ...............................................................................................................22

CERTIFICATE OF SERVICE...............................................................................23

CERTIFICATE OF COMPLIANCE WITH RULES 32(A)..................................24

# TABLE OF AUTHORITIES

Cases

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ...................................................15

*Baldwin v. Dorsey*, 964 F.3d 320 (5th Cir. 2020)......................................16

*Buehler v. City of Austin/Austin Police Dep't*, 824 F.3d 548 (5th Cir.2016)..........20

*Carroll v. Carman*, 135 S.Ct. 348, (2014)....................................................15

*City of Escondido, Cal. v. Emmons*, 139 S.Ct. 500 (2019)....................................15

*Cope v. Cogdill*, 3 F.4th 198 (5th Cir. 2021) .................................................. 14, 15

*Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir. 2018) ........................ 16, 17

*Groh v. Ramirez,* 540 U.S. 551 (2004) .......................................................14

*Hand v. Gary*, 838 F.2d 1420 (5th Cir. 1988) ...........................................20

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982) ................................................14

*Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319 (5th Cir. 2020)........ 16, 17

*Lopera v. Town of Coventry*, 652 F. Supp. 2d 203 ....................................14

*Malley v. Briggs*, 475 U.S. 335 (1986) ........................................................... 16, 20

*Marlowe v. LeBlanc*, No. 20-30738, 2022 WL 2101523 (5th Cir. June 10, 2022)..16

*Messerschmidt v. Millender*, 565 U.S. 535, (2012) .......................................20

*Morrow v. Meachum*, 917 F.3d 870 (5th Cir. 2019)....................................15

*Mullenix v. Luna*, 577 U.S. 7, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (per curiam ................................................................................................................... 14, 15

*Pearson v. Callahan*, 555 U.S. 223 (2009)................................................14

*Plumhoff v. Rickard*, 572 U.S. 765 (2014)................................................15

*Reichle v. Howards*, 566 U.S. 658 (2012) ................................................15

*Sanchez v. Swyden*, 139 F.3d 464 (5th Cir. 1998) ....................................14

*Smith v. Gonzales*, 670 F.2d 522 (5th Cir. 1982).......................................20

*Stanton v. Sims*, 571 U.S. 3 (2013) ...........................................................15

*Villarreal v. City of Laredo, Texas*, 44 F.4th 363 (5th Cir. 2022).................. passim

*Wesby v. District of Columbia*, 816 F.3d 96 (D.C. Cir. 2016) ..............................15

*White v. Pauly*, 137 S.Ct. 548 (2017) .......................................................15

*Wood v. Moss*, 572 U.S. 744 (2014) .........................................................15

Statutes

Texas Penal Code §39.06............................................................................. passim

Rules

Fed. R. App. P. 35(a)(1).............................................................................13

Fed. R. App. P. 35(a)(2).............................................................................13

TO THE HONORABLE COURT OF APPEALS:

Defendants–Appellees Isidro R. Alaniz and Marisela Jacaman ("Alaniz" and "Jacaman") file this Petition for Rehearing *En Banc* and respectfully show the following:

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

**Issue 1 – The panel majority opinion creates confusion related to when a First and/or Fourth Amendment violation is "obvious" for purposes of qualified immunity and erred in conducting the proper qualified immunity analysis.**

**Issue 2 – The panel majority opinion erred in denying qualified immunity by ignoring the independent intermediary doctrine contradicting Supreme Court and Fifth Circuit precedent.**

## STATEMENT OF THE COURSE OF PROCEEDINGS

### I.    District Court proceedings

Alaniz and Jacaman filed their Motion to Dismiss for Failure to State a Claim to Plaintiff-Appellant Priscilla Villarreal's ("Villarreal") First Amended Complaint based on absolute immunity and qualified immunity.[1] ROA.212-232. The City of Laredo Defendants ("City") filed their Amended Motion to Dismiss for Failure to State a Claim on June 14, 2019. ROA.232-251. Villarreal filed responses to these motions to dismiss on July 2, 2019. ROA.265-336.  Alaniz and Jacaman filed their

---

[1] Villarreal did not appeal the dismissal of her claims for Webb County, Texas. *Villarreal v. City of Laredo, Texas*, 44 F.4th 363, 369 (5th Cir. 2022).

Reply to Villarreal's Response to the Motion to Dismiss on July 9, 2019. ROA.338-344.

Supplemental briefs were filed by both: (1) Villarreal; and (2) Alaniz and Jacaman on September 5, 2019. ROA.402-404 and ROA.381-398, respectively. A hearing was conducted by the trial court on September 9, 2019. ROA.504-625. Following the hearing, additional supplemental briefs were filed by all parties. ROA.409-422.

On May 8, 2020, the Honorable Judge John A. Kazen entered a fifty-nine (59) page Memorandum and Order granting the motions to dismiss for all Defendants; therefore, dismissing with prejudice Counts I–VIII asserted in the First Amended Complaint. ROA.423-481. "The Court determine[d] that further amendment would be futile as Plaintiff has failed to cure the pleading deficiencies addressed in the first motion to dismiss." ROA.481. Final Judgment was also entered on May 8, 2020. ROA.482.

Villarreal appealed "the May 8, 2020 final judgment of this Court granting Defendants' motions to dismiss and dismissing the action with prejudice against all Defendants." ROA.483-484.

## II.    Panel decision

On August 14, 2022, the published 2-1 split panel opinion affirmed in part, reversed in part, and remanded for further proceedings. *Villarreal v. City of Laredo,*

*Texas*, 44 F.4th 363 (5th Cir. 2022). Specifically, the Panel reversed the judgment of the district court dismissing Villarreal's First Amendment claim stating that "she has articulated a viable First Amendment right to ask questions of public officials;" however, "Villarreal has not pleaded an actionable First Amendment retaliation claim under the standards set forth in our circuit precedent." *Id.* at 374. The majority opinion reversed the judgment of the district court on the Fourth Amendment claim stating that "[a] reasonable well-trained officer would have understood that arresting a journalist for merely asking a question clearly violated the First Amendment." *Id.* at 375. The majority determined that the district court erred in dismissing the Fourteenth Amendment claims, as well as her civil conspiracy claims. *Id.* at 375-377. The majority affirmed the district court's judgment dismissing Villarreal's municipal liability claims against the City of Laredo. *Id.* at 377-378.The case was remanded to the district court for further proceedings. *Id*.

Chief Judge Richman concurred in part and dissented in part, arguing that the majority opinion "paints with a broad brush, as does Judge Ho's concurring opinion," because "[t]hey make no effort to consider the particular allegations as to each individual defendant" and each individual defendant's entitlement to qualified immunity. *Id.* at 382-393; *Id*. at 393. As discussed, "it is also unclear from the majority opinion precisely what actions the defendants took that violated Villarreal's Fourth or First Amendment rights and which of the ten individual defendants may

be liable for each of those violations." *Id*. at 393. Chief Judge Richman notes that Fifth Circuit precedent requires Villarreal to "identify 'an example' of a similarly situated comparator who was nonetheless treated differently" and "her failure to do so dooms her selective enforcement claim" under the Fourteenth Amendment. *Id*. at 392. "Villarreal's civil conspiracy claim fails in tandem with her First, Fourth, and Fourteenth Amendment claims." *Id*. Therefore, Chief Judge Richman "would affirm the district court's dismissal of all of Villarreal's claims*." Id.* at 393.

## III.    Petition for Rehearing *En Banc*

On August 25th, an extension of time to file this petition for rehearing *en banc* was granted until September 9, 2022. Thus, Appellees Alaniz and Jacaman timely request that this matter be reheard *en banc*.

## STATEMENT OF RELEVANT FACTS

As noted in the district court's Memorandum and Order granting the Honorable Isidro R. Alaniz, Webb County District Attorney, and Webb County Chief Assistant District Attorney Marisela Jacaman's motion to dismiss, the district court states:

> On April 11, 2017, Plaintiff [Villarreal] published a story on the Lagordiloca Facebook page about a man who committed suicide by jumping off a public overpass in Laredo. (*Id*. ¶ 65). Plaintiff published the name of the man and identified his employer as the United State Customs and Border Protection agency. (*Id*.). Plaintiff alleges that she learned this information from a janitor who worked near the overpass, and that she later received corroborating information from LPD Officer Barbara Goodman ("Goodman"). (*Id.* ¶ 65).

On May 6, 2017, Plaintiff posted a live video feed of a fatal traffic accident on her Lagordiloca Facebook page. (*Id*. ¶ 66). She published the location of the accident, and information about the family involved. (*Id*.). Plaintiff [alleges] that she first learned this information from a relative of the family who saw the live video feed on the Lagordiloca Facebook page. (*Id*.) Plaintiff later received corroborating information from Goodman. (*Id*.).

Plaintiff alleges that Ruiz, an investigator for LPD, subsequently made statements in support of two criminal complaints and affidavits in support of warrants for Plaintiff's arrest based on the April 11, 2017 and May 6, 2017 posts (collectively, the "Subject Publications"). (*Id*. ¶¶ 86–90). Ruiz's statements alleged that Plaintiff violated the Texas Misuse of Official Information statute, which provides:

> [a] person commits an offense if, with intent to obtain a benefit or with intent to harm or defraud another, he solicits or receives from a public servant information that:
> (1) the public servant has access to by means of his office or employment; and
> (2) has not been made public.

(*Id*. ¶ 72) (citing Tex. Penal Code §39.06(c) ("§39.06(c)")). The statute defines "information that has not been made public" as "any information to which the public does not generally have access, and that is prohibited from disclosure under" the Texas Public Information Act ("TPIA"). (Dkt. No. 24. ¶ 72 (citing Tex. Penal Code §39.06(c))).

…

On December 5, 2017, two warrants were issued for Plaintiff's arrest (the "Arrest Warrants"). (*Id*. ¶ 95). Plaintiff alleges the Arrest Warrants were issued because of misstatements and omissions in Ruiz's affidavits (the "Arrest Warrant Affidavits"), and that no other LPD officer provided an affidavit or statement in support of the arrest warrants. (*Id*. ¶¶ 87, 95). In the Arrest Warrant Affidavits, Ruiz asserted that Plaintiff violated §39.06(c) and that probable cause existed. (*Id.* ¶ 88). Ruiz named DV as an officer who participated in the investigation leading to the Arrest Warrant Affidavits and identified Jacaman as

"signing off" on subpoenas concerning the investigation of Plaintiff. (*Id.* ¶ 88). Jacaman signed an "Arrest Warrant Approval Form," dated November 21, 2017, to which the Arrest Warrant Affidavits were attached. (*Id.*).

Ruiz alleged in the Arrest Warrant Affidavits that Plaintiff had received or solicited the name and condition of a traffic accident victim and the name and identification of a suicide victim, and that the information Plaintiff published in the Subject Publications "had not been made public." (*Id.* ¶ 89). Ruiz also alleged that an unnamed source told DV that Plaintiff received this information from Goodman, who communicated with Plaintiff. (*Id.*). Ruiz alleged that Plaintiff gained additional followers on her Lagordiloca Facebook page by publishing this news before other news outlets. (*Id.* ¶ 92).

ROA.426-428.

Villarreal "sometimes enjoys a free meal from appreciative readers, and occasionally receives fees for promoting a local business [and] has used her Lagordiloca Facebook page to ask for donations for new equipment necessary to continue her citizen journalism efforts." ROA. 437.

## ARGUMENT

This Court should grant this petition and rehear the case *en banc*. The issues requiring the full Court's resolution concern: (1) whether a proper qualified immunity analysis was conducted in the majority opinion; (2) whether the majority opinion creates confusion related to when a First and/or Fourth Amendment violation is "obvious" for purposes of qualified immunity; (3) whether the majority opinion contradicts Supreme Court and Fifth Circuit precedent concerning the independent intermediary doctrine; and (4) the majority opinion incorrectly

determined that Villareal states a selective enforcement claim. Review by the full Court is "necessary to secure or maintain uniformity of the Court's decisions." Fed. R. App. P. 35(a)(1). These issues are also of exceptional importance." Fed. R. App. P. 35(a)(2).

