NO. 20-40359
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

PRISCILLA VILLARREAL,

*Plaintiff-Appellant,*

v.

THE CITY OF LAREDO, TEXAS; WEBB COUNTY, TEXAS; ISIDRO
R. ALANIZ; MARISELA JACAMAN; CLAUDIO TREVINO, JR.; JUAN
L. RUIZ; DEYANRIA VILLARREAL; ENEDINA MARTINEZ;
ALFREDO GUERRERO; LAURA MONTEMAYOR; DOES 1-2,

*Defendants-Appellees.*

## APPELLANT'S SUPPLEMENTAL EN BANC BRIEF

On Appeal from the United States District Court for the Southern
District of Texas, Laredo Division, Civil Action No. 5:19-CV-48
Hon. John A. Kazen Presiding

JT Morris
   *Counsel of Record*
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Ave. S.E., Ste. 340
Washington, D.C. 20003
Tel:  (215) 717-3473
jt.morris@thefire.org

Darpana Sheth
Conor T. Fitzpatrick
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
510 Walnut Street, Ste. 1250
Philadelphia, PA 19106
Tel:  (215) 717-3473
darpana.sheth@thefire.org
conor.fitzpatrick@thefire.org

*Attorneys for Plaintiff-Appellant Priscilla Villarreal*

## CERTIFICATE OF INTERESTED PARTIES

The cause number and style of the case is No. 20-40359, *Priscilla Villarreal v. City of Laredo, Texas, et al.* (USDC Civil No. 5:19-CV-48, Southern District of Texas).

The undersigned counsel of record certifies that the following additional listed persons and entities described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiff-Appellant**

Priscilla Villarreal

**Attorneys for Plaintiff-Appellant Priscilla Villarreal**

JT Morris
Darpana Sheth
Conor T. Fitzpatrick
Foundation for Individual Rights and Expression (FIRE)

**Past Attorneys for Plaintiff-Appellant**

Jose Salvador Tellez II
Tellez Law, PLLC

Ramzi Khazen

**Defendants-Appellees**

1. The City of Laredo, Texas;

2. Webb County, Texas;

3. Isidro R. Alaniz;

4. Marisela Jacaman;

5. Claudio Trevino, Jr.;

6. Juan L. Ruiz;

7. Deyanria Villarreal;

8. Enedina Martinez;

9. Alfredo Guerrero;

10. Laura Montemayor; and

11. Does 1-2, each alleged to be or to have been an elected or appointed official, employee, servant, or agent of the City of Laredo, Texas or Webb County, Texas.

**Attorneys for Defendants-Appellees Webb County, Texas; Isidro R. Alaniz; and Marisela Jacaman**

J. Eric Magee
Allison, Bass & Magee, LLP

Philip Barr Arnold (past attorney)
Bickerstaff Heath Delgado Acosta LLP

**Attorneys for Defendants-Appellees The City of Laredo, Texas; Claudio Trevino, Jr.; Juan L. Ruiz; Deyanria Villarreal; Enedina Martinez; Alfredo Guerrero; Laura Montemayor; and Does 1-2**

William M. McKamie
Alicia K. Kreh
Taylor Olson Adkins Sralla & Elam LLP

**Intervenor**

The State of Texas

**Attorneys for Intervenor The State of Texas**

Lanora C. Pettit
Kathryn Cherry
Office of the Solicitor General
Office of the Attorney General of Texas

***Amici Curiae***

1. Institute for Justice
   <u>Attorneys</u>:
   Jaba Tsitsuashvili
   Anya Bidwell
   Caroline Grace Brothers
   Patrick Jaicomo
   Arif Panju

2. The Texas Press Association, Texas Association of Broadcasters, Freedom of Information Foundation of Texas, Brechner Center for Freedom of Information, News Leaders Association, and Society of Professional Journalists
   <u>Attorneys</u>:
   Laura Lee Prather
   Catherine L. Robb
   Haynes and Boone, LLP

The undersigned also certifies under Fed. R. App. P. 26.1(a) that Foundation for Individual Rights and Expression (FIRE) is not a publicly held corporation and does not have any parent corporation, and that no publicly held corporation owns 10 percent or more of any stock.

Respectfully,

/s/ JT Morris
JT Morris
Counsel of record for Plaintiff-Appellant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... viii

INTRODUCTION ..................................................................... 1

STATEMENT OF JURISDICTION ........................................... 2

ISSUES PRESENTED ................................................................. 2

STATEMENT OF THE CASE .................................................... 3

    Villarreal is Laredo's "most influential journalist." ........................ 3

    Local officials start to target Villarreal. ..................................... 4

    Defendants orchestrate Villarreal's arrest. .................................. 6

    Villarreal wins her habeas petition. .......................................... 8

    Villarreal sues, and a panel majority vindicates her rights. .......... 9

STANDARD OF REVIEW ....................................................... 13

SUMMARY OF THE ARGUMENT ......................................... 13

ARGUMENT .......................................................................... 17

I.    The First Amendment Protects Routine Newsgathering and
        Reporting, Including Asking Officials Questions. ................ 17

II.    Defendants Are Not Entitled to Qualified Immunity for
        Deliberately Criminalizing Routine Journalism. ................. 21

        A.    Qualified immunity does not shield officials who
            disregard "fair warning" of a constitutional
            violation. ...................................................................... 21

        B.    Having fair warning of a First Amendment
            violation, no reasonable official would have
            arrested Villarreal. ...................................................... 26

C.   No reasonable official would have enforced Texas Penal Code § 39.06(c) against Villarreal. .................... 30

    1.   Qualified immunity does not shield officials who enforce state statutes in obviously unconstitutional ways. ........................................ 31

    2.   No reasonable official could have believed the Texas statute justified Villarreal's arrest. .................................................................... 35

D.   Because no reasonable official would have sought a warrant, the independent intermediary doctrine does not save Defendants. ............................................. 40

E.   The calculated nature of Defendants' actions cements why qualified immunity is unavailable. ....... 42

III.   The Court Should Adopt an Objective Standard for the Chilling Element of a First Amendment Retaliation Claim. ............................................................................. 46

IV.   The Court Should Reinstate Villarreal's Selective Enforcement Claim. ............................................... 50

V.   The Court Should Also Reinstate Villarreal's Civil Conspiracy Claim. .................................................. 54

VI.   Reversal Will Uphold Vital Civic Participation and News Reporting Without Fear of Arrest. ........................................ 55

CONCLUSION ........................................................................ 57

CERTIFICATE OF SERVICE ................................................ 58

CERTIFICATE OF COMPLIANCE ........................................ 59

ADDENDUM ..................................................................... ADD-1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anderson v. Creighton,*
   483 U.S. 635 (1987) ........................................................... 22, 31, 32

*Ashcroft v. al-Kidd,*
   563 U.S. 731 (2011) ........................................................... 23

*Ballentine v. Tucker,*
   28 F.4th 54 (9th Cir. 2022) ................................................ 24, 34

*Bartnicki v. Vopper,*
   532 U.S. 514 (2001) ........................................................... 29, 38

*Barton v. Clancy,*
   632 F.3d 9 (1st Cir. 2011) .................................................. 49

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................... 13

*Bennett v. Hendrix,*
   423 F.3d 1247 (11th Cir. 2005) ......................................... 48

*Branzburg v. Hayes,*
   408 U.S. 665 (1972) ........................................................... 13, 18, 29

*Bryan v. City of Madison,*
   213 F.3d 267 (5th Cir. 2000) ............................................. 50, 51

*Buffkins v. City of Omaha,*
   922 F.2d 465 (8th Cir. 1990) ............................................. 27

*Carrasca v. Pomeroy,*
   313 F.3d 828 (3d Cir. 2002) ............................................... 53

*Causey v. Sewell Cadillac-Chevrolet, Inc.,*
   394 F.3d 285 (5th Cir. 2004) ............................................. 13

*Chaplinsky v. New Hampshire*,
    315 U.S. 568 (1942) ........................................................ 27

*City of Tahlequah v. Bond*,
    142 S. Ct. 9 (2021) .......................................................... 44

*Constantine v. Rectors & Visitors of George Mason. Univ.*,
    411 F.3d 474 (4th Cir. 2005) .................................... 48, 49

*Cox Broad. Corp. v. Cohn*,
    420 U.S. 469 (1975) ........................................................ 37

*Davidson v. City of Stafford*,
    848 F.3d 384 (5th Cir. 2017) ........................................ 22

*Dickson v. Lilith Fund for Reprod. Equity*,
    647 S.W.3d 410 (Tex. App. 2021) .................................. 15

*Dorsett v. Cnty. of Nassau*,
    732 F.3d 157 (2d Cir. 2013) ........................................... 48

*Garrison v. Louisiana*,
    379 U.S. 64 (1964) .......................................................... 19

*Gonzalez v. Trevino*,
    42 F.4th 487 (5th Cir. 2022) .......................................... 43

*Hoggard v. Rhodes*,
    141 S. Ct. 2421 (2021) .............................................. 43, 45

*Holzemer v. City of Memphis*,
    621 F.3d 512 (6th Cir. 2010) ......................................... 48

*Hope v. Pelzer*,
    536 U.S. 730 (2002) ......................................... 22, 23, 32

*Houchins v. KQED, Inc.*,
    438 U.S. 1 (1978) ........................................................... 18

*In re Express-News Corp.*,
    695 F.2d 807 (5th Cir. 1982) ......................................... 27

*Innovative Database Sys. v. Morales,*
    990 F.2d 217 (5th Cir. 1993) .......................................................... 37

*Int'l News Serv. v. Associated Press,*
    248 U.S. 215 (1918) ..................................................................... 36

*Intervarsity Christian Fellowship/USA v. Univ. of Iowa,*
    5 F.4th 855 (8th Cir. 2021) ..................................................... 44, 45

*Keenan v. Tejeda,*
    290 F.3d 252 (5th Cir. 2002) ............................................. 46, 47, 48

*Kinney v. Weaver,*
    367 F.3d 337 (5th Cir. 2004) .......................................................... 22

*Lacey v. Maricopa Cnty.,*
    693 F.3d 896 (9th Cir. 2012) .......................................................... 46

*Lawrence v. Reed,*
    406 F.3d 1124 (10th Cir. 2005) ................................................. 32, 33

*Leonard v. Robinson,*
    477 F.3d 347 (6th Cir. 2007) ................................................... 25, 33

*Lindquist v. City of Pasadena, Tex.,*
    669 F.3d 225 (5th Cir. 2012) ................................................... 52, 53

*Malley v. Briggs,*
    475 U.S. 335 (1986) ............................................................... 40, 42

*McCoy v. Alamu,*
    141 S. Ct. 1364 (2021) ................................................................... 23

*McLin v. Ard,*
    866 F.3d 682 (5th Cir. 2017) .......................................................... 25

*Meadours v. Ermel,*
    483 F.3d 417 (5th Cir. 2007) .......................................................... 30

*Mendocino Env't. Ctr. v. Mednocino Cnty.,*
    192 F.3d 1283 (9th Cir. 1999) ................................................. 49, 50

*Messerschmidt v. Millender*,
    565 U.S. 535 (2012). ........................................................ 40

*Michigan v. DeFillippo*,
    443 U.S. 31 (1979) .......................................................... 32

*Mink v. Knox*,
    613 F.3d 995 (10th Cir. 2010) ...................................... 25, 33, 34, 41

*Mirabella v. Villard*,
    853 F.3d 641 (3d Cir. 2017) ........................................... 48

*Monroe v. Pape*,
    365 U.S. 167 (1961) ........................................................ 31

*Mullenix v. Luna*,
    577 U.S. 7 (2015) ........................................................... 42

*Myers v. Anderson*,
    238 U.S. 368 (1915) ........................................................ 31

*New York Times Co. v. United States*,
    403 U.S. 713 (1971) ................................................ 20, 38, 39

*Nieves v. Bartlett*,
    139 S. Ct. 1715 (2019) ........................................... 46, 50, 56

*Pfannstiel v. City of Marion*,
    918 F.2d 1178 (5th Cir. 1990) ........................................ 55

*Pollack v. Reg'l. Sch. Unit 75*,
    12 F. Supp. 3d 173 (D. Maine. 2014) ............................ 49

*Rhodes v. Robinson*,
    408 F.3d 559 (9th Cir. 2005); ....................................... 48

*Rivas-Villegas v. Cortesluna*,
    142 S. Ct. 4 (2021) ........................................................ 44

*Rountree v. Dyson*,
    892 F.3d 681 (5th Cir. 2018) ......................................... 52

*Sandul v. Larion,*
119 F.3d 1250 (6th Cir. 1997) .............................................. 25, 27, 33

*Sause v. Bauer,*
138 S. Ct. 2561 (2018) .................................................... 24

*Saved Magazine,*
19 F.4th 1193 (9th Cir. 2021) ........................................ 29

*Scheffler v. Molin,*
743 F.3d 619 (8th Cir. 2014); ....................................... 48

*Shero v. City of Grove,*
510 F.3d 1196 (10th Cir. 2007); ................................... 48

*Smith v. Daily Mail Publ'g. Co.,*
443 U.S. 97 (1979) ................................................... *passim*

*Snider v. City of Cape Girardeau,*
752 F.3d 1149 (8th Cir. 2014) ................................... 41, 42

*Surita v. Hyde,*
665 F.3d 860 (7th Cir. 2011) ........................................ 48

*Taylor v. Riojas,*
141 S. Ct. 52 (2020) ................................................. 23

*The Florida Star v. B.J.F,*
491 U.S. 524, 538 (1989) ....................................... *passim*

*Thompson v. Ragland,*
23 F.4th 1252 (10th Cir. 2022) ................................ 24, 25

*Thurairajah v. City of Ft. Smith,*
925 F.3d 979 (8th Cir. 2019) ........................................ 46

*Toolaprashad v. Bureau of Prisons,*
286 F.3d 576 (D.C. Cir. 2002) ..................................... 48

*Turner v. Driver,*
848 F.3d 678 (5th Cir. 2017) ......................... 13, 18, 19, 29

*Tyson v. Sabine,*
    42 F.4th 508 (5th Cir. 2022) ........................................................ 23

*United States v. Lanier,*
    520 U.S. 259 (1997) ...................................................................... 22

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976) ...................................................................... 37

*Vill. of Willowbrook v. Olech,*
    528 U.S. 562 (2000) ................................................................ 50, 51

*Villarreal v. City of Laredo,*
    17 F.4th 532 (5th Cir. 2021) ........................................................ 10

*Villarreal v. City of Laredo,*
    44 F.4th 363 (5th Cir. 2022) ................................................. *passim*

*Villarreal v. City of Laredo,*
    52 F.4th 265 (5th Cir. 2022) ........................................................ 11

*Wayte v. United States,*
    470 U.S. 598 (1985) ...................................................................... 33

*Wearry v. Foster,*
    52 F.4th 258 (5th Cir. 2022) ........................................................ 43

*Whren v. United States,*
    517 U.S. 806 (1996) ...................................................................... 53

**Constitutional Provisions:**

U.S. Const. amend. I. ................................................................ *passim*

**Statutes:**

28 U.S.C. § 1291 ............................................................................ 2

28 U.S.C. § 1331 ............................................................................ 2

28 U.S.C. § 1343 ............................................................................ 2

42 U.S.C. § 1983 .................................................................... *passim*

Mass. Gen. Laws ch. 264, § 9. .................................................................. 34

MCL 750.103 .......................................................................................... 34

MCL 750.441 .......................................................................................... 34

Tex. Gov. Code § 552.007 ...................................................................... 39

Tex. Gov. Code § 552.010 ...................................................................... 39

Tex. Gov. Code § 552.352 ...................................................................... 39

Tex. Penal Code § 1.07(a)(7) .................................................................... 6

Tex. Penal Code § 39.06(c). ........................................................... *passim*

Tex. Penal Code § 39.06(d) ....................................................................... 6

## Other Authorities:

4 Annals of Cong. 934 (1794) ................................................................. 20

F. Andrew Hessick & Katherine C. Richardson, *Qualified Immunity Laid Bare*, 56 Wake Forest L. Rev. 501, 529 (2021) ............................... 43

L. Gordon Crovitz, *You Commit Three Felonies a Day*, Wall Street Journal, Sep. 27, 2009) .................................................................... 56

Simon Romero, *La Gordiloca: The Swearing Muckraker Upending Border Journalism*, The New York Times  (Mar. 10, 2019) ..................... 3

*The Tryal of John Peter Zenger* (1738) .................................................. 56

**INTRODUCTION**

For ages, free speech fell victim to tyranny. Too often, the powerful jailed—or worse—speakers whose words and ideas challenged the status quo. But the First Amendment turned the tables, promising Americans that they can seek the truth, inform the public, and even criticize the powerful without having to fear the government's heavy hand.

By arresting Priscilla Villarreal, Defendants spurned that promise. Fearing her growing popularity as a citizen journalist and government critic, Defendants orchestrated Villarreal's arrest. They even dug up an obscure Texas felony law for the arrest. And Villarreal's offense? Exercising her First Amendment rights to ask a police officer for information and publishing what the officer volunteered.

Section 1983 provides a remedy for constitutional violations made "under the color of any statute . . . of any State." There is no more fitting example of Section 1983's necessity than officials weaponizing a state felony statute against the First Amendment. As the panel majority rightly held, Villarreal's arrest was an obvious constitutional violation for which there is no qualified immunity. The Court should hold the same and preserve the promises of the First Amendment and Section 1983.

## STATEMENT OF JURISDICTION

The district court had federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1291 because Villarreal appeals the district court's order and final judgment dismissing her claims. ROA.423–482. Villarreal filed her notice of appeal within 30 days of the district court's final judgment. ROA.483.

## ISSUES PRESENTED

1. The First Amendment protects using routine reporting techniques, like asking law enforcement for information, to gather and publish the news. Defendants arrested Villarreal even though their only basis for probable cause was that Villarreal asked for and learned facts from a police officer as part of her regular reporting on local news. Did this arrest violate the First and Fourth Amendments and leave Defendants without qualified immunity?

2. Unlike other circuits, this Court requires a First Amendment retaliation plaintiff to show she curtailed her speech. Although Villarreal's arrest would chill any person of ordinary firmness, she did not stop reporting the news after her arrest. Should the Court follow

other circuits in adopting a purely objective chilling test for retaliation claims?

3. The Equal Protection Clause bars selectively enforcing laws because of hostility toward a person's exercise of constitutional rights. Villarreal alleged that because Defendants disliked her reporting, they arrested her under a neglected statute never enforced against others who also asked police for information as part of routine news reporting. Did she establish a selective enforcement claim?

## STATEMENT OF THE CASE

**Villarreal is Laredo's "most influential journalist."**

Villarreal, also known as "Lagordiloca," has been a citizen journalist around Laredo, Texas since 2015. ROA.158–59 [¶¶ 24, 31]. She publishes a wealth of information and colorful commentary on Facebook about local news, including video and livestreams of local crime and traffic scenes. ROA.158–59.

"[Villarreal] is arguably the most influential journalist in Laredo,"[1]

---

[1] Simon Romero, *La Gordiloca: The Swearing Muckraker Upending Border Journalism*, The New York Times (Mar. 10, 2019), https://www.nytimes.com/2019/03/10/us/gordiloca-laredo-priscilla-villarreal.html [https://perma.cc/CY2X-YHZ6].

with over 120,000 users following her "Lagordiloca" Facebook page.
ROA.160. [¶ 37]. Because of her unfiltered style, Villarreal has her share
of critics. Her reporting often captures Laredo Police Department (LPD)
officers in controversial situations. ROA.161. And while Villarreal has
sometimes praised LPD, she has not shied from criticizing it or other local
officials. ROA.161–62 [¶¶ 47–50]. For example, Villarreal reported about
animal abuse at a local property, which she soon learned belonged to a
close relative of Defendant Marisela Jacaman, the Chief Assistant
District Attorney (ADA) in Webb County. ROA.161–62. When Villarreal
discovered district attorney Defendant Isidro Alaniz's office recalled an
arrest warrant for Jacaman's relative, she openly criticized him for it.
ROA.162 [¶ 50].

**Local officials start to target Villarreal.**

District Attorney Alaniz noticed Villarreal's criticism. In fact, he
took Villarreal behind closed doors to chastise her. ROA.163 [¶ 54].
Villarreal also started facing regular harassment from LPD. ROA.162–
63. As one stark example, LPD Officer Laura Montemayor threatened to
seize Villarreal's camera while she was filming a public crime scene along
with other reporters. ROA.163 [¶ 54]. Yet Montemayor did not threaten

any of the other reporters at the scene. *Id.*

Although Laredo's police chief, Defendant Claudio Treviño, knew of this harassment, he encouraged it. ROA.165 [¶ 61], ROA.174–75 [¶ 110]. So did other local officials. ROA.165 [¶ 62], ROA.196 [¶ 222]. One thing became clear: These public officials wanted to stifle Villarreal's reporting. *E.g.*, ROA.163–64 [¶¶ 55–59].

So in 2017, Treviño, Alaniz, and Jacaman, along with Defendants Juan Ruiz and Deyanria Villarreal (DV) and two Doe Defendants (collectively, Defendants) set out to arrest Villarreal in retaliation for her critical reporting, hoping to force her into self-censorship. ROA.165–67 [¶¶ 64–66, 69–70], ROA.173 [¶¶ 101–02]. They focused on two Facebook posts Villarreal made in spring 2017. ROA.165–66 [¶¶ 64–66]. In one post, Villarreal reported the name and occupation of a border agent who committed suicide jumping off a Laredo overpass. ROA.166 [¶ 65]. And in the other, she published information about a family involved in a fatal traffic accident. ROA.166 [¶ 66].

Both times, Villarreal got leads on the information from private citizens. ROA.166. And like any good journalist, she wanted to verify her facts before publishing. So both times, Villarreal contacted LPD officer

Barbara Goodman, who confirmed the information Villarreal eventually published. ROA.166 [¶¶ 65–66], ROA.170 [¶ 89]. Like other local reporters, Villarreal routinely asked LPD officers for information and reported what the officers provided. ROA.166 [¶ 67], ROA.174 [¶ 106], ROA.187 [¶¶ 177–78].

**Defendants orchestrate Villarreal's arrest.**

District Attorney Alaniz, his chief assistant Jacaman, and the Laredo police officers hunted for a criminal statute into which they could squeeze Villarreal's routine newsgathering and reporting. ROA.167, ROA.174 [¶ 109], ROA.175 [¶ 113]. And they found one—Texas Penal Code § 39.06(c). ROA.167. That law makes it a felony if, "with intent to obtain a benefit," a person "solicits or receives from a public servant information that . . . has not been made public." Tex. Penal Code § 39.06(c). In turn, "information that has not been made public" means "information to which the public does not generally have access, and that is prohibited from disclosure" under the Texas Public Information Act (TPIA). *Id.* § 39.06(d). The Texas Penal Code also defines "benefit" as "anything reasonably regarded as economic gain or advantage . . . ." Tex. Penal Code § 1.07(a)(7).

Relying on Section 39.06(c) was more than a stretch. No local official had enforced the statute in its 23 years of existence—let alone against other local journalists they knew regularly asked for and received information from LPD officers. ROA.174 [¶ 106], ROA.181–82 [¶ 141], ROA.187 [¶¶ 177–78]. Yet Defendants opted to enforce the statute against Villarreal for doing those same things. ROA.174 [¶¶ 106–07].

Months after Villarreal published the two Facebook posts, Defendants manufactured arrest warrants against her under Section 39.06(c). ROA.169–71; ROA.174–76. All the Defendants played a part. Chief ADA Jacaman approved investigatory subpoenas targeting Villarreal's reporting, with District Attorney Alaniz's knowing endorsement. ROA.176 [¶ 114]. And LPD Officer Juan Ruiz assembled two arrest warrant affidavits with help, direction, and approval from LPD Chief Treviño, Alaniz, and Jacaman, who wanted to silence Villarreal's candid reporting about their offices. ROA.170 [¶¶ 86, 88], ROA.174–75 [¶¶ 109–10], ROA.176 [¶ 115].

Officer Ruiz claimed an unnamed source told LPD Officer DV that Officer Goodman was communicating with Villarreal. ROA.170 [¶ 88]. He asserted that Villarreal asked for or received information from Goodman

about the incidents reported in Villarreal's Facebook posts and that this information "had not been made public." ROA.170 [¶ 89]. But Ruiz listed no TPIA exception that applied, even though Section 39.06 defined "not been made public" as information "prohibited" from TPIA disclosure. ROA.170–71 [¶ 90]. Nor did Officer Ruiz specify any economic benefit Villarreal intended to obtain from asking for or receiving the information, despite the statute's requirement. ROA.171–72 [¶¶ 92, 94]. Rather, he claimed only that Villarreal's release of the information before other news outlets "gained her popularity in Facebook." *Id.* [¶ 92].

After Chief ADA Jacaman approved Officer Ruiz's warrant affidavits (with District Attorney Alaniz's encouragement), a magistrate issued two arrest warrants against Villarreal. ROA.172, ROA.176 [¶ 114]. Villarreal soon turned herself in. ROA.172. When she arrived at booking, LPD officers mocked her, laughed at her, and took cell phone pictures of Villarreal in handcuffs. *Id.* [¶ 97].

**Villarreal wins her habeas petition.**

After posting bond, Villarreal filed for a writ of habeas corpus, arguing that Section 39.06(c) was facially invalid. ROA.178 [¶ 124]. A Webb County, Texas district court judge made a bench ruling granting

the writ, finding the statute unconstitutionally vague. ROA.179 [¶ 127].

**Villarreal sues, and a panel majority vindicates her rights.**

In 2019, Villarreal sued the City of Laredo, Webb County, and the officials responsible for her arrest and harassment under 42 U.S.C. § 1983 for violating her First, Fourth, and Fourteenth Amendment rights. Defendants then moved for Rule 12(b)(6) dismissal, asserting qualified immunity. ROA.219–24, ROA.237–42. Alaniz and Jacaman also asserted absolute prosecutorial immunity. ROA.216–19.

The district court granted the motions to dismiss and entered final judgment. ROA.423–82. Although the district court denied Alaniz and Jacaman absolute immunity, it granted both them and the LPD Defendants qualified immunity. ROA.430–56. But instead of first addressing the contours of Villarreal's constitutional rights, the district court looked to the elements of Section 39.06(c) and found "that a reasonable officer could have found probable cause to arrest Plaintiff for violating" the statute. ROA.435–44. The district court then found "that § 39.06(c) was not so patently or obviously unconstitutional that no reasonable law enforcement officer could have believed that their

9

enforcement of the statute against the Plaintiff was constitutional." ROA.446.

The district court suggested that Villarreal's First Amendment rights were not clearly established because "39.06(c) punishes the obtaining of information from a governmental entity which has *not* been released to the public." ROA.445. Yet it did not address Villarreal's First Amendment rights to ask government officials questions and rely on routine reporting techniques to gather and publish the news. *See* ROA.443–46. The district court also dismissed Villarreal's selective enforcement claim, holding she failed "to allege any facts indicating that Defendants failed to enforce § 39.06(c) against any other person where a similar situation existed." ROA.453.

Villarreal timely appealed.[2] ROA.486. On November 1, 2021, Judges Graves and Ho issued a majority panel opinion reversing the dismissal of Villarreal's First, Fourth, and Fourteenth Amendment claims against the individual Defendants and her civil conspiracy claim. *Villarreal v. City of Laredo*, 17 F.4th 532 (5th Cir. 2021). On August 12,

---

[2] Villarreal is not appealing the dismissal of her claims against Webb County, Guerrero, Montemayor, or Martinez. Appellant's Panel Br. at 13 n. 2.

10

2022, the panel majority withdrew its first opinion and issued a substitute opinion resulting in the same reversal. *Villarreal v. City of Laredo*, 44 F.4th 363 (5th Cir. 2022), *reh'g granted and vacated*, 52 F.4th 265 (5th Cir. Oct. 28, 2022).

> The panel majority explained the heart of the case:

> If the First Amendment means anything, it surely means that a citizen journalist has the right to ask a public official a question, without fear of being imprisoned. Yet that is exactly what happened here: Priscilla Villarreal was put in jail for asking a police officer a question.

> If that is not an obvious violation of the Constitution, it's hard to imagine what would be.

*Villarreal,* 44 F.4th at 367. The panel majority denied Defendants qualified immunity, looking to the Supreme Court's "fair warning" test and a collection of relevant decisions to find that Defendants violated Villarreal's clearly established constitutional rights. *Id.* at 369–71. In doing so, the panel majority rejected the view that Defendants were "simply enforcing a statute," concluding "that no reasonable officer could have found probable cause under § 39.06(c)." *Id.* at 372–73. And noting that the police cannot base probable cause on protected speech, the panel majority found it was no bar to Villarreal's wrongful arrest claim that a magistrate issued the arrest warrants. *Id.* at 375.

11

The panel majority also found Villarreal sufficiently pled a selective enforcement claim, rejecting the district court's rigid view of a similarly situated class. *Villarreal,* 44 F.4th at 376-77. It did, however, affirm the dismissal of Villarreal's First Amendment retaliation claim because of this Court's particular requirement that a plaintiff show she curtailed her speech in response to a retaliatory act. *Id.* at 373-74.[3] Judge Ho concurred separately, remarking on "the unabashedly selective behavior of the law enforcement officials here." *Id.* at 382.

Chief Judge Richman dissented in part, stating that the panel majority opinion "is likely to confuse the bench and the bar as to when a First Amendment violation is 'obvious' for purposes of qualified immunity." *Id*. The dissent also disagreed with the panel majority's view of the independent intermediary doctrine and Villarreal's selective enforcement claim. *Id.*

Defendants petitioned for rehearing en banc. The Court ordered rehearing en banc on October 28, 2022.

---

[3] The panel also affirmed the dismissal of Villarreal's retaliatory investigation claim and *Monell* claim against the City. She is not raising either on rehearing en banc.

## STANDARD OF REVIEW

The Court reviews a Rule 12(b)(6) dismissal de novo. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004) (citation omitted). To defeat a Rule 12(b)(6) motion, a plaintiff must "plead enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A court ruling on a Rule 12(b)(6) motion must examine the allegations in the light most favorable to the plaintiff and with every reasonable inference resolved in her favor. *Causey*, 394 F.3d at 288.

## SUMMARY OF THE ARGUMENT

Few First Amendment violations are more obvious than arresting someone for peaceably asking a public servant for information, let alone arresting a journalist for doing it while reporting the news. Indeed, decades of precedent leave no doubt: Villarreal's arrest violated the Constitution. There is an "undoubted" First Amendment right to lawful newsgathering. *Branzburg v. Hayes*, 408 U.S. 665, 682 (1972); *Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017). When reporters use routine methods—like asking government officials questions—the First Amendment protects publishing what those officials volunteer. *Smith v.*

*Daily Mail Publ'g. Co.*, 443 U.S. 97, 99, 103, 105–06 (1979). And the First Amendment generally forbids the government from punishing a citizen for the government's failure to protect sensitive information. *The Florida Star v. B.J.F*, 491 U.S. 524, 538 (1989).

True to the Supreme Court's "fair warning" standard for "clearly established law," these decisions confirm Villarreal's arrest was an obvious constitutional violation for which qualified immunity is unavailable. But the district court still granted Defendants qualified immunity, finding that they could rely on Texas Penal Code § 39.06(c) to arrest Villarreal. That is reversible error for one overarching reason: No reasonable official could have believed it was lawful to arrest Villarreal.

Qualified immunity does not shield officials who criminalize the exercise of clearly established First Amendment rights, no matter if a state statute authorizes an arrest. And here, longstanding precedent gave Defendants fair warning that the First Amendment protected Villarreal peacefully asking Officer Goodman for information and then publishing what Goodman volunteered. Thus, no reasonable official could have believed it was lawful to arrest Villarreal under Section 39.06(c), knowing his supreme duty is to the Constitution, not an obscure state

14

statute.[4]

Nor would the elements of Section 39.06(c) have changed the reasonable official's view—if he considered those elements at all. While Section 39.06(c) requires an "intent to benefit," it would have been obvious that the government cannot jail a journalist because she wanted to "gain popularity." The First Amendment fiercely guards the marketplace of ideas from heavy-handed officials who would criminalize a newspaper, book, or Facebook page that gets too popular for the state's liking.

Likewise, no reasonable official could have believed Section 39.06(c)'s "not been made public" element justified Villarreal's arrest. If Goodman gave out information without LPD's blessing, the consequences were hers alone to bear. At the same time, it would have been clear to any reasonable public official that the First Amendment did not permit arresting Villarreal for Goodman's mistake.

Nor does the independent intermediary doctrine save Defendants.

---

[4] *Cf. Dickson v. Lilith Fund for Reprod. Equity*, 647 S.W.3d 410, 417 (Tex. App. 2021) (explaining that a reasonable Texan would know that the Constitution is "the supreme Law of the Land").

The Constitution forbids probable cause from resting on protected expression. Knowing that, no reasonable official would have asked a magistrate for an arrest warrant in the first place.

That's especially true because Defendants had *months* to recognize that arresting Villarreal would violate the Constitution. Unlike officials making split-second decisions under duress, officials have no case for qualified immunity when they orchestrate a citizen journalist's arrest behind a pretextual statute despite having time to consider the clear constitutional principles prohibiting their acts. With that in mind, the Court should deny qualified immunity and reverse the dismissal of Villarreal's First and Fourth Amendment claims.

The Court should also reinstate Villarreal's First Amendment retaliation claim, and in doing so, adopt a purely objective "ordinary person" standard. This will align the Court with its sister circuits and ensure speakers do not have to self-censor to preserve a remedy for retaliation against their protected speech. The First Amendment embraces, not shuns, citizens like Villarreal who fearlessly persevere in informing the public.

Moreover, the Court should reverse the dismissal of Villarreal's

selective enforcement claim because the district court erred in construing Villarreal's allegations. At their core, her allegations show Defendants dug up a 23-year-old law to enforce against Villarreal that they never enforced against other journalists or citizens who sought information from the police. That is textbook selective enforcement. And because qualified immunity does not shield Defendants, the Court should also reverse the dismissal of Villarreal's civil conspiracy claim.

## ARGUMENT

## I.   The First Amendment Protects Routine Newsgathering and Reporting, Including Asking Officials Questions.

Americans depend on the freedom to ask government officials questions and publish what those officials give out. Without that freedom, officials could keep the public in the dark. So too could they chill the civic participation vital to healthy self-government.

As a result, many decisions from the Supreme Court and this Court confirm two things. First, the First Amendment protects asking government officials for information and reporting what those officials freely disclose. And second, Defendants violated the Constitution by arresting Villarreal for exercising those First Amendment rights.

17

Start with the "undoubted right to gather news 'from any source by means within the law.'" *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (quoting *Branzburg*, 408 U.S. at 681–82). This Court later reaffirmed that "undoubted" First Amendment right in *Turner v. Driver*—a case involving not a professional journalist, but a citizen filming police with a video camera. 848 F.3d at 688 (citing *Houchins*, 438 U.S. at 11). If the "undoubted" First Amendment right to newsgathering extends to citizens filming police, then it surely protects citizen journalists like Villarreal asking police to confirm facts.

In fact, the Supreme Court confirmed as much over 40 years ago in *Smith v. Daily Mail Publishing Company*: "A free press cannot be made to rely solely upon the sufferance of government to supply it with information." 443 U.S. at 104. To that end, the Supreme Court held it violated the First Amendment to criminalize the truthful publication of a juvenile suspect's name that reporters pursuing a lead "lawfully obtained" using "routine newspaper reporting techniques" like "asking various witnesses, the police, and an assistant prosecuting attorney" for information. *Id.* at 99, 103, 105–06 (1979). The Supreme Court emphasized that because the reporters learned the information by using

those routine reporting techniques, it "is not controlling" whether "the government itself provided or made possible press access to the information." *Id.* at 103.

Ten years later, the Supreme Court held that the First Amendment barred civil liability against a newspaper that published a rape victim's name its reporter learned from a police report left in the department's press room. *Florida Star*, 491 U.S. at 538. *Florida Star* confirmed that "[w]here information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts." 491 U.S. at 534. And of course, if the government cannot subject citizens to civil liability for its failure to safeguard information, it cannot throw them in jail for it, either.

Though some might argue that Villarreal is not a "conventional" journalist, it matters not. The Court's decision in *Turner* affirms that the First Amendment right to newsgathering extends beyond the conventional press. 848 F.3d at 688. Even more broadly, asking public servants questions is at the heart of First Amendment protection. There are few rights more apparent in our system of self-government. *See Garrison v. Louisiana,* 379 U.S. 64, 74–75 (1964) ("For speech concerning

public affairs is more than self-expression; it is the essence of self-government.") This principle dates back to the nation's founding. As James Madison explained, "If we advert to the nature of Republican Government, we shall find that the censorial power is in the people over the Government, and not in the Government over the people." 4 Annals of Cong. 934 (1794).

First Amendment protection for peaceably asking officials questions is vital to keeping that "censorial power" with the people. As the panel majority aptly observed: "If the government cannot punish someone for *publishing* the Pentagon Papers, how can it punish someone for simply *asking* for them?" *Villarreal*, 44 F.4th at 371 (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam)). And the First Amendment right to ask public officials questions goes beyond the freedom of speech and of the press. The First Amendment's guarantee of "the right to petition the government for a redress of grievances" would mean little if it did not protect asking the government questions. U.S. Const. amend. I.

In short, these enduring decisions and First Amendment principles show Defendants violated the Constitution when they arrested Villarreal

for peaceably asking Officer Goodman for information and writing down what Goodman provided. And any reasonable public official would have known as much.

## II. Defendants Are Not Entitled to Qualified Immunity for Deliberately Criminalizing Routine Journalism.

It would have been obvious to any reasonable official that throwing someone in jail for asking questions of an official while reporting the news violates the First and Fourth Amendments. But Defendants did not act like reasonable officials. Instead, they deployed a derelict statute against Villarreal because they disliked her criticism and candid reporting about them. Defendants have no excuse for that brazen violation of Villarreal's constitutional rights. It was not a split-second decision made in the heat of the moment. Instead, Defendants defied the Constitution despite having *months* to recognize that arresting Villarreal would violate her constitutional rights.

For these reasons, qualified immunity does not shield Defendants from Villarreal's Section 1983 claims.

### A. Qualified immunity does not shield officials who disregard "fair warning" of a constitutional violation.

A plaintiff overcomes qualified immunity by showing two things:

first, that the defendants violated a constitutional right; and second, that their actions were objectively unreasonable in light of clearly established law. *Davidson v. City of Stafford*, 848 F.3d 384, 391 (5th Cir. 2017). The second prong turns on whether "a reasonable official would understand that what he is doing violates [a constitutional] right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). And as this Court has explained, the "central concept" of that question is "fair warning," a standard the Supreme Court established 20 years ago. *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

In affirming the "fair warning" standard, the Supreme Court explained that constitutional violations can be obvious: "'[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'" *Hope*, 536 U.S. at 741 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)) (cleaned up); *see also Anderson*, 483 U.S. at 640. So "[a]lthough earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly

established, they are not necessary to such a finding." *Hope*, 536 U.S. at 741; *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (noting that the "clearly established" question does "not require a case on point."). Instead, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741.

In *Hope*, the Supreme Court denied qualified immunity to officials who handcuffed a prisoner to a hitching post in the sun, noting the "[t]he obvious cruelty inherent" in the act. 536 U.S. at 745. More recently, the Supreme Court denied qualified immunity to officials who kept a prisoner in feces-filled jail cells for days, recognizing the "obviousness of Taylor's right" despite a lack of on-point precedent. *Taylor v. Riojas*, 141 S. Ct. 52, 54 n.2 (2020) (per curiam)); *see also McCoy v. Alamu*, 141 S. Ct. 1364 (2021) (Mem.), granting, vacating, and remanding, 950 F.3d 226 (5th Cir. 2020) (directing reconsideration "in light of *Taylor*"). And like the panel majority here, another recent panel of this Court confirmed the vitality of the "obvious violation" rule, denying qualified immunity for a sheriff's deputy alleged to have sexually assaulted the plaintiff during a welfare check. *Tyson v. Sabine*, 42 F.4th 508, 520 (5th Cir. 2022).

By extension, where First Amendment principles "apply with obvious clarity" to show a constitutional violation any reasonable official would recognize, that is "fair warning" of a violation and meets the "clearly established" benchmark. For instance, the Supreme Court reversed and remanded on qualified immunity for officers who ordered a woman to stop praying, recognizing that "[t]here can be no doubt that the First Amendment protects the right to pray." *Sause v. Bauer*, 138 S. Ct. 2561, 2562 (2018) (per curiam). And it recognized that obvious right without citing a case in support. *Id.*

More recently, a federal appeals court denied qualified immunity to a detective after he arrested activists for "chalking" anti-police messages on public sidewalks. *Ballentine v. Tucker,* 28 F.4th 54, 66 (9th Cir. 2022). Although the court found no factually identical case, it held the First Amendment right to be free from retaliatory arrest clearly established a constitutional violation. *Id.* And another sister circuit recently denied qualified immunity to a college administrator who punished a student for criticizing a professor over email, even though the court found no case with identical facts. *Thompson v. Ragland*, 23 F.4th 1252, 1255–56,

1259–60 (10th Cir. 2022) ("But the law was clear that discipline cannot be imposed on student speech without good reason.")

Those decisions exemplify how clearly established First Amendment principles provide more than enough "fair warning" to overcome qualified immunity. This rule applies equally to officials who use state statutes to criminalize clearly established First Amendment rights. For example, there's no qualified immunity for arresting a person who utters profanity despite a state statute against swearing in public. *Leonard v. Robinson*, 477 F.3d 347, 361 (6th Cir. 2007) ("[I]t cannot be seriously contended that any reasonable peace officer, or citizen, for that matter, would believe that mild profanity while peacefully advocating a political position could constitute a criminal act."); *see also Sandul v. Larion*, 119 F.3d 1250, 1256–57 (6th Cir. 1997) (denying qualified immunity for a police officer who enforced a local disorderly conduct ordinance against little more than public profanity). Nor does qualified immunity shield officials who rely on a criminal defamation statute to arrest a student blogger for what every reasonable officer would know is plainly protected satire. *Mink v. Knox*, 613 F.3d 995, 1009–10 (10th Cir. 2010); *see also McLin v. Ard,* 866 F.3d 682, 695 (5th Cir. 2017) (finding

that no reasonable officer could have found probable cause for a violation of Louisiana's criminal defamation statute, because "[s]peech criticizing the official conduct of public officials is protected by the First Amendment.")

### B. Having fair warning of a First Amendment violation, no reasonable official would have arrested Villarreal.

Villarreal's First Amendment rights to peaceably ask officials questions and to engage in routine newsgathering and reporting would have been obvious to every reasonable official. With that in mind, no reasonable official would have orchestrated Villarreal's arrest for exercising those rights.

Consider first a fact about our nation that every citizen understands: Asking public servants questions is an essential right of all Americans. Citizens and officials alike see that right in action every day, from the podium at city council meetings to the comments on the local sheriff department's Facebook page, from town halls across the country to the James S. Brady Press Briefing Room in the White House. And even if no Supreme Court decision has explicitly discussed that specific right, the panel majority rightly pointed out why it obviously exists: "If the freedom of speech secured by the First Amendment includes the right to

curse at a public official, then it surely includes the right to politely ask that official a few questions as well." *Villarreal*, 44 F.4th at 371 (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 569 (1942); *Sandul*, 119 F.3d at 1255; *Buffkins v. City of Omaha*, 922 F.2d 465, 467 (8th Cir. 1990)). Villarreal did just that with Officer Goodman.

The panel majority also aptly framed the First Amendment protections for the press: "If freedom of the press guarantees the right to publish information from the government, then it surely guarantees the right to ask the government for that information in the first place." *Villarreal*, 44 F.4th at 371 (citing *In re Express-News Corp.*, 695 F.2d 807, 808 (5th Cir. 1982); *Florida Star*, 491 U.S. at 538). The decades-old decision in *Daily Mail* underscores why that principle applies here. If the First Amendment protected the newspaper reporters in *Daily Mail* asking police and a prosecutor for information and accurately publishing what those officials willingly disclosed, then the First Amendment also protected Villarreal asking Officer Goodman for information and accurately publishing what Goodman willingly disclosed. 443 U.S. at 99, 103, 105–06; ROA.166 [¶¶ 65–66], ROA.170 [¶ 89]. Indeed, the arrest warrant affidavits Defendants fashioned described nothing materially

different from what the reporters did in *Daily Mail*. ROA.169–71. And while the First Amendment violation in *Daily Mail* targeted the newspaper's publication of sensitive facts, the Supreme Court made clear that the reporters "lawfully obtained" those facts by using "routine newspaper reporting techniques," like asking government officials for information. 443 U.S. at 103, 106.

Thus, *Daily Mail* would have given every reasonable official fair warning that arresting Villarreal would violate the First Amendment. And the Supreme Court's decision in *Florida Star* would have made the violation even more obvious. At bottom, it would have confirmed that the First Amendment barred punishing Villarreal for Officer Goodman's failure to keep information under wraps. 491 U.S. at 534–35. True, the Supreme Court cautioned to not read *Daily Mail* and *Florida Star* as affirming an absolute right for truthful publication or unfettered press access. *Florida Star*, 491 U.S. at 532, 541; *Daily Mail*, 443 U.S. at 106; ROA.445. But that caution does not diminish the fair warning from those cases: Arresting Villarreal for using routine reporting techniques to gather and report the news violates the First Amendment.

To be clear, Villarreal did not threaten, bribe, or coerce Officer Goodman for the information. The arrest warrant affidavits described nothing of the sort. ROA.170–71 [¶¶ 88–94]. Rather, Villarreal simply exercised her "undoubted right" to gather news[5] by asking Goodman for information. And Goodman obliged. If Goodman gave out the information without LPD's blessing, the consequences were hers alone to bear. In any case, it was obvious that the First Amendment protected Villarreal from paying for Goodman's mistake. *Florida Star*, 491 U.S. at 534–35; *see also Bartnicki v. Vopper*, 532 U.S. 514, 534–35 (2001) (finding that the First Amendment protects publication of even illegally obtained newsworthy information so long as the publisher did not participate in the illegality).

Having the benefit of all these enduring clear First Amendment principles and precedents, no reasonable officer would have hunted for a

---

[5] *Turner*, 848 F.3d at 688. The City Defendants have argued that *Saved Magazine v. Spokane Police Department* "establishes that it is reasonable for an officer to believe it is constitutional to restrict a journalist from engaging in questioning." City Pet. for Reh'g. 14–15 (citing *Saved Magazine*, 19 F.4th 1193 (9th Cir. 2021)). That is wrong because the decision did not touch on the right to ask government officials questions. Rather, it involved police interrupting a journalist who was interfering with protestors exercising their First Amendment rights. *Saved Magazine*, 19 F.4th at 1196–97. What's more, the court reaffirmed that "there is no question that news gathering is protected by the First Amendment." *Id.* at 1198 (citing *Branzburg,* 408 U.S. at 681).

statute as pretext to criminalize Villarreal's core First Amendment rights—let alone one local officials had never enforced. Because Defendants defied the fair warning that decades of precedent established, the Court should reverse and deny Defendants qualified immunity.[6] Doing so will faithfully meet the Supreme Court's qualified immunity standards and preserve a vital constitutional remedy for Villarreal.

### C. No reasonable official would have enforced Texas Penal Code § 39.06(c) against Villarreal.

Defendants insist they could dig Texas Penal Code § 39.06(c) out of mothballs and rely on it to arrest Villarreal.[7] But no reasonable official would have used the statute as cover to violate the First Amendment. The Constitution demands that government officials be more than automatons blindly enforcing state laws. So when it would be obvious

---

[6] Villarreal's allegations detail each Defendant's unlawful participation in orchestrating her arrest, including hunting for a statute and manufacturing the arrest warrant affidavits. *See* Statement of the Case, *supra*; ROA.166–67 [¶¶ 69–70]; ROA.169–172 [¶¶ 84–95]; ROA.174–76 [¶¶ 109–16]. In addition, the district court granted qualified immunity to Defendants in unison, based on their reliance on Section 39.06(c). ROA.435–446. So this Court can likewise reverse that grant in unison. *See Meadours v. Ermel,* 483 F.3d 417, 421 (5th Cir. 2007).

[7] County Defs. Panel Br. at 24–30; City Defs. Panel Br. at 20–21; County Defs. Pet. for Reh'g. at 17–19.

that enforcing a criminal law would violate the Constitution, reasonable officials uphold their oath and don't enforce it.

### 1. Qualified immunity does not shield officials who enforce state statutes in obviously unconstitutional ways.

No state statute trumps the Constitution. For that reason, qualified immunity is unavailable for officials who enforce a statute in an obviously unconstitutional way.

Look first to the text of Section 1983. "Every person who, *under color of any statute* . . . of any State [ ] subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983 (emphasis added). "Under color of any statute" plainly covers constitutional violations that result from an authorizing state statute. *See, e.g.*, *Myers v. Anderson*, 238 U.S. 368, 377–78 (1915). And it must, given that the Supreme Court extended Section 1983 remedies to constitutional violations resulting from acts *not authorized* by a state statute. *Monroe v. Pape*, 365 U.S. 167, 183–87 (1961).

Nor does the advent of qualified immunity diminish Section 1983's promise of a remedy against officials who enforce state statutes in unconstitutional ways. If anything, the doctrine rejects immunity for officials when they enforce a state statute despite having fair warning that doing so will violate the Constitution. *See Hope*, 536 U.S. at 740–41. None of this is to say that public officials must be constitutional scholars or resolve means-end scrutiny questions to receive qualified immunity. *See Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979). But neither are officials machines incapable of reason and discretion. In fact, the modern qualified immunity doctrine presumes they can exercise discretionary duties reasonably. *See Anderson*, 483 U.S. at 640 (explaining that the "clearly established" question turns on whether "a reasonable official would understand that what he is doing violates [a constitutional] right").

That is why qualified immunity is unavailable if it would have been obvious to a reasonable official that enforcing a state law would violate a constitutional right. *See Lawrence v. Reed*, 406 F.3d 1124, 1232 (10th Cir. 2005) ("[W]here a statute authorizes conduct that is patently violative of fundamental constitutional principles, reliance on the statute does not immunize the officer's conduct.") (cleaned up). So when an official

enforces a state criminal law against a citizen for protected speech or other expressive activity, the paramount inquiry is not whether a reasonable officer believed he could fit the expression into the statute's elements. After all, an official "may not base her probable cause determination on an 'unjustifiable standard,' such as speech protected by the First Amendment." *Mink,* 613 F.3d at 1003–04 (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985)).

Instead, "the overarching inquiry is whether, *in spite of the existence of the statute*, a reasonable officer should have known that his conduct" violated the First Amendment. *Lawrence*, 406 F.3d at 1232 (emphasis added). For instance, the Sixth Circuit's inquiry in *Leonard* was not whether a reasonable official could have believed that "mild profanity while peacefully advocating a political position" met the elements of Michigan indecent language and disorderly person laws. Instead, it was whether a reasonable official could believe the speech "could constitute a criminal act" given "First Amendment jurisprudence that is decades old" and "the prominent position that free political speech has in our jurisprudence and in our society." 477 F.3d at 359–61; *see also Sandul*, 119 F.3d at 1256–57; *Ballentine,* 28 F.4th at 66 (denying

qualified immunity for officer who arrested citizens under anti-graffiti statute for drawing political messages in chalk on a public sidewalk). Likewise, as then-Judge Gorsuch clarified in *Mink*, the proper inquiry was whether a reasonable official could believe that a publisher's parody fell outside of First Amendment protection, not whether the official could believe it satisfied the elements of Colorado's criminal libel statute. *Mink*, 613 F.3d at 1012 (Gorsuch, J., concurring).

Imagine if the courts in those decisions flipped the inquiry. Not only would blatantly unconstitutional applications of state laws have skirted accountability, but the results would encourage other officials to shroud obvious First Amendment violations in state statutes. And there is no shortage of cobwebbed statutes like Tex. Penal Code § 39.06(c) waiting for overzealous government officials to dust off. For instance, Michigan's criminal code prohibits "swear[ing] by the name of God, Jesus Christ, or the Holy Ghost" (MCL 750.103) and "advocat[ing]" the concept of polygamy (MCL 750.441). And Massachusetts criminalizes singing the Star Spangled Banner with an improper amount of "embellishment" or playing the tune "as dance music." Mass. Gen. Laws ch. 264, § 9. Asking courts to assess whether a reasonable officer could have believed a

resident advocated polygamy or sang the national anthem with too much gusto is no way to protect the First Amendment.

The bottom line is this: If an official enforces a criminal law against the exercise of a First Amendment right of which a reasonable official would have fair warning, qualified immunity does not shield that official. Any other outcome would undermine both Section 1983's guarantee of constitutional remedies and the Supreme Court's qualified immunity framework.

### 2. No reasonable official could have believed the Texas statute justified Villarreal's arrest.

Qualified immunity does not shield Defendants for employing Section 39.06(c) to criminalize Villarreal's routine newsgathering and reporting. The correct inquiry here is not whether a reasonable official could have believed Villarreal's routine reporting met the "intent to benefit" and "not been made public" elements of Section § 39.06(c). Rather, it's whether a reasonable official would have had fair warning that arresting Villarreal would violate the First Amendment—no matter what Section 39.06(c) authorized. And as Villarreal explains above, her arrest was an obvious constitutional violation because of that fair warning.

Defendants, like the district court did, incorrectly focus the qualified immunity question on the elements of Section 39.06(c). *See* County Defs. Panel Br. 25–28; City Defs. Panel Br. 21–27; ROA.435–44. Suppose, for a moment, that a reasonable official would have considered those elements. For qualified immunity to hold, a reasonable official would have needed to believe two impermissible things. *First*, that the First Amendment doesn't protect reporters wanting to make a living and gain readers (or "to gain [ ] popularity," as the warrant affidavits put it). *See* ROA.171 [¶ 92]. And *second*, that the First Amendment doesn't protect peaceably asking for information and writing it down just because the government believes it is "nonpublic." No reasonable official could have believed either.

Reporters do not gather and publish news hoping that others won't read it. By contrast, every reasonable official would understand the First Amendment protects reporters who want to gain readers and earn a living. Newsgathering is expensive and reporters normally do not work for free. *See generally Int'l News Serv. v. Associated Press*, 248 U.S. 215, 235 (1918) (discussing the "compensation for the cost of gathering and distributing" the news, with "the added profit so necessary as an

incentive to effective action in the commercial world.") To that end, it was beyond debate that even if Villarreal had some economic motive, the First Amendment still protected her. *See, e.g.*, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976) ("Speech likewise is protected even though it is carried in a form that is 'sold' for profit.") (citations omitted); *Innovative Database Sys. v. Morales*, 990 F.2d 217, 221–22 (5th Cir. 1993) (*citing Florida Star*, *Daily Mail*, and *Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975)).

Above all, using routine reporting techniques "to gain popularity" does not justify an arrest. In fact, just the opposite is true. The First Amendment protects relying on routine reporting techniques because it is part of good journalism. An informed public is well-served by credibly sourced, accurate stories. Indeed, Villarreal's knack for candor is what drove her popularity. ROA.160 [¶ 39]. No reasonable official could have thought Villarreal's impressive ability to reach a growing audience was a "benefit" that justified her arrest.

Nor would any reasonable official have arrested Villarreal just because LPD considered the information Goodman gave her to be "nonpublic." Press freedom does not tilt to the government's whims about

when and how the public gets information. Instead, to do their job and accurately inform the public about government affairs, reporters *must* ask the government for information they do not already have or to confirm leads. *See, e.g.*, *Daily Mail*, 443 U.S. at 99.

Of course, an official can say "no" in response. But public officials cannot—as any reasonable official would know—throw a reporter or any other citizen in jail for questioning officials without violating the First Amendment. And they cannot—as any reasonable official would also know—punish a reporter or any other citizen because an official mishandles newsworthy information. *Id.* at 103; *Florida Star.*, 491 U.S. at 531–32, 540–41; *see also Bartnicki*, 532 U.S. at 525; *New York Times Co.*, 403 U.S. 713.

Though Defendants might argue exceptions under the Texas Public Information Act (TPIA) justified arresting Villarreal,[8] no reasonable official would have believed that. If anything, the TPIA would have made it *more* obvious that arresting Villarreal was unlawful. For one thing, the TPIA applies to records, not information—and in any case, it does not bar

---

[8] City Panel Br. 22–26; County Panel Br. 27–28.

a citizen from merely *asking* an official for information (nor could it). The TPIA also embraces the First Amendment's protection for those that receive and publish information the government releases, as it requires the government to protect "confidential information" in its possession. *See, e.g.*, Tex. Gov. Code §§ 552.007, 552.010, 552.352. Likewise, the First Amendment forbids burdening Villarreal or any other citizen to know if a TPIA exception applies just to avoid felony arrest. *See Florida Star*, 491 U.S. at 536 ("But the fact that state officials are not required to disclose such reports does not make it unlawful for a newspaper to receive them when furnished by the government.")

In short, reasonable officials know they cannot take out their angst on reporters and other citizens who ask for "nonpublic" information, even when loose-lipped public officials reveal the information. That much has been clear First Amendment law since, at minimum, the Pentagon Papers. *New York Times Co.*, 403 U.S. 713; *see also Daily Mail*, 443 U.S. 97; *Florida Star*, 491 U.S. 524. Otherwise, nearly every White House, State Department, and police press briefing would be an active crime scene.

For these reasons, the district court erred by focusing its analysis on whether a reasonable official could believe Villarreal's routine reporting fit the elements of the Texas statute. Focusing the qualified immunity inquiry on where it belongs—the Constitution—no reasonable official could believe that Villarreal's routine newsgathering from a government official fell outside the First Amendment's protection.

**D.    Because no reasonable official would have sought a warrant, the independent intermediary doctrine does not save Defendants.**

The independent intermediary doctrine does not shield the Defendants from Villarreal's First or Fourth Amendment claims because Defendants had no basis to seek a warrant. "[T]he fact that a neutral magistrate has issued a warrant . . . does not end the inquiry into objective reasonableness." *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012). Indeed, a court should deny qualified immunity if "it is obvious that no reasonably competent officer would have concluded that a warrant should issue," no matter what the magistrate does. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Warrants must be based on probable cause. And as explained, probable cause cannot rest on "an unjustifiable standard, such as speech

protected by the First Amendment." *Mink*, 613 F.3d at 1003–04 (cleaned up). The Eight Circuit's decision in *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1156–57 (8th Cir. 2014), is helpful. In *Snider*, the Eighth Circuit denied qualified immunity to an officer who arrested a citizen for burning the American flag. The officer, like Defendants do here, relied on a state statute prohibiting the conduct and the fact a neutral magistrate authorized the arrest warrant. Applying *Malley*, the Eighth Circuit explained, "A reasonably competent officer in [the officer's] position would have concluded no arrest warrant should issue for the expressive conduct. . . . Although it is unfortunate and fairly inexplicable that the error was not corrected by the county prosecutor or the magistrate judge, no warrant should have been sought in the first place." *Id.* at 1157.

So too here: Probable cause could not be based on Villarreal's protected First Amendment activity. The district court erred finding otherwise, overlooking how no "reasonably competent officer" could believe Villarreal's routine newsgathering and reporting fell outside First Amendment protection. *See* ROA.437-440.

Thus, there is no reason to probe the magistrate's decision-making because Defendants should not have applied for a warrant "in the first

place." *Snider*, 752 F.3d at 1157. The independent intermediary doctrine does not shield Defendants from Villarreal's Fourth Amendment wrongful arrest claim or her First Amendment claim. *Malley*, 475 U.S. at 341.

### E.    The calculated nature of Defendants' actions cements why qualified immunity is unavailable.

Defendants faced no imminent threat from Villarreal or other circumstances requiring a split-second decision. Instead, they had *months* to recognize, as any reasonable official would have, that arresting Villarreal would violate the First Amendment. Yet they chose to dig up a pretextual statute and arrest her for no more than what the reporters did in *Daily Mail*. ROA.166 [¶¶ 65–66], ROA.170–72.

When officials violate the First Amendment despite having time to recognize the established constitutional principles limiting their acts, the justifications for qualified immunity fade. Indeed, fair warning of a constitutional violation will vary with the time an official has to consider the law limiting his acts. "Fair warning" for police officers faced with split-second decisions about using force under duress might require factually similar precedent. *E.g.*, *Mullenix v. Luna,* 577 U.S. 7, 12 (2015) (per curiam) ("[S]pecificity is especially important in the Fourth

Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.") (citation and internal quotations omitted). But "fair warning" of a clearly established right will be less exacting absent exigent circumstances, when officials have time to evaluate the constitutional limits on their power.

In his recent criticism of a "one-size-fits-all" view of qualified immunity, Justice Thomas aptly summed up this difference: "[W]hy should university officers, who have time to make calculated choices about enacting or enforcing unconstitutional policies, receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting?" *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422, (2021) (statement of Thomas, J., respecting the denial of *certiorari*). The panel majority and other members of this Court have recognized this difference, too. *Villarreal*, 44 F.4th at 371; *Wearry v. Foster*, 52 F.4th 258, 259-60 (5th Cir. 2022) (Ho, J., concurring); *Gonzalez v. Trevino*, 42 F.4th 487, 507 (5th Cir. 2022) (Oldham, J., dissenting).[9]

---

[9] *See also* F. Andrew Hessick & Katherine C. Richardson, *Qualified Immunity Laid Bare*, 56 Wake Forest L. Rev. 501, 529 (2021) (arguing that "immunity is less

A comparison of recent holdings highlights the disparity between split-second decisions and more deliberative ones in the qualified immunity inquiry. For example, the City Defendants have pointed to the Supreme Court's recent decisions in *City of Tahlequah v. Bond* and *Rivas-Villegas v. Contesluna* affirming grants of qualified immunity. *See* City Pet. for Reh'g. at 13 (citing *City of Tahlequah,* 142 S. Ct. 9 (2021) (per curiam) and *Rivas-Villegas*, 142 S. Ct. 4 (2021) (per curiam)). But in both cases, police officers faced split-second, use-of-force decisions in dangerous circumstances, where "fair warning" might require factual specificity beyond clear constitutional principles. *Bond*, 142 S. Ct. at 10–11; *Rivas-Villegas*, 142 S. Ct. at 6–8.

Contrast the dangerous circumstances in those decisions with the non-exigent circumstances in decisions finding obvious constitutional violations, like *Riojas, Ragland*, and *Ballentine*. Likewise, the Eighth Circuit recently denied qualified immunity for university administrators who discriminated against religious groups over months, pointing to Justice Thomas's statement from *Hoggard. Intervarsity Christian*

---

warranted in situations where officers have more opportunity to ensure that their decisions comply with the law").

*Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 867 (8th Cir. 2021) (citing *Hoggard*, 141 S. Ct. at 2422).

In sum, when government officials have time to coolly consider the constitutionality of their conduct—conduct that any reasonable official in their shoes would have known to be unlawful—they should not enjoy qualified immunity in a *post facto* bid for amnesty. That is why, as the panel majority rightly recognized, "the facts alleged here present an especially weak basis for invoking qualified immunity." *Villarreal*, 44 F.4th at 371–72. If anything, the months over which Defendants concocted Villarreal's arrest negates their claim that relying on Section 39.06(c) was reasonable. A reasonable officer having that time would have discovered that no local official had enforced the law in its 23-year history—let alone against journalists doing their job—providing even more reason not to enforce it against Villarreal.

In the end, Defendants defied obvious First Amendment limits on their authority to retaliate against an ascending local journalist, using a cobwebbed felony statute as a sword and a shield. The Court should reverse the district court's grant of qualified immunity and its dismissal of Villarreal's First and Fourth Amendment claims.

## III. The Court Should Adopt an Objective Standard for the Chilling Element of a First Amendment Retaliation Claim.

The First Amendment "prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (cleaned up). A First Amendment retaliation claim requires three ingredients: protected First Amendment activity by the plaintiff, an "adverse action" against the plaintiff by the government, and that the government took the adverse action based on the plaintiff's protected activity. Because some government actions "are too trivial or minor to be actionable," the adverse act must "chill a person of ordinary firmness from continuing to engage" in the protected activity. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). Courts have no trouble holding that arresting and jailing an American for protected speech would "chill a person of ordinary firmness." *See, e.g.*, *Thurairajah v. City of Ft. Smith*, 925 F.3d 979, 985 (8th Cir. 2019) ("[T]here can be little doubt that being arrested for exercising the right to free speech would chill a person of ordinary firmness from exercising that right in the future.") (cleaned up); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) ("To state that

arresting someone in retaliation for their exercise of free speech rights is sufficient to chill speech is an understatement.") (cleaned up).

But this Court imposes a higher burden, even for those jailed in retaliation for their protected speech. It requires a plaintiff to prove that the government's action *subjectively* chilled her from engaging in additional speech. *Keenan*, 290 F.3d at 259 ("[A] retaliation claim requires some showing that the plaintiffs' exercise of free speech has been curtailed") (citing cases). Because of that requirement, the panel majority affirmed the dismissal of Villarreal's First Amendment retaliation claim. As it explained, "Villarreal has continued reporting since her arrest— consistent with the highest traditions of fearless journalism." *Villarreal*, 44 F.4th at 374.

Fearless Americans who persevere through government oppression to continue exercising their First Amendment freedoms should not be penalized. Thus, the Fifth Circuit should join its sister circuits and abandon its subjective requirement for the "ordinary firmness" chilling element. Indeed, the Third, Fourth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, and D.C. Circuits all use an objective test to determine whether the government's action would chill a person of "ordinary

firmness" from engaging in additional speech, with no requirement that the plaintiff cease engaging in protected conduct out of fear of further retaliation.[10]

There are three reasons for the Court to drop its subjective chill requirement. *First*, when adopting that requirement in the 2003 *Keenan* decision, the Court relied on authority from the First, Second, and Fourth Circuits. 290 F.3d at 259. But that authority is now outdated. The Fourth Circuit expressly abandoned a subjective test in 2005. *See Constantine*, 411 F.3d at 500. The Second Circuit likewise clarified in 2013 that "[c]hilled speech is not the *sine qua non* of a First Amendment claim. A plaintiff has standing if he can show *either* that his speech has been adversely affected by government retaliation or that he has suffered some other concrete harm." *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). And in 2011, the First Circuit explained that the proper adverse action test is whether, "viewed objectively," "the defendant's

---

[10] *Mirabella v. Villard*, 853 F.3d 641, 650 (3d Cir. 2017); *Constantine v. Rectors & Visitors of George Mason. Univ.*, 411 F.3d 474, 500 (4th Cir. 2005); *Holzemer v. City of Memphis*, 621 F.3d 512, 525 (6th Cir. 2010); *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011); *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014); *Rhodes v. Robinson*, 408 F.3d 559, 568–69 (9th Cir. 2005); *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007); *Bennett v. Hendrix*, 423 F.3d 1247, 1251 (11th Cir. 2005); *Toolaprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002).

actions would deter a reasonably hardy individual from exercising his constitutional rights." *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011) (internal quotation marks and citation omitted).[11]

*Second*, if an American is brave enough to show up the day after a retaliatory act and continue exercising their First Amendment rights, as Villarreal did, the subjective chill requirement bars a retaliation claim, no matter how severe and brazen the government's conduct. To keep the claim, a citizen must self-censor. That's not only unjust, but it assists the very goal of the retaliation—scaring a citizen into silence.

*Third*, the subjective chill requirement takes the focus away from the government's abuse of the First Amendment and instead puts it on the plaintiff's *reaction* to the government's misconduct. The Fourth Circuit put it well: "A subjective standard would expose public officials to liability in some cases, but not in others, for the very same conduct, depending on the plaintiff's will to fight." *Constantine*, 411 F.3d at 500; *see also Mendocino Env't. Ctr. v. Mednocino Cnty.*, 192 F.3d 1283, 1300

---

[11] *See also Pollack v. Reg'l. Sch. Unit 75*, 12 F. Supp. 3d 173, 188 (D. Maine. 2014) (interpreting and applying *Barton* as establishing "objective" test for non-employment First Amendment retaliation claims). Some district courts outside the First Circuit, however, continue to impose "actual chill" language.

(9th Cir. 1999) ("[I]t would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity.") And as Justice Gorsuch observed, the purpose of a First Amendment retaliatory arrest claim is "to guard against officers who *abuse* their authority by making an otherwise lawful arrest for an unconstitutional *reason*." *Nieves,* 139 S. Ct. at 1731 (Gorsuch, J., concurring in part and dissenting in part).

To preserve First Amendment rights, the Court should take the opportunity that en banc review provides and join its sister circuits in adopting an objective standard for the adverse action element of a First Amendment retaliation claim, doing away with the subjective chill requirement. Applying that standard, the Court should also reverse the dismissal of Villarreal's First Amendment retaliation claim.

## IV.   The Court Should Reinstate Villarreal's Selective Enforcement Claim.

Because Villarreal's allegations meet the standards for a selective enforcement claim, the Court should reverse the dismissal of that claim. Selective enforcement of a law violates the Equal Protection Clause. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Bryan v. City of Madison*, 213 F.3d 267, 277 (5th Cir. 2000). A plaintiff must allege how

"she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S.at 564. A plaintiff must also allege how a defendant selectively enforced a law because of "improper considerations, such as [ ] the desire to prevent the exercise of a constitutional right." *Bryan*, 213 F.3d at 277. "[R]etaliation for an attempt to exercise one's religion or right to free speech would be expected to qualify." *Id*. at 277 n.18.

As the panel majority rightly concluded, Villarreal alleges enough to show Defendants singled her out in retaliation for her candid reporting and criticism. *Villarreal*, 44 F.4th at 376. Villarreal's allegations of harassment and the arrest show retaliation against her exercise of First Amendment rights. ROA.162–63, ROA.169–70 [¶¶ 84–85], ROA.174 [¶ 106]; ROA.187–89. And Villarreal describes a similarly situated group of "(a) those who had asked for or received information from local law enforcement officials, and (b) persons who published truthful and publicly accessible information on a newsworthy matter." ROA.187. She also describes how that group includes those like her: "local professional

newspaper journalists, local professional broadcast journalists, and citizens who published on matters of public concern." *Id.*

True enough, the Court before has asked that a selective enforcement plaintiff establish a specific comparator. *E.g.*, *Rountree v. Dyson*, 892 F.3d 681, 685 (5th Cir. 2018). At the same time, the panel majority rightly explained this Court's rule that "when a case 'involves the application of an ordinance or statute, the plaintiff's and comparators' relationships with the ordinance at issue will generally be a relevant characteristic for purposes of the similarly-situated analysis." *Villarreal*, 44 F.4th at 376 (quoting *Lindquist v. City of Pasadena, Tex.*, 669 F.3d 225, 234 (5th Cir. 2012) (internal quotation omitted)).

Villarreal's allegations meet that rule. For example, she explains how the Defendants knew that, like Villarreal, other local media asked for and learned information from LPD officials about matters like crime scenes, investigations, and traffic accidents. ROA.174 [¶ 106], ROA.187 [¶ 178]. And she also explains that the Defendants knew local officials had never arrested any person under Tex. Penal Code 39.06(c), including those other local media members. ROA.181–82 [¶ 141], ROA.187 [¶ 177].

Taking Villarreal's allegations as true, the Court should, like the panel majority, "have no difficulty observing that journalists commonly ask for nonpublic information from public officials." *Villarreal*, 44 F.4th at 376. The district court erred in harshly construing the similarly situated requirement, rather than taking Villarreal's allegations and reasonable inferences in the light most favorable to her as required at this stage.[12] For example, the district court focused on whether local journalists asked about or learned information only from LPD spokesperson Jose Baeza. ROA.454. But that was the wrong inquiry. As explained, the relevant inquiry is the plaintiff's and comparators' "relationships with the ordinance at issue." *Lindquist*, 669 F.3d at 234. And as the panel majority observed, the police department never claimed a policy of arresting everybody who sought information outside Baeza. *Villarreal*, 44 F.4th at 377.

---

[12] The district court also erroneously found that probable cause barred Villarreal's selective enforcement claim. Defendants lacked probable cause because the only basis for Villarreal's arrest was her exercise of clearly established First Amendment rights. *See* Sections II.B-C, *supra*. In any event, probable cause does not bar a selective enforcement claim. *Whren v. United States,* 517 U.S. 806, 813 (1996); *Carrasca v. Pomeroy*, 313 F.3d 828, 836 (3d Cir. 2002).

So it is no bar to Villarreal's claim if she does not identify a specific comparator at the pleadings stage, having no benefit of discovery. This is the right result. Not only does it accord with this Court's precedent, but it also ensures that if officials single out critics and dissenters by criminalizing their exercise of First Amendment rights, those speakers can pursue an equal protection claim under Section 1983 by detailing "relationships with the ordinance at issue." If plaintiffs must categorically specify a comparator at the pleadings stage, that remedy will all but disappear.

For these reasons, the Court should reverse the district court's dismissal of Villarreal's selective enforcement claim.

## V. The Court Should Also Reinstate Villarreal's Civil Conspiracy Claim.

Villarreal's conspiracy claim is straightforward: she details how Defendants agreed to retaliate against her and orchestrate her arrest. ROA.166–167 [¶ 69], ROA.169–170 [¶¶ 85–86], ROA.173, ROA.191. They did just that, violating Villarreal's constitutional rights. Because Villarreal meets the pleading standard for a Section 1983 civil conspiracy claim, the Court should reinstate that claim. *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990).

## VI.    Reversal Will Uphold Vital Civic Participation and News Reporting Without Fear of Arrest.

At the panel stage, Judge Ho pinpointed why Villarreal's arrest is so alarming: "There's no way the police officers here would have ever enforced § 39.06(c) against a citizen whose views they agreed with, and whose questions they welcomed. And that's what disturbs me most about this case—the unabashedly selective behavior of the law enforcement officials here." *Villarreal*, 44 F.4th at 382. (Ho, J., concurring). Without a damages remedy under Section 1983, Defendants and other officials have little reason to stop abusing criminal laws to single out, punish, and ultimately silence their critics and others who shine light on the government. And the opportunities for that abuse are rampant: "criminal laws have grown so exuberantly and come to cover so much previously innocent conduct that almost anyone can be arrested for something. If the state could use these laws not for their intended purposes but to silence those who voice unpopular ideas, little would be left of our First

Amendment liberties . . . ." *Nieves*, 139 S. Ct. at 1730 (Gorsuch, J., concurring in part and dissenting in part).[13]

Going back to the landmark free press case of John Peter Zenger,[14] our nation and the First Amendment stand on a cherished tradition of ensuring the public's right to know and right to criticize officials does not bow to the government's will. No citizen should have to fear arrest for pursuing the truth and sharing it with her fellow citizens. Nor should any citizen have to fear arrest for criticizing the government. But Villarreal's arrest puts that speech-chilling fear at stake.

Reinstating Villarreal's well-pled claims will grant her the chance to pursue the remedies and constitutional accountability that Section 1983 guarantees. So too will it preserve those constitutional remedies for all citizens who endure officials exploiting criminal laws at the First Amendment's expense.

---

[13] *See also* L. Gordon Crovitz, *You Commit Three Felonies a Day*, Wall Street Journal, Sep. 27, 2009), https://www.wsj.com/articles/SB10001424052748704471504574438900830760842 [https://perma.cc/2E32-JVAT].

[14] *See, e.g., The Tryal of John Peter Zenger* (1738), https://history.nycourts.gov/wp-content/uploads/2018/11/History_Tryal-John-Peter-Zenger.pdf [https://perma.cc/7YGK-DHPD].

## CONCLUSION

Villarreal asks that the Court reverse the district court's dismissal and judgment on her Section 1983 claims for violations of the First, Fourth, and Fourteenth Amendments and her civil conspiracy claim.

Dated: December 5, 2022                    Respectfully submitted,

/s/ JT Morris
JT Morris
    FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
700 Pennsylvania Ave. S.E.,
Suite 340
Washington, D.C. 20003
Tel:   (215) 717-3473
jt.morris@thefire.org

Darpana Sheth
Conor T. Fitzpatrick
    FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
510 Walnut Street, Ste. 1250
Philadelphia, PA 19106
Tel:   (215) 717-3473
darpana.sheth@thefire.org
conor.fitzpatrick@thefire.org

## CERTIFICATE OF SERVICE

This certifies that on December 5, 2022, in compliance with Rules 25(b) and (c) of the Federal Rules of Appellate Procedure, the undersigned served the foregoing via the Court's ECF filing system on all registered counsel of record.

*/s/ JT Morris*
JT Morris

# CERTIFICATE OF COMPLIANCE

1.     This response complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this response contains 10,978 words, excluding the parts of the brief exempted by Local Rule 28.3 and Fed R. App. P. 32(f).

2.     This response complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because this response has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Century Schoolbook font.

*/s/ JT Morris*
JT Morris

# ADDENDUM

## Table of Contents

| Description | Page |
|---|---|
| Tex. Penal. Code § 39.06 | ADD-2 |
| Tex. Penal Code § 1.07(a)(7) | ADD-4 |

Texas Penal Code

Title 8. Offenses Against Public Administration

Chapter 39. Abuse of Office

Sec. 39.06.  MISUSE OF OFFICIAL INFORMATION.  (a)  A public servant commits an offense if, in reliance on information to which the public servant has access by virtue of the person's office or employment and that has not been made public, the person:

> (1)  acquires or aids another to acquire a pecuniary interest in any property, transaction, or enterprise that may be affected by the information;
>
> (2)  speculates or aids another to speculate on the basis of the information; or
>
> (3)  as a public servant, including as a school administrator, coerces another into suppressing or failing to report that information to a law enforcement agency.

(b)  A public servant commits an offense if with intent to obtain a benefit or with intent to harm or defraud another, he discloses or uses information for a nongovernmental purpose that:

> (1)  he has access to by means of his office or employment; and

ADD-2

(2)  has not been made public.

(c)  A person commits an offense if, with intent to obtain a benefit or with intent to harm or defraud another, he solicits or receives from a public servant information that:

(1)  the public servant has access to by means of his office or employment; and

(2)  has not been made public.

(d)  In this section, "information that has not been made public" means any information to which the public does not generally have access, and that is prohibited from disclosure under Chapter 552, Government Code.

(e)  Except as provided by Subsection (f), an offense under this section is a felony of the third degree.

(f)  An offense under Subsection (a)(3) is a Class C misdemeanor.

ADD-3

Texas Penal Code

Title 1. Introductory Provisions

Chapter 1. General Provisions


Sec. 1.07.  DEFINITIONS.  (a)  In this code:

    . . .

    (7)  "Benefit" means anything reasonably regarded as economic gain or advantage, including benefit to any other person in whose welfare the beneficiary is interested.