No. 20-40359

# United States Court of Appeals for the Fifth Circuit

**PRISCILLA VILLARREAL,**

*Plaintiff-Appellant,*

v.

**CITY OF LAREDO, TEXAS; WEBB COUNTY, TEXAS; ISIDRO R. ALANIZ; MARISELA JACAMAN; CLAUDIO TREVINO, JR.; JUAN L. RUIZ; DEYANRIA VILLARREAL; ENEDINA MARTINEZ; ALFREDO GUERRERO; LAURA MONTEMAYOR; DOES 1–2,**

*Defendants-Appellees.*

---

**Appeal from the United States District Court for the Southern District of Texas, Laredo Division, Civil Action No. 5:19-CV-48**

---

BRIEF OF *AMICI CURIAE* ELECTRONIC FRONTIER FOUNDATION, NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, AND PELICAN INSTITUTE FOR PUBLIC POLICY IN SUPPORT OF PLAINTIFF-APPELLANT PRISCILLA VILLARREAL

---

Matthew Kudzin
Jacob Crump
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000

Gawon Go
COVINGTON & BURLING LLP
The New York Building
620 Eighth Avenue
Washington, DC 20001
New York, NY 10018
(212) 840-1000

Zachary Glasser
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 900067-4643
(424) 332-4800

*Counsel for Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel certifies that the following listed persons and entities, in addition to those listed in the parties' briefs, have an interest in the outcome of this case.

### *Amici Curiae*

Electronic Frontier Foundation
National Press Photographers Association
Pelican Institute for Public Policy

### Counsel for *Amici Curiae*

Matthew Kudzin (Covington & Burling LLP)
Jacob Crump (Covington & Burling LLP)
Gawon Go (Covington & Burling LLP)
Zachary Glasser (Covington & Burling LLP)

Undersigned counsel further certifies, pursuant to Federal Rule of Appellate Procedure 26.1(a), that *amici curiae* are not publicly held corporations and do not have any parent corporation, and that no publicly held corporation owns 10 percent or more of any corporation's stock.

/s/ Jacob Crump
Jacob Crump
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Certificate of Interested Persons ....................................................i

Table of Contents.........................................................................ii

Table of Authorities....................................................................iii

Statement of Interest ................................................................ix

Introduction ............................................................................... 1

Argument ................................................................................... 2

I.    Citizen journalism serves an important role in modern
democratic society. ........................................................... 2

II.   Damages remedies, which are essential to protect the First
Amendment rights of all journalists, are particularly
important to citizen journalists. ..................................... 12

    A.    Damages are guaranteed in Section 1983 cases. ................... 13

    B.    Damages are necessary to deter the suppression of
protected speech. .................................................... 14

    C.    The best way to deter free speech violations is to
provide a full arsenal of remedies. ....................... 17

    D.    First Amendment violations cause real harm and the
affected journalists deserve to be compensated.................... 19

    E.    Nominal damages are vital for First Amendment
plaintiffs when compensatory damages cannot be
proven. .................................................................. 23

    F.    Damages remedies are particularly important for
citizen journalists.................................................. 25

Conclusion................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. City of Round Rock,*
854 F.3d 298 (5th Cir. 2017)............................................. 16

*Baumgartner v. United States,*
322 U.S. 665 (1944)....................................................... 15

*Carey v. Piphus,*
435 U.S. 247 (1978)....................................................... 14

*Carlson v. Green,*
446 U.S. 14 (1980)......................................................... 25

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983)......................................................... 18

*City of Newport v. Fact Concerts, Inc.,*
453 U.S. 247 (1981)....................................................... 14

*Creamer v. Porter,*
754 F.2d 1311 (5th Cir. 1985)........................................ 25

*Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro,*
477 F.3d 807 (6th Cir. 2007).......................................... 17

*Ellison v. Balinski,*
625 F.3d 953 (6th Cir. 2010).......................................... 21

*Fairley v. Andrews,*
578 F.3d 518, (7th Cir. 2009) ........................................ 22

*FCC v. Pacifica Found.,*
438 U.S. 726 (1978)....................................................... 15

*Forsyth v. City of Dallas,*
91 F.3d 769 (5th Cir. 1996)............................................ 21

*Glik v. Cunniffe*,
655 F.3d 78 (1st Cir. 2011) ................................................... 3

*Hazle v. Crofoot*,
727 F.3d 983 (9th Cir. 2013) ......................................... 13, 19

*Kerman v. City of New York*,
374 F.3d 93 (2d Cir. 2004) ..................................................... 20

*Louisiana ACORN Fair Hous. v. LeBlanc*,
211 F.3d 298 (5th Cir. 2000) ................................................. 24

*Marbury v. Madison*,
5 U.S. 137 (1803) ................................................................. 12

*Memphis Cmty. Sch. Dist. v. Stachura*,
477 U.S. 299 (1986) ............................................. 13, 14, 20, 23

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ............................................................. 15

*Owen v. City of Independence*,
445 U.S. 622 (1980) ............................................................. 14

*Rodriguez-Garcia v. Miranda-Marin*,
610 F.3d 756 (1st Cir. 2010) ................................................. 21

*Smith v. Wade*,
461 U.S. 30 (1983) ................................................... 13, 15, 25

*Train v. City of Albuquerque*,
629 F. Supp. 2d 1243 (D.N.M. 2009) ................................... 22

*Uzuegbunam v. Preczewski*,
141 S. Ct. 792 (2021) ........................................................... 23

*Villarreal v. City of Lardo*,
44 F.4th 363 (5th Cir. 2022) .......................................... 15, 17

*Williams v. Kaufman Cnty.*,
352 F.3d 994 (5th Cir. 2003) ................................................. 24

*Young v. City of Little Rock*,
249 F.3d 730 (8th Cir. 2001) ............................................................ 20

*Younger v. Harris*,
401 U.S. 37 (1971) ............................................................................ 19

**Other Authorities**

Amanda Muñoz-Temple, *The Man Behind Weiner's Resignation*,
Nat'l J. (June 16, 2011), http://www.nationaljournal.com/the-man-behind-weiner-s-resignation-20110616 .................................................. 7

Amy Forliti, *Philando Castile's Family Reaches $3 Million Settlement in His Death*, Yahoo News (Jun. 26, 2017), https://news.yahoo.com/philando-castile-apos-family-reaches-131426226.html ...................................................................... 8

Anne Medley, *Why Training Citizen Journalists Is So Important After the Arab Spring*, PBS's MediaShift (Jan. 13, 2012), https://mediashift.org/2012/01/why-training-citizen-journalists-is-so-important-after-the-arab-spring013/ ...................................... 3, 5

Antonis Kalogeropoulos, *How Younger Generations Consume News Differently*, Digital News Report (Sept. 2019), https://www.digitalnewsreport.org/survey/2019/how-younger-generations-consume-news-differently/ .............................. 11

Dan Gilmor, *Ferguson's Citizen Journalists Revealed the Value of an Undeniable Video*, The Guardian (Aug. 16, 2014), https://www.theguardian.com/commentisfree/2014/aug/16/fergusons-citizen-journalists-video ............................................................ 7

David Glenn, *The (Josh) Marshall Plan*, Columbia Journalism Review (Oct. 2007), https://archives.cjr.org/feature/the_josh_marshall_plan.php .................................................. 6

Denetra Walker, *How Citizen Journalists, Cell Phones and Technology Shape Coverage of Police Shootings*, Univ. of S.C., Coll. of Info. and Commc'n (June 20, 2020), https://www.sc.edu/study/colleges_schools/cic/journalism_ and_mass_communications/news/2020/citizen_journalists _cell_phones_shape_coverage.php ....................................................... 7

Helen Dewar & Mike Allen, *Lott Resigns as Senate GOP Leader*, The Washington Post (Dec. 21, 2002) ..................................... 6

James Madison, *The Federalist No. 43* ...................................................... 1

Joe Hernandez, *Darnella Frazier, Who Filmed George Floyd's Murder, Wins anHonorary Pulitzer*, NPR (June 11, 2021) https://www.npr.org/2021/06/11/1005601724/darnella-frazier-teen-who-filmed-george-floyds-murder-wins-pulitzer-prize-citati ...... 9

John Nichols, *Trent Lott's "Uptown Klan", The Nation (Dec. 12, 2002),* https://www.thenation.com/article/archive/trent-lotts-uptown-klan/ .......................................................................... 6

Katie Hawkins-Garr, *36 Stories That Prove Citizen Journalism Matters*, CNN (Apr. 3, 2013), https://www.cnn.com/2013/04/03/ opinion/ireport-awards-hawkins-gaar/index.html ............................ 12

Kayla Drake, *'People Like Me': Black Citizen Journalists Fill Trust Gap In St. Louis Media Landscape*, St. Louis Public Radio (July 24, 2020), https://news.stlpublicradio.org/2020-07-25/people-like-me-black-citizen-journalists-fill-trust-gap-in-st-louis-media-landscape; ........................................................ 7

Laura Yuen & Riham Feshir, *Philando Castile Police Shooting Probe Complete, Sent to Prosecutors*, MPR News (Sept. 28, 2016), https://www.mprnews.org/story/2016/09/28/philando-castile-investigation-done-prosecutor-review; .................................. 8

*Marshall Plan*, Columbia Journalism Review (Oct. 2007), https://archives.cjr.org/feature/the_josh_marshall_plan.php ............. 6

Mason Walker & Katerina Eva Matsa, *News Consumption Across
Social Media in 2021* Pew Research Center (Sept. 20, 2021),
https://www.pewresearch.org/journalism/2021/09/20/news-
consumption-across-social-media-in-2021/ .......................................... 4

Penny Abernathy, *The State of Local News: The 2022 Report*,
Northwestern Medill Local News Initiative (June 29, 2022),
https://localnewsinitiative.northwestern.edu/research/state-
of-local-news/report/ .............................................................................. 10

Pew Research Center, *Newspaper Fact Sheet* (June 29, 2021),
https://www.pewresearch.org/journalism/fact-
sheet/newspapers/ ............................................................................ 9, 10

Phil Helsel & Jacquellena Carrero, *Philando Castile, Killed By
Police During Traffic Stop, Remembered as Gentle Man*, NBC
News (July 7, 2016), https://www.nbcnews.com/news/us-
news/philando-castile-killed-police-during-traffic-stop-
remembered-gentle-man-n605581 ....................................................... 8

Rachel Bartlett, *Citizen Journalism Site Blottr to Supply Video to
NYT Syndicate*. (Oct. 10, 2013), https://www.journalism.co.uk/
news/citizen-journalism-site-blottr-to-supply-video-to-new-york-
times-syndicate/s2/a554403/ ....................................................... 11, 12

Saleem Kassim, *Twitter Revolution:  How the Arab Spring Was
Helped by Social Media*, MIC (July 3, 2012),
https://www.mic.com/articles/10642/twitter-revolution-how-the-
arab-spring-was-helped-by-social-media ............................................. 5

Shannon Luibrand, *How a Death in Ferguson Sparked a
Movement in America*, CBS News (Aug. 7, 2015),
https://www.cbsnews.com/news/how-the-black-lives-
matter-movement-changed-america-one-year-later/ ........................... 8

Sheryl Gay Stolberg, Under Fire, *Lott Apologizes for his Comments
at Thurmond's Party*, The New York Times (Dec. 10, 2002) .............. 6

Soumitra Dutta & Matthew Frasier, *Barack Obama and the Facebook Election*, U.S. News & World Reports (Nov. 19, 2008), https://www.usnews.com/opinion/articles/2008/11/19/barack-obama-and-the-facebook-election ......................................................... 4

*Up the Paywall*, The Economist (Nov. 19, 2015) .................................... 10

# STATEMENT OF INTEREST

This brief is filed on behalf of *amici curiae* Electronic Frontier Foundation ("EFF"), National Press Photographers Association ("NPPA"), and Pelican Institute for Public Policy ("the Pelican Institute").

EFF is a San Francisco-based, member-supported, nonprofit civil liberties organization that has worked for over 30 years to protect free speech, privacy, security, and innovation in the digital world. With over 38,000 members, and harnessing the talents of lawyers, activists, and technologists, EFF represents the interests of technology users in court cases and policy debates regarding the application of law to the internet and other technologies. EFF has filed many amicus briefs in support of the First Amendment rights, including the rights of citizen journalists and the right to record on-duty police officers. *See Fields v. City of Phila.*, 862 F.3d 353 (3d Cir. 2017); *Project Veritas Action Fund v. Rollins*, 982 F.3d 813 (1st Cir. 2020); *Frasier v. Evans*, 992 F.3d 1003 (10th Cir. 2021); *Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022).

NPPA is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's members include television and still photographers,

editors, students, and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism.

The Pelican Institute is a nonpartisan research and educational organization—a think tank—and the leading voice for free markets in Louisiana. The Institute's mission is to conduct research and analysis that advances sound policies based on free enterprise, individual liberty, and  constitutionally limited government.

Given the value that individuals acting as citizen journalists provide to the public discourse, their First Amendment rights should be broadly construed. The *amici* share a concern that the District Court decision put those rights at risk. The panel correctly reversed the District Court's decision and reiterated the importance of First Amendment protection for journalists, including citizen journalists who primarily publish on social media. *Amici* therefore have an interest in seeing the panel's reasoning adopted by the entire Court sitting *en banc*.

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c)(1), each of the *amici* state that it does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock.

Pursuant to Fed. R. App. P. 29(a)(4), each of the *amici* certify that counsel for *amici* authored this brief in whole; that no counsel for a party authored this brief in any respect; and that no person or entity, other than a*mici* and their counsel, contributed monetarily to this brief's preparation or submission.

# INTRODUCTION

A basic tenet of Anglo-American law states that "a right implies a remedy." The Federalist No. 43 (James Madison). Ms. Villarreal's First Amendment rights were violated and she is entitled to damages, both to compensate her for her injuries and to deter future violations. That is the essence of what Congress provided when it enacted Section 1983, and it is what courts take away when they expand the doctrine of qualified immunity. When the District Court granted Defendants qualified immunity in this case, it decided that even though Ms. Villarreal may be able to prove that Defendants violated the Constitution in a manner that caused her real harms, she should not be compensated for those harms.

That decision was an injustice. Ms. Villarreal's merits brief, and the panel's majority opinion, compellingly explain why the District Court's decision was wrong as a matter of law. *Amici* submit this brief to explain why a damages remedy is so vital for Ms. Villarreal and other plaintiffs like her.

Ms. Villarreal represents a specific kind of civil rights plaintiff—the citizen journalist. Citizen journalism has come to fill an enormously important role in society over the last two decades. The movement has

democratized the free press. It consists of individuals independently gathering and publishing newsworthy information, and speaking truth to power with unprecedented strength and scale.[1] But this newfound power is also fragile—diffused among thousands of ordinary people armed with little more than a cell phone, lacking the institutional muscle of traditional media. Citizen journalists are especially vulnerable to having their work suppressed by those who may not like what they have to say—or to reveal. Fortunately, in Section 1983 citizen journalists have a damages remedy to provide a safety net and to deter attempts to violate their rights. This Court should secure that remedy.

## ARGUMENT

### I. Citizen journalism serves an important role in modern democratic society.

We are living through a revolution in journalism that has transformed the way that news is gathered, reported, and received by the public. No longer the exclusive domain of daily newspapers and the six o'clock news, journalism has been democratized. Today, anyone with a

---

[1] Although the term "citizen journalist" has become a term of art, *amici* understand that it encompasses individuals who are not citizens of the United States.

cell phone and internet access can instantly report on the events around them, reaching an audience that spans the globe. This type of citizen journalism has the potential to hold accountable public officials and other institutions that are supposed to act in the public interest. Ms. Villarreal has realized that potential.

Citizen journalists are a significant source of news today. As the First Circuit has observed, "many of our images of current events come from bystanders with a ready cell phone or digital camera rather than a traditional film crew, and news stories are now just as likely to be broken by a blogger at her computer as a reporter at a major newspaper." *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011). In some parts of the world, citizen journalism is the primary source of news.[2] Even here in the United States, where we are fortunate to have a dedicated corps of professional journalists, citizen journalism is playing an ever-increasing role. As of 2021, about half of Americans consume news through social media

---

[2] *See* Anne Medley, *Why Training Citizen Journalists Is So Important After the Arab Spring*, PBS's MediaShift (Jan. 13, 2012), https://mediashift.org/2012/01/why-training-citizen-journalists-is-so-important-after-the-arab-spring013/.

platforms such as Twitter, Facebook, Reddit, and YouTube.[3] Specifically, nearly a third of respondents to a 2021 Pew Research study reported that they regularly receive their news from Facebook, and another 13% receive their news from Twitter.[4]

Facebook first demonstrated the potential for social media to have a major impact on current events during the 2008 presidential election, which some have dubbed "the Facebook Election."[5] President Obama had more than three times as many supporters on Facebook as his opponent, and he successfully used the platform to organize and mobilize his supporters.[6] Ever since then, social media has been a crucial battleground in every election.

---

[3] *See* Mason Walker & Katerina Eva Matsa, *News Consumption Across Social Media in 2021*, Pew Research Center (Sept. 20, 2021), https://www.pewresearch.org/journalism/2021/09/20/news-consumption-across-social-media-in-2021/.

[4] *Id.*

[5] Soumitra Dutta & Matthew Frasier, *Barack Obama and the Facebook Election*, U.S. News & World Reports (Nov. 19, 2008), https://www.usnews.com/opinion/articles/2008/11/19/barack-obama-and-the-facebook-election.

[6] *Id.*

Twitter's watershed moment came in the Arab Spring of 2011. Anti-government protests, uprisings, and armed rebellions spread across much of the Arab world, enabled in significant part by Twitter. Many activists used Twitter to expose the injustices committed by their governments, and to inform their fellow citizens about the protest movements.[7] Twitter became an essential platform by which the Arab Spring activists could share uncensored, accurate information with the people who were otherwise unaware of the underground communities that were willing to listen to them, when their government did not.[8] Ever since, Twitter has been recognized as a platform where private citizens can share newsworthy stories, comment on them, and ultimately, shape the public narrative.

Citizen journalists serve the same functions as traditional journalists, in that they disseminate crucial information to the public, and act as a check on the government. Citizen journalists have, for

---

[7] *See* Medley, *supra* note 2..

[8] *Id. See also* Saleem Kassim, *Twitter Revolution: How the Arab Spring Was Helped by Social Media*, MIC (July 3, 2012), https://www.mic.com/articles/10642/twitter-revolution-how-the-arab-spring-was-helped-by-social-media.

example, broken stories that have altered—or in some cases, ended—the careers of senior members of both major political parties. In 2002, a citizen journalist reported Senator Trent Lott's controversial statement that the country "wouldn't have had all these problems over the years" if Strom Thurmond had been elected President on his segregationist platform.[9] The comments were heavily criticized by members of both parties and required Senator Lott to publicly apologize and, ultimately, resign as Senate Minority Leader.[10] In 2011, it was a citizen journalist

---

[9] *See* John Nichols, *Trent Lott's "Uptown Klan"*, The Nation (Dec. 12, 2002), https://www.thenation.com/article/archive/trent-lotts-uptown-klan/; *see also* David Glenn, *The (Josh) Marshall Plan*, Columbia Journalism Review (Oct. 2007), https://archives.cjr.org/feature/the_josh_marshall_plan.php

[10] *See* Sheryl Gay Stolberg, Under Fire, *Lott Apologizes for his Comments at Thurmond's Party*, The New York Times (Dec. 10, 2002), https://www.nytimes.com/2002/12/10/us/under-fire-lott-apologizes-for-his-comments-at-thurmond-s-party.html; Helen Dewar & Mike Allen, *Lott Resigns as Senate GOP Leader*, The Washington Post (Dec. 21, 2002), https://www.washingtonpost.com/archive/politics/2002/12/21/lott-resigns-as-senate-gop-leader/7c0ea1d7-4adc-427d-94d1-cb90b755b43f/.

who broke the news about Congressman Anthony Weiner's explicit photographs that ultimately led to the Congressman's resignation.[11]

Citizen journalists have also played a key role in reporting on, and thereby curbing, police abuses. In 2014, police in Ferguson, Missouri killed Michael Brown, an unarmed African-American teenager. The story came to national attention in large part because a citizen journalist was the first to post photographs of Mr. Brown to Twitter, ahead of traditional journalists.[12] The killing was among those that sparked the Black Lives Matter movement, leading to protests across the country. At those demonstrations, citizen journalists again provided the most thorough, detailed, and immediate coverage.[13] Those same journalists also reported

---

[11] Amanda Muñoz-Temple, *The Man Behind Weiner's Resignation*, Nat'l J. (June 16, 2011), http://www.nationaljournal.com/the-man-behind-weiner-s-resignation-20110616.

[12] *See* Dan Gilmor, *Ferguson's Citizen Journalists Revealed the Value of an Undeniable Video*, The Guardian (Aug. 16, 2014), https://www.theguardian.com/commentisfree/2014/aug/16/fergusons-citizen-journalists-video.

[13] *See* Kayla Drake, *'People Like Me': Black Citizen Journalists Fill Trust Gap In St. Louis Media Landscape*, St. Louis Public Radio (July 24, 2020), https://news.stlpublicradio.org/2020-07-25/people-like-me-black-citizen-journalists-fill-trust-gap-in-st-louis-media-landscape; Denetra Walker, *How Citizen Journalists, Cell Phones and Technology Shape Coverage of Police Shootings*, Univ. of S.C., Coll. of Info. and Commc'n (June 20,

on the nascent police reform movement, which demanded a critical look at systemic racism, called for changes by police departments, and led to the release of a comprehensive report identifying best policing practices.[14]

In 2016, when Philando Castile, a 32-year-old African-American man, was fatally shot by a policer officer during a traffic stop, his girlfriend live-streamed the incident.[15] The video quickly gained global attention, leading to the prosecution of the police officer who shot Mr. Castile and wrongful death lawsuits against the City.[16]

---

2020), https://www.sc.edu/study/colleges_schools/cic/journalism_and_mass_communications/news/2020/citizen_journalists_cell_phones_shape_coverage.php.

[14] *See* Shannon Luibrand, *How a Death in Ferguson Sparked a Movement in America*, CBS News (Aug. 7, 2015), https://www.cbsnews.com/news/how-the-black-lives-matter-movement-changed-america-one-year-later/.

[15] *See* Phil Helsel & Jacquellena Carrero, *Philando Castile, Killed By Police During Traffic Stop, Remembered as Gentle Man*, NBC News (July 7, 2016), https://www.nbcnews.com/news/us-news/philando-castile-killed-police-during-traffic-stop-remembered-gentle-man-n605581.

[16] *See id.*; *see also* Laura Yuen & Riham Feshir, *Philando Castile Police Shooting Probe Complete, Sent to Prosecutors*, MPR News (Sept. 28, 2016), https://www.mprnews.org/story/2016/09/28/philando-castile-investigation-done-prosecutor-review; Amy Forliti, *Philando Castile's Family Reaches $3 Million Settlement in His Death*, Yahoo News (Jun.

In 2021, the Pulitzer Prize Board issued a Special Citation and Award to Darnella Frazier, the woman who recorded the murder of George Floyd by Minneapolis police officers and posted the video to Facebook and Instagram.[17] As the citation explained, her video highlighted "the crucial role of citizens in journalists' quest for truth and justice."[18]

Citizen journalists also fill needs in many communities that are underserved by mainstream journalism. Newspaper circulation peaked in the mid-1980s, reaching approximately 63.3 million readers in 1984.[19] Circulation has steadily declined over the past forty years, hitting a new low of 24.3 million readers in 2020.[20] The loss of readers has forced many

26, 2017), https://news.yahoo.com/philando-castile-apos-family-reaches-131426226.html.

[17] Joe Hernandez, *Darnella Frazier, Who Filmed George Floyd's Murder, Wins an Honorary Pulitzer*, NPR (June 11, 2021) https://www.npr.org/2021/06/11/1005601724/darnella-frazier-teen-who-filmed-george-floyds-murder-wins-pulitzer-prize-citati.

[18] *Id.*

[19] Pew Research Center, *Newspaper Fact Sheet* (June 29, 2021), https://www.pewresearch.org/journalism/fact-sheet/newspapers/.

[20] *Id.*

newspapers to close or scale back on their operations.[21] In 2006, newspapers across the United States employed over 74,000 people; by 2020, the number had fallen to under 31,000.[22] According to a 2022 study by Northwestern University, more than a fifth of the population of the United States live in a "news desert," having either no local newspaper or, at best, a once-weekly paper "covering multiple communities spread over a vast area."[23] Webb County, Texas, where Ms. Villarreal lives and works, has only a single newspaper.[24] Many communities rely on citizen journalists as their primary—in some case their only—source of local news.

Citizen journalism is also able to reach a younger demographic, because younger people are more likely to consume news through social

---

[21] *Id.*

[22] *Id.*; *see also Up Against the Paywall*, The Economist (Nov. 19, 2015), https://www.economist.com/business/2015/11/19/up-against-the-paywall.

[23] Penny Abernathy, *The State of Local News: The 2022 Report*, Northwestern Medill Local News Initiative (June 29, 2022), https://localnewsinitiative.northwestern.edu/research/state-of-local-news/report/.

[24] *See id.*

media.[25] A 2019 survey revealed that about 45% of those aged 18 to 24 receive their news from their smartphone, while only 19% receive their news from television.[26] Some survey respondents reported that the first thing they check in the morning is social media to keep themselves updated with the latest news.[27]

Recognizing the changing landscape, many traditional news sources now collaborate with citizen journalists, who can provide additional reporting for existing publications. Citizen journalists can supply information to traditional media, at times providing additional information to an existing story, or informing traditional journalists of potentially newsworthy events. For example, in 2013, the citizen journalism website Blottr began to share breaking news video content with the New York Times.[28] Blottr's wire-style news service, which is

---

[25] *See* Antonis Kalogeropoulos, *How Younger Generations Consume News Differently*, Digital News Report (Sept. 2019), https://www.digitalnewsreport.org/survey/2019/how-younger-generations-consume-news-differently/.

[26] *Id.*

[27] *Id.*

[28] Rachel Bartlett, *Citizen Journalism Site Blottr to Supply Video to NYT Syndicate*, Journalism.Co.Uk. (Oct. 10, 2013),

supported by 500,000 citizen journalists worldwide, is used by more than 200 newsrooms.[29]

CNN has actively solicited news stories, photos, and videos from citizen journalists. In 2012, more than 100,000 news stories were submitted to CNN by citizen journalists.[30] Of those, more than 10,000 were selected by CNN to be broadcast on their cable TV channel or featured on their website.[31]

## II. Damages remedies, which are essential to protect the First Amendment rights of all journalists, are particularly important to citizen journalists.

"It is a settled and invariable principle, that every right, when withheld, must have a remedy, and every injury its proper redress." *Marbury v. Madison*, <u>5 U.S. 137, 147</u> (1803). While there are different forms of remedies, damages are particularly important in First

---

https://www.journalism.co.uk/news/citizen-journalism-site-blottr-to-supply-video-to-new-york-times-syndicate/s2/a554403/.

[29] *Id.*

[30] *See* Katie Hawkins-Garr, *36 Stories That Prove Citizen Journalism Matters*, CNN (Apr. 3, 2013), https://www.cnn.com/2013/04/03/opinion/ireport-awards-hawkins-gaar/index.html.

[31] *Id.*

Amendment cases, both to compensate for the deprivation of the right and to deter future violations. Damages are especially vital when First Amendment claims are brought by citizen journalists because they deter the suppression of this vulnerable type of journalism and compensate real losses.

### A. Damages are guaranteed in Section 1983 cases.

Civil rights claims brought under Section 1983 are a "species of tort liability" for persons who have been deprived of their constitutional rights. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305–06 (1986). Not only are monetary damages available to compensate the plaintiff for injuries that are caused by the deprivation of rights, they are mandatory once a violation and injury have been established. *Smith v. Wade*, 461 U.S. 30, 52 (1983) ("Compensatory damages . . . are mandatory; once liability is found, the jury is required to award compensatory damages in an amount appropriate to compensate the plaintiff for his loss."); *see also Hazle v. Crofoot*, 727 F.3d 983, 992 (9th Cir. 2013) ("[E]ntitlement to compensatory damages in a civil rights action is not a matter of discretion."). Damages are thus a vital part of the system Congress created when it enacted Section 1983. In creating a

damages remedy, Congress recognized that "[r]ights, constitutional and otherwise, do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests, and their contours are shaped by the interests they protect." *Carey v. Piphus*, 435 U.S. 247, 254 (1978). Courts would thus be subverting the will of Congress to fully realize the protection of constitutional rights "if injuries caused by the deprivation of constitutional rights went uncompensated." *Carey*, 435 U.S. at 258.

**B.** **Damages are necessary to deter the suppression of protected speech.**

Deterring constitutional deprivations is a key purpose of Section 1983's damages remedy. *See Owen v. City of Independence*, 445 U.S. 622, 651 (1980) ("[Section] 1983 was intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations."); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 268 (1981) ("[T]he deterrence of future abuses of power by persons acting under color of state law is an important purpose of § 1983."); *Memphis*, 477 U.S. at 307 ("Deterrence is also an important purpose of this system."). While we may wish to "assume, and hope, that most officials are guided primarily by" their constitutional obligations "out of devotion to duty," the Supreme Court has recognized

that officials are also motivated by "the interest of avoiding liability for compensatory damages." *Smith*, 461 U.S. at 50. Egregious cases such as this one, where the police officers not only arrested Ms. Villarreal for exercising her constitutional rights, but also "mocked and laughed at her" as they did so, illustrate the need for a concrete deterrent. *Villarreal v. City of Lardo*, 44 F.4th 363, 369 (5th Cir. 2022).

The deterrent effect of a damages remedy is especially important in the First Amendment context, where the law compels state actors to exercise restraint in the face of speech that may be critical, embarrassing, or even offensive to them. The First Amendment requires state officials to tolerate speech against them that is "vehement, caustic, and sometimes unpleasantly sharp." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Indeed, protecting speech which is offensive or embarrassing to the state is a core purpose of the First Amendment. *See Baumgartner v. United States*, 322 U.S. 665, 673–74 (1944) ("One of the prerogatives of American citizenship is the right to criticize public men and measures—and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation.") (Frankfurter, J.); *FCC v. Pacifica Found.*, 438 U.S. 726, 745–46 (1978)

("[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection. For it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas.").

State officials do not need to outlaw unwanted speech in order to suppress it. For example, the entire premise of a First Amendment retaliation claim is that state officials through their actions can deter the exercise of protected speech. *See Alexander v. City of Round Rock*, <u>854 F.3d 298, 308</u> (5th Cir. 2017) (element of the claim is that the officer caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in" the protected speech). The police are uniquely capable of chilling offensive or embarrassing speech with their power to arrest, or even to briefly stop and search. As the Sixth Circuit observed, "[a] two and one-half hour detention absent probable cause, accompanied by a search of both their vehicles and personal belongings, conducted in view of an ever-growing crowd of on-lookers, would undoubtedly deter an average law-abiding citizen from

similarly expressing controversial views." *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007).

In this case, Ms. Villarreal uncovered and published unflattering information about the police and local officials in Laredo, Texas, as well as "colorful—and often unfiltered—commentary." *Villarreal*, 44 F.4th at 368. On one occasion she filmed an officer choking an arrestee during a traffic stop. *Id.* While local officials may not have wanted the public to learn what Ms. Villarreal had uncovered, her reporting is precisely the type of activity that the First Amendment was designed to protect. The dangers—both to Ms. Villarreal and the public at large—of local officials suppressing true, factual information about their government demand a vigorous response, including an effective deterrent, which is best provided by a damages remedy.

## C. The best way to deter free speech violations is to provide a full arsenal of remedies.

Of course, damages are not the only remedy available to First Amendment plaintiffs. Injunctive and declaratory relief also serve an important role. An injunction, for example, can put a stop to a particular prior restraint of speech, or otherwise allow protected speech to go

forward. The First Amendment may also serve as an affirmative defense to criminal and civil liability.

But to most effectively protect First Amendment rights, courts must allow Section 1983 plaintiffs to pursue all traditional remedies. In general, the only way to remedy past harms is with compensatory damages. And unfortunately, the best way to deter some state officials from violating the First Amendment is with the threat of having to pay damages.

There are also practical impediments that can make injunctive relief a poor deterrent. For example, to have Article III standing to pursue an injunction, the plaintiff generally must be able to show a real and immediate threat of future injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). In many cases, it may be difficult, if not impossible, to make this showing and thus obtain an injunction. In such cases, damages for past violations can serve as a deterrent to future violations when an injunction is not available.

Additionally, where, as here, the police make a retaliatory arrest, the speaker faces additional barriers to injunctive relief. For example, injunctions are usually not available while criminal proceedings are

pending. *See Younger v. Harris*, [401 U.S. 37](#) (1971) (federal courts generally must abstain from interfering with state criminal proceedings). The journalist may have to endure the process of criminal prosecution and obtain a favorable ruling before she can pursue affirmative relief. By that point, any injunction will likely have long since lost its value. In contrast, compensatory damages still have value even if they are delayed until after a criminal prosecution is resolved.

### D. First Amendment violations cause real harm and the affected journalists deserve to be compensated.

In addition to their deterrent effect, damages remedies are necessary to compensate people for the actual harms caused by violations of their constitutional rights. A deprivation of a journalist's First Amendment rights is not an abstract or theoretical injury. The individuals involved, including in the cases of a citizen journalist, are genuinely harmed, and they should be compensated.

In cases such as this, where the state has punished constitutionally protected activities, the consequences for the journalist can be severe. Ms. Villarreal, and others in similar situations, have been wrongly incarcerated and have suffered a loss of liberty for which she can and should be compensated. *See, e.g.*, *Hazle*, [727 F.3d at 992](#) (reversing jury

award of only nominal damages because plaintiff was entitled to actual damages for period of wrongful incarceration). Courts have awarded substantial damages even for relatively brief periods of wrongful detention or incarceration, whether because their conduct was protected by the First Amendment or otherwise. Such injuries should not go uncompensated.

In *Dennis v. Warren*, for example, this Circuit affirmed an award of $6,000—over $16,000 in today's dollars—for a plaintiff who had spent three hours in jail after being arrested without probable cause. 779 F.2d 245, 248 (5th Cir. 1985). In *Young v. City of Little Rock*, the court affirmed a jury verdict of $100,000 for a plaintiff who was wrongly arrested and spent a day in a municipal jail. 249 F.3d 730, 736–37 (8th Cir. 2001); *see also Kerman v. City of New York*, 374 F.3d 93, 125–26 (2d Cir. 2004) ("[E]ven absent such other injuries, an award of several thousand dollars may be appropriate simply for several hours' loss of liberty.").

Plaintiffs in Section 1983 cases are entitled to damages for "impairment of reputation, personal humiliation, and mental anguish and suffering." *Memphis*, 477 U.S. at 307 (cleaned up). Emotional distress damages take on particular importance in civil rights cases,

where plaintiffs suffer from "an intangible injury to [their] constitutional and dignitary interest." *Ellison v. Balinski*, 625 F.3d 953, 959 (6th Cir. 2010). The pain and suffering caused by injuries to this dignitary interest can be substantial, and result in a substantial damages award. *See, e.g., Forsyth v. City of Dallas*, 91 F.3d 769, 774–75 (5th Cir. 1996) (affirming awards of $100,000 and $75,000 to two whistle blowers who suffered emotional distress due to their employer's retaliation against them); *Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 774 (1st Cir. 2010) (affirming award of $350,000 in emotional distress damages).

The facts of this case further illustrate the potential for these types of injuries and damage. The officers actively attempted to humiliate and embarrass Ms. Villarreal by taking pictures of her in handcuffs and mocking and laughing at her. A reasonable person would have easily been traumatized by the entire incident. The indignity was compounded by the fact that it involved police officers' abuse of their authority to punish a citizen's exercise of her core constitutional rights. *See Ellison*, 625 F.3d at 959.

Compensatory damages can also include economic damages, including lost income. For example, when police arrest citizen journalists

for doing their job, they lose income from time spent in jail or prison following a retaliatory arrest. *See Train v. City of Albuquerque*, <u>629 F. Supp. 2d 1243, 1250</u> (D.N.M. 2009) (holding that lost income from time spent wrongfully incarcerated is recoverable under Section 1983).

In *Fairley v. Andrews*, the Seventh Circuit held that "threats of punishment designed to discourage future speech" can lead to damages for lost income if they cause plaintiffs to quit their jobs or otherwise "are the sort of harms that would cause a reasonable person to keep quiet." <u>578 F.3d 518, 526</u> (7th Ci<u>r. 2009</u>). For journalists, whose jobs often place them at odds with the government officials on whom they are reporting, the threat of criminal prosecution, including the ordeal that Ms. Villarreal endured, would certainly cause many reasonable people to seek other employment rather than face such harassment again. For many journalists—citizen and otherwise—reporting is their livelihood. Journalists should not have to choose between their livelihood and their liberty.

**E.** **Nominal damages are vital for First Amendment plaintiffs when compensatory damages cannot be proven.**

Even if a plaintiff is unable to demonstrate actual damages, nominal damages are still available in a Section 1983 claim and serve an important function. In a recent First Amendment case, the Supreme Court held that even when a claim for injunctive relief is moot and there are no actual damages, the plaintiff still has standing to pursue a Section 1983 claim because the constitutional violation can be redressed by nominal damages. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021). *Uzuegbunam* involved a public college student whose pamphleteering was unconstitutionally limited to a restrictive "free speech zone." After the student sued under Section 1983, the college changed its policy, and then argued that the case was moot. *Id.* at 796–97.

Citing to common law principles, the Court held that "every injury imports a damage, so a plaintiff who proved a legal violation could always obtain some form of damages because he must of necessity have a means to vindicate and maintain the right." *Id.* at 800 (cleaned up); *see also Memphis*, 477 U.S. at 308 ("[N]ominal damages . . . are the appropriate means of 'vindicating' rights whose deprivation has not caused actual,

provable injury."); *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1014 (5th Cir. 2003) ("The law is well-established in this Circuit that plaintiffs may recover nominal damages when their constitutional rights have been violated but they are unable to prove actual injury.").

Nominal damages vindicate important rights and satisfy Article III's overarching requirement that federal courts only resolve live controversies and not issue advisory opinions. To deprive a person of even nominal damages is to deprive them of their day in court.

Nominal damages can also open the door for punitive damages, even when there are no actual damages. In *Williams v. Kaufman Cnty.*, this Court upheld a punitive damages award of $15,000, even though there were no actual damages and only nominal damages were otherwise awarded. 352 F.3d at 1015 ("Just as nominal damages are allowed without proof of injury, 'a punitive award may stand in the absence of actual damages where there has been a constitutional violation.'") (quoting *Louisiana ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 303 (5th Cir. 2000)). The Court also held that when punitive damages are awarded on top of only nominal damages, it need not conduct the typical "ratio analysis" of punitive damages to compensatory damages. *Id.* at 1016.

Punitive damages are recoverable in Section 1983 cases where "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith*, 461 U.S. at 56. Punitive damages are specifically intended to serve as a deterrent, and play an important role in Section 1983 cases. *See Creamer v. Porter*, 754 F.2d 1311, 1319 (5th Cir. 1985) ("The award of punitive damages is consistent with the purpose of § 1983 where such an award will act to deter future egregious conduct in violation of constitutional rights.").

In fact, the Supreme Court has long recognized that punitive damages "are especially appropriate to redress the violation by a Government official of a citizen's constitutional rights." *Carlson v. Green*, 446 U.S. 14, 22 (1980). In cases where the actual injury is small, "punitive damages may be the only significant remedy available in some § 1983 actions where constitutional rights are maliciously violated but the victim cannot prove compensable injury." *Id.* at 22 n.9.

F.     **Damages remedies are particularly important for citizen journalists.**

Damages remedies are important for every journalist—indeed for anyone at all—whose First Amendment rights have been violated. But

the need for an effective damages remedy is particularly acute in the case of citizen journalists. Citizen journalists cannot depend on the institutional resources available to traditional journalists working for major news organizations. Traditional news organizations often have a dedicated department of in-house attorneys whose sole job is to vindicate the rights of the publication and the journalists it employs. Many others have the means to retain outside counsel. Traditional news organizations also have the financial means both to defend their journalists against malicious prosecution and to ensure their continued employment. Most citizen journalists do not have the same kind of legal and financial resources.

As a result, citizen journalists are especially vulnerable to the kinds of First Amendment violations discussed above. Even one night in jail or a misdemeanor criminal charge can be especially traumatic and economically crushing for someone who does not have a news-oriented employer to support them. Many citizen journalists lack the means to effectively enforce their rights, making them more susceptible to intimidation and retaliation. An effective damages remedy is therefore vital both to the individual journalist and to citizen journalism. This

Court must not take away this key remedy, provided by Congress in Section 1983, by granting qualified immunity to the officers who violated Ms. Villarreal's clearly established First Amendment rights.

## CONCLUSION

Citizen journalists play a vital role in our society. Their First Amendment rights must be protected, and the best way to do so is to ensure that a meaningful damages remedy is available when their constitutional rights have been violated. *Amici* respectfully urge this Court to reverse the decision below, and hold that Defendants do not have qualified immunity.

Respectfully submitted,

*/s/ Jacob Crump*

Matthew Kudzin
Jacob Crump
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000

Gawon Go
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 841-1000

Zachary Glasser
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (424) 332-4800

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limits of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2, this document contains 5,360 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14 point Century Schoolbook font.

Dated: December 12, 2022          /s/ *Jacob Crump*
                                  Jacob Crump
                                  *Counsel for Amici Curiae*

# CERTIFICATE OF SERVICE

I certify that on December 12, 2022, the foregoing document was served on all counsel of record through the Court's CM/ECF system.


Dated: December 12, 2022
/s/ *Jacob Crump*
Jacob Crump
*Counsel for Amici Curiae*