No. 20-40359

# In the United States Court of Appeals for the Fifth Circuit

Priscilla Villarreal,

*Plaintiff-Appellant,*

*v.*

The City of Laredo, Texas; Webb County, Texas; Isidro R. Alaniz; Marisela Jacaman; Claudio Trevino, Jr.; Juan L. Ruiz; Deyanria Villarreal; Enedina Martinez; Alfredo Gurrero; Laura Montemayor; Does 1-2,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Texas, Laredo Division

## BRIEF FOR INTERVENOR THE STATE OF TEXAS IN SUPPORT OF DEFENDANTS-APPELLEES

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Judd E. Stone II
Solicitor General

Lanora C. Pettit
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

Kathryn M. Cherry
Assistant Solicitor General

Counsel for Intervenor

## Certificate of Interested Persons

No. 20-40359

Priscilla Villarreal,

*Plaintiff Appellant,*

*v.*

The City of Laredo, Texas; Webb County, Texas; Isidro R. Alaniz; Marisela Jacaman; Claudio Trevino, Jr.; Juan L. Ruiz; Deyanria Villarreal; Enedina Martinez; Alfredo Gurrero; Laura Montemayor; Does 1-2,

*Defendants-Appellees.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Intervenor, as a governmental party, need not furnish a certificate of interested persons.

/s/ Lanora C. Pettit
Lanora C. Pettit
*Counsel of Record for Intervenor*

## Statement Regarding Oral Argument

The en banc Court will hold oral argument on January 25, 2023.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ................................................................. i

Statement Regarding Oral Argument ......................................................... ii

Table of Authorities ................................................................................ iv

Introduction ........................................................................................... 1

Summary of the Argument ....................................................................... 3

Argument ............................................................................................... 5

    I.   Section 39.06(c) Is Facially Constitutional—or at Least Not
        Obviously Unconstitutional Under Existing Precedent. ........................... 6

      A.  Section 39.06(c) does not abridge the freedom of expression. ............ 6

          1.  There is no freestanding, unfettered First Amendment right
              to "gather news." ...................................................................... 7

          2.  Section 39.06(c) criminalizes conduct, not merely "asking a
              question." .................................................................................15

          3.  Section 39.06(c) falls outside the First Amendment because
              it prohibits inducing a public servant to engage in a felony. .........15

      B.  Section 39.06(c) is not unconstitutionally vague ............................... 23

    II.  The Individual Defendants Are Entitled to Qualified Immunity
        for the Manner in Which Section 39.06(c) Was Applied to
        Villarreal. ............................................................................................ 26

      A.  The panel examined the "obviously unconstitutional"
          exception at too high a level of generality. ...................................... 26

      B.  The cases identified by the panel majority do not show an
          "obvious" constitutional violation. ................................................ 28

      C.  Villarreal's arrest did not violate clearly established law. .................. 29

          1.  Villarreal's arrest was supported by probable cause. ................... 30

          2.  The panel erred in discarding the independent-intermediary
              doctrine. ................................................................................... 39

Conclusion ............................................................................................ 46

Certificate of Service .............................................................................. 47

Certificate of Compliance ...................................................................... 47

# Table of Authorities

Page(s)

**Cases:**

*Am. Civ. Liberties Union v. Alvarez,*
679 F.3d 583 (7th Cir. 2012) ............................................................ 14

*Anderson v. Creighton,*
483 U.S. 635 (1987) ................................................................... 6, 26

*Ashcroft v. al-Kidd,*
563 U.S. 731 (2011) ................................................................ *passim*

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................... 24, 26, 33, 37

*Assoc. Press v. NLRB,*
301 U.S. 103 (1937) ........................................................................ 10

*Bailey v. Morales,*
190 F.3d 320 (5th Cir. 1999) ........................................................ 24

*Bartnicki v. Vopper,*
532 U.S. 514 (2001) ............................................................... 3, 11-12

*Branzburg v. Hayes,*
408 U.S. 665 (1972) ................................................................. 6, 9, 10

*Brown v. Lyford,*
243 F.3d 185 (5th Cir. 2001) .......................................................... 5

*Butler v. State,*
No. 14-00-01186-CR, 2003 WL 253296 (Tex. App.—Houston
[14th Dist.] Feb. 6, 2003, no pet.) ................................................ 21

*Calder v. IRS,*
890 F.2d 781 (5th Cir. 1989) .......................................................... 7

*Cameron v. EMW Women's Surgical Ctr., P.S.C.,*
142 S. Ct. 1002 (2022) ..................................................................... 1

*Chaplinsky v. New Hampshire,*
315 U.S. 568 (1942) ........................................................................ 21

*Chavez v. State,*
843 S.W.2d 586 (Tex. Crim. App. 1992) ....................................... 15

*Clark v. Martinez,*
543 U.S. 371 (2005) ............................................................. 17-18, 19

iv

*Dist. of Columbia v. Heller*,
    554 U.S. 570 (2008) ................................................................ 8
*District of Columbia v. Wesby*,
    138 S. Ct. 577 (2018) ............................................ 13, 29, 38-39
*Dorsey v. Portfolio Equities, Inc.*,
    540 F.3d 333 (5th Cir. 2008) ................................................31
*Duffield v. State*,
    643 S.W.2d 139 (Tex. Crim. App. 1982) ............................ 18
*Edenfield v. Fane*,
    507 U.S. 761 (1993) .............................................................. 4
*Ex parte Perry*,
    483 S.W.3d 884 (Tex. Crim. App. 2016) ...........................17
*Franks v. Delaware*,
    438 U.S. 154 (1978) ............................................................ 42
*Gericke v. Begin*,
    753 F.3d 1 (1st Cir. 2014) .................................................. 14
*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949)........................................................ 21-22
*Glik v. Cunniffe*,
    655 F.3d 78 (1st Cir. 2011)................................................. 14
*Gonzales v. Carhart*,
    550 U.S. 124 (2007) ........................................................... 25
*Green v. State*,
    208 S.W. 514 (Tex. Crim. App. 1919) ............................... 18
*Grosjean v. Am. Press Co.*,
    297 U.S. 233 (1936) ........................................................ 7, 8
*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)................................................................ 22
*Houchins v. KQED, Inc.*,
    438 U.S. 1 (1978)................................................6-7, 9, 10
*Indianapolis v. Edmond*,
    531 U.S. 32 (2000) ............................................................. 30
*Indus. Found. of the S. v. Tex. Indus. Accident Bd.*,
    540 S.W.2d 668 (Tex. 1976) ............................................. 33
*Kingsley v. Hendrickson*,
    576 U.S. 389 (2015)......................................................33, 35

*Landmark Commc'ns, Inc. v. Virginia*,
   435 U.S. 829 (1978) ................................................................. 12

*Los Angeles Police Department v. United Reporting Publishing Corp.*,
   528 U.S. 32 (1999) .................................................................. 11

*Malley v. Briggs*
   475 U.S. 335 (1986) ...................................................... 41, 44, 45

*Marks v. United States*,
   430 U.S. 188 (1977) ................................................................. 14

*Massachusetts v. Sheppard*,
   468 U.S. 981 (1984) ................................................................. 41

*McFadden v. United States*,
   576 U.S. 186 (2015) ................................................................. 25

*Melton v. Phillips*,
   875 F.3d 256 (5th Cir. 2017) ..................................................... 41

*Messerschmidt v. Millender*,
   565 U.S. 535 (2012) ...................................................... 39, 40, 41, 45

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) ................................................................. 18

*Morgan v. Swanson*,
   659 F.3d 359 (5th Cir. 2011) ..................................................... 26

*New York Times Co. v. United States*
   403 U.S. 713 (1971) ........................................................... 3, 13, 14

*Ohralik v. Ohio*,
   436 U.S. 447 (1978) ............................................................. 4, 22

*Patel v. Trevino*,
   No. 01-20-00445-CV, 2022 WL 3720135 (Tex. App.—Houston
   [1st Dist.] Aug. 30, 2022, no pet.) .............................................. 20

*Paxton v. City of Dallas*,
   509 S.W.3d 247 (Tex. 2017) .................................................... 2, 19

*Pearson v. Callahan*,
   555 U.S. 223 (2009) .................................................................. 5

*PG Publ'g Co. v. Aichele*,
   705 F.3d 91 (3d Cir. 2013) ....................................................... 10

*Powers v. Northside Indep. Sch. Dist.*,
   951 F.3d 298 (5th Cir. 2020) .................................................. 5, 6, 44

*Ramie v. City of Hedwig Village*,
  765 F.2d 490 (5th Cir. 1985) .......................................................... 33-34

*Regan v. Wald*,
  468 U.S. 222 (1984) ........................................................................ 10

*Reichle v. Howards*,
  566 U.S. 658 (2012) .......................................................................... 5

*Reno v. Bossier Parish Sch. Bd.*,
  528 U.S. 320 (2000) ........................................................................... 7

*Salman v. United States*,
  137 S. Ct. 420 (2016) ................................................................... 36-37

*Sanders v. State*,
  129 S.W. 605 (Tex. Crim. App. 1910) ............................................ 18

*Sause v. Bauer*
  138 S. Ct. 2561 (2018) .......................................................... 3, 28, 29

*Scott v. United States*,
  436 U.S. 128 (1978) ........................................................................ 30

*Smith v. City of Cumming*,
  212 F.3d 1332 (11th Cir. 2000) ..................................................... 14

*Smith v. Daily Mail Publ'g Co.*,
  443 U.S. 97 (1979) .................................................................... 10-11

*State v. Ford*,
  179 S.W.3d 117 (Tex. App.—San Antonio 2005, no pet.) ................... 19

*State v. Furr*,
  235 S.E.2d 193 (N.C. 1977) ........................................................... 17

*State v. Johnson*,
  475 S.W.3d 860 (Tex. Crim. App. 2015) .......................................... 19

*State v. Martinez*
  116 S.W.3d 385 (Tex. App.—El Paso 2003, no pet.) ................... 20-21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................................ 31

*Tex. Democratic Party v. Abbott*,
  978 F.3d 168 (5th Cir. 2020) ................................................... 7, 8-9

*Tex. Dep't of Pub. Safety v. Cox Tex. Newspapers, L.P.*,
  343 S.W.3d 112 (Tex. 2011) ........................................................... 19

*The Florida Star v. BJF*,
  491 U.S. 524 (1989) ........................................................................ 12

*Tidwell v. State,*
No. 08-11-00322-CR, 2013 WL 6405498 (Tex. App.—El Paso Dec. 4, 2013, pet. ref'd) ................................................................. 20

*Turner v. Lieutenant Driver*
848 F.3d 678 (5th Cir. 2017) ................................................. 13-14

*United States v. Cortez,*
449 U.S. 411 (1981) .................................................................. 38

*United States v. Leon,*
468 U.S. 897 (1984) .................................................................. 41

*United States v. Mejia-Aguilar,*
575 Fed. App'x 233 (5th Cir. 2014) .......................................... 17

*United States v. Perez,*
43 F.4th 437 (5th Cir. 2022) ...................................................... 22

*United States v. Rosen*
445 F. Supp. 2d 602 (E.D. Va. 2006) ........................... 12-13, 15

*United States v. Stevens,*
559 U.S. 460 (2010) .................................................................. 21

*United States v. Williams,*
553 U.S. 285 (2008) ............................................................ 24-25

*Villarreal v. City of Laredo,*
17 F.4th 532 (5th Cir. 2021) ........................................... 3, 4, 25

*Villarreal v. City of Laredo,*
44 F.4th 363 (5th Cir. 2022) .............................................. *passim*

*White v. Pauly,*
580 U.S. 73 (2017) .................................................................... 26

*Wilson v. Stroman,*
33 F.4th 202 (5th Cir. 2022) ..................................................... 39

*Wood v. Moss,*
572 U.S. 744 (2014) ............................................................. 26-27

*Zemel v. Rusk,*
381 U.S. 1 (1965) ............................................................ 7, 9, 10

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const. amend. I .......................................................... *passim*

U.S. Const. amend. IV ....................................................... *passim*

U.S. Const. amend. IVX ...................................................... 8, 24

Act of May 29, 1993, 73rd Leg., R.S., ch 900, § 1.01 .......................... 18

18 U.S.C.:

    § 793 ...................................................................................13

    § 793(d)-(e) ........................................................................13

    § 793(e) ..............................................................................13

    § 793(g) ..............................................................................13

1993 Tex. Gen. Laws 3586 ....................................................... 18

Tex. Crim. Law § 18.8 (2d ed. 2021).........................................15

Tex. Gov't Code:

    ch. 552 .................................................................................19

    § 552.001 .....................................................................2, 7, 10

    § 552.022(a)(1) ................................................................ 34-35

    § 552.101 .............................................................................19

    § 552.101-.156.............................................................. 2, 32

    § 552.108 ............................................................................ 34

    § 552.108(a)(1)-(2) ........................................................... 34

    § 552.221(a) ..................................................................... 20

    § 552.304 ...................................................................... 20, 34

    § 552.305 .......................................................................... 20

    § 552.305(b) ..................................................................... 20

Tex. Penal Code:

    § 1.07(a)(7) ........................................................................ 36

    § 5.02 .................................................................................16

    § 7.02 .................................................................................16

    § 15.03 .............................................................................. 22

    § 32.35(c) ........................................................................... 18

    § 32.43(b) .......................................................................... 18

    § 32.44(b) .......................................................................... 18

    § 32.441(a) ......................................................................... 18

    § 36.02 ............................................................................... 18

    § 36.05(b) .......................................................................... 18

    § 36.07(a) .......................................................................... 18

    § 36.08 ............................................................................... 18

    § 39.06 ......................................................................... 20, 32

    § 39.06(c) ...................................................................*passim*

    § 39.06(c)(2) ..................................................................... 35

§ 39.06(d) ...................................................................... 2, 19, 22, 32

§ 43.03(a) ................................................................................... 18

Tex. Transp. Code:

§ 550.065(f)(2)(A) ..................................................................... 34

§ 550.065(c)(4)(K) ..................................................................... 34

§ 550.065(a)-(b) ......................................................................... 34

Fla. Stat. § 777.04 .......................................................................... 22

Ga. Code Ann. § 16-4-7 .................................................................. 22

N.Y. Penal Law § 100.13 ................................................................. 22

Nev. Rev. Stat. § 200.575(6)(g)(2) .................................................. 10

18 Pa. Cons. Stat. Ann. § 902 ......................................................... 22

Fed. R. App. P. 28(i) ........................................................................ 1

**Other Authorities:**

American Heritage Dictionary of the English Language (5th ed. 2016) ................17

Black's Law Dictionary (11th ed. 2019) ................................................16-17

Bryan A. Garner, A Dictionary of Modern Legal Usage (2d ed. 1995) ...................16

Kelly Ehlers, *2017: The Year of the Influencer*, Forbes (Feb. 23, 2017),
    https://tinyurl.com/27ackuxy ...................................................... 43

Merriam-Webster's Collegiate Dictionary (11th ed. 2003) .....................................17

Office of the Attorney General, *Public Information Act Handbook*
    (2022) https://tinyurl.com/2j6zajx5 .......................................... 34

Office of the Dir. of Nat'l Intel., *Statistical Transparency Report:*
    *Regarding the Use of National Security Authorities for Calendar Year*
    *2016* (Apr. 2017), https://tinyurl.com/yk2a4yx8 ....................................... 9

Potter Stewart, *Or of the Press*, 26 Hastings L.J. 631 (1975) .................................9, 10

Simon Romero, *La Gordiloca: The Swearing Muckraker Upending*
    *Border Journalism*, N.Y. Times Online, Mar. 10, 2019,
    https://tinyurl.com/29x7e6aw ......................................................31

Stephen I. Vladeck, *Inchoate Liability and the Espionage Act: The*
    *Statutory Framework and the Freedom of the Press*, 1 Harv. L. & Pol'y
    Rev. 219 (2007) ..................................................................... 23

Tex. Atty Gen. OR2022-36798, 2022 WL 17552725 (2022) .............................33, 34

Webster's New World College Dictionary (5th ed. 2016) .....................................17

Webster's Third New International Dictionary (2002) ...........................................17

William E. Lee, *Probing Secrets: The Press and Inchoate Liability for Newsgathering Crimes*, 36 Am. J. Crim. L. 129 (Spring 2009) ........................... 22

# Introduction

The State of Texas intervenes in this action to protect its sovereign "interest in the continued enforceability of its own statutes." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 142 S. Ct. 1002, 1011 (2022). That interest is implicated by both now-vacated panel opinions, which called into question the constitutionality of Texas Penal Code § 39.06(c). But it is imperiled by the panel majority's larger holding that the tens of thousands of dedicated public servants charged with enforcing Texas law on a day-to-day basis may be subject to a claim for damages (and attorneys' fees) in their personal capacities for enforcing a lawfully obtained, facially valid arrest warrant for violation of a duly enacted, facially constitutional law.

"For several years," Priscilla Villarreal has "used her Facebook page," "a smartphone[,] and an old pickup truck" to bring herself notoriety among, influence over, and at least some concrete benefits from members of her community by "publish[ing] livestreams, videos and photographs" of what she deems "newsworthy events in and around Laredo." ROA.153.[1] In 2017, however, she was arrested for receiving confidential information (which she subsequently published) about a suicide and a fatal accident from a public official not authorized to disclose it. According to the panel majority, this arrest was so obviously a violation of the First Amendment that ten members of the Laredo Police Department ("LPD") should be subject to

---

[1] Pursuant to Federal Rule of Appellate Procedure 28(i), Texas adopts the more detailed statement of the case contained in the brief of Defendants-Appellees the City of Laredo, Claudio Treviño, Jr., Juan L. Ruiz, Deyanria Villarreal, Enedina Martinez, Alfredo Guerrero, Laura Montemayor, and Does 1-2.

personal liability for monetary damages notwithstanding that (1) the officers had a facially valid warrant, (2) the statute itself is facially valid, and (3) there was no on-point case demonstrating that an arrest under these circumstances is unconstitutional. The dissent was correct that the panel majority's reasoning misstated Texas law and misapplied well established jurisprudence regarding both the First Amendment and the scope of qualified immunity.[2]

For decades, it has been "the policy of [Texas] that each person is entitled, unless otherwise expressly provided by law, at all times to complete information about the affairs of government and the official acts of public officials and employees." Tex. Gov't Code § 552.001. Any exceptions to that policy—which is embodied in the Texas Public Information Act or "TPIA"—must, by law, be "liberally construed" in favor of transparency to the public. *Id.* These exceptions are designed to protect other important interests such as, for example, maintaining the integrity of ongoing criminal investigations, preserving the confidentiality of attorney-client communications for governmental entities, and protecting constitutional zones of privacy for Texas citizens. *See Paxton v. City of Dallas*, 509 S.W.3d 247, 249-50 & n.3 (Tex. 2017) (citing Tex. Gov't Code §§ 552.101-.156). To protect these same important interests, Texas has criminalized certain forms of misuse of information "that is prohibited from disclosure" under the TPIA. Tex. Penal Code § 39.06(d).

---

[2] Although Chief Judge Richman concurred in part and dissented in part, this brief refers to her opinion as "the dissent" in the text, consistent with the terminology used in the concurrence and to distinguish the Chief Judge's opinion from the concurrence.

The only question in this appeal is whether that law is so obviously unconstitutional as applied to a self-styled "citizen journalist" who solicited and received protected information that any reasonable police officer should have known that it could not be enforced—notwithstanding the issuance of an otherwise facially valid arrest warrant by a neutral magistrate. It is not.

## Summary of the Argument

The now-twice-vacated majority opinion from this Court held that because there is a right to pray and to publish the Pentagon Papers, it would have been "obvious" to any reasonable officer that Villarreal had the right to ask for and receive information not yet released to the public concerning a suicide and a fatal car accident. But that leap ignored the nuances in the very cases upon which it relied. *Villarreal v. City of Laredo*, 17 F.4th 532, 540 (5th Cir. 2021) (*Villarreal I*); *Villarreal v. City of Laredo*, 44 F.4th 363, 371-72 (5th Cir. 2022) (*Villarreal II*). After all, in *Sause v. Bauer*, the Supreme Court did not hold that Sause had an obvious right to pray; it sent the case back for details concerning the actions of her and the officers. 138 S. Ct. 2561 (2018) (per curiam). In *New York Times Co. v. United States*, the Supreme Court did not absolve the press from all criminal liability for stolen intelligence; it denied an injunction against the publication of information already obtained without illegal action from the press. 403 U.S. 713 (1971) (per curiam). The Supreme Court has *never* recognized an unfettered right to access all sensitive information, at all times, for all purposes—whether asserted by the press or anyone else. *See Bartnicki v. Vopper*, 532 U.S. 514, 528 (2001).

3

The ten individual defendants were entitled to qualified immunity because reasonable officers would not have been on notice of an alleged constitutional violation from the statute itself. The First Amendment is a notoriously difficult and nuanced area of law. Indeed, there is an entire body of caselaw specific to when solicitation laws like (at least one part) of the challenged statute are consistent with the First Amendment. *E.g.*, *Edenfield v. Fane*, 507 U.S. 761, 767 (1993) (distinguishing *Ohralik v. Ohio*, 436 U.S. 447 (1978)). While acknowledging there was no on-point case involving analogous facts, the panel majority eschewed any of this nuance by describing the question as whether a State can imprison someone for "asking a question." And in its original opinion, they found the answer obvious and section 39.06(c) "patently unconstitutional." *Villarreal I*, 17 F.4th at 541. Upon reconsideration, the panel majority correctly concluded that section 39.06(c), which does no more than restrict the solicitation or receipt of certain limited, statutorily defined classes of information in the hands of the government, is not unconstitutional "[o]n its face." *Villarreal II*, 44 F.4th at 372.[3] Given that the named defendants had a facially valid warrant to enforce a facially valid law, this case should have been an easy one to apply qualified immunity.

Nevertheless, the panel majority concluded in its revised opinion (*Villarreal II*) that there was an obvious constitutional violation and that any reasonable police officer would have known that the statute could not be enforced against Villarreal

---

[3] The panel never addressed Villarreal's now-abandoned claim, which she pressed in state court, that the statute is unconstitutionally vague.

because she was simply "asking a question." *Id.* at 375. This conclusion, however, reflects the same legal errors that infected the original opinion. Section 39.06(c) penalizes receipt, not simply solicitation, and Villarreal's actions involved both. ROA.166, 170. In addition, Villarreal's operative complaint contains no well-pleaded facts to show that the officers knew the warrant lacked probable cause, which is enough to satisfy the Fourth Amendment. Moreover, in the absence of a binding case addressing factually analogous circumstances, the panel majority should have concluded that the officers reasonably relied upon the neutral magistrate's conclusion that there was probable cause to arrest Villarreal for violating a facially valid statute.

## Argument

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Qualified immunity applies even when the government official makes a mistake of law, of fact, or both. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "A plaintiff must clear a significant hurdle to defeat qualified immunity." *Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001).

The inquiry into whether qualified immunity applies to an official turns on two questions: (1) whether the official violated a statutory or constitutional right, and, if so, (2) was the defendant's "conduct objectively reasonable in light of clearly-established law." *Powers v. Northside Indep. Sch. Dist.*, 951 F.3d 298, 305-06 (5th Cir. 2020). To be clearly established the right must be so clear "that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v.*

*al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Thus, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* A government official's conduct is "objectively reasonable" if, given the totality of the circumstances and clearly established law at the time of the challenged act, the official's act was objectively reasonable. *Powers*, 951 F.3d at 306.

The State does not dispute that *if* a statute is *obviously* unconstitutional, it would be difficult for a reasonable officer to show that enforcing the statute was "objectionably reasonable in light of clearly established law." *Id.* at 305-06. But even the panel majority acknowledges section 39.06(c) is not such a law. That probably explains why a state judge—who is *not* alleged to be involved in any "conspiracy" to get back at Villarreal for past negative coverage, *see* ROA.154-57—issued an arrest warrant. The panel erred in holding that any of the named officers—let alone all ten of them—behaved in an objectively unreasonable manner in relying upon that warrant.

# I. Section 39.06(c) Is Facially Constitutional—or at Least Not Obviously Unconstitutional Under Existing Precedent.

## A. Section 39.06(c) does not abridge the freedom of expression.

Laws implicating the First Amendment involve "intrusions upon speech or assembly," "prior restraint or restriction on what the press may publish," or an "express or implied command that the press publish what it prefers to withhold." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). Section 39.06(c) does none of those things: it limits individuals' access to "government information or sources of information within the government's control." *Houchins v. KQED, Inc.*, 438 U.S. 1, 15

(1978). Moreover, it is best read as either a prohibition against incitement of a crime or a regulation of conduct. Neither of those is a law "abridging the freedom of speech, or of the press." U.S. Const. amend. 1.

### 1. There is no freestanding, unfettered First Amendment right to "gather news."

No one disputes the importance of an "untrammeled press" or the need for "informed public opinion" to check government misconduct. *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936). That has been Texas's public policy for decades. Tex. Gov't Code § 552.001. But Villarreal is wrong to assert there is also a "clearly established First Amendment right to lawfully gather . . . information on newsworthy issues." ROA.169. To the contrary, courts—including this one—have recognized "[t]he right to speak and publish does *not* carry with it an unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (emphasis added); *Calder v. IRS*, 890 F.2d 781, 783-84 (5th Cir. 1989).

**a.** This conclusion flows from the First Amendment itself, its history, and the values judgment that it represents. Starting with the text: the First Amendment says nothing about gathering news. Instead, it provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. 1. As this Court has recognized, "the 'core meaning' of 'abridge' is to 'shorten,' and shortening 'necessarily entails a comparison.'" *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 191 (5th Cir. 2020) (quoting *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 (2000)).

To determine that "freedom of the Press" cannot be abridged requires the Court to look at the content of that right at the time the First Amendment was ratified—typically by examining the ills at which it was aimed. *E.g.*, *Dist. of Columbia v. Heller*, 554 U.S. 570, 605-10 (2008). The panel majority made no effort to perform such analysis. But in *Grosjean*, the Supreme Court noted the Amendment arose out of a "persistent effort" to muzzle free expression of unfavorable commentary concerning the government, *Grosjean*, 297 U.S. at 245—not a belief that the government was under an affirmative obligation to provide information to be published against it. For example, in 1644, John Milton wrote an "Appeal for the Liberty of Unlicensed Printing," challenging a recent act of Parliament that allowed censorship of the press prior to publication. *Id.* Milton's work "vigorously defended the right of every man to make public his honest views 'without previous censure.'" *Id.* In 1712, Queen Anne encouraged Parliament to impose a tax on all newspapers and advertisements, whose main purpose was "to suppress the publication of comments and criticisms objectionable to the Crown." *Id.* at 246. The next hundred years involved more taxes, more resistance to those taxes, and so on. *Id.*

As a result of this history, the Court concluded in *Grosjean* that "the First Amendment . . . was meant to preclude the national government, and by the Fourteenth Amendment to preclude the [S]tates, from adopting any form of previous restraint upon printed publications, or their circulation, including that which had theretofore been effected by these two wellknown and odious methods." *Id.* at 249. But a constitutional prohibition against *abridging* speech is not an obligation to *increase* speech. *Tex. Democratic Party*, 978 F.3d at 191. The government is not

obligated to provide information, even if doing so would assist in creating more speech. *See id.* As the Court noted in *Houchins*, "[t]he Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act." 438 U.S. at 14-15 (quoting Potter Stewart, *Or of the Press*, 26 Hastings L.J. 631, 636 (1975)). Although "the role of the media is important," and "they can be a powerful and constructive force," "like all other components of our society media representatives are subject to limits." *Id.* at 8. One of those limits, Chief Justice Burger explained, is that while the Constitution protects "the freedom of the media to *communicate* information once it is obtained," there is nothing in "the Constitution [that] *compels* the government to provide the media with information or access to it on demand." *Id.* at 9. Although "[t]here is an undoubted right to gather news 'from any source by means within the law,' . . . that affords no basis for the claim that the First Amendment compels others—private persons or governments—to supply information." *Id.* at 11 (quoting *Branzburg*, 408 U.S. at 681-82).

The need to observe that limit has, if anything, become more apparent. In the digital age, both state and national governments receive, create, or maintain enormous amounts of information regarding private individuals. *See* Office of the Dir. of Nat'l Intel., *Statistical Transparency Report: Regarding the Use of National Security Authorities for Calendar Year 2016* (Apr. 2017), https://tinyurl.com/yk2a4yx8. If the First Amendment guarantees access to government information, there are virtually no limits on this right because, as the Supreme Court noted more than 50 years ago, "[t]here are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow." *Zemel*, 381 U.S. at 16-17. But the Supreme

Court has recognized that the First Amendment interest in ensuring a well-informed public does not create "a constitutional right to have access to particular government information, or to require openness from the bureaucracy." *Houchins*, 438 U.S. at 14 (quoting Stewart, *supra*, at 636); *accord Regan v. Wald*, 468 U.S. 222, 241-42 (1984) (reaffirming *Zemel*'s rule that a ban on travel may "diminish[] the right to gather information" but "no First Amendment rights . . . were implicated").[4]

**b.**    Contrary to the panel majority's suggestion, *e.g.*, *Villarreal II*, 44 F.4th at 387, the mere fact that Villarreal considers herself a "journalist" does not change the First Amendment analysis. After all, "the publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others." *Branzburg*, 408 U.S. at 683 (quoting *Assoc. Press v. NLRB*, 301 U.S. 103, 132-33 (1937)). "Routine newsgathering" is not a term in the Constitution, and it has no special constitutional protection—as this Court's sister circuits have recognized. *E.g.*, *PG Publ'g Co. v. Aichele*, 705 F.3d 91, 99 (3d Cir. 2013).

Villarreal is correct (*e.g.*, at 18-19) that the Supreme Court has stated that "[a] free press cannot be made to rely solely upon the sufferance of government to supply it with information," *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 104 (1979). But the

---

[4] A State can, of course, choose to make public information in its possession that the Constitution would permit it to keep private, Tex. Gov't Code § 552.001, or even immunize journalists from crimes of general applicability, such as stalking, *see, e.g.*, Nev. Rev. Stat. § 200.575(6)(g)(2) (2009). This does not mean such policies are constitutionally mandated.

statement does not mean what she thinks: it referred to the fact that the press may *publish lawfully obtained information* even if the government does not provide or "ma[k]e possible press access to the information." *Id.* at 103. That statement neither establishes a government obligation to share information with the press nor immunizes the press from generally applicable criminal laws protecting government information.

To the contrary, in *Los Angeles Police Department v. United Reporting Publishing Corp.*, the Supreme Court held that a California law that "places two conditions on public access to arrestees' addresses" based on the requestor's purpose was not subject to "facial invalidation" under the First Amendment because it was "not a case in which the government is prohibiting a speaker from conveying information that the speaker already possesses." 528 U.S. 32, 34, 40 (1999). Rather, the statute "is nothing more than a governmental denial of access to information in its possession." *Id.* at 40. The Court agreed with the petitioners that "the section in question is not an abridgment of anyone's right to engage in speech . . . but simply a law regulating access to information in the hands of the police department." *Id.* "California," the Court added, "could decide not to give out arrestee information at all without violating the First Amendment." *Id.*

And, as the Supreme Court explained in *Bartnicki*, the Court's opinion involving the Pentagon Papers—upon which the panel majority relied so heavily to find a clearly established constitutional violation— "raised, but did not resolve, the question 'whether, in cases where information has been acquired *unlawfully* by a newspaper or by a source, government may ever punish not only the unlawful acquisition,

but the ensuing publication as well.'" 532 U.S. at 528 (quoting *The Florida Star v. BJF*, 491 U.S. 524, 535 n.8 (1989)). And that is not the only time the Court has deliberately left open the question of "the possible applicability" of regulations regarding the publication of information against one "who secures the information by illegal means and thereafter divulges it." *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 837 (1978); *see also The Florida Star*, 491 U.S. at 535 n.8.

Villarreal cites (at 14) *The Florida Star* in support of her assertion that "the First Amendment generally forbids the government from punishing a citizen for the government's failure to protect sensitive information." But that proves too much: an individual who gains government information through trespassing, hacking, theft, and bribery is criminally liable even if his success hinged on "the government's failure to protect sensitive information." *The Florida Star* did not say otherwise; it held only that having treated supposedly nonpublic information as if it were public information, the government cannot treat the press's use of the information as a use of confidential information. 491 U.S. at 538. And, in any event, *The Florida Star* dealt with a statute penalizing publication of information, not acquisition of it. *Id.* at 534.

Although the panel majority considered the question obviously closed, other courts have recognized that the question of whether a person can be punished for improperly obtaining information remains open. For example, in *United States v. Rosen*, the United States prosecuted two lobbyists who allegedly cultivated relationships with Department of Defense officials to obtain sensitive government intelligence, which the lobbyists "orally communicated" to individuals not entitled to receive it—including the media—to influence United States foreign policy. 445 F.

Supp. 2d 602, 608, 631 (E.D. Va. 2006), *amended*, No. 1:05CR225, 2006 WL 5049154 (E.D. Va. Aug. 16, 2006), *and aff'd*, 557 F.3d 192 (4th Cir. 2009). The lobbyists were charged with conspiracy to violate 18 U.S.C. § 793, which concerns "[g]athering, transmitting, or losing defense information." 18 U.S.C. § 793(d)-(e), (g). The lobbyists challenged the statute on, among other grounds, its alleged prohibition on speech—they had simply received the information, then orally transmitted it. Looking to the example of the Pentagon Papers, the district court noted that "[o]f the six Justices concurring in the result three—Justices Stewart, White and Marshall—explicitly acknowledged the possibility of a prosecution of the newspapers under section 793(e)." 445 F. Supp. 2d at 638. *See N.Y. Times*, 403 U.S. at 730 (Stewart, J., concurring); *id.* at 737 (White, J., concurring with Stewart, J.); *id.* at 745 (Marshall, J., concurring). And the "opinions of the other concurring justices arguably support, or at least do not contradict, the view that the application of § 793(e) to the instant facts would be constitutional." *Rosen*, 445 F. Supp. 2d at 638.

**c.** The lower court cases upon which Villarreal relies are not to the contrary. As an initial matter, under recent Supreme Court caselaw, it is far from clear that the circuit courts' decisions "qualify as controlling authority for purposes of qualified immunity." *District of Columbia v. Wesby*, 138 S. Ct. 577, 591 n.8 (2018). But even if they do, they show no obvious violation here. In particular, Villarreal relies (at 18) on this Court's decision in *Turner v. Lieutenant Driver*, but there again this Court held that the plaintiff could record *public* police activity "subject to reasonable time, place, and manner restrictions." 848 F.3d 678, 690 (5th Cir. 2017). The Court also viewed recording police conduct as "creating" speech, not acquiring it from the

government. *See id.* at 688-89. And the cases on which *Turner* relied did not extend that holding to nonpublic government information, either.[5]

The panel majority countered that "[i]f the government cannot punish someone for *publishing* the Pentagon Papers, how can it punish someone for simply *asking* for them?" *Villarreal II*, 44 F.4th at 371. But for at least three of the Justices—whose votes were necessary under *Marks v. United States*, 430 U.S. 188 (1977)—the only reason the defendants succeeded in *New York Times* was that the government sought an injunction but failed to prove the harm was sufficiently "direct, immediate, and irreparable" to justify that relief. *N.Y. Times*, 403 U.S. at 730 (Stewart, J., with whom White, J., joins, concurring); *see id.* at 731 (White, J., with whom Stewart, J., joins, concurring); *see id.* at 734-44 (Marshall, J., concurring). Moreover, publishing information already in your possession is different from acquiring and asking is different from soliciting and receiving. The words of section 39.06(c) concern the latter, not the former, which is conduct that is unprotected by the First Amendment.

---

[5] *See, e.g.*, *Gericke v. Begin*, 753 F.3d 1, 8 (1st Cir. 2014) (repeatedly describing a right to videotape police "performing their duties in public"); *Am. Civ. Liberties Union v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012) (finding statute that "prohibits nonconsensual audio recording of public officials performing their official duties in public" unconstitutional); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) (concerning "[t]he filming of government officials engaged in their duties in a public place"); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (concerning filming "what public officials do on public property").

### 2. Section 39.06(c) criminalizes conduct, not merely "asking a question."

Once Villarreal's incorrect assertions that the Constitution protects "routine reporting techniques" are set aside, *see, e.g.*, Appellant's Suppl. Br. 34, it becomes clear that section 39.06(c) can be satisfied based entirely on conduct—namely the *receipt* or access of confidential data. Villarreal admits that she "received" information from her inside contact at LPD, ROA.166, which is a sufficient ground for prosecution absent any verbal solicitation, Tex. Penal Code § 39.06(c). To be charged with criminal receipt of an item, Texas law typically requires that the defendant must know that he does not have "official" consent to possess the information. *See, e.g.*, Receiving Stolen Property, 6 Tex. Prac., Tex. Crim. Law § 18.8 (2d ed. 2021) ("the sine qua non of theft is the defendant's knowledge that the defendant does not have the owner's consent to dispose of the property"). As a result, "[t]he manner in which he came to possess it"—in this instance, whether Villarreal *asked* for the information—"is not an essential element" of such a crime. *Chavez v. State*, 843 S.W.2d 586, 588 (Tex. Crim. App. 1992) (en banc). Under *Rosen*, and the cases it cites, there is no constitutional infirmity with criminalizing the non-expressive act of receiving information. *Supra* Part I.A.1.b. And the constitutionality of the "solicits" element cannot be part of her as-applied challenge to a charge based on such *receipt*.

### 3. Section 39.06(c) falls outside the First Amendment because it prohibits inducing a public servant to engage in a felony.

**a.** But assuming the solicitation aspect of section 39.06(c) is even at issue, the panel still erred in holding it clearly unconstitutional. To start, the dissent was

correct (at *Villarreal II*, 44 F.4th at 382) that the panel majority drastically overread the statute's scope in two ways by characterizing it as a ban on "ask[ing] a question about nonpublic information from LPD officials other than the department's designated spokesperson." *Villarreal II*, 44 F.4th at 377 (suggesting the statute covers a broad variety of journalistic activity).

*First*, it is very unlikely that a Texas court would interpret "solicit" in section 39.06(c) to extend so far. "Solicit" has several potential meanings. It *can* mean to "elicit" information, as the panel majority seems to suggest, *see, e.g.*, *Villarreal II*, 44 F.4th at 377, but that is generally considered a mistake, *see* Bryan A. Garner, A Dictionary of Modern Legal Usage 816 (2d ed. 1995) (describing this use of "solicit" as a malapropism). In the criminal context, solicitation is more akin to incitement. For example, under the Texas Penal Code, "[a] person is criminally responsible for an offense committed by the conduct of another if: (1) acting with the kind of culpability required for the offense, he causes or aids an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense; (2) acting with intent to promote or assist the commission of the offense, he *solicits*, encourages, directs, aids, or attempts to aid the other person to commit the offense; or (3) having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense." Tex. Penal Code § 7.02 (emphasis added). The Model Penal Code uses the terms "commands" and "encourages" in its definition of criminal solicitation. Model Penal Code § 5.02 (2001). *Black*'s defines the term as the "criminal offense of urging, advising, commanding, or otherwise inciting another to commit a crime."

16

*Solicit*, Black's Law Dictionary 1677 (11th ed. 2019). And this Court has explained that the "gravamen of the offense of soliciting lies in counseling, enticing or inducing another to commit a crime." *United States v. Mejia-Aguilar*, 575 Fed. App'x 233, 238 (5th Cir. 2014) (quoting *State v. Furr*, 235 S.E.2d 193 (N.C. 1977)) (quotation marks omitted). Put another way, the panel majority's view was that "solicit" means to request something; most criminal definitions of solicitation mean to actually cause something to happen. *See id.*[6]

By employing a broad definition of "solicit" that most grammarians would consider a mistake, the panel majority failed to consider "the consequences of a particular construction." *Ex parte Perry*, 483 S.W.3d 884, 903 (Tex. Crim. App. 2016). In particular, because the penalty for all the conduct in subsections (a), (b), and (c) is the same, the panel majority's reading would lead to a *request* for confidential government information that does not exist receiving the same punishment as *actual* disclosure or use of confidential government information by the individuals who owe loyalty to the government. That is not how the Texas Court of Criminal Appeals would interpret the statute (*see Ex parte Perry*), or how a federal court would typically read a federal statute, *see Clark v. Martinez*, 543 U.S. 371, 380 (2005) ("when

---

[6] Even outside the criminal context, to "solicit" typically requires more than just a question. Instead, it usually means to "entreat, importune," "to strongly urge (as one's cause or point): insist upon," to "demand as a requisite"—not merely to ask for information. *Solicit*, Webster's Third New International Dictionary 2169 (2002); *accord Solicit*, Merriam-Webster's Collegiate Dictionary 1187 (11th ed. 2003); *Solicit*, Webster's New World College Dictionary 1382 (5th ed. 2016); *Solicit*, American Heritage Dictionary of the English Language 1666 (5th ed. 2016).

deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice"). And it would be particularly improper for a federal court to read a *Texas* statute this way, "where it is not even clear the State itself would consider its law" to operate that way. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382 (1992).

To the contrary, Texas law is very particular about when "solicit" means an inchoate request (such as that contemplated by the panel majority) or a completed offense. That is, when the Texas Legislature wants to penalize an inchoate request, it typically pairs "solicits" with "accepts, or agrees to accept." *See, e.g.*, Tex. Penal Code §§ 32.43(b) (Commercial Bribery), § 32.44(b) (Rigging Publicly Exhibited Contest), § 32.441(a) (Illegal Recruitment of Athlete), § 36.02 (Bribery), § 36.05(b) (Tampering with Witness), § 36.07(a) (Acceptance of Honorarium), § 36.08 (Gift to Public Servant by Person Subject to His Jurisdiction). By contrast, when the Legislature pairs "solicits" with "receives," it typically refers to a completed offense. *See, e.g.*, *id.* § 43.03(a) (Promotion of Prostitution); *see Duffield v. State*, 643 S.W.2d 139, 140 (Tex. Crim. App. 1982); *Green v. State*, 208 S.W. 514, 514-15 (Tex. Crim. App. 1919); *Sanders v. State*, 129 S.W. 605, 606 (Tex. Crim. App. 1910). When the Legislature wants to criminalize both forms of solicitation—an offer and a completed act—"solicits" stands alone. *See Tex. Penal Code* § 32.35(c).[7]

---

[7] These differences in verbiage cannot be explained by the passage of time. All of the Penal Code provisions listed above were altered at the same time that the modern version of section 39.06(c) was adopted. *See* Act of May 29, 1993, 73rd Leg., R.S., ch 900, § 1.01, 1993 Tex. Gen. Laws 3586.

Because section 39.06(c) pairs "solicit" and "receives," the panel majority should have adopted the definition of "solicits" that refers to the completed act—to induce or convince a government employee to provide information she is legally obligated to keep confidential—not an inchoate request. Standard rules of interpretation applied by both federal and state courts would have also favored this narrower interpretation, which avoids many of the constitutional problems highlighted by the panel majority. *See Clark*, 543 U.S. at 380-81; *State v. Johnson*, 475 S.W.3d 860, 872 (Tex. Crim. App. 2015).

*Second*, even assuming asking a question could be solicitation, the definition of "nonpublic information" contained in section 39.06(d) is far narrower than the panel majority suggests. Section 39.06(d) defines "information that has not been made public" as "any information to which the public does not generally have access, and that is prohibited from disclosure under Chapter 552, Government Code"—the TPIA. Although the TPIA has about sixty exceptions, many are discretionary. *See City of Dallas*, 509 S.W.3d at 254. Only a subset of them includes information that a public employee could not "voluntarily disclose . . . without being criminally sanctioned." *Id.*; *see also State v. Ford*, 179 S.W.3d 117, 123 (Tex. App.—San Antonio 2005, no pet.). These include "other statutes, judicial decisions, and rules promulgated by the judiciary" designed to protect—among other things—the privacy or proprietary rights of third parties. *Tex. Dep't of Pub. Safety v. Cox Tex. Newspapers, L.P.*, 343 S.W.3d 112, 114 (Tex. 2011); *see also* Tex. Gov't Code § 552.101. Section 39.06(c) targets that information that it would be *illegal* to disclose based on pre-existing law or from knowing violation of the TPIA. Anyone—press or

otherwise—can request that a government entity disclose information under the Act, and government entities are required to respond to such requests "promptly," "as soon as possible under the circumstances," and "without delay." Tex. Gov't Code §§ 552.221(a), 552.234(a). If a requestor is dissatisfied with the result, he may appeal to the Attorney General, and then to a district court. *Id.* §§ 522.305(b), 552.325. Thus Section 39.06(c) also targets those actors who knowingly disregard the procedures for gaining government permission, or who reject the government entity, the Attorney General, and/or a state court's decision to prohibit disclosure.

It is this narrow scope of section 39.06(c), *not* some conspiracy to pick on Villarreal, that explains how infrequently the statute has been invoked. *Contra* Appellant's Suppl. Br. 8-9. Nevertheless, section 39.06 has been employed by other Texas jurisdictions. For example, in *Tidwell v. State*, a county attorney was prosecuted under section 39.06 for using information obtained from the Texas Medical Board to retaliate against nurses who reported a hospital for protecting an incompetent doctor. *Tidwell v. State*, No. 08-11-00322-CR, 2013 WL 6405498, at *3, *6-7, *11 (Tex. App.—El Paso Dec. 4, 2013, pet. ref'd) (not designated for publication). In *Patel v. Trevino*, a constable in Harris County claimed she was fired by her supervisor for reporting that her supervisor had allowed her husband access to classified papers and equipment even though he was a felon on probation, which the court suggested was a violation of 39.06. *Patel v. Trevino*, No. 01-20-00445-CV, 2022 WL 3720135, at *11-13 (Tex. App.—Houston [1st Dist.] Aug. 30, 2022, no pet.) (mem. op.). And in *State v. Martinez*, "[c]onfidential information was leaked to the local newspaper and a television station concerning an ongoing investigation into administrative issues within

the police department," allegedly by the deputy chief of police. 116 S.W.3d 385, 387 (Tex. App.—El Paso 2003, no pet.). These cases obviously do not demonstrate that section 39.06(c) is immune from being applied unconstitutionally, but they belie the notion that by its nature, the provision obviously infringes on the rights of the media and press to report on the government. Instead, they demonstrate that it is typically used to effectuate other vital public interests in protecting data in the hands of the government.

  **b.** The statute's ban on solicitation falls well within constitutional bounds. Although "[t]he First Amendment provides that 'Congress shall make no law . . . abridging the freedom of speech,'" "[f]rom 1791 to the present . . . the First Amendment has permitted restrictions upon the content of speech in a few limited areas, and has never included a freedom to disregard these traditional limitations." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quotation marks omitted). Those categories of verbal activity—obscenity, defamation, fraud, incitement, and speech integral to criminal conduct—"are 'well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.'" *Id.* at 468-69 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)).

  The "constitutional freedom for speech and press [does not] extend[] its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). And "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced,

or carried out by means of language, either spoken, written, or printed." *Id.* at 502; *see also id.* (noting that otherwise, it would be impossible to enforce antitrust laws or other "conspiracies deemed injurious to society"). For example, bribery is a crime. *See Butler v. State*, No. 14-00-01186-CR, 2003 WL 253296, at *2 (Tex. App.—Houston [14th Dist.] Feb. 6, 2003, no pet.) (not designated for publication). And solicitation can be a crime—even if the underlying activity is not. *Ohralik*, 436 U.S. at 447. Indeed, "nearly all states have a general prohibition on criminal solicitations." William E. Lee, *Probing Secrets: The Press and Inchoate Liability for Newsgathering Crimes*, 36 Am. J. Crim. L. 129, 157-58 & n.195 (Spring 2009).[8]

Because such speech—which is solely speech essential to commit a crime—is unprotected, there is no need to engage in a First Amendment analysis weighing the interests of the speaker with that of the government. *See United States v. Perez*, 43 F.4th 437, 444 (5th Cir. 2022) (holding that "unprotected true threats" made by defendant meant that applying federal threat statute to him "did not violate his right to free speech"). Even if section 39.06(c) fell outside the scope of when solicitation may *itself* be criminalized, it would be constitutional because it applies only to individuals who knowingly solicit or receive nonpublic information that cannot be legally disclosed by a public servant, Tex. Penal Code § 39.06(d), with the intent to benefit or harm or defraud another, *id.* As explained above, there is no First Amendment right to assist in the unlawful disclosure of such confidential information.

---

[8] *See, e.g.*, Fla. Stat. § 777.04; Ga. Code Ann. § 16-4-7; N.Y. Penal Law § 100.13; 18 Pa. Cons. Stat. Ann § 902; Tex. Penal Code § 15.03.

**c.**   In response, Villarreal argues (at 14-15) that only the public servant who *released* the nonpublic information *should* be held liable for the criminal act. But that is a policy argument—not a constitutional one.[9] Looking to the Supreme Court's caselaw in this area, one commentator has summarized that as long as "the retention of [the relevant] information is itself unlawful, and so long as the reporters are being punished not for the act of publication itself, but for the unlawful gathering of secret information, it is *impossible* to find *any precedent* in the Supreme Court's jurisprudence that would recognize a First Amendment defense." Stephen I. Vladeck, *Inchoate Liability and the Espionage Act: The Statutory Framework and the Freedom of the Press*, 1 Harv. L. & Pol'y Rev. 219, 234 (2007) (emphases added). Section 39.06(c) falls squarely within that framework, as it criminalizes the "solicitation or receipt"— but not the publication—of certain specified information. Thus, far from "obvious," Appellant's Suppl. Br. 14, any constitutional violation would have been "impossible" for the ten individual defendants here to have divined from Supreme Court precedent, Vladeck, *supra*, at 234.

**B.   Section 39.06(c) is not unconstitutionally vague.**

Nor would it have been "obvious" to Defendants that the statute was unconstitutionally vague, as the state trial court found in assessing Villarreal's pre-trial writ of habeas corpus. ROA.179. Indeed, Villarreal appears to have abandoned any such

---

[9] Villarreal's argument also ignores that in almost every other context, the instigator of the illegal conduct is as culpable as, if not *more* culpable than, the one who acts. *See also Holder v. Humanitarian Law Project*, 561 U.S. 1, 27-28 (2010) (concerning material support to terrorism).

assertion. Although she made gestures at the theory in the trial court, *see* ROA.154, 169, her vague, conclusory allegations were never enough to state a claim for relief under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The panel decision never addressed the argument, and Villarreal does not raise it in her supplemental brief. For good reason.

A statute that is so vague that it does not afford defendants fair notice of the conduct proscribed is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment. *Bailey v. Morales*, 190 F.3d 320, 325-26 (5th Cir. 1999). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). In *Williams*, the Supreme Court provided the example of statutes with requirements such as "annoying" or "indecent"—"wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Id.*

Section 39.06(c)'s relevant terms—"confidential," "public information," and "public official"—are all defined by the Texas Legislature, and show no such "indeterminacy," *id*. In *Williams*, the Supreme Court actually used the term "solicitation" as a benchmark for constitutional clarity. Specifically, the Court concluded the phrase "in a manner intended to cause another [] to believe" was constitutionally sound because courts and juries "pass every day upon the reasonable import of a defendant's statements." 553 U.S. at 306-07. The Court likened the exercise to when courts and juries determine whether statements "fairly convey a false

representation . . . or a threat of physical injury," as well as statements at issue in "laws against fraud, conspiracy, or solicitation." *Id.* "Receive" has a similarly straightforward meaning. *Supra* Part I.A.2. And the inclusion of a specific-intent requirement—namely, that the solicitation or receipt be done "with intent to harm or defraud another," *id.*—"'alleviate[s] vagueness concerns,' 'narrow[s] the scope of the prohibition[,] and limit[s] prosecutorial discretion.'" *McFadden v. United States*, 576 U.S. 186, 197 (2015) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007)). Thus, the finding by a state court was not only *after* the alleged violation here—and thus could not have provided notice to the defendants, *see Villarreal II*, 44 F.4th at 384 (Richman, C.J., concurring in part and dissenting in part)—it was also wrong.

\* \* \*

In sum, the panel majority's original opinion that section 39.06(c) was "obviously" unconstitutional, *Villarreal I*, 17 F.4th at 541, was entirely incorrect, as its own revised opinion at least implicitly acknowledged, *Villarreal II*, 44 F.4th at 372 ("On its face, Texas Penal Code § 39.06(c) is not one of those 'obviously unconstitutional' statutes."). The panel majority's revised opinion erred, however, in continuing to project the view that section 39.06(c) could not have been constitutionally applied on the facts of this case in the absence of controlling, on-point precedent.

## II. The Individual Defendants Are Entitled to Qualified Immunity for the Manner in Which Section 39.06(c) Was Applied to Villarreal.

### A. The panel examined the "obviously unconstitutional" exception at too high a level of generality.

Notwithstanding its conclusion that "section 39.06(c) is not . . . obviously unconstitutional," the panel majority held that Defendants were not entitled to qualified immunity because any reasonable officer would have known that "Villarreal has a constitutional right to ask questions of public officials." *Villarreal II*, 44 F.4th at 371-72 (quotation marks omitted). Assuming the answer to that question is as obvious as the panel majority suggests, respectfully, it is not the right question. "The Supreme Court recently—and forcefully—underscored this point in *Ashcroft v. al-Kidd*, where it noted, with some exasperation, that it has 'repeatedly told courts . . . not to define clearly established law at a high level of generality.'" *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (quoting *al-Kidd*, 563 U.S. at 742). After all, "if the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of qualified immunity." *Id.* (quoting *Anderson*, 483 U.S. at 635). And "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (quoting *Anderson*, 483 U.S. at 639).

Instead, the qualified-immunity inquiry is a specific one, "which must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson*, 483 U.S. at 640). For example, in *Wood v. Moss*, the Court began by noting that "[i]t is uncontested and

uncontestable that government officials may not exclude from public places persons engaged in peaceful expressive activity solely because the government actor fears, dislikes, or disagrees with the views those persons express." 572 U.S. 744, 756-57 (2014). But the "*particular question*" before the Court was "whether the protesters have alleged violation of a clearly established First Amendment right based on the agents' decision to order the protesters moved from their original location in front of the Inn, first to the block just east of the Inn, and then another block farther." *Id.* at 757 (emphasis added).

The appropriate question here is therefore whether, under the particular circumstances Defendants faced—the evidence that Villarreal had, with the intent to financially benefit (*see* Appellant's Suppl. Br. 35), acquired information not yet made public through official channels by the LPD spokesperson, concerning sensitive information potentially about crimes and certainly affecting families, from a public servant who the LPD discovered was providing it to her, in violation of a facially constitutional statute, and based on a warrant approved by both legal counsel and a neutral magistrate, involving individuals who apparently had not displayed animus toward Villarreal in years, was unconstitutional "beyond debate," *al-Kidd*, 563 U.S. at 741, because Villarreal is a journalist. Under existing precedent, the answer to that question is "no"—the press are not immune from generally appliable criminal laws. *Supra* Part I.A.1.b. At the very least, the answer is not obviously "yes." Moreover, though a prior restraint on *publication* of such unlawfully acquired information may raise a First Amendment flag, criminalizing an individual's decision to acquire information through particular (illegal) means does not. *Supra* Part I.A.1.

## B. The cases identified by the panel majority do not show an "obvious" constitutional violation.

In concluding that a constitutional violation here was nonetheless obvious, the panel majority asserted that "the decision most analogous to this appeal is *Sause v. Bauer*." *Villarreal II*, 44 F.4th at 370. Texas does not disagree. But in describing *Sause*, the majority again phrased the qualified-immunity question at a too-high level of generality. Specifically, it focused, *id.* at 371, entirely on the Supreme Court's statement "[t]here [could] be no doubt that the First Amendment protects the right to pray," *Sause*, 138 S. Ct. at 2562, *see* 44 F.4th at 370. But just as significant to *Sause* was the Court's observation that there are "clearly circumstances in which a police officer may lawfully prevent a person from praying at a particular time and place." *Id*. at 2562. For example, the Court said a suspect "does not have a right to delay" transportation to jail "by insisting on first engaging in conduct that, at another time, would be protected by the First Amendment." *Id.* at 2562-63. Far from finding the constitutional violation obvious, the Court held that it was "impossible" to determine if Sause's constitutional rights had been violated without information on why the officers were in her apartment, whether they had her consent to be there, whether they had probable cause or some other ground consistent with the Fourth Amendment to be in the apartment, the lawfulness of their entry, and what the officers wanted her to do while she wanted to pray. *Id.* at 2563. In other words, the Court could not know whether the officers violated her rights—much less whether there was clearly established law that would negate the officers' qualified immunity—without considering the totality of the circumstances. *See id.*

The question of whether Defendants violated Villarreal's rights also requires the Court to "consider the whole picture." *Wesby*, 138 S. Ct. at 588. An opinion that fails to "ask[] wh[at] a reasonable officer could conclude—considering *all* of the surrounding circumstances" is an opinion that is subject to reversal. *Id.* (emphasis added). In this case, the question is not whether Villarreal has a right to ask questions, just as the question in *Sause* was not whether Sause had a right to pray. The question is whether, under the circumstances, Defendants violated Villarreal's clearly established right to freedom of speech (or of the press) by arresting her—pursuant to a facially valid warrant—for violating a generally applicable law that criminalizes receipt of nonpublic information from public servants for personal gain or with intent to harm or defraud. The answer to that question is "no."

## C.  Villarreal's arrest did not violate clearly established law.

As the district court found, under these circumstances, Villarreal's "claims primarily arise from her investigation and arrest under § 39.06(c), allegedly without probable cause." *See* ROA.435. Whether the arrest was unconstitutional, and, if so, whether qualified immunity nonetheless applies, determines the result of Villarreal's other claims. *See* ROA.435-46. In count two of the operative complaint, Villarreal alleges that Defendants infringed on her Fourth Amendment rights because (1) her arrest and detention were without probable cause, (2) the allegations against her—presumably in support of the warrant—were false and retaliatory, and (3) "no reasonable official would have considered [section 39.06(c)] to be constitutional." ROA.214. Thus, whether she has a Fourth Amendment claim is inextricably intertwined with whether section 39.06(c) could constitutionally be applied to her.

Nothing in Villarreal's arrest violated clearly established law. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. An arrest qualifies as a "seizure," and therefore must not be unreasonable. *See al-Kidd*, 563 U.S. at 735-36. The question of whether an arrest is unreasonable "'is predominantly an objective inquiry,'" *id.* at 736 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000))—namely, "whether the circumstances, viewed objectively, justify the challenged action," *id.* (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)). If the act is objectively reasonable, the subjective intent of the officer "motivating" the arrest is irrelevant. *Id.* Here, the act was objectively reasonable because there was probable cause to believe Villarreal had violated a statute, which, as discussed above, was facially valid. Moreover, an independent magistrate had issued a warrant—suggesting to a reasonable officer that the statute could be validly applied to Villarreal.

### 1. Villarreal's arrest was supported by probable cause.

There is relatively little information in Villarreal's complaint about the circumstances behind the warrant that led to her arrest, but what she *does* say demonstrates that there was more than adequate probable cause to think that Villarreal violated section 39.06(c). Villarreal notes that Ruiz alleged in the affidavit accompanying the warrants "that Villarreal had received or solicited the name and condition of a traffic accident victim and the name and identification of a suicide victim" from Officer Goodman. ROA.170. She never challenges Ruiz's statements about the type of

information she solicited or claims that those statements in his affidavit were false. And, tellingly, neither panel majority opinion said otherwise.

We learn more about Villarreal's theory from a *New York Times* article incorporated into Villarreal's complaint. ROA.153 n.2. According to that article, after the LPD saw Villarreal's post with the name and employer of a man who committed suicide, the LPD began:

> hunting down the source of other leaks to Ms. Villarreal. They identified a police officer suspected of supplying the information—a woman who had worked on the force for 19 years—after searching the officer's phone and finding hundreds of calls exchanged with Ms. Villarreal. The department placed the officer on suspension for 20 days and said in a statement that the case against Ms. Villarreal involved an "obligation to the protection of a person's right to privacy as it relates to sensitive information."[10]

In other words, according to this article, the LPD investigated the source of the information Villarreal posted and found that it was released by Officer Goodman without authorization. *Id.*

These facts easily support probable cause that Villarreal violated section 39.06(c) of the Texas Penal Code, "Misuse of Official Information," which penalizes a person who (1) has the intent to benefit or harm or defraud another, and (2)

---

[10] Simon Romero, *La Gordiloca: The Swearing Muckraker Upending Border Journalism*, N.Y. Times Online, Mar. 10, 2019, https://tinyurl.com/29x7e6aw. A court ruling on a motion to dismiss is permitted to rely on "documents incorporated into the complaint by reference and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338-39 (5th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)).

solicits or receives from a public servant information that the public servant had access to by means of his office or employment and that has not been made public.

**a.**    The actus reus of section 39.06(c) requires that the accused solicit or receive from a public servant nonpublic information—that is, information that the public servant *is forbidden from sharing under the TPIA*, *supra* Part I.A.3.a—to which the public servant had access due to her position. *See* Tex. Penal Code § 39.06(c). Villarreal *admits* in her operative complaint that she received information from a public servant: she reached out to LPD Officer Barbara Goodman for "corroborating information" about a man who committed suicide and a family involved in a "fatal traffic accident," and she does not allege that she failed to gain any information from the officer. ROA.166. Instead, Villarreal argues that the information was public "as [her] initial receipt of the information from two non-governmental individuals"—one for each incident—"demonstrates." ROA.168. She also asserts that the information she published was obviously not nonpublic under section 39.06(c). ROA.168.

Her first argument fails on at least three fronts. *First*, it is far from clear that the level of publicity she claims would remove otherwise confidential information from the scope of section 39.06, which looks to either the terms of the TPIA or to whether information is something the public "generally has access to." Tex. Penal Code § 39.06(d). One person's personal knowledge of a fact does not mean that the public "generally has access" to the information. After all, unless she is dead, the victim always knows the facts of the crime—that does not make all crime information public. Villarreal seems to acknowledge as much by insisting (at 51) that she is "similarly situated" to a hypothetical group of reporters who publish "publicly accessible

information on a newsworthy matter." But her complaint states no facts supporting that conclusion, *See Villarreal II*, 44 F.4th at 386-88 (Richman, C.J., concurring in part and dissenting in part), and Villarreal is not permitted to amend her complaint through conclusory assertions in her appellate briefing.

*Second*, even assuming the knowledge of two non-governmental sources would mean the information was public, the question at issue in a Fourth Amendment reasonableness inquiry is an objective one: what facts the officers knew or should have known at the time of her arrest. *See Kingsley v. Hendrickson*, 576 U.S. 389, 399 (2015). But Villarreal does not allege that the police knew about the information from the non-government officials or *should have known* (for example, by alleging how these non-government officials had themselves obtained the information). As a result, there is no "factual content that allows the court to draw the reasonable inference that the[se] defendant[s]" had reason to know that the information was public. *Iqbal*, 556 U.S. at 678. As a result, the complaint "stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quotation marks omitted).

Nor is it enough to suggest (*e.g.*, at 47) that the information Villarreal published was obviously information the government regularly releases. The TPIA's confidentiality rules are deliberately narrow, and often protect specific individuals or specific time periods depending on the public interest each exception seeks to serve. For example, the TPIA "encompasses the constitutional right to privacy," Tex. Atty Gen. OR2022-36798, 2022 WL 17552725, at *2 (2022), which is owned—and can be waived—by specific individuals, *Indus. Found. of the S. v. Tex. Indus. Accident Bd.*, 540 S.W.2d 668, 681 (Tex. 1976); *see also Ramie v. City of Hedwig Village*, 765 F.2d

490, 492 (5th Cir. 1985). In the instance that involves personally identifying information of someone who has committed suicide, Texas law recognizes that "members of the deceased individuals' families may have privacy interest[s] in the information." Tex. Att'y Gen. OR2022-36798, 2022 WL 17552725, at *2. Thus, although such information may eventually become public, it could remain confidential for a period of time so that governmental bodies could "notify the deceased's family of their right to submit comments to the attorney general explaining how release will affect their privacy interests." Office of the Attorney General, *Public Information Act Handbook* 76 & n.363 (2022), https://tinyurl.com/2j6zajx5 (citing Tex. Gov't Code § 552.304).

For similar reasons, the Texas Transportation Code allows individuals "directly concerned in the accident or having a proper interest therein," including "a newspaper" (as defined in the Government Code), to receive accident reports "held by the department or another governmental entity." Tex. Transp. Code § 550.065(a)-(b), (c)(4)(K). But the Department is required to redact certain identifying information, including the "first, middle, and last name of any person listed in an accident report," before the information is released outside of the Department. *Id.* § 550.065(f)(2)(A).

Moreover, section 552.108 of the TPIA exempts "[i]nformation held by a law enforcement agency or prosecutor that deals with the detection, investigation, or prosecution of crime," if "release of the information would interfere with the detection, investigation, or prosecution of crime," or if the investigation "did not result in conviction or deferred adjudication." Tex. Gov't Code § 552.108(a)(1)-(2). It only

allows—indeed, requires—such reports be made public when they are "completed." *Id.* § 552.022(a)(1) As the dissent recognizes, this process could take time because a death that appears to be suicide or an accident can later turn out to be foul play. *Villarreal II*, 44 F.4th at 387. Villarreal does not allege that at the time she obtained the information from Officer Goodman, that decision had been made. She certainly does not allege facts from which the Court can infer that Defendants should have known that decision had been made. *Kingsley*, 576 U.S. at 399.

To the contrary, some of the facts that Villarreal alleges prove Defendants' improper motive instead show the opposite. In particular, she points to the fact that when the LPD's spokesperson "directly" informed her about a local suicide and she posted that information, she was *not* investigated or arrested. ROA.159, 166. Information that has "been made public" (in this instance, by the LPD's official spokesperson, Joe Baeza) is expressly excluded from the relevant statute. Tex. Penal Code § 39.06(c)(2). That she was arrested only when she obtained information illegally *before* it was released by Baeza demonstrates that LPD was *not* conspiring to violate her constitutional rights. *Contra* ROA.154-57. They were trying to faithfully apply section 39.06(c).

The panel majority's second vacated opinion tried to get around this problem in two primary ways. *First*, it asserted that any reasonable officer would have known that section 39.06(c) could not criminalize "the right to politely ask [a public official] a few questions," or "punish someone for simply *asking* for [nonpublic information]." *Villarreal II*, 44 F.4th at 371. But, as discussed above, how Villarreal "received" the information was not material to the actus of the crime for which she was

charged—only that, with the requisite intent, she received facts she should not have from Officer Goodman, who was not authorized to provide them. *See supra* Part II.C.1.a; ROA.166, 170.

*Second*, the panel emphasized that she was only using Goodman to corroborate the information she already had. *Villarreal II*, 44 F.4th at 372-73. But there is no exception in section 39.06(c) for "corroborating" confidential information, so Defendants did not act unreasonably in considering her liable, even if they knew Goodman was simply corroborating information Villarreal somehow had already acquired.

**b.**   Villarreal has similarly failed to make well-pleaded allegations that she lacked the relevant mens rea—namely the intent to obtain a benefit, harm or defraud. Tex. Penal Code § 1.07(a)(7); *id.* § 39.06(c). The panel majority held that "no reasonable officer could have found probable cause under § 39.06(c)" because Villarreal did not intend to obtain a benefit. *Villarreal II*, 44 F.4th at 367. The panel found significant Villarreal's allegations in her complaint that she "does not generate regular revenue or other economic gain from her citizen journalism." *Id.* at 373.

That is a misstatement of Texas law. Section 39.06(c) does not require that Villarreal's income be "regular," only a "benefit." Texas Penal Code section 1.07(a)(7) defines "[b]enefit" as "anything reasonably regarded as economic gain or advantage, including benefit to any other person in whose welfare the beneficiary is interested." In this way, it is not dissimilar from federal law, which recognizes that an individual "receives a direct or indirect benefit" even if he receives "no monetary or personal benefit" but instead, for example, obtains "a reputational benefit that will translate into future earnings" or pecuniary gain. *Salman v. United States*, 137 S.

Ct. 420, 427 (2016). Even a familial gift can be a gain because the defendant does not have to expend funds he might otherwise have.

Villarreal admits in the operative complaint that though she "does not generate regular revenue or other regular economic gain," she obtains other benefits of value. ROA.159. For example, "[s]he sometimes enjoys a free meal from appreciative readers, and occasionally receives fees for promoting a local business"; she also has "ask[ed] for"—and presumably received—"donations for new equipment." ROA.159. These facts prove that Villarreal uses her Facebook page not only as a means of communicating the news, but also to benefit economically from her reporting. The "bare assertions" Villarreal made in her operative complaint that she "does not generate . . . economic gain from her citizen journalism" are "not entitled to be assumed true" given the other facts in the complaint the court must accept that illustrate how she generates economic gain from her citizen journalism. *Iqbal*, 550 U.S. at 681.

The panel majority concluded that "Villarreal maintains that she acted not to obtain economic gain, but to be a good journalist." *Villarreal II*, 44 F.4th at 372. Villarreal's interest in gaining corroborating information "only slowed [her] down—the very opposite of the benefit alleged by the officers." *Id.* at 373. Moreover, according to the panel, her behavior was not that of a "purely economically motivated actor." *Id.* But being "a good journalist" and obtaining a "benefit" are not mutually exclusive. In fact, many times across many professions, "a reputational benefit" today "will translate" into other benefits tomorrow. *Salman*, 137 S. Ct. at 427. In addition, if Villarreal's information was unreliable, she would lose the popularity of her

news site and the benefits that accompany it—free meals, "donations" for new equipment, and profits for advertising local businesses. ROA.159.

The panel majority also ignored the fact that, by using an inside source, Villarreal was able to move more quickly than other reporters who were waiting for information from the Police Department's spokesperson, Joe Baeza. ROA.159. Villarreal does not dispute that she knew about Baeza, but based on what she reported, LPD knew she did not go to him for information about the suicide or the traffic accident. ROA.166.[11] As the dissent noted, this is evidence both that Villarreal knew the information was not public and that she received a benefit by "scooping" her competition. *Villarreal II*, 44 F.4th at 389. (Richman, C.J., concurring in part and dissenting in part).

But even if Villarreal was interested only in being a good journalist and did *not* expect any benefit to flow from that, Defendants could not read her mind. As a result, they were entitled to look at the totality of the circumstances and "formulate[] certain common sense conclusions about human behavior," *United States v. Cortez*, 449 U.S. 411, 418 (1981), including that a journalist may believe that ensuring her reporting was accurate would increase her popularity and influence, which would result in more financial benefits from her readers. *See, e.g.*, *Wesby*, 138 S. Ct. at 587 (finding that, "[t]aken together, the condition of the house and the conduct of the partygoers

---

[11] A reasonable law enforcement officer would likely also have seen this as further indicia that the information Villarreal published was nonpublic. *See supra* Part II.C.1.a.

allowed [law enforcement] officers to make several common-sense conclusions about human behavior" in concluding that partygoers were trespassing).

Finally, in concluding that Defendants' conduct was unreasonable, Villarreal (at 8-9), the revised majority opinion (*Villarreal II*, 44 F.4th at 371-72), and the concurrence (*id.* at 382) each emphasize Defendants' allegedly retaliatory, petty, and unprofessional conduct. If true, the State in no way condones such behavior. But at most such behavior goes to subjective intent, which is not relevant to the qualified-immunity analysis.

## 2. The panel erred in discarding the independent-intermediary doctrine.

Moreover, even if aspects of intent survived the objective standard for qualified immunity, "[i]t is well settled that if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party." *Wilson v. Stroman*, 33 F.4th 202, 208 (5th Cir.), *cert. denied sub nom. Reyna v. Wilson*, 143 S. Ct. 425 (2022). Because judges (state and federal) are presumed to act in good faith and in conformity with the Constitution, "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). As a result, even if the arrestee was never convicted of a crime, a "properly secured arrest warrant . . . will shield a defendant who has committed or initiated a false arrest." *Wilson*, 33 F.4th at 208.

**a.**    Under existing precedent, the independent-intermediary doctrine should have applied here. In *Messerschmidt*, the Supreme Court noted that "the fact that the officers sought and obtained approval of the warrant application from a superior and a deputy district attorney before submitting it to the Magistrate provides further support for the conclusion that an officer could reasonably have believed that the scope of the warrant was supported by probable cause." 565 U.S. at 553. That is precisely what happened: Villarreal alleges that Ruiz, an investigator for the LPD, ROA.156, provided statements in support of the criminal complaints and two affidavits in support of arrest warrants "under the supervision and direction of Defendants Treviño, Alaniz, and Jacaman." ROA.170. Treviño is chief of police for the LPD, Alaniz is the Webb County District Attorney, and Jacaman is his Chief Assistant. ROA.155. Although Villarreal alleges that Alaniz and Jacaman are hostile toward her as a result of past journalistic activity, ROA.176, she does not allege that Treviño or Ruiz had any such personal animus.

If anything, the case for ignoring the independent-intermediary doctrine is particularly weak. The incident that allegedly drew hostility from Jacaman and Alaniz occurred in 2015. ROA.161-62; *cf.* ROA.163, 315. And she does not allege that Jacaman, Alaniz, or any LPD officer involved in the investigation of her conduct did anything to harm her in the two years prior to the investigation and arrest, *cf.* ROA.176—notwithstanding that she alleges misconduct by *other* officers at LPD, ROA.170. Assuming that Jacaman and Alaniz retained enough animosity after two years to risk their reputations—and potentially their law licenses—to sign off on an "obviously unconstitutional" warrant application, Villarreal has not alleged that

Ruiz and Treviño had a similar incentive. Nor does she allege facts from which the Court can infer that they had "any apparent misgivings" when signing off on the warrant, before Jacaman and Alaniz sought "the approval of a neutral Magistrate, who issued the requested warrant." *Messerschmidt*, 556 U.S. at 554. Instead, the facts as alleged by Villarreal show that "[t]he officers thus 'took every step that could reasonably be expected of them,'" triggering the independent-intermediary exception. *Id.* (quoting *Massachusetts v. Sheppard*, 468 U.S. 981, 989 (1984)).

**b.** Absent allegations against the magistrate himself (which do not exist here), the State is aware of only two exceptions to the independent-intermediary doctrine that are clearly established for qualified-immunity purposes. *First*, under *Malley v. Briggs*, an officer can be held liable for a search authorized by a warrant when the application presented to the magistrate was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." 475 U.S. 335, 344-45 (1986). The *Malley* exception concerns "the obvious failure of accurately presented evidence to support the probable cause required for the issuance of a warrant." *Melton v. Phillips*, 875 F.3d 256, 264 (5th Cir. 2017) (en banc). That is, the warrant must be "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Messerschmidt*, 565 U.S. at 547 (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)). "[T]he threshold for establishing this exception is a high one, as it should be." *Id.* Villarreal cannot meet that burden because, for the reasons already discussed (at Part II.C.1), there was ample cause to think she had violated a facially valid statute.

*Second*, under *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978), the independent-intermediary doctrine excludes only affidavits sworn by officers when there are allegations (and an offer of proof) of "deliberate falsehood[s] or [] reckless disregard for the truth" that negate a finding of probable cause. Villarreal fails to plausibly plead that the *Franks* exception applies either. Her complaint asserts that Defendants "manufacture[d] criminal complaints, a search warrant affidavit and approval, and arrest warrant affidavits and approvals with the intent that Villarreal be arrested and detained in order to coerce her into easing her citizen journalism efforts." ROA.169-70. But Villarreal never alleges that specific facts were misstated in the affidavit or omitted, relying instead on her theory that Defendants executed the warrant with the subjective motive to retaliate against Villarreal "for the exercise of her First Amendment rights." ROA.173. But this theory alone cannot overcome the independent-intermediary doctrine, or the exception would swallow the rule. *See Franks*, 438 U.S. at 171 ("the challenger's attack must be more than conclusory").

At most, Villarreal asserts that the statements given by Ruiz in support of the affidavit were false, because he "knew or should have known that the information Villarreal published was not subject to a TPIA exception and was generally accessible to the public." ROA.171. But, as discussed above, that statement is conclusory and unsupported by the facts alleged: that only one person who was at the scene or related to the victims knew the information. *Supra* Part II.C.1.a. Similarly faulty is the allegation that Ruiz "knew or should have known" that "at all times leading up to Villarreal's arrest, Villarreal did not use her Facebook page as a means of economic gain." ROA.171. She does not explain why that would be. After all, a prominent

periodical declared the year these events took place to also be "the year of the influencer," citing the growth in the understanding that "attention"—here, Villarreal's large Facebook following—"is a valuable resource and a growing commodity in the modern market." Kelly Ehlers, *2017: The Year of the Influencer*, Forbes (Feb. 23, 2017), https://tinyurl.com/27ackuxy. If anything, Villarreal's disclaiming of economic gain is contradicted by her own allegations that she—like other influencers—was paid by companies for advertising for them on her site and that she requested money from readers for equipment she needed as a journalist. ROA.159. Thus, it is unsurprising that the panel majority never concluded that any of the Defendants (let alone all of them) misstated the facts or somehow tainted the magistrate's view of the facts.

**b.**    Instead, Villarreal seems to ask the Court to recognize a third exception to the independent-intermediary doctrine based on some combination of a policy disagreement with receipt-based statutes and her theory of discriminatory prosecution. Specifically, she asserts that (1) "there was no basis for criminally investigating, arresting, and prosecuting a citizen for simply asking for or receiving publicly-accessible information," ROA.173-74; and (2) "Defendants also knew that members of the local media regularly asked for and received information from LPD officials relating to crime scenes and investigations, traffic accidents, and other LPD matters." ROA.174; *see also* ROA.174 (Defendants knew they could not apply the statute to "those who publish information on matters of public concern to gain more readers"). In perhaps an example of the old adage that bad facts make bad law, the panel majority agreed that the independent-intermediary doctrine does not apply because

"a reasonably well-trained officer would have understood that arresting a journalist for merely asking a question clearly violates the First Amendment." *Villarreal II*, 44 F.4th at 375. The legal grounds behind this statement are entirely unclear.

To the extent that the panel majority tied its analysis to existing, clearly established law, it appears to have seen its rule as a gloss on *Malley*, 475 U.S. at 345, because it was "obvious that no reasonably competent officer would have concluded that a warrant should issue." *Villarreal II*, 44 F.4th at 375. But, as explained above, it is *not* obvious under existing Supreme Court caselaw that criminal solicitation is protected by the First Amendment when a journalist knowingly seeks to influence a public servant to break the law. *See supra* Part I.A. Thus, no clearly established law would have provided a reasonable officer notice that he should not have submitted a warrant request concerning Villarreal's conduct. *See Malley*, 475 U.S. at 345.

And to the extent that the panel majority was recognizing a *new* exception to the independent-intermediary doctrine, it could not be applied to deprive Defendants of qualified immunity here. After all, this Court has repeatedly recognized that qualified immunity must be measured as of the time of the challenged act. *E.g.*, *Powers*, 951 F.3d at 306 (collecting cases). An exception to the independent-intermediary exception recognized today could not have been well-established when Villarreal was arrested in 2017.

**c.** Any new exception to the independent-intermediary doctrine along the lines the panel majority suggests should also be dismissed on the merits because it renders it a toothless doctrine aimed solely at intent and is irreconcilable with current Supreme Court precedent. For example, in *Ashcroft v. al-Kidd*, al-Kidd accused then-

Attorney General John Ashcroft of authorizing the use of the material-witness stat-
ute in the wake of 9-11 to detain suspected terrorists he had no intention of using as
witnesses. 563 U.S. at 734. The Ninth Circuit held that Ashcroft was not entitled to
qualified immunity because "the Fourth Amendment prohibits pretextual arrests ab-
sent probable cause of criminal wrongdoing." *Id*. The Supreme Court reversed, ex-
plaining that "[a] warrant issued by a neutral Magistrate Judge authorized al-Kidd's
arrest," and the affidavit accompanying the warrant "gave individualized reasons to
believe that [al-Kidd] was a material witness and that he would soon disappear." *Id*.
at 738. The Court held that "[a] warrant based on individualized suspicion in fact
grants more protection against the malevolent and the incompetent than existed in
most of our cases eschewing inquiries into intent." *Id*. (footnote omitted).

If pretext did not vitiate the warrant in *al-Kidd*, neither does alleged retaliatory
animus. After all, the entire point of the doctrine is that an officer should not be ex-
pected to question the magistrate's probable-cause determination because it is the
magistrate's responsibility to determine whether probable cause exists—and thus to
issue a warrant that comports with the requirements of the Fourth Amendment. *Mes-
serschmidt*, 565 U.S. at 547. To serve any purpose, "'it goes without saying that
where a magistrate acts mistakenly in issuing a warrant but within the range of pro-
fessional competence of a magistrate, the officer who requested the warrant cannot
be held liable.'" *Id.* at 547-48 (quoting *Malley*, 475 U.S. at 346 n.9). At worst, that is
what happened here. Therefore, there was no clearly established constitutional vio-
lation for which the officers named as defendants may be held personally liable for
monetary damages.

## Conclusion

The Court should affirm the district court's judgment dismissing Villarreal's claims.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Judd E. Stone II
Solicitor General

/s/ Lanora C. Pettit
Lanora C. Pettit
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

Kathryn M. Cherry
Assistant Solicitor General

Counsel for Intervenor

## CERTIFICATE OF SERVICE

On January 11, 2023, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Lanora C. Pettit
LANORA C. PETTIT

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,632 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Lanora C. Pettit
LANORA C. PETTIT