**Issue 1 -- The panel majority opinion creates confusion related to when a First and/or Fourth Amendment violation is "obvious" for purposes of qualified immunity and erred in conducting the proper qualified immunity analysis.**

Chief Judge Richman's dissent properly identifies the issue before the Court as "[o]ur focus in this case is on qualified immunity, and the majority opinion correctly holds that '[o]n its face, Texas Penal Code §39.06(c) is not [an] obviously unconstitutional statute.'" *Villarreal*, 44 F.4th at 384. However, the majority opinion "vociferously and insistently" makes declarations related to the obviousness of a violation of Villarreal's constitutional rights. *Id.* Chief Judge Richman inquires

> [w]hat are the bench and bar to make of this? Similarly, what are the bench and bar to make of the passages in the majority opinion cataloging cases in which qualified immunity was denied because law enforcement officials attempted to enforce "obviously unconstitutional statutes"? That discussion is followed by a single sentence, which is an actual holding of the majority opinion: "[o]n its face, Texas Penal Code §39.06(c) is not one of those 'obviously unconstitutional' statutes." That holding, though a grudging one, correctly resolves the issue of whether section 39.06(c) is "obviously" unconstitutional. That holding should not be lost or overlooked due to its brevity or obfuscated by preceding or succeeding passages in the majority opinion.

*Id.* at 385.

Qualified immunity shields from liability officials who perform their duties reasonably and "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Lopera v. Town of Coventry*, 652 F. Supp. 2d 203, 211, *aff'd,* 640 F.3d 388 (1st Cir. 2011) (quoting *Groh v. Ramirez,* 540 U.S. 551, 567 (2004)). It is generally true that public officials acting within the scope of their authority are shielded from civil liability by the doctrine of qualified immunity. *See Harlow v. Fitzgerald,* 457 U.S. 800, 815-19 (1982). Officials sued in their individual capacities are protected by qualified immunity unless the alleged act violates a constitutional right that was clearly established at the time. *Sanchez v. Swyden*, 139 F.3d 464, 466 (5th Cir. 1998).

The test for qualified immunity has two parts that a plaintiff must prove in order to prevail. These two aspects of qualified immunity are: "whether the plaintiff has alleged a violation of a constitutional right and whether the right at issue was "clearly established" at the time of the alleged violation. *Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 2573 (2022)(citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "A right is "clearly established" if it is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (per curiam) (internal quotation marks and citation omitted).

As stated in *Morrow v. Meachum*, "[t]he second question [of the qualified immunity analysis] – whether the officer violated clearly established law – is a **doozy**." *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019)(emphasis added). Here, Villarreal bore the burden of proof "**and the burden is heavy**: A right is clearly established only if relevant precedent 'has placed the … constitutional question beyond debate.'" *Id.* (*citing Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). This Court discussed the four applicable commandments when dealing with this question, including the fourth and final commandment is for courts to "think twice before denying qualified immunity." *Morrow*, 917 F.3d at 876. Specifically, this Court stated that

> [t]he Supreme Court reserves the extraordinary remedy of a summary reversal for decisions that are manifestly incorrect. *Kisela*, 138 S.Ct. at 1162 (Sotomayor, J., dissenting) (quotation omitted). Yet it routinely wields this remedy against denials of qualified immunity. *See City of Escondido, Cal. v. Emmons*, 139 S.Ct. 500, 503–04 (2019)(summarily reversing the Ninth Circuit); *Kisela*, 138 S.Ct. at 1153 (majority op.) (summarily reversing the Ninth Circuit); *White v. Pauly*, 137 S.Ct. 548, 553 (2017) (per curiam) (summarily reversing the Tenth Circuit); *Mullenix*, 136 S.Ct. at 312(summarily reversing our Court); *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (per curiam) (summarily reversing the Ninth Circuit). Because of the **importance of qualified immunity to society as a whole**, the [Supreme] Court often corrects lower courts when they wrongly subject individual officers to liability. *Sheehan*, 135 S.Ct. at 1774 n.3(quotation and citation omitted); *accord Carroll v. Carman*, 135 S.Ct. 348, (2014) (per curiam); *Wood v. Moss*, 572 U.S. 744, 764 (2014); *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014); *Reichle v. Howards*, 566 U.S. 658, 663 (2012); *Wesby v. District of Columbia*, 816 F.3d 96, 102 (D.C. Cir. 2016)(Kavanaugh, J., dissenting from the denial of rehearing en banc) (Indeed, in just the past five years, the Supreme Court has issued 11 decisions reversing federal courts of

appeals in qualified immunity cases, including five strongly worded summary reversals.), *rev'd*, 138 S.Ct. 577 (2018). We'd be ill advised to misunderstand the message and deny qualified immunity to anyone but the plainly incompetent or those who knowingly violate the law. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

*Id.*

"Generally, to satisfy this standard, the plaintiff must identify a case in which an officer acting under similar circumstances was held to have violated the Constitution, and ... explain why the case clearly proscribed the conduct of that individual officer." *Cope*, 3 F.4th at 205 (quoting *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 345 (5th Cir. 2020)(concluding the defendants were entitled to qualified immunity because the plaintiffs failed to identify an analogous case)). This Court notes that "[w]hile an exact case on point is not required, the confines of the officers' violation must be 'beyond debate.'" *Id.* (citing *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020) (internal quotation marks and citation omitted), *cert. denied*, —— U.S. ——, 141 S. Ct. 1379, (2021) (mem.)). Therefore, "[b]road general propositions are not enough to overcome qualified immunity." *Id.*

Additionally, this Court identified a fifth commandment that "the inquiry should be conducted for each defendant individually, not on a group-wide basis." *Marlowe v. LeBlanc*, No. 20-30738, 2022 WL 2101523, at *2 (5th Cir. June 10, 2022)(citing *Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir. 2018) ("In cases where the defendants have not acted in unison, qualified immunity claims

should be addressed separately for each individual defendant."); *Joseph v. Bartlett*, 981 F.3d at 325 & n.7 ("To the extent [*Darden*] could be read as suggesting that collective analysis is appropriate for defendants acting in unison, we don't read it that way.")).

The majority opinion "paints with a broad brush, as does Judge Ho's concurring opinion," because "[t]hey make no effort to consider the particular allegations as to each individual defendant" and each individual defendant's entitlement to qualified immunity. *Villarreal*, 44 F.4th at 393. Each defendant "is entitled to know what they must defend against in district court." *Id.*

Texas Penal Code §39.06(c) provides that "a person commits an offense if, with intent to obtain a benefit or with intent to harm or defraud another, he solicits or receives from a public servant information that: (1) the public servant has access to by means of his office or employment; and (2) has not been made public." Tex. Penal Code §39.06(c). Based on information from the Laredo Police Department, Alaniz and Jacaman could reasonably believe that Villarreal "was deriving an economic benefit[2] from her Facebook journalism in the form of sponsors." ROA.437. (FN 6). The district court properly determined that Villarreal "has not

---

[2] "No court had construed the meaning of "with intent to obtain a benefit" as used in Texas Penal Code §39.06 when Villareal was arrested. There was no clearly established law that there was no probable cause for arresting Villareal, and there was no clearly established law that in arresting Villareal based on section 39.06, the defendants were violating her First Amendment rights." *Villarreal*, 44 F.4th at 390.

alleged plausible facts to support an inference that no reasonable officer could have found probable cause as to the benefit element of the statute." ROA.437. Villarreal readily admits that she "sometimes enjoys a free meal from appreciative readers, and occasionally receives fees for promoting a local business [and] has used her Lagordiloca Facebook page to ask for donations for new equipment necessary to continue her citizen journalism efforts." ROA. 437.

Additionally, the district court determined that Villarreal "failed to support a plausible inference that no reasonable officer could have found that the information at issue was public and therefore, subject to" Texas Penal Code §39.06. ROA.438. The second prong of section 39.06(c) requires that the information had not been made public. Villarreal admits that the information obtained, privately from Goodman, was the subject of the arrest warrant and that the arrest warrant states that such information had not been made public. ROA.438. Further, Villarreal admits that the obtained information was not received from the Laredo Police Department's public spokesman. ROA.453. While the majority opinion attempts to assert that Villarreal had already obtained that identity of those individuals from other sources, that "is beside the point, not to mention misleading, because Villarreal has not plausibly alleged that any defendant she sued knew that she had obtained the identities of the victims before she approached her back-channel LPD source. Nor has Villarreal plausibly alleged that any defendant had a basis to believe or even

suspect that the original sources of Villarreal's information were witnesses at or near the scenes of the deaths." *Villarreal*, 44 F.4[th] at 387.

Villarreal nor the majority opinion identifies any case precedent or law that was well-established that requires before an arrest can be made, law enforcement officers are required to question a "suspect to ascertain whether information the officers believe has been obtained in violation of a statute such as Texas Penal Code §39.06 was instead obtained from a source other than a public servant." *Id.* at 388. As Judge Richman's notes in her dissent

> Villarreal's First Amendment claim stems from her arrest under section 39.06. If there was no Fourth Amendment violation, the defendants are also entitled to qualified immunity as to Villarreal's First Amendment claims. Villarreal's First Amendment claim is inextricably intertwined with, tethered to, and inseparable from the facts that gave rise to her Fourth Amendment claim. The Texas statute is not "obviously" unconstitutional. suspect to ascertain whether information the officers believe has been obtained in violation of a statute such as Texas Penal Code §39.06 was instead obtained from a source other than a public servant.

*Id.*[3]

For these reasons, this significant confusion and flawed analysis of qualified immunity merits the consideration of the full Court of Appeals.

---

[3] Similarly, Villarreal failed to state a valid claim against Alaniz and Jacaman for her selective enforcement claim. As Chief Judge Richman notes, Fifth Circuit precent requires that "to allege selective enforcement adequately, plaintiffs must identify "an example" of a similarly situated comparator who was nonetheless treated differently. Villareal's failure to do so dooms her selective enforcement claim." *Villarreal*, 44 F.4th at 392.

**Issue 2 -- The panel majority opinion erred in denying qualified immunity by ignoring the independent intermediary doctrine contradicting Supreme Court and Fifth Circuit precedent.**

The independent intermediary doctrine provides that "even an officer who acted with malice ... will not be liable if *the facts* supporting the warrant or indictment are put before an impartial intermediary such as a magistrate or a grand jury, for that intermediary's 'independent' decision 'breaks the causal chain' and insulates the initiating party." *Buehler v. City of Austin/Austin Police Dep't*, 824 F.3d 548, 553-554 (5th Cir.2016)(quoting *Hand v. Gary*, 838 F.2d 1420, 1427 (5th Cir. 1988)and *Smith v. Gonzales*, 670 F.2d 522, 526 (5th Cir. 1982)).  The Supreme Court has recognized that an exception that would allow suit is when "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Messerschmidt v. Millender*, 565 U.S. 535, 547, (2012)(quoting *Malley v. Briggs,* 475 U.S. 335, 341(1986). However, the Supreme Court notes that

> [o]ur precedents make clear, however, that the threshold for establishing this exception is a high one, and it should be. As we explained in *Leon,* "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination" because "[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment." *Id.,* at 921, 104 S.Ct. 3405; see also *Malley, supra,* at 346, n. 9, 106 S.Ct. 1092 ("It is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination, and it goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant

cannot be held liable" (internal quotation marks and citation omitted)).

*Id*. at 547-548.

As Chief Judge Richman points out, the majority opinion "builds on its mischaracterization of Villarreal's claims." *Villarreal*, 44 F.4th at 391. "[I]t cannot be overemphasized: *Villarreal did not plausibly allege that she was arrested for merely asking a question*." *Id*. Villarreal's arrest was based on allegations that she solicited and received nonpublic information from a governmental official, the LPD back-channel source, with the intent to obtain a benefit in violation of Texas Penal Code §39.06 which is not "obviously unconstitutional." *Id*.; ROA.426-428.

As demonstrated *supra*, Alaniz and Jacaman could reasonably believe that based on the information from the Laredo Police Department that Villarreal was attempting to obtain a benefit by soliciting and receiving information from a public servant, the LPD back-channel source, for information that had not been made public in violation for Texas Penal Code §39.06. Thus, the district court properly determined that Villarreal "has not alleged plausible facts to support an inference that no reasonable officer could have found probable cause as to the benefit element of the statute." ROA.437.

For these reasons, this issue merits consideration of the full Court of Appeals.

**PRAYER**

Alaniz and Jacaman request that the Court grant a rehearing *en banc* and affirm the district court's grant of their motion to dismiss and dismissal of all of Villarreal's claims based on their entitlement to qualified immunity.

Respectfully submitted,

/s/ J. Eric Magee
J. Eric Magee
e.magee@allison-bass.com
State Bar Number: 24007585
**ALLISON, BASS & MAGEE, L.L.P.**
A. O. Watson House
402 West 12th Street
Austin, Texas 78701
(512) 482-0701 telephone
(512) 480-0902 facsimile

## CERTIFICATE OF SERVICE

I, J. Eric Magee, attorney of record for Defendants-Appellees Alaniz and Jacaman, hereby certifies that a true and correct copy of the above and foregoing Appellees Alaniz and Jacaman's Petition for Rehearing *En Banc* was filed on the 9th of September 2022 with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

JT Morris
jt@jtmorrislaw.com
JT Morris Law, PLLC
1105 Nueces Street, Suite B
Austin, Texas 78701
***Attorney for Plaintiff-Appellant***

William M. McKamie
mmckamie@toase.com
Alicia K. Kreh
akreh@toase.com
Taylor Olson Adkins Sralla & Elam LLP
13750 San Pedro Ave., Suite 555
San Antonio, Texas 78232
***Attorneys for Defendants-Appellees***
***the City of Laredo, Texas; Claudio Trevino, Jr.;***
***Juan L. Ruiz; Deyanria Villarreal;***
***Enedina Martinez; Alfredo Guerrero;***
***Laura Montemayor; and Does 1-2***

*/s/ J. Eric Magee*
J. Eric Magee

## CERTIFICATE OF COMPLIANCE WITH RULES 32(A)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 35(b)(2) because:

- this brief contains 3,899 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), *or*

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

- this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word Version 2019</u>, in <u>14-point Times New Roman Font</u>, *or*

<u>*/s/ J. Eric Magee*</u>
J. Eric Magee
ALLISON, BASS & MAGEE, LLP
***Attorney for Defendants-Appellees***
***Alaniz and Jacaman***

Dated: September 9, 2022

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 12, 2022

Lyle W. Cayce
Clerk

No. 20-40359

Priscilla Villarreal,

*Plaintiff—Appellant,*

*versus*

The City of Laredo, Texas; Webb County, Texas; Isidro R. Alaniz; Marisela Jacaman; Claudio Trevino, Jr.; Juan L. Ruiz; Deyanria Villarreal; Enedina Martinez; Alfredo Guerrero; Laura Montemayor; Does 1-2,

*Defendants—Appellees.*

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 5:19-CV-48

Before Richman, *Chief Judge*, and Graves and Ho, *Circuit Judges*.

James C. Ho, *Circuit Judge*:

We previously issued an opinion in this case and noted that a dissenting opinion was forthcoming. *See Villarreal v. City of Laredo*, 17 F.4th 532, 536 n.* (5th Cir. 2021). We now withdraw our prior opinion and substitute the following in its place.

\* \* \*

1

No. 20-40359

If the First Amendment means anything, it surely means that a citizen journalist has the right to ask a public official a question, without fear of being imprisoned. Yet that is exactly what happened here: Priscilla Villarreal was put in jail for asking a police officer a question.

If that is not an obvious violation of the Constitution, it's hard to imagine what would be. And as the Supreme Court has repeatedly held, public officials are not entitled to qualified immunity for obvious violations of the Constitution.

The district court accordingly erred in dismissing Villarreal's First and Fourth Amendment claims on qualified immunity grounds. The district court also erred in dismissing her Fourteenth Amendment claim for failure to state a claim. We reverse in part and affirm in part and remand for further proceedings.

## I.

For purposes of this appeal, we accept the factual allegations stated in Villarreal's complaint as true. *See*, *e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## A.

Priscilla Villarreal is a journalist in Laredo, Texas. She regularly reports on local crime, missing persons, community events, traffic, and local government. But Villarreal is not a traditional journalist. Instead of publishing her stories in the newspaper, she posts them on her Facebook page. Instead of using a tape recorder to conduct interviews, she uses her cell phone to live-stream video footage of crime scenes and traffic accidents. Her reporting frequently includes colorful—and often unfiltered—commentary. Perhaps because of this, she is one of Laredo's most popular news sources, with more than 120,000 Facebook followers. *See*, *e.g.*, Simon Romero, *La*

*Gordiloca: The Swearing Muckraker Upending Border Journalism*, N.Y. Times (Mar. 10, 2019), https://www.nytimes.com/2019/03/10/us/gordiloca-laredo-priscilla-villarreal.html ("[Villarreal] is arguably the most influential journalist in Laredo, a border city of 260,000.").

Villarreal is not shy about criticizing law enforcement. For example, in 2015, law enforcement uncovered evidence of animal abuse on the property of a relative of Marisela Jacaman, Webb County's Chief Assistant District Attorney. Villarreal vocally denounced the district attorney's decision to recall the arrest warrant for Jacaman's relative on animal cruelty charges and instead pursue a civil settlement. On another occasion, Villarreal live-streamed Laredo Police Department (LPD) officers choking an arrestee during a traffic stop.

Not surprisingly, local law enforcement officials were less than enthused with Villarreal's reporting. During a meeting with Villarreal, Webb County District Attorney Isidro Alaniz told her that he did not appreciate her criticism of the decision to withdraw the arrest warrant for Chief Assistant District Attorney Jacaman's relative. On another occasion, an officer threatened to take Villarreal's cell phone when she was recording a crime scene from behind a barricade—while saying nothing to the other members of the media standing next to her.

**B.**

In April 2017, Villarreal published a story about a man who committed suicide. The story identified the man by name and revealed that he was an agent with the U.S. Border Patrol. Villarreal first uncovered this information from talking to a janitor who worked near the scene of the suicide. She then contacted LPD Officer Barbara Goodman, who confirmed the man's identity.

The following month, Villarreal published the last name of a family involved in a fatal car accident in Laredo. She first learned the family's identity from a relative of the family who saw a video that Villarreal had posted. Again, Villarreal contacted Officer Goodman, and again, the officer verified this information.

Six months later, two arrest warrants were issued for Villarreal for violating Texas Penal Code § 39.06(c). According to Villarreal, local officials have never brought a prosecution under § 39.06(c) in the nearly three-decade history of that provision—and Defendants do not contend otherwise.

Section 39.06(c) states that "[a] person commits an offense if, with intent to obtain a benefit . . . , he solicits or receives from a public servant information that: (1) the public servant has access to by means of his office or employment; and (2) has not been made public." TEX. PENAL CODE § 39.06(c). According to the affidavit in support of the arrest warrants, Villarreal solicited or received the names of the suicide victim and the traffic accident victims (which, according to the affidavit, was "nonpublic" information). The affidavit further alleged that Villarreal benefitted from publishing this information before other news outlets, by gaining additional followers on her Facebook page. Chief Assistant District Attorney Jacaman approved the arrest warrant application.

After learning about the warrant, Villarreal turned herself in. During the booking process, Villarreal saw LPD officers taking pictures of her in handcuffs with their cell phones. The officers mocked and laughed at her. Villarreal was then detained at the Webb County Jail.

Villarreal filed a petition for a writ of habeas corpus in the Webb County district court. In March 2018, a judge granted her petition and held that § 39.06(c) was unconstitutionally vague. The government did not appeal.

She subsequently brought suit under 42 U.S.C. § 1983 against various LPD officers, Webb County prosecutors, Webb County, and the City of Laredo. The suit alleged a pattern of harassment and retaliation by various local officials, culminating in her arrest, in violation of her First, Fourth, and Fourteenth Amendment rights. She sought damages as well as injunctive and declaratory relief.

Defendants moved to dismiss all of her claims under Federal Rule of Civil Procedure 12(b)(6). The officials sought dismissal on grounds of qualified immunity and failure to state a claim, and the county and city sought dismissal under *Monell*. The district court granted the motion and dismissed all claims accordingly.

Villarreal appeals the dismissal of her claims against the officials under the First, Fourth, and Fourteenth Amendments. She also appeals the dismissal of her municipal liability claims against the City of Laredo, but not her claims against Webb County.

We review de novo a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6). *Sw. Bell Tel., LP v. City of Houston*, 529 F.3d 257, 260 (5th Cir. 2008). To survive a Rule 12(b)(6) motion to dismiss, Villarreal must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). With respect to the defense of qualified immunity, Villarreal must plead specific facts that defeat that defense with equal specificity. *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012).

## II.

Villarreal alleges that Defendants violated her First Amendment rights in two ways—first, by infringing on her constitutional right to ask questions of public officials, and second, by arresting her in retaliation for her exercise of First Amendment rights. We address each in turn.

**A.**

The district court dismissed her First Amendment infringement claim against various officials on qualified immunity grounds, finding that any violation was not clearly established at the time. We disagree.

To defeat qualified immunity at the motion to dismiss stage, Villarreal must allege, first, that the officials violated her First Amendment rights, and second, that their actions were objectively unreasonable in light of clearly established law. *See, e.g.*, *Powers v. Northside Indep. Sch. Dist.*, 951 F.3d 298, 305–06 (5th Cir. 2020). The crucial question in this inquiry is whether "a reasonable official would understand that what he is doing violates [a constitutional] right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "The central concept is that of 'fair warning.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

Ordinarily, a plaintiff defeats qualified immunity by citing governing case law finding a violation under factually similar circumstances. But that is not the only way to defeat qualified immunity. "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope*, 536 U.S. at 741.

"[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id*. "'[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'" *Id.* (second alteration in original) (quoting *Anderson*, 483 U.S. at 640).

In *Hope*, prison guards handcuffed a prisoner to a hitching post for seven hours in the sun with little water. *Id.* at 734–35. They taunted him

about his thirst, giving water to some dogs, before bringing the water cooler closer to the prisoner and kicking the cooler over, spilling the water onto the ground. *Id.* at 735. The guards also refused to allow him to use a restroom. *Id.*

The Court acknowledged that there was no "materially similar" case finding an Eighth Amendment violation under those particular circumstances. *Id.* at 739–41. But the Court denied qualified immunity anyway, based on "[t]he obvious cruelty inherent" in the guards' conduct. *Id.* at 745.

Similarly, in *Taylor v. Riojas*, 141 S. Ct. 52 (2020) (per curiam), two prison cells contained massive amounts of feces over a period of six days. *Id.* at 53. Again, there was no binding case on point involving those particular factual circumstances. But the Court nevertheless denied qualified immunity, reasoning that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house Taylor in such deplorably unsanitary conditions for such an extended period of time." *Id.*

Perhaps the decision most analogous to this appeal is *Sause v. Bauer*, 138 S. Ct. 2561 (2018) (per curiam). There, police officers entered a woman's living room in response to a noise complaint. When she knelt down to pray, they ordered her to stop, despite the lack of any apparent law enforcement need. *Id.* at 2562. She brought suit against the officers alleging, *inter alia*, a violation of the Free Exercise Clause. *Id.* The Tenth Circuit granted qualified immunity, reasoning that any violation was not clearly established because "Sause d[id]n't identify a single case in which this court, or any other court for that matter, has found a First Amendment violation based on a factual scenario even remotely resembling the one we encounter here." *Sause v. Bauer*, 859 F.3d 1270, 1275 (10th Cir. 2017).

The Court reversed the Tenth Circuit's grant of qualified immunity and remanded for further proceedings, holding that "[t]here can be no doubt that the First Amendment protects the right to pray," and that "[p]rayer unquestionably constitutes the 'exercise' of religion." *Sause*, 138 S. Ct. at 2562.

The point is this: The doctrine of qualified immunity does not always require the plaintiff to cite binding case law involving identical facts. An official who commits a patently "obvious" violation of the Constitution is not entitled to qualified immunity. *Hope*, 536 U.S. at 745.

That principle should have precluded dismissal of the various constitutional claims presented here. Just as it is obvious that Mary Anne Sause has a constitutional right to pray, it is likewise obvious that Priscilla Villarreal has a constitutional right to ask questions of public officials. Yet according to her complaint, Defendants arrested and sought to prosecute Villarreal for doing precisely that—asking questions of public officials.

If the freedom of speech secured by the First Amendment includes the right to curse at a public official, then it surely includes the right to politely ask that official a few questions as well. *See, e.g., Chaplinsky v. New Hampshire*, 315 U.S. 568, 569 (1942) ("'You are a God damned racketeer' and 'a damned Fascist'"); *Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir. 1997) ("In 1990 when [the defendant] was arrested for his use of the 'f-word,' it was clearly established that speech is entitled to First Amendment protection."); *Buffkins v. City of Omaha*, 922 F.2d 465, 467 (8th Cir. 1990) ("I will have a nice day, asshole.").

If freedom of the press guarantees the right to publish information from the government, then it surely guarantees the right to ask the government for that information in the first place. *See, e.g., In re Express-News Corp.*, 695 F.2d 807, 808 (5th Cir. 1982) ("news-gathering is entitled to

[F]irst [A]mendment protection, for 'without some protection for seeking out the news, freedom of the press could be eviscerated'") (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)); *The Florida Star v. B.J.F.*, 491 U.S. 524, 538 (1989) ("That appellant gained access to the information in question through a government news release makes it especially likely that, if liability were to be imposed, self-censorship would result.").

Put simply: If the government cannot punish someone for *publishing* the Pentagon Papers, how can it punish someone for simply *asking* for them? *See New York Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam).

Finally, if the First Amendment safeguards the right to petition the government for a redress of grievances, then it surely safeguards the right to petition the government for information. As one of our colleagues once noted, "[t]he original design of the First Amendment petition clause . . . included a governmental duty to consider petitioners' grievances"—not the right to detain the petitioner. Stephen A. Higginson, Note, *A Short History of the Right to Petition Government for the Redress of Grievances*, 96 Yale L.J. 142, 142–43 (1986).

So it should be patently obvious to any reasonable police officer that the conduct alleged in the complaint constitutes a blatant violation of Villarreal's constitutional rights. And that should be enough to defeat qualified immunity. The Institute for Justice, a respected national public interest law firm, puts the point well in its amicus brief: There is a big difference between "split-second decisions" by police officers and "premeditated plans to arrest a person for her journalism, especially by local officials who have a history of targeting her because of her journalism." We agree that the facts alleged here present an especially weak basis for invoking qualified immunity. For "[w]hen it comes to the First Amendment, . . . we are concerned about government chilling the citizen—not the other way

around." *Horvath v. City of Leander*, 946 F.3d 787, 802 (5th Cir. 2020) (Ho, J., concurring in the judgment in part and dissenting in part). *Cf. Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., respecting denial of cert.) ("But why should university officers, who have time to make calculated choices about enacting or enforcing unconstitutional policies, receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting?").

Defendants respond that the officials were simply enforcing a statute. But "some statutes are so obviously unconstitutional that we will require officials to second-guess the legislature and refuse to enforce an unconstitutional statute—or face a suit for damages if they don't." *Lawrence v. Reed*, 406 F.3d 1224, 1233 (10th Cir. 2005). We agree with Judge McConnell and our other sister circuits that police officers can invoke qualified immunity by "rely[ing] on statutes that authorize their conduct—but not if the statute is obviously unconstitutional." *Id.* at 1232. We do not grant qualified immunity where the official attempts to hide behind a statute that is "'so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws.'" *Carey v. Nevada Gaming Control Bd.*, 279 F.3d 873, 881 (9th Cir. 2002) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979)). *See also, e.g.*, *Guillemard-Ginorio v. Contreras-Gómez*, 490 F.3d 31, 40–41 (1st Cir. 2007) (denying qualified immunity where statute allowed officials to suspend a professional license without a hearing in violation of the Due Process Clause); *Leonard v. Robinson*, 477 F.3d 347, 359, 361 (6th Cir. 2007) (denying qualified immunity where statute criminalized cursing by the name of God and indecent language in front of women or children); *Lawrence*, 406 F.3d at 1233 (denying qualified immunity where derelict vehicle ordinance provided "no hearing whatsoever" because that was a "sufficiently obvious" violation of due process); *Vives v. City of New York*, 405 F.3d 115, 118 (2nd Cir. 2005) (no

qualified immunity where official relies on a law "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws") (quoting *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 103 (2nd Cir. 2003)); *Lederman v. United States*, 291 F.3d 36, 47 (D.C. Cir. 2002) (similar); *Aubin v. Columbia Cas. Co.*, 272 F. Supp. 3d 828, 839 (M.D. La. 2017) ("[N]o reasonable officer could rely on Louisiana's public intimidation statute to arrest a person who threatens to have them fired.").

On its face, Texas Penal Code § 39.06(c) is not one of those "obviously unconstitutional" statutes. Villarreal nevertheless prevails because it is far from clear that the officers can even state a plausible case against Villarreal under § 39.06(c) in the first place.

Section 39.06(c) only applies if Villarreal solicited or received non-public information from a public servant "with intent to obtain a benefit." Tex. Penal Code § 39.06(c). And Texas law defines "benefit" to mean "anything reasonably regarded as economic gain or advantage." Tex. Penal Code § 1.07(a)(7).

That is plainly not this case. Villarreal maintains that she acted not to obtain economic gain, but to be a good journalist. Indeed, all she sought here was "corroborating information" to confirm what she had already received from other sources. So Villarreal wasn't even soliciting information she did not already have. She only wanted further confirmation before publication—what a purely economically motivated actor wouldn't need, but precisely what a good journalist would require.

Moreover, Villarreal alleges in her complaint that she "does not generate regular revenue or other economic gain from her citizen journalism." What's more, according to her complaint, the arrest warrant affidavits signed by the officers contained just one single theory of unlawful "benefit" under § 39.06(c)—her alleged desire to gain "popularity [o]n

Facebook" by reporting "the information before other news outlets." But by that token, soliciting confirmation from public officials only slowed Villarreal down—the very opposite of the benefit alleged by the officers, namely, the reporting of information "before other news outlets."

Accepting these allegations as true as we must, we conclude that no reasonable officer could have found probable cause under § 39.06(c)— separate and apart from whether § 39.06(c) could constitutionally apply to a person motivated by journalism rather than by profits. "At this stage, we do not determine what actually is or is not true; we only ask whether [Villarreal's] plausible allegations state a claim." *Converse v. City of Kemah*, 961 F.3d 771, 780 (5th Cir. 2020). Villarreal "has pleaded the violation of a clearly established right." *Anderson v. Valdez*, 845 F.3d 580, 602 (5th Cir. 2016). Nothing more is required at this stage to avoid dismissal. To the extent Defendants dispute Villarreal's version of the facts, they can present their evidence on remand. *See Joseph v. Bartlett*, 981 F.3d 319, 330–31 (5th Cir. 2020) (an "official can raise qualified immunity at any stage in the litigation . . . and continue to raise it at each successive stage").

\* \* \*

It should be obvious to any reasonable police officer that locking up a journalist for asking a question violates the First Amendment. Indeed, even Captain Lorenzo, the stubborn police chief in *Die Hard 2*, acknowledged: "Now personally, I'd like to lock every [expletive] reporter out of the airport. But then they'd just pull that 'freedom of speech' [expletive] on us and the ACLU would be all over us." DIE HARD 2 (1990).

Captain Lorenzo understood this. The officers in Laredo should have, too. *Cf. Dickerson v. United States*, 530 U.S. 428, 443 (2000) ("*Miranda* has become embedded in routine police practice to the point where the warnings have become part of our national culture."). The complaint here alleges an

obvious violation of the First Amendment. The district court erred in holding otherwise.

## B.

Turning to Villarreal's First Amendment retaliation theory: To establish such a claim, she "must show that (1) [she] w[as] engaged in constitutionally protected activity, (2) the defendants' actions caused [her] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against [her] exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) (citations omitted).

Notwithstanding that the second element turns on "a person of ordinary firmness," this court has held that "a retaliation claim requires some showing that *the plaintiffs'* exercise of free speech has been curtailed." *Id.* at 259 (emphasis added) (citing cases). The court found that the plaintiffs there demonstrated curtailment when they asserted that they "backed off from direct involvement in helping expose unlawful practices in the constable's office." *Id.* at 260. *See also McLin v. Ard*, 866 F.3d 682, 697 (5th Cir. 2017) (holding that plaintiff's "allegation of 'great personal damage[]' . . . d[id] not demonstrate that he reduced or changed his exercise of free speech in any way.").

Villarreal fails to allege that *her own* "exercise of free speech has been curtailed." *Keenan*, 290 F.3d at 259. She alleges that she lost sleep, suffered reputational damage, became physically ill, was detained, and feared future interference from officials. But these allegations do not show that Villarreal curtailed her speech. To the contrary, as Defendants point out, Villarreal has continued reporting since her arrest—consistent with the highest traditions of fearless journalism.

No. 20-40359

In response, Villarreal contends that "a chilling injury does not require the injured party to stop exercising her First Amendment rights." That is the law in other circuits—and perhaps for good reason—but it is not the law of this circuit. *Compare Keenan*, 290 F.3d at 259 ("[A] retaliation claim requires some showing that the plaintiffs' exercise of free speech has been curtailed."), *with Smith v. Plati*, 258 F.3d 1167, 1177 (10th Cir. 2001) ("The focus . . . is upon whether a *person of ordinary firmness* would be chilled, rather than whether the particular plaintiff is chilled."), *and Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) ("[I]t would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity.").

We are duty-bound to follow our circuit precedent. Accordingly, we must hold that Villarreal has failed to sufficiently plead a First Amendment retaliation claim.[1]

* * *

Although Villarreal has not pleaded an actionable First Amendment retaliation claim under the standards set forth in our circuit precedent, she has articulated a viable First Amendment theory based on the officers' infringement of her constitutional right to ask questions of public officials. The district court accordingly erred in dismissing her First Amendment claim.

---

[1] Villarreal also brings a retaliatory investigation claim. But this circuit does not recognize such a claim. *See Colson v. Grohman*, 174 F.3d 498, 512 (5th Cir. 1999) ("[The plaintiff] has alleged only that she was the victim of criticism, an *investigation* (or an attempt to start one), and false accusations: all harms that, while they may chill speech, are not actionable under our First Amendment retaliation jurisprudence.") (emphasis added).

No. 20-40359

Villarreal seeks not only damages but also injunctive and declaratory relief for her First Amendment claim. We agree with the district court that she fails to allege a risk of future injury as required to establish standing for injunctive and declaratory relief. To the contrary, Defendants have not appealed the grant of Villarreal's petition for a writ of habeas corpus by the Webb County district court. Nor have they sought to arrest or investigate her in the two years since that ruling.

### III.

We turn to Villarreal's Fourth Amendment wrongful arrest claim. To prevail on this claim, Villarreal must show that she was seized and that the seizure was unreasonable because it lacked probable cause. *See, e.g.*, *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001) ("The 'constitutional tort[ ]' of false arrest . . . require[s] a showing of no probable cause."). Defendants do not dispute that Villarreal's surrender in response to the arrest warrants was a seizure. *See McLin*, 866 F.3d at 694 ("McLin's seizure occurred when he surrendered to the arrest warrants and [the sheriff's office] exercised authority consistent with the warrants.").

"Probable cause exists when all of the facts known by a police officer 'are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense.'" *Texas v. Kleinert*, 855 F.3d 305, 316 (5th Cir. 2017) (quoting *United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999) (en banc)). Defendants argue they are entitled to qualified immunity because their arrest warrant sufficiently alleges a violation of § 39.06(c), which they obtained from a magistrate judge.

But "the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness." *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012). Even when officers obtain an arrest warrant from a

magistrate, we ask "whether a reasonably well-trained officer in [the defendants'] position would have known that his affidavit failed to establish probable cause and that he should not have applied for a warrant." *Jennings v. Joshua Indep. Sch. Dist.*, 877 F.2d 313, 317 (5th Cir. 1989) (quoting *Malley v. Briggs*, 475 U.S. 335, 345 (1986)). "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Malley*, 475 U.S. at 341.

As explained above, a reasonably well-trained officer would have understood that arresting a journalist for merely asking a question clearly violates the First Amendment. "A government official may not base her probable cause determination on an 'unjustifiable standard,' such as speech protected by the First Amendment." *Mink v. Knox*, 613 F.3d 995, 1003–04 (10th Cir. 2010) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). *See also Swiecicki v. Delgado*, 463 F.3d 489, 498 (6th Cir. 2006) ("[A]n officer may not base his probable-cause determination on speech protected by the First Amendment."). And no reasonable officer could have found probable cause under § 39.06(c) in any event, for the reasons we explained above.

Just as the First Amendment violation alleged in the complaint was obvious for purposes of qualified immunity, so too the Fourth Amendment violation alleged here. The district court therefore erred in dismissing Villarreal's Fourth Amendment claim.

## IV.

Next, we address Villarreal's selective enforcement claim under the Equal Protection Clause of the Fourteenth Amendment. "[T]o successfully bring a selective . . . enforcement claim, a plaintiff must prove that the government official's acts were motivated by improper considerations, such as race, religion, or the desire to prevent the exercise of a constitutional right." *Bryan v. City of Madison*, 213 F.3d 267, 277 (5th Cir. 2000).

"[R]etaliation for an attempt to exercise one's religion or right to free speech would be expected to qualify." *Id.* at 277 n.5.

"As a prerequisite to such a claim, the plaintiff must prove that similarly situated individuals were treated differently." *Id.* at 276 (citing *Wheeler v. Miller*, 168 F.3d 241, 252 (5th Cir. 1999)). The district court here dismissed Villarreal's selective enforcement claim for failure to identify similarly situated individuals that could have been arrested, but were not. So we begin our analysis there.

Defining the universe of similarly situated individuals is a "case specific" inquiry—one that "requires us to consider 'the full variety of factors that an objectively reasonable . . . decisionmaker would have found relevant in making the challenged decision.'" *Lindquist v. City of Pasadena*, 669 F.3d 225, 234 (5th Cir. 2012) (alteration in original) (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1203 (11th Cir. 2007)). In *Lindquist*, we explained that, when a case "involves the application of an ordinance or statute, the plaintiff's and comparators' relationships with the ordinance at issue will generally be a relevant characteristic for purposes of the similarly-situated analysis." 669 F.3d at 234. So, for example, in *Beeler v. Rounsavall*, 328 F.3d 813 (5th Cir. 2003), a store alleged that it was treated differently than another store located nearby. *Id.* at 816. The court held that "the relevant question [was] whether the two stores were similarly situated under [the relevant provision of] the Code," not whether they were geographically proximate. *Id.* at 817.

Under Defendants' interpretation of § 39.06(c), any journalist who asks a public official a question regarding nonpublic information commits a crime. Villarreal's complaint sufficiently alleges that countless journalists have asked LPD officers all kinds of questions about nonpublic information. Yet they were never arrested.

Specifically, she alleges a similarly situated group that includes: "(a) those who had asked for or received information from local law enforcement officials, and (b) persons who published truthful and publicly-accessible information on a newsworthy matter." She points to "local professional newspaper journalists, local professional broadcast journalists, and citizens who published on matters of local public concern." She further alleges that Defendants "also knew that members of the local media regularly asked for and received information from LPD officials relating to crime scenes and investigations, traffic accidents, and other LPD matters." Finally, Villarreal alleges, and Defendants concede, that LPD had never before arrested any person under § 39.06(c).

It is true that Villarreal did not name a specific journalist who solicited or received nonpublic information from the LPD in her complaint. When evaluating whether Villarreal survives a motion to dismiss under Rule 12(b)(6), however, we must draw all reasonable inferences in favor of Villarreal. *See, e.g.*, *Woodard v. Andrus*, 419 F.3d 348, 351 (5th Cir. 2005) ("The complaint must be liberally construed, with all reasonable inferences drawn in the light most favorable to the plaintiff.").

We have no difficulty observing that journalists commonly ask for nonpublic information from public officials, and that Villarreal was therefore entitled to make that same reasonable inference. Yet Defendants chose to arrest Villarreal—and only Villarreal—for violating § 39.06(c). We accordingly conclude that Villarreal has sufficiently pled the existence of similarly situated journalists who were not arrested for violating § 39.06(c).

The district court reached the opposite conclusion, holding that Villarreal "fail[ed] to allege any facts indicating that Defendants failed to enforce § 39.06(c) against any other person where a similar situation

existed." The court offered various rationales to justify its conclusion. None of them are plausible.

First, the district court reiterated that the officers had "probable cause to arrest [her]," because they had "objectively reasonable grounds to find probable cause that [Villarreal] violated § 39.06(c)." But probable cause is not a bar to a selective enforcement claim. "The courts have long held that a selective enforcement claim may be available even where there is probable cause for prosecution." *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997) (citing *Wayte*, 470 U.S. at 607; *Oyler v. Boles*, 368 U.S. 448, 455–56 (1962)). *See also Bradley v. United States*, 299 F.3d 197, 205 (3rd Cir. 2002) ("The fact that there was no Fourth Amendment violation does not mean that one was not discriminatorily selected for a search.").

Second, the district court found that local journalists were not similarly situated to Villarreal because she was arrested for communicating with Officer Goodman—and not with Jose Beza, LPD's official spokesman. The district court reasoned that local journalists are similarly situated to Villarreal only if they too "solicited or received information from Goodman"—or at least from "some other unofficial or unsanctioned source of information within the police department"—but not if they solicited information from LPD's designated spokesman. But of course, LPD has never claimed that it has a policy of arresting every journalist who asks questions about nonpublic information from LPD officials other than the department's designated spokesmen. Nor is there anything in § 39.06(c) to justify such a distinction.

Finally, the district court found that Villarreal's allegations could not establish a discriminatory effect because "it would be equally plausible to infer that Defendants had never before encountered circumstances giving rise to potential prosecution under the statute." That is implausible on its

face. Defendants' interpretation of § 39.06(c) criminalizes routine reporting. It is not "equally plausible" that the only journalist to ever ask questions of Laredo public officials was Villarreal.

The district court accordingly erred in dismissing Villarreal's selective enforcement claim for failure to identify similarly situated individuals. We of course make no comment on whether Villarreal will ultimately prevail on her selective enforcement claim—that is for the district court to decide in the first instance on remand.

## V.

As for Villarreal's remaining claims: She also brings a claim for conspiracy to violate her constitutional rights under § 1983. Given our conclusion that the district court erred in dismissing her First, Fourth, and Fourteenth Amendment claims, we remand her conspiracy claim as well.

Finally, we address Villarreal's municipal liability claim against the City of Laredo. "[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy [or custom]; and a violation of constitutional rights whose 'moving force' is th[at] policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)). The district court held that Villarreal failed to identify an official policy or custom made by a final policymaker. We agree. Although Villarreal repeatedly refers to an "official city policy or custom" of retaliating against her for her reporting, she fails to sufficiently allege either. Villarreal does not point to any ordinance, statute, statement, or regulation directing city employees to retaliate against her. *See Doe v. United States*, 831 F.3d 309, 318 (5th Cir. 2016) (noting that "[a]n official policy is usually evidenced by 'duly promulgated policy statements, ordinances or regulations'") (quoting *Piotrowski*, 237 F.3d at 579). Nor does Villarreal sufficiently allege a

"custom." Although she alleges "a persistent and widespread practice of City officials and employees engaging in retaliatory acts against [her]," such a "persistent, widespread practice" must be "so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc). Villarreal does not allege that city employees retaliated against, investigated, or arrested anyone else because of their speech. *See Culbertson v. Lykos*, 790 F.3d 608, 628 (5th Cir. 2015) (holding that the plaintiffs failed to allege a "widespread practice" of retaliation because they "offered no evidence that similar retaliation had victimized others."). We affirm the district court's judgment dismissing Villarreal's municipal liability claim against the City of Laredo.[2]

\* \* \*

It is not a crime to be a journalist. As the Institute for Justice rightly observes, the position urged by the City of Laredo in this case is "dangerous to a free society," for "[i]t assumes that the government can choose proper and improper channels for newsgathering—indeed, that the government can decide what is and is not newsworthy." *See also Jobe v. Nat'l Transp. Safety Bd.*, 1 F.4th 396, 410 (5th Cir. 2021) (Ho, J., dissenting) ("Open government is a founding principle of our country.").

We reverse the judgment of the district court dismissing Villarreal's First, Fourth, and Fourteenth Amendments claims, as well as her civil conspiracy claims. We affirm the district court's judgment dismissing Villarreal's municipal liability claims against the City of Laredo. We remand the case for further proceedings consistent with this opinion.

---

[2] Villarreal also appeals the district court's denial of her request for a declaratory judgment on her claim against the City of Laredo. Because she fails to establish municipal liability, she is not entitled to a declaratory judgment.

No. 20-40359

James C. Ho, *Circuit Judge*, concurring:

If any principle of constitutional law ought to unite all of us as Americans, it's that government has no business telling citizens what views they may not hold, and what questions they may not ask. "If there is any fixed star in our constitutional constellation, it is that no official . . . can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

But this principle does not appear to even unite the judiciary, never mind the citizenry at large. *See, e.g.*, *Dr. A. v. Hochul*, 595 U.S. \_, \_, (2021) (Gorsuch, J., dissenting from the denial of application for injunctive relief) (*Barnette* ranks "among our Nation's proudest boasts," but as "today's case shows, however, sometimes our promises outrun our actions"); *Oliver v. Arnold*, 19 F.4th 843, 852 n.7 (5th Cir. 2021) (Ho, J., concurring in denial of rehearing en banc) (noting disagreement over whether *Barnette* is a sufficiently "fixed star" to overcome qualified immunity).

Our split decision today further illustrates this unfortunate trend. I write separately to offer a few additional thoughts in light of the dissenting opinion by our learned colleague.

## I.

Assuming, as we must at this stage, that the allegations presented in this case are true, a group of police officers arrested Priscilla Villarreal for no other reason than that she asked questions they didn't like. They didn't like that, as a citizen journalist, she reported on corruption and abuse in local law enforcement.

So they jailed her. They took pictures of her in handcuffs with their cell phones. And they mocked and laughed at her while they did it.

The dissent responds that the police officers were just dutifully enforcing a Texas statute. *See* TEX. PENAL CODE § 39.06(c).

But no statute may be enforced that violates the Constitution. Likewise, no officer of the law may hide behind an obviously unconstitutional statute to justify trampling on a citizen's fundamental liberties.

As our sister circuits have repeatedly recognized, "some statutes are so obviously unconstitutional that we will require officials to second-guess the legislature and refuse to enforce an unconstitutional statute—or face a suit for damages if they don't." *Lawrence v. Reed*, 406 F.3d 1224, 1233 (10th Cir. 2005). We don't grant qualified immunity when an officer claims his misconduct is authorized by a law "'so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws.'" *Carey v. Nevada Gaming Control Bd.*, 279 F.3d 873, 881 (9th Cir. 2002) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979)).

To its credit, the dissent does not dispute this principle. And for good reason. Surely none of us would excuse a police officer for enforcing a statute that blatantly discriminated on the basis of race. By the same token, we wouldn't excuse an officer for enforcing a statute that blatantly violated other constitutional rights, either.[1]

---

[1] *See, e.g.*, *Guillemard-Ginorio v. Contreras-Gómez*, 490 F.3d 31, 40–41 (1st Cir. 2007) (denying qualified immunity where statute allowed officials to suspend a professional license without a hearing in violation of the Due Process Clause); *Leonard v. Robinson*, 477 F.3d 347, 359, 361 (6th Cir. 2007) (denying qualified immunity where statute criminalized cursing by the name of God and indecent language in front of women or children); *Lawrence*, 406 F.3d at 1233 (denying qualified immunity where derelict vehicle ordinance provided "no hearing whatsoever" because that was a "sufficiently obvious" violation of due process); *Vives v. City of New York*, 405 F.3d 115, 118 (2nd Cir. 2005) (no qualified immunity where official relies on a law "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws") (quoting *Connecticut ex*

## II.

Moreover, there's an even simpler principle that we can invoke to decide this case. Rather than treat § 39.06 as obviously unconstitutional, we can construe it to avoid unconstitutionality altogether.

In fact, that's what we're duty bound to do. Under the canon of constitutional avoidance, courts must construe statutes reasonably to avoid unconstitutionality. *See*, *e.g.*, *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (discussing "the elementary rule" that "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality") (cleaned up).

And that's precisely what the majority does here. As the majority explains, § 39.06(c) applies only when a person solicits or receives non-public information from a public servant "with intent to obtain a benefit." TEX. PENAL CODE § 39.06(c). Texas law defines "benefit" to mean "anything reasonably regarded as economic gain or advantage." TEX. PENAL CODE § 1.07(a)(7). And there's no need to construe these provisions to apply here.

It isn't difficult to come up with plausible interpretations of § 39.06(c) that pass constitutional muster. For example, imagine a citizen who tries to obtain non-public information from a public official about a confidential investigation into a major company, with the intent of turning a profit by selling that company's stock short once the investigation becomes public. A state might very well enact a statute like § 39.06(c) to stop that citizen. And nothing in the First Amendment prevents the state from doing so.

---

*rel. Blumenthal v. Crotty*, 346 F.3d 84, 103 (2nd Cir. 2003)); *Lederman v. United States*, 291 F.3d 36, 47 (D.C. Cir. 2002) (similar); *Aubin v. Columbia Cas. Co.*, 272 F. Supp. 3d 828, 839 (M.D. La. 2017) ("[N]o reasonable officer could rely on Louisiana's public intimidation statute to arrest a person who threatens to have them fired.").

That's a far cry from this case. As the majority explains, "Villarreal maintains that she acted not to obtain economic gain, but to be a good journalist." *Ante*, at 11.

The dissent responds by claiming that Villarreal acted with the intent to obtain economic gain. For example, Villarreal "sometimes enjoys a free meal from appreciative readers." *Post*, at 33. It's not clear why the dissent finds those free meals fatal. Other journalists are paid full salaries by their media outlets. And they talk to government sources about non-public information, too. Should they be arrested, too? Surely not.

Yet that's precisely (if alarmingly) what the dissent seems to have in mind. To quote the dissent, "the statute does not exclude journalists." *Post*, at 32. "The Texas Penal Code defines 'benefit' as 'anything reasonably regarded as economic gain or advantage.'" *Id.* (cleaned up). And "[j]ournalists generally gather information 'with intent to benefit', for example, to sell newspapers or magazines, or to attract viewers on television, computer, iPad or smart-phone screens." *Id.*

In sum, it is a crime to be a journalist in Texas, thanks to the dissent's reading of § 39.06(c).

There are a number of flaws with the dissent's approach. But perhaps the simplest is this: Even if we were to set aside the canon of constitutional avoidance and accept the dissent's theory of interpretation of § 39.06(c), the result is an obvious violation of the First Amendment.

If a statute can't be reasonably construed to avoid a constitutional violation, that just means there's no avoiding the constitutional violation.

## III.

Finally, the dissent makes some additional points that warrant a brief response.

No. 20-40359

1.     The dissent claims that this concurring opinion "directly conflicts with the majority opinion's holding." *Post*, at 35.

I don't see how.   There are two separate and independently compelling reasons why reversal is warranted.   And they're entirely compatible with one another.   First, § 39.06(c) can and should be construed not to prohibit Villarreal's acts as a journalist.   Second, if that's wrong, and the statute does in fact criminalize Villarreal's acts as a journalist, then § 39.06(c) is obviously unconstitutional.

These are alternative holdings, not contradictory ones.   The majority expressly adopts the former holding.   So does the concurrence.   The concurrence simply provides an additional, second holding, in hopes of offering a coherent and complete intellectual response to the dissent.

2.     The dissent contends that our holding today "shreds the independent intermediary doctrine." *Post*, at 36.   In essence, the dissent says that a magistrate issued a warrant, so the officers were entitled to rely on it.

But that's not how the doctrine works.   As the majority already explains (*ante*, at 15–16), "the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness." *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012).   We deny qualified immunity if "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Similarly, the dissent argues that, just as we can't question the officers because a magistrate issued a warrant, we likewise can't question the officers because a federal district court granted them qualified immunity.   To quote the dissent, "[w]hat does [our majority opinion] say about . . . the United States Magistrate Judge . . . who decided the motion to dismiss on its merits

and concluded that the defendants had reason to find probable cause to arrest Villarreal under the Texas statute?" *Post*, at 31.

My answer is simple: It says that the federal magistrate judge got it wrong. So we reverse.

If I understand the dissent's theory, however, it's that it's just too insulting for us to deny qualified immunity, when a fellow member of the federal judiciary has already voted to grant such immunity. But that would mean that, if one member of the judiciary would grant qualified immunity, the rest of us have no choice but to go along. That can't be right. That not only misunderstands qualified immunity—it's an alarming theory of our role under the Constitution.

Finally, the dissent asserts that "[i]t is asking a lot of law enforcement officers to know about and then apply the doctrine of constitutional avoidance." *Post*, at 43.

I profoundly disagree. We don't just ask—we require—every member of law enforcement to avoid violations of our Constitution. As well we should, given the considerable coercive powers that we vest in police officers. *See Aucoin v. Cupil*, 958 F.3d 379, 380 (5th Cir. 2020) ("Police officers . . . sometimes must use physical force to enforce our laws and keep people safe. But as with any use of government power, the law places important limits on the use of such force."). And when the violation is as obvious as it is here, we don't grant qualified immunity.

3.    Lastly, the dissent accuses the majority of "employ[ing] blunt force rather than careful analysis," by "cast[ing] aside *every individual defendant's* qualified immunity in connection with the Fourth and First Amendment claims without regard to the role each was alleged to have played." *Post*, at 36.

That overreads the majority opinion. The district court categorically granted qualified immunity to all of the individual defendants, on the ground that § 39.06(c) gives each defendant a complete defense to the various claims presented in this case. The majority simply rejects that rationale, and remands for further proceedings, as we typically do under these circumstances.

It goes without saying, of course, that if individual defendants have particular reasons why they should be entitled to qualified immunity, including the reasons intimated by the dissent, they are welcome to present those claims on remand.

\* \* \*

The dissent's interpretation and defense of § 39.06(c), if accepted, would undoubtedly condemn countless other journalists besides Villarreal, as the dissent fully acknowledges. *See post*, at 32. Yet local officials have *never* brought a § 39.06(c) prosecution against any other individual in the nearly three-decade history of that provision. *See ante*, at 4.

So make no mistake: There's no way the police officers here would have ever enforced § 39.06(c) against a citizen whose views they agreed with, and whose questions they welcomed.

And that's what disturbs me most about this case—the unabashedly selective behavior of the law enforcement officials here.

It is the unfortunate reality of modern American life that more and more citizens are increasingly unable or unwilling to live amicably with those we disagree with. Rather than debate, we would destroy. Instead of engaging opponents in the political arena, we expel them from economic and social life, using every resource available to us. "Our society . . . once embraced the quintessentially American maxim: 'I disapprove of what you say, but I will

defend to the death your right to say it.' But our culture . . . increasingly send[s] citizens . . . the opposite message: I disapprove of what you say, and I will use every means at my disposal to stop you from saying it." *Oliver*, 19 F.4th at 854 (Ho, J., concurring in denial of rehearing en banc).

In these already troubling times, this is an exceedingly troubling case. It's bad enough when private citizens mistreat others because of their political views. It's beyond the pale when law enforcement officials weaponize the justice system to punish their political opponents. One is terrible. But the other is totalitarian.

I'm grateful that the majority of our court will not stand for that here. I just wish we were unanimous in this regard. I concur.

No. 20-40359

Priscilla Richman, *Chief Judge*, concurring in part and dissenting in part:

The district court faithfully applied the law in holding that the defendants were entitled to qualified immunity and in granting a motion to dismiss. I would affirm that court's judgment across the board. Accordingly, I concur only to the extent the panel's majority opinion affirms the dismissal of Priscilla Villareal's First Amendment retaliation and municipal liability claims. I otherwise dissent. The principal disagreements I have with the majority opinion are that 1) it is likely to confuse the bench and the bar as to when a First Amendment violation is "obvious" for purposes of qualified immunity; 2) it misapplies the law in concluding that even though a magistrate issued arrest warrants for Villareal, a reasonably well-trained law enforcement officer should not have applied for the warrants because he would have known that Villareal, whose Complaint describes herself as having over 120,000 Facebook followers and recounts that the New York Times has dubbed her as "arguably the most influential journalist in Laredo,"[1] did not act "with intent to obtain a benefit" within the meaning of a Texas criminal statute[2] when Villareal obtained and published nonpublic information from a public servant about two fatalities that were then under investigation; and 3) the majority opinion misapplies the law governing selective enforcement claims brought under the Equal Protection Clause of the Fourteenth Amendment.

The majority opinion trumpets, repeatedly, that "Priscilla Villareal was put in jail for asking a police officer a question."[3] One would think in

---

[1] First Amended Complaint ¶ 3 at ROA.153.

[2] Tex. Penal Code § 39.06(c) and (d).

[3] *Ante*, at 2.

reading the first ten pages of the opinion (in its slip opinion form) that none of the defendants had any basis, whatsoever, for arresting Villareal—that they arrested her solely because she "politely ask[ed] [a police officer] a few questions."[4] But in order to make the jarring assertions that it does, the majority opinion has to conclude that no reasonably competent law enforcement officer could objectively have had a basis for seeking to arrest Villareal under Texas Penal Code § 39.06(c) and (d). That means the opinion necessarily concludes that the action of the state magistrate in issuing the arrest warrants "is not just a reasonable mistake, but an unacceptable error indicating gross incompetence or neglect of duty."[5] What does that say about the decision of the United States Magistrate Judge, in this case JUDGE JOHN KAZEN, who decided the motion to dismiss on its merits and concluded that the defendants had reason to find probable cause to arrest Villareal under the Texas statute?[6] Is the federal Magistrate Judge, and for that matter the undersigned Circuit Judge, "grossly incompeten[t] or neglect[ful] of duty"?

I do not suggest that each time a magistrate issues an arrest warrant and a federal district court grants qualified immunity to a state actor based on the independent intermediary doctrine, a court of appeals cannot have a

---

[4] *Ante*, at 8.

[5] *Malley v. Briggs*, 475 U.S. 335, 346 n.9 (1986).

[6] *See* ROA.437 (holding "the Court is unable to find that no reasonable officer would have believed Plaintiff intended to gain economically from the receipt of information from [police officer] Goodman. Accordingly, the Court finds Plaintiff has not alleged plausible facts to support an inference that no reasonable officer could have found probable cause as to the benefit element of the statute."); *see also* ROA.453 (concluding that "Defendants had objectively reasonable grounds to find probable cause that Plaintiff violated § 39.06(c)").

different view.[7]  I ask a rhetorical question, intimating that in the present case, there is room for reasonable disagreement, even among federal judges, as to the application of Texas Penal Code § 39.06(c).

Pertinent here, section 39.06(c) provides that "[a] person commits an offense if, with intent to obtain a benefit . . . he solicits or receives from a public servant information that . . . the public servant has access to by means of his office or employment . . . and has not been made public."[8]  Subsection 39.06(d) defines "information that has not been made public" to mean "any information to which the public does not generally have access, and that is prohibited from disclosure under Chapter 552, Government Code."[9]  There are elements to the offense other than "asking a question."

Without citing any case law whatsoever construing the Texas law at issue, the majority opinion holds that every reasonably competent law enforcement officer would have understood that a "benefit" as used in Texas Penal Code § 39.06(c) does not include a "good journalist"[10] gathering information.  But the statute does not exclude journalists, "good" or otherwise.  The Texas Penal Code defines "[b]enefit" as "anything reasonably regarded as economic gain or advantage, including benefit to any other person in whose welfare the beneficiary is interested."[11]  Journalists generally gather information "with intent to benefit", for example, to sell newspapers or magazines, or to attract viewers on television, computer, iPad or smart-phone screens.  No allegations in Villareal's Complaint plausibly

---

[7] *See ante*, at 26-27.

[8] Tex. Penal Code § 39.06(c).

[9] *Id.* § 39.06(d).

[10] *Ante*, at 11.

[11] Tex. Penal Code § 1.07(a)(7).

allege that the defendants had reason to believe that Villareal, as a "citizen" journalist, as opposed to some other variety of journalist, or as a uniquely situated journalist, had no intent to obtain an economic gain or advantage. To the contrary, Villareal's Complaint alleges that the affidavits supporting the arrest warrants asserted that "Villarreal's release of the information before other news outlets gained her popularity in Facebook."[12] This is what journalists, including "good" journalists, do. They often attempt to "scoop" other news sources to increase readership or listeners. It would be reasonable for a law enforcement officer to think that there was an economic benefit to attracting readers or viewers. As a general proposition, it is necessary to draw readers or viewers to sustain the journalistic undertaking. In fact, Villareal's Complaint says that she "sometimes enjoys a free meal from appreciative readers, . . . occasionally receives fees for promoting a local business [and] has used her Facebook page [where all of her reporting is published] to ask for donations for new equipment necessary to continue her citizen journalism efforts."[13] With great respect, the majority opinion is off base in holding that no reasonably competent officer could objectively have thought that Villareal obtained information from her back-door source within the Laredo Police Department with an "intent to benefit."

Texas courts, including the Supreme Court of Texas, have held that statutes defining "information that has not been made public,"[14] as used in section 39.06, constitutionally shield certain categories of sensitive

---

[12] First Amended Complaint ¶ 92 at ROA.171.

[13] First Amended Complaint ¶ 35 at ROA.159.

[14] *See generally* Tex. Gov't Code ch. 52; *id.* §§ 552.001, 552.101, 552.108.

information from public disclosure.[15]  Villareal's Complaint recounts that after she was arrested, she sought a writ of habeas corpus, and a Texas state trial court ruled orally from the bench that Texas Penal Code § 39.06 was unconstitutionally vague.[16]  That decision was not appealed.  But none of the defendants in the present case had the benefit of the state court's ruling at the time they sought warrants for Villareal's arrest.

There are certainly valid questions as to whether Texas Penal Code § 39.06(c) would violate the Constitution if applied in certain scenarios. However, we do not need to resolve and do not resolve those questions.  Our focus in this case is on qualified immunity, and the majority opinion correctly holds that "[o]n its face, Texas Penal Code § 39.06(c) is not [an] 'obviously unconstitutional statute.'"[17]  But at the same time, the opinion vociferously and insistently declares that "[j]ust as it is obvious that Mary Anne Sause has a constitutional right to pray [referring to *Sause v. Bauer*[18]], it is likewise obvious that Priscilla Villarreal has a constitutional right to ask questions of public officials"[19]; "[i]f the freedom of speech secured by the First Amendment includes the right to curse at a public official, then it surely includes the right to politely ask that official a few questions"[20]; "[i]t should be obvious to any reasonable police officer that locking up a journalist for

---

[15] *See Houston Chronicle Publ'g Co. v. City of Houston*, 536 S.W.2d 559 (Tex. 1976), *aff'g Houston Chronicle Publ'g Co. v. City of Houston*, 531 S.W.2d 177 (Tex. Civ. App.—Houston [1st] 1975).

[16] First Amended Complaint ¶ 127 at ROA.179.

[17] *Ante*, at 11.

[18] ___ U.S. ___, 138 S. Ct. 2561 (2018).

[19] *Ante*, at 8.

[20] *Ante*, at 8 (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 569 (1942); *Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir. 1997); and *Buffkins v. City of Omaha*, 922 F.2d 465, 467 (8th Cir. 1990)).

asking a question violates the First Amendment"[21]; "[t]he complaint here alleges an obvious violation of the First Amendment.  The district court erred in holding otherwise"[22]; "[i]f freedom of the press guarantees the right to publish information from the government, then it surely guarantees the right to ask the government for that information in the first place"[23]; "[p]ut simply: If the government cannot punish someone for *publishing* the Pentagon Papers, how can it punish someone for simply *asking* for them?".[24]

What are the bench and bar to make of this?  Similarly, what are the bench and bar to make of the passages in the majority opinion cataloging cases in which qualified immunity was denied because law enforcement officials attempted to enforce "obviously unconstitutional statutes"?[25]  That discussion is followed by a single sentence, which is an actual holding of the majority opinion:  "[o]n its face, Texas Penal Code § 39.06(c) is not one of those 'obviously unconstitutional' statutes."[26]  That holding, though a grudging one, correctly resolves the issue of whether section 39.06(c) is "obviously" unconstitutional.  That holding should not be lost or overlooked due to its brevity or obfuscated by preceding or succeeding passages in the majority opinion.

Nor should JUDGE HO's concurring opinion muddy the water.  It directly conflicts with the majority opinion's holding.   The concurring

---

[21] *Ante*, at 12.

[22] *Ante*, at 12-13.

[23] *Ante*, at 8-9 (citing *In re Express-News Corp.*, 695 F.2d 807, 808 (5th Cir. 1982); then citing *The Florida Star v. BJF*, 491 U.S. 524, 538 (1989)).

[24] *Ante*, at 9 (emphasis in original) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam)).

[25] *Ante*, at 10.

[26] *Ante*, at 11.

opinion leads off its discussion of Texas Penal Code § 39.06(c) saying, "no statute may be enforced that violates the Constitution" and "[l]ikewise, no officer of the law may hide behind an obviously unconstitutional statute to justify trampling on a citizen's fundamental liberties."[27] This and the discussion that follows would validate Villareal's insistence that section 39.06(c) is obviously unconstitutional.

None of the impassioned observations about the First Amendment in the majority opinion or JUDGE HO's concurring opinion would be relevant to the case before us if a reasonably competent officer could objectively have concluded there was cause to arrest Villareal for suspected violations of Texas Penal Code § 39.06. This is the core disagreement I have with the majority opinion; that, and the fact that it shreds the independent intermediary doctrine.

The majority opinion also employs blunt force rather than careful analysis. It casts aside *every individual defendant's* qualified immunity in connection with the Fourth and First Amendment claims without regard to the role each was alleged to have played. For example, it concludes that *every* individual defendant violated the Fourth Amendment because there was no probable cause to arrest Villareal. Yet, not every defendant was alleged to have participated in preparing and presenting arrest warrant affidavits. This exemplifies the rush to judgment in this case, heaping condemnation on all.

# I

## A

Villareal obtained then published the name of a person who committed suicide and the identity of his employer, which was, according to

---

[27] *Ante*, at 23.

Villareal's Complaint, the United States Customs and Border Protection agency, while that death was being investigated. On another occasion she obtained and published the name of a family involved in a fatal vehicular accident while the crash was under investigation. The identities of the suicide and vehicular crash victims had not been made public by law enforcement authorities when Villareal posted the information on her Facebook page. The City of Laredo had an established means of providing information to the public and the press, of which Villareal was aware, and the information that Villareal publicized did not come from that source. Villareal instead reached out to an employee of the Laredo Police Department (LPD) who was her back-channel contact.

Villareal's arrest was based on Texas Penal Code § 39.06. That Texas statute provides in pertinent part:

> (c) A person commits an offense if, with intent to obtain a benefit or with intent to harm or defraud another, he solicits or receives from a public servant information that:
>
> (1) the public servant has access to by means of his office or employment; and
>
> (2) has not been made public.
>
> (d) In this section, "information that has not been made public" means any information to which the public does not generally have access, and that is prohibited from disclosure under Chapter 552, Government Code.[28]

Chapter 552 of the Texas Government Code,[29] expressly referenced in section 39.06(d), is known as the Texas Public Information Act and was

---

[28] TEX. PENAL CODE § 39.06(c).

[29] TEX. GOV'T CODE ANN. §§ 552.001-.353 (West 2012).

formerly known as the Open Records Act.[30]  Chapter 552 excludes certain categories of information from public disclosure, including certain information pertaining to the detection, investigation or prosecution of a crime.[31] A Texas court has confirmed that the reference in section 39.06(d) to "any information . . . that is prohibited from disclosure under Chapter 552, Government Code" means "the set of exceptions to disclosure listed in Subchapter C" of the Texas Public Information Act.[32]

The Attorney General of Texas in 1976, John Hill, who later became the Chief Justice of the Supreme Court of Texas, explained more than forty years ago why investigations regarding a death, even if it may appear to be a suicide or caused by a vehicular accident, can come within the exception to public disclosure while an investigation remains open:

---

[30] *See* Act of May 29, 1995, 74th Leg., R.S., ch. 1035, § 29, 1995 Tex. Gen. Laws 5127, 5142 (effective Sept. 1, 1995).

[31] *See* TEX. GOV'T CODE § 552.108, which provides in relevant part:

Sec. 552.108.    EXCEPTION:    CERTAIN    LAW ENFORCEMENT, CORRECTIONS, AND PROSECUTORIAL INFORMATION.  (a)  Information held by a law enforcement agency or prosecutor that deals with the detection, investigation, or prosecution of crime is excepted from the requirements of Section 552.021 if:

(1)  release of the information would interfere with the detection, investigation, or prosecution of crime; [or]

(2)  it is information that deals with the detection, investigation, or prosecution of crime only in relation to an investigation that did not result in conviction or deferred adjudication. . . .

[32] *See Texas v. Ford*, 179 S.W.3d 117, 123 (Tex. App.—San Antonio 2005, no pet.) (holding that "prohibited from disclosure" under § 39.06(d) means "the set of exceptions to disclosure listed in Subchapter C" of the TPIA); TEX. GOV'T CODE § 552.108 (requiring the release of "basic information about an arrested person, an arrest, or a crime" but not other information if it would "interfere with the detection, investigation, or prosecution of crime").

Police investigations of incidents such as this death by other than natural causes are rarely closed completely, and what initially appears to be an accident may later be found to have involved a criminal act. Cases are not always closed by prosecution or a determination that no crime was involved.

The Open Records Act excepts from required public disclosure records of law enforcement agencies "that deal with the detection and investigation of a crime." We do not believe that this exception was intended to be read so narrowly that it only applies to those investigative records which in fact lead to prosecution. We believe that it was also intended to protect other valid interests such as maintaining as confidential the investigative techniques and procedures used in law enforcement and insuring the privacy and safety of witnesses willing to cooperate with law enforcement officers. These interests in non-disclosure remain even though there is no prosecution in a particular case.[33]

Mainstream, legitimate media outlets routinely withhold the identity of accident victims until public officials or family members release that information publicly. Similarly, the identity of those who commit suicide is generally not released by legitimate, mainstream media until a family spokesperson or public officials provide that information. The identities of victims are often withheld by public officials to ensure there is no interference with an ongoing investigation.

The majority opinion asserts that Villareal had already obtained the identities of the victims from a witness at or near each of the scenes of the fatalities before she "confirmed" each of the victims' identities with the LPD employee who was her source. While that assertion may be true, it is beside the point, not to mention misleading, because Villareal has not plausibly

---

[33] Tex. Att'y Gen. ORD-127 at 7 (1976).

alleged that any defendant she sued *knew* that she had obtained the identities of the victims before she approached her back-channel LPD source. Nor has Villareal plausibly alleged that any defendant had a basis to believe or even suspect that the original sources of Villareal's information were witnesses at or near the scenes of the deaths.

Villareal did assert in her Complaint that the defendants knew or should have known that the information she published "was generally accessible by the public,"[34] but those allegations are conclusory and unsupported by any specific facts. Villareal asserts only that her "initial receipt of the information from two non-government individuals demonstrates" that the information "was generally accessible by the public."[35] This is not a plausible construction of what section 39.06(c)(2) means when it refers to "information that . . . has not been made public" or

---

[34] *See, e.g.*, First Amended Complaint ¶ 90 at ROA.171 (alleging that "Ruiz knew or should have known that the information Villarreal published was not subject to a TPIA exception and was generally accessible to the public. But Ruiz failed to mention or discuss these essential elements of the Statute in the Arrest Warrant Affidavits. He also failed to disclose that the information Villarreal received or published was generally accessible to the public and not subject to a TPIA exception. On information and belief, Ruiz's misrepresentations and omissions were deliberate"); First Amended Complaint ¶ 91 at ROA.171 (alleging "[d]espite knowing that the information in the Targeted Publications was publicly accessible information, Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants deliberately did not question or attempt to question Villarreal about the circumstances of her access to the information in Targeted Publications, in furtherance of their efforts to manufacture the Arrest Warrant Affidavits and cause the arrest of Villarreal without probable cause").

[35] *See* First Amended Complaint ¶ 77 at ROA.168 (alleging "[t]here also was no probable cause because the information Villarreal received and published in the Targeted Publications was generally accessible by the public, as Villarreal's initial receipt of the information from two non-government individuals demonstrates. Any reasonable official would have understood the Statute required a showing that the information at issue be that to which public does not generally have access. And any reasonable official would have understood that the information in the Targeted Publications did not meet this element").

of what section 39.06(d) means when it refers to "any information to which the public does not generally have access." Under Villareal's reading of the statute, information would rarely if ever be nonpublic because in virtually every scenario, a person who is not a "public servant" would have some knowledge of the event or incident. The fact that there are witnesses to a crime, for example, does not mean that information the witnesses have or may have related to other individuals is publicly accessible. Information individual witnesses have is not commonly thought of as generally accessible to the public.

Nor is the law well-established that before an arrest can be made, law enforcement officers must question the suspect to ascertain whether information the officers believe has been obtained in violation of a statute such as Texas Penal Code § 39.06 was instead obtained from a source other than a public servant. Villareal has not pointed to any authority for such a proposition.

Villareal's conclusory allegations that one or more defendants knew or should have known that she first acquired the information she published from a source other than a public servant do not raise a material fact question regarding the qualified immunity analysis.

Each of the defendants could have reasonably believed there was probable cause to arrest Villareal. Villareal's First Amendment claim stems from her arrest under section 39.06. If there was no Fourth Amendment violation, the defendants are also entitled to qualified immunity as to Villareal's First Amendment claims. Villareal's First Amendment claim is inextricably intertwined with, tethered to, and inseparable from the facts that gave rise to her Fourth Amendment claim. The Texas statute is not

"obviously" unconstitutional. It does not purport to criminalize "asking questions of public officials."[36]

## B

Perhaps in recognition that its conclusion regarding the obviousness of a First Amendment claim has no legs, the majority opinion proffers what it says is an alternative basis for finding a First Amendment violation, which is that "it is far from clear that the officers can even state a plausible case against Villareal under § 39.06(c) in the first place."[37] The opinion reasons that Villareal did not seek non-public information from her police-department source "with intent to obtain a benefit"[38] and that "no reasonable officer could have found probable cause under § 39.06(c)—separate and apart from whether § 39.06(c) could constitutionally apply to a person motivated by journalism rather than by profits."[39] The majority opinion concludes that Villarreal acted out of a desire to be a "good journalist," not out of a "purely" economic calculation.[40]

The statute's text does not require *pure* economic motivation, only solicitation or receipt "with intent to obtain a benefit."[41] The Texas Penal Code defines "[b]enefit" as "anything reasonably regarded as economic gain or advantage, including benefit to any other person in whose welfare the beneficiary is interested."[42] As discussed above, section 39.06(c) and (d) do

---

[36] *Ante*, at 8.

[37] *Ante*, at 11.

[38] *Ante*, at 11.

[39] *Ante*, at 12.

[40] *Ante*, at 11.

[41] *See* Tex. Penal Code § 39.06(d).

[42] *Id.* § 1.07(a)(7).

No. 20-40359

not exclude journalists, and as a general proposition, journalists are engaged in an economic enterprise when they gather information that they intend or hope to publish or disseminate.

JUDGE HO's concurring opinion concludes that, because of the doctrine of constitutional avoidance, section 39.06(c) must be construed to exclude journalists or else it would be unconstitutional. It is asking a lot of law enforcement officers to know about and then apply the doctrine of constitutional avoidance.

It is also far from clear that journalists must be categorically excluded from the reach of section 39.06(c) or else that statute is unconstitutional. Suppose that a national media outlet authorizes one of its journalists to pay a police officer to obtain a copy of a nonpublic witness statement in a high-profile criminal case. The media company then publishes that statement, in the hopes that its scoop will boost ratings and therefore advertising revenue. The witness is murdered shortly after her statement is publicized. It is at least debatable whether applying section 39.06(c) to such facts would violate the First Amendment.

A reasonably well-trained law enforcement officer could have concluded that Villareal sought non-public information from her LPD source "with intent to obtain a benefit." Moreover, Villareal's brand of journalism and economic benefit are two sides of the same coin: through "scooping" traditional news sources and sensationalizing tragedies such as a suicide and a fatal vehicular crash, the popularity of Villarreal's Facebook page might (or arguably would likely) increase and, in turn, the likelihood of fees, donations, and free meals would increase. Even though Villarreal "does not generate regular revenue" from her Facebook page,[43] it would have been reasonable

---

[43] ROA.159.

for a law enforcement officer to think that she intended to gain at least some economic benefit by solicitating and receiving non-public information. As noted above, Villarreal admitted in her Complaint that she "sometimes enjoys a free meal from appreciative readers, and occasionally receives fees for promoting a local business" and that she has "used her Facebook page to ask for donations for new equipment necessary to continue her citizen journalism efforts."[44]

The majority opinion maintains that Villareal sought only "'corroborating information' to confirm what she had already received from other sources."[45] But as already discussed, Villareal did not plausibly allege that any defendant knew she had obtained the information from another source before or even after she made inquiry of the LPD officer.

No court had construed the meaning of "with intent to obtain a benefit" as used in Texas Penal Code § 39.06 when Villareal was arrested. There was no clearly established law that there was no probable cause for arresting Villareal, and there was no clearly established law that in arresting Villareal based on section 39.06, the defendants were violating her First Amendment rights.

## II

The majority opinion denies the defendants qualified immunity on the First and Fourth Amendment claims in spite of the fact that a neutral magistrate issued the warrants for Villareal's arrest. "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly

---

[44] ROA.159.

[45] *Ante*, at 11.

unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken.'"[46]  The Supreme Court has explained that under the independent intermediary doctrine, when an officer seizes someone pursuant to a warrant, "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'"[47]

The independent intermediary doctrine applies to First and Fourth Amendment violations.[48]  Though issuance of a warrant by a magistrate "does not end the inquiry into objective reasonableness" of an officer's actions, there can be liability "when 'it is obvious that no reasonably competent officer would have concluded that a warrant should issue.'"[49] The "threshold for establishing this exception is a high one, and it should be."[50]  That is because "'[i]t is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination, and it goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable.'"[51]

---

[46] *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal citation omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982)).

[47] *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *United States v. Leon*, 468 U.S. 897, 922-23 (1984)).

[48] *Buehler v. City of Austin/Austin Police Dep't*, 824 F.3d 548, 553-54 (5th Cir. 2016).

[49] *Messerschmidt*, 565 U.S. at 547 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[50] *Id.*

[51] *Id.* 547-48 (quoting *Malley*, 475 U.S. at 346 n.9).

Whether the facts set forth in the affidavits supporting the request for warrants for Villareal's arrest under Texas Penal Code § 39.06(c) gave rise to probable cause was within the range of professional competence of a magistrate. The defendants were entitled to qualified immunity.

In brushing aside the intermediary doctrine, the majority opinion builds on its mischaracterization of Villareal's claims. The opinion musters its talismanic recitation that "a reasonably well-trained officer would have understood that arresting a journalist for merely asking a question clearly violates the First Amendment."[52] The opinion then extends this rationale to justify its finding of a Fourth Amendment violation.[53] The opinion's ultimate conclusion is that "[j]ust as the First Amendment violation alleged in the Complaint was obvious for purposes of qualified immunity, so too the Fourth Amendment violation alleged here."[54] But it cannot be overemphasized: *Villareal did not plausibly allege that she was arrested for "merely asking a question"* and the majority opinion has not identified any basis for concluding that Villareal has stated a claim that she was arrested for simply asking a question.

The majority opinion dashes off a statement that officers may not find probable cause using "an unjustifiable standard, such as speech protected by the First Amendment."[55] But Villareal's arrest was not based on protected speech. It was based on allegations that she solicited and received nonpublic information from a government official with the intent to obtain a benefit in

---

[52] *Ante*, at 16.

[53] *Ante*, at 16.

[54] *Ante*, at 16.

[55] *Ante*, at 15 (internal quotation marks omitted) (quoting *Mink v. Knox*, 613 F.3d 995, 1003-04 (10th Cir. 2010)).

violation of a statute that the majority opinion correctly recognizes is *not* "obviously unconstitutional."[56]

To resolve the independent intermediary doctrine issue in Villareal's favor, it must be "obvious that no reasonably competent officer would have concluded that a warrant should issue."[57] The discussions above regarding the elements of Texas Penal Code § 39.06(c) and (d), and probable cause to arrest Villareal under that statute apply equally to the inquiry of whether the intermediary doctrine applies. The standard for liability has not been met here.

This is not a case in which the defendants tainted the intermediary's decision-making process, such as "maliciously withh[olding] relevant information or otherwise misdirect[ing] the intermediary,"[58] and the majority opinion does not conclude otherwise. Villarreal's Complaint did assert that Ruiz failed to disclose in the arrest affidavits that the information Villareal received or published was accessible to the public and was not subject to an exception under the Texas Public Information Act.[59] But she failed to raise this issue on appeal[60] and has therefore forfeited any potential taint exception argument.[61]

---

[56] *See* Tex. Penal Code §§ 39.06(c)-(d); *ante*, at 11.

[57] *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[58] *Shaw v. Villanueva*, 918 F.3d 414, 417 (5th Cir. 2019).

[59] *See* First Amended Complaint ¶ 90 at ROA.171.

[60] *See* Villarreal Br. at 42-44.

[61] *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 & n.1 (5th Cir. 2021).

### III

As for the selective enforcement claim, Villareal has not made the "prerequisite" showing "that similarly situated individuals were treated differently."[62] Villareal has not alleged that one person, ever, solicited and received nonpublic information in a facial violation of § 39.06(c).[63] Instead, her Complaint refers vaguely to "those who had asked for or received information from local law enforcement officials, and . . . persons who published truthful and publicly-accessible information on a newsworthy matter," such as "local professional newspaper journalists, local professional broadcast journalists, and citizens who published on matters of local public concern."[64]

The majority opinion concludes that because "we must draw all reasonable inferences in favor of Villareal," we should "have no difficulty observing that journalists commonly ask for nonpublic information from public officials," even though "Villareal did not name a specific journalist who solicited or received nonpublic information from the LPD in her Complaint."[65] The majority opinion's approach, which allows courts to speculate and draw inferences when no facts are alleged, departs from our law in this area. Under our precedent, to allege selective enforcement adequately, plaintiffs must identify "an example" of a similarly situated

---

[62] *Bryan v. City of Madison*, 213 F.3d 267, 276 (5th Cir. 2000).

[63] *See ante*, at 17 (conceding this point); ROA.187.

[64] ROA.187.

[65] *Ante*, at 18.

comparator who was nonetheless treated differently.[66]  Villareal's failure to do so dooms her selective enforcement claim.

## IV

Finally, Villareal cannot maintain a § 1983 conspiracy claim.  Such claims require an underlying constitutional violation and are "not actionable" against officials entitled to qualified immunity.[67]  Accordingly, Villareal's civil conspiracy claim fails in tandem with her First, Fourth, and Fourteenth Amendment claims.

## V

Villareal sued eight individuals by name and two other individuals as John Does.  Her Complaint identifies only "Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants" as being involved in the decision to arrest Villareal and preparing the affidavits supporting the arrest warrants.  There are no colorable allegations against the other defendants, yet the majority opinion holds that none of the defendants have qualified immunity.

It also unclear from the majority opinion precisely what actions the defendants took that violated Villareal's Fourth or First Amendment rights and which of the ten individual defendants may be liable for each of those violations.  Is "threaten[ing] to take Villreal's cell phone when she was

---

[66] *Bryan*, 213 F.3d at 276-77; *see Rountree v. Dyson*, 892 F.3d 681, 685 (5th Cir. 2018) (holding that a plaintiff "did not sufficiently allege that he ha[d] been treated differently from others similarly situated" when "[h]is complaint generally allege[d] that other similarly situated individuals were treated differently, but he point[ed] to no specific person or persons and provide[d] no specifics as to their violations"); *Lindquist v. City of Pasadena*, 669 F.3d 225, 234 (5th Cir. 2012) ("The Lindquists have not satisfied their burden of *pointing to* similarly situated comparators" (emphasis added)).

[67] *Hale v. Townley*, 45 F.3d 914, 921 (5th Cir. 1995); *see Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019).

recording a crime scene from behind a barricade—while saying nothing to the other members of the media standing next to her"[68] a violation for which one or more defendants may be liable? If so, which defendants?

JUDGE HO's concurring opinion says, "They took pictures of her [Villareal] in handcuffs with their cell phones. And they mocked and laughed at her while they did it."[69] The majority opinion also refers to these allegations in Villareal's Complaint.[70] Does the alleged conduct constitute inappropriate, unprofessional, shameful, disgraceful, dishonorable conduct? Yes, absolutely. Does it amount to a constitutional violation? The majority opinion does not say.

An equally important question is, who is "they"? Villareal's Complaint identifies only "Martinez, Montemayor and Guerrero" as having been present when she was photographed in handcuffs and mocked. Are all of the defendants nevertheless potentially liable?

The majority opinion paints with a broad brush, as does JUDGE HO's concurring opinion. They make no effort to consider the particular allegations as to each individual defendant. All are denied qualified immunity. At the very least, there are no plausible allegations of constitutional violations by Martinez, Montemayor and Guerrero. They are entitled to qualified immunity. Each of the other defendants is entitled to know what they must defend against in the district court.

\*         \*         \*

I would affirm the district court's dismissal of all of Villareal's claims.

---

[68] *Ante*, at 3.

[69] *Ante*, at 22.

[70] *Ante*, at 4.