NO. 20-40359

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

PRISCILLA VILLARREAL,

*Plaintiff-Appellant*,

v.

THE CITY OF LAREDO, TEXAS; WEBB COUNTY, TEXAS; ISIDRO R. ALANIZ; MARISELA JACAMAN; CLAUDIO TREVINO, JR.; JUAN L. RUIZ; DEYANRIA VILLARREAL; ENEDINA MARTINEZ; ALFREDO GUERRERO; LAURA MONTEMAYOR; DOES 1-2,

*Defendants–Appellees*.

## APPELLANT'S RESPONSE TO BRIEF FOR INTERVENOR THE STATE OF TEXAS IN SUPPORT OF DEFENDANTS-APPELLEES

On Appeal from the United States District Court for the Southern District of Texas, Laredo Division, Civil Action No. 5:19-CV-48
Hon. John A. Kazen Presiding

JT Morris
   *Counsel of Record*
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Ave. S.E., Ste. 340
Washington, D.C. 20003
Tel:  (215) 717-3473
jt.morris@thefire.org

Darpana Sheth
Conor T. Fitzpatrick
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
510 Walnut Street, Ste. 1250
Philadelphia, PA 19106
Tel:  (215) 717-3473
darpana.sheth@thefire.org
conor.fitzpatrick@thefire.org

*Attorneys for Plaintiff-Appellant Priscilla Villarreal*

## Supplemental Certificate of Interested Parties

The cause number and style of the case is No. 20-40359, *Priscilla Villarreal v. City of Laredo, Texas, et al.* (USDC Civil No. 5:19-CV-48, Southern District of Texas).

The undersigned counsel of record certifies that he is unaware of any persons or entities described in the fourth sentence of Rule 28.2.1, other than those identified in the parties' briefs and the *amici curiae* briefs, that have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Respectfully,

/s/ JT Morris
JT Morris
Counsel of record for Plaintiff-Appellant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................... iv

SUMMARY OF THE ARGUMENT ........................................... 1

ARGUMENT .......................................................................... 3

I.   A Reasonable Official Would Have Understood That the
     First Amendment Protected Villarreal's Routine
     Newsgathering and Reporting.......................................... 3

     A.   The Supreme Court's decision in *Daily Mail* shows why
          Villarreal's' newsgathering was lawful.................................. 4

     B.   Texas miscasts this case as one of access. ............................ 5

     C.   Texas fails to identify any unprotected speech or
          conduct.................................................................................... 8

II.  Texas's Arguments on Qualified Immunity Fail. .......................... 10

     A.   It is not objectively reasonable to enforce generally
          applicable criminal laws against clearly established
          First Amendment rights. ...................................................... 11

     B.   Arrest warrants do not shield officials like Defendants
          who base their probable cause determination on clearly
          established First Amendment rights. .................................... 13

     C.   Texas Overlooks a Key Point: Defendants' Acts Were
          Deliberate. ............................................................................ 15

III. Texas's Concessions About Section 39.06(c)'s Scope
     Underscore Why Defendants Do Not Deserve Qualified
     Immunity. .................................................................................... 18

IV.  The Historical Importance of a Free Press and an Informed
     Public Also Underscores Why Defendants Do Not Deserve
     Qualified Immunity....................................................................... 21

V.    Texas Is Right to Invoke Common Sense, But Wrong That It
      Justified Arresting Villarreal. ....................................................... 23

CONCLUSION ........................................................................ 25

CERTIFICATE OF SERVICE ................................................. 27

CERTIFICATE OF COMPLIANCE ........................................ 28

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Brandenburg v. Ohio,*
395 U.S. 444 (1969).................................................................. 23

*Grosjean v. American Press Co.,*
297 U.S. 233 (1936).................................................................. 22

*Hand v. Gary,*
838 F.2d 1420 (5th Cir. 1988)............................................... 14

*Hope v. Pelzer,*
536 U.S. 730 (2002)........................................................... 16, 18

*Houchins v. KQED, Inc.,*
438 U.S. 1 (1978)................................................................... 4, 5

*Houston Chron. Publ'g Co. v. City of Houston,*
531 S.W.2d 177 (Tex. Civ. App.—Houston [14th Dist.] 1975)............. 5

*Houston Chron. Publ'g Co. v. City of Houston,*
536 S.W.2d 559 (Tex. 1976).................................................... 5

*In re Express News Corp.,*
695 F.2d 807 (5th Cir. 1982)................................................... 5

*Kleindienst v. Mandel,*
408 U.S. 753 (1972).................................................................. 7

*L.A. Police Dep't v. United Reporting Publ'g Corp.,*
528 U.S. 32 (1999)................................................................... 7

*Leonard v. Robinson,*
477 F.3d 347 (6th Cir. 2007)................................................ 11

*Malley v. Briggs,*
475 U.S. 335 (1986)........................................................... 14, 15

*Mink v. Knox,*
613 F.3d 995 (10th Cir. 2010)............................................ 11, 13

*Mullenix v. Luna,*
577 U.S. 7 (2015) ............................................................................ 16

*Oklahoma Publ'g Co. v. District Court,*
430 U.S. 308 (1977) .......................................................................... 6

*Patel v. Trevino,*
No. 01-20-00445-CV, 2022 WL 3720135 (Tex. App.—Houston
[1st Dist.] Aug. 30, 2022) ................................................................ 20

*PG Publ'g Co. v. Aichele,*
705 F.3d 91 (3d Cir. 2013) ................................................................ 7

*Sandul v. Larion,* 119 F.3d 1250
(6th Cir. 1997) ............................................................................... 12

*Sause v. Bauer,*
138 S. Ct. 2561 (2018) ..................................................................... 21

*Smith v. Daily Mail Publ'g Co.,*
443 U.S. 97 (1979) ................................................................... 4, 6, 8

*Snider v. City of Cape Girardeau,*
752 F.3d 1149 (8th Cir. 2014) ...................................................... 13, 15

*State v. Martinez,*
116 S.W.3d 385 (Tex. App.—El Paso 2003) ...................................... 20

*Texas v. Ford,*
179 S.W.3d 117 (Tex. App.—San Antonio 2005) ................................ 19

*The Florida Star v. B.J.F,*
491 U.S. 524 (1989) .......................................................................... 6

*Tidwell v. State,*
No. 08-11-00322-CR, 2013 WL 6405498 (Tex. App.—El Paso
Dec. 4, 2013) ................................................................................. 20

*Turner v. Driver,*
848 F.3d 678 (5th Cir. 2017) ............................................................. 4

v

*United States v. Cortez,*
     449 U.S. 411 (1981) ................................................................... 24

*United States v. Rosen,*
     445 F. Supp. 2d 602 (E.D. Va. 2006) ........................................ 9

*United States v. Stevens,*
     559 U.S. 460 (2010) ..................................................................... 9

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
     425 U.S. 748 (1976) ..................................................................... 7

*Villarreal v. City of Laredo,*
     44 F.4th 363 (2022) ......................................................... passim

*Villarreal v. City of Laredo, Tex.,*
     17 F.4th 532 (5th Cir. 2021) ..................................................... 2

*Wayte v. United States,*
     470 U.S. 598 (1985) ................................................................... 13

*Whitney v. California,*
     274 U.S. 357 (1927) ................................................................... 23

*Wood v. Moss,*
     572 U.S. 744 (2014) ........................................................... 16, 17

## Statutes and Rules

Fed. R. App. P. 44(b) ..................................................................... 2

Tex. Penal Code § 39.06(c) .................................................. passim

Tex. Gov't Code § 552.001 ........................................................ 21

Tex. Gov. Code § 552.352 ......................................................... 20

## Other Authorities

*Die Hard 2* (1990) ...................................................................... 25

*Letter from James Madison to W.T. Barry* (Aug. 4, 1822)...................... 23

*Letter from Thomas Jefferson to Edward Carrington* (Jan. 16, 1787) ......3

Stephen I. Vladeck, *Inchoate Liability and the Espionage Act: The Statutory Framework and the Freedom of the Press*, 1 Harv. L. & Pol'y Rev. 219 (2007) ............................................................................. 10

## SUMMARY OF THE ARGUMENT

Texas's defense of the City of Laredo and Webb County officials that orchestrated Priscilla Villarreal's arrest boils down to this: the government gets to decide what is and what is not lawful newsgathering. Under Texas's view, states could use endless laws and executive orders to squeeze the flow of vital information about government affairs to a trickle, holding the threat of arrest over anyone who dared seek the truth from anyone but a formal, government-sanctioned source.

Thankfully, the First and Fourteenth Amendments render Texas's defense no more than a paper tiger. As much as it tries, Texas cannot avoid that the First Amendment protects lawful newsgathering—including asking for and receiving even sensitive information from public officials, as the Supreme Court affirmed decades ago in *Smith v. Daily Mail*. Much of Texas's brief is devoted to attacking a strawman: whether Villarreal had a constitutional right to "access" certain information. Villarreal is not claiming Defendants violated any affirmative right to access information, and she is not suing because Officer Goodman or any other official denied her information. Rather, she is suing because Defendants threw her in jail for merely *asking* Goodman for basic

information about local news, and then receiving and publishing what Goodman *volunteered* in response. Punishing basic journalism is no way for an American government to keep its house in order. And the First Amendment makes certain of it.

The State's arguments on qualified immunity do not save Defendants.[1] Above all, Texas overlooks that qualified immunity does not shield public officials who enforce state statutes against clearly established rights, especially when those officials have months to recognize the constitutional limits on their authority. And if one accepts the State's narrowing constructions of Texas Penal Code § 39.06(c), those constructions show even more why no reasonable official could have believed it was lawful to enforce the derelict statute against Villarreal's routine reporting.

Finally, neither the State's appeal to history nor to common sense support qualified immunity. The Founders emphasized the right—even

---

[1] Any purported interest Texas had intervening in this case involved the facial validity of the Texas Penal Code § 39.06(c), not the distinct qualified immunity issue. *See Villarreal v. City of Laredo, Texas,* 17 F.4th 532, 546–47 (5th Cir. 2021); Fed. R. App. P. 44(b). Texas acknowledged in August 2022 that the superseding panel opinion in this case "no longer calls into question the facial constitutionality of section 39.06(c)." Dkt. 117, August 15, 2022 letter from K. Cherry.

the duty—of the people to arm themselves with knowledge.[2] Asking the government questions is vital to that right. And good sense here doesn't advocate throwing a citizen journalist in jail for doing her job. Rather, it counsels that Americans have a right to seek answers from public officials and share those answers without fearing government retribution.

## ARGUMENT

### I.   A Reasonable Official Would Have Understood That the First Amendment Protected Villarreal's Routine Newsgathering and Reporting.

Texas's failure to acknowledge three key points dooms its arguments. *First*, the Supreme Court established decades ago that asking officials for information and receiving what they volunteer is lawful newsgathering. *Second*, leaving aside any ambiguity over a constitutional right to access, a reasonable official would have known the First Amendment protects receiving and publishing information a public servant freely provides. And *third*, Villarreal did not engage in any

---

[2] *See, e.g.,* Letter from Thomas Jefferson to Edward Carrington (Jan. 16, 1787) ("And were it left to me to decide whether we should have a government without newspapers, or newspapers without a government, I should not hesitate a moment to prefer the latter.") (https://founders.archives.gov/documents/Jefferson/01-11-02-0047).

conduct or unprotected speech that would have permitted a reasonable official to believe he could lawfully arrest her.

### A. The Supreme Court's decision in *Daily Mail* shows why Villarreal's' newsgathering was lawful.

Texas claims "[t]here is no freestanding, unfettered First Amendment right to 'gather news.'" Texas Br. 7. Whether or not that's accurate, the Court need not consider it to reject Texas's argument and deny Defendants qualified immunity. What matters are two long-settled First Amendment principles. *First*, the Supreme Court affirmed the "undoubted right to gather news from any source by means within the law." *Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017) (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (internal quotation marks omitted)). And *second*, the Supreme Court confirmed in *Smith v. Daily Mail Publishing Co.* that asking public official questions to gather and report the news—even sensitive information—is a means within the law. 443 U.S. 97, 99, 103–04 (1979) (finding that reporters "lawfully obtained" the name of a juvenile murder suspect "simply by asking various witnesses, the police, and an assistant prosecuting attorney. . ."); *see also* Appellant's En Banc Br. 18–19.

4

With that, a reasonable official would have known that Villarreal was lawfully gathering and reporting the news, under the First Amendment's full protection. Appellant's En Banc Br. 27–28; *see also In re Express News Corp.*, 695 F.2d 807, 809–10 (5th Cir. 1982) (holding that a rule barring juror interviews without court permission violated the First Amendment as applied to interviews done in connection with a news story.)

## B. Texas miscasts this case as one of access.

Much of Texas's argument hinges on the limits of a constitutional right to access. Texas Br. 3, 6, 9–10. True enough, that is an unsettled question. *See, e.g., Houchins,* 438 U.S. at 14; *Houston Chron. Publ'g Co. v. City of Houston,* 531 S.W.2d 177, 186 (Tex. Civ. App.—Houston [14th Dist.] 1975) (finding a limited constitutional right to access government information "concerning crime in the community."), *aff'd by Houston Chron. Publ'g Co. v. City of Houston,* 536 S.W.2d 559 (Tex. 1976).

But Villarreal's complaint shows she's not suing over a refusal to give her affirmative access to information (or claiming an unfettered right to access). *See* ROA.183 [¶¶ 148–153]. Had Officer Goodman responded to Villarreal's inquiries with "I cannot tell you," "Please file a

public records request," or even a flat "No," it is not obvious that Goodman's refusal would violate the Constitution.

On the other hand, it is obvious that what happened here violated the Constitution. Villarreal asked Goodman for information—a protected act of pure speech. And Goodman volunteered information in response to Villarreal's basic inquiries. At that point, the First Amendment clearly established Villarreal's right to receive the information and publish it free of punishment—even if the government did not formally sanction its release. *Daily Mail*, 443 U.S. at 103–04; *The Florida Star v. B.J.F,* 491 U.S. 524, 538 (1989); *see also Oklahoma Publ'g Co. v. District Court,* 430 U.S. 308 (1977) (striking down under the First Amendment an injunction against the publication of facts learned from juvenile proceedings opened, by a judge, to reporters and other members of the public, despite a state law closing those proceedings to the public). Indeed, "the fact that state officials are not required to disclose [certain information] does not make it unlawful for a newspaper to receive them when furnished by the government," even if the disclosure were "inadvertent" or "erroneous." *Florida Star*, 491 U.S. at 536, 538.

That is why the decisions Texas cites cast no doubt on the unlawfulness of Villarreal's arrest. Those cases concern the government refusing to give access at all, not the government punishing someone who asks an official for information and then receives and publishes what the official volunteers. *PG Publ'g Co. v. Aichele*, 705 F.3d 91, 99 (3d Cir. 2013) (concerning denial of access to polling place); *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 34, 40 (1999) (concerning limit of access of arrestee addresses to commercial entities). At the same time, Texas overlooks the clear principles of *Daily Mail* and *Florida Star*, while ignoring the longstanding "First Amendment right to 'receive information and ideas,' and that freedom of speech 'necessarily protects the right to receive.'" *Va. State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 762–763 (1972)). And that right to receive extends even to expressive activity done for profit. *Id.* at 759–760.

With all of that, a reasonable official would have no doubt that he lacked authority to arrest Villarreal for what reporters and other citizens do every day—asking public servants questions and sharing what they volunteer.

### C.    Texas fails to identify any unprotected speech or conduct.

What did Villarreal do wrong? That is the question that Texas, like Defendants, cannot answer. Texas dwells on *unlawful* conduct and *unprotected* speech. *E.g.,* Texas Br. 14–15, 17–18, 21–23. But it fails to show anything Villarreal did that falls into either category. For instance, Texas notes conduct like "trespassing, hacking, theft, and bribery" is outside the First Amendment protection explained in *Florida Star*. *Id.* at 12. Villarreal does not dispute that. But there was nothing—in the arrest warrant affidavits or otherwise—hinting at independently illegal conduct like trespassing or bribery. ROA.170–71 [¶¶ 88–94]; *see also* Appellant's En Banc Br. 29.

To be sure, a journalist breaking into a government building to steal documents has committed a burglary. Of course, the First Amendment provides no special immunity for journalists for engaging in such actions. But Texas's position here is that it can criminalize *lawful* journalism, like peaceably asking a government official for information. The First Amendment is not nearly so brittle. *Daily Mail*, 443 U.S. at 103–04.

Texas's argument about unprotected speech also fails. As Texas acknowledges, unprotected speech like "obscenity, defamation, fraud,

incitement, and speech integral to criminal conduct *are well-defined and narrowly limited classes of speech*, the prevention and punishment of which have never been thought to raise any Constitutional problem." Texas Br. 21 (quoting *United States v. Stevens*, <u>559 U.S. 460, 468</u> (2010)) (cleaned up) (emphasis added). But again, Texas can point to nothing hinting, for example, that Villarreal threatened or tried to extort Officer Goodman. <u>ROA.170</u>–71 [¶¶ 88–94]. The best it can argue is that Villarreal's speech was integral to criminal conduct. That fails because the only basis Defendants had for "criminal conduct" was routine gathering and reporting of daily news that the First Amendment squarely protected. That stands in stark contrast, for example, to the *Rosen* decision Texas leans on, where two lobbyists were indicted under the Espionage Act for conspiring to share national security secrets having "reason to believe" the information could be used to harm the nation. Texas Br. 12–13 (citing *United States v. Rosen*, <u>445 F. Supp. 2d 602, 608, 631</u> (E.D. Va. 2006), *amended*, No. 1:05CR225, <u>2006 WL 5049154</u> (E.D. Va. Aug. 16, 2006), *aff'd by* <u>557 F.3d 192</u> (4th Cir. 2009)).[3]

---

[3] For the same reason, the state's reliance on Professor Stephen Vladeck's article is unconvincing. Texas Br. 23 (citing Stephen I. Vladeck, *Inchoate Liability and the*

In the end, the Texas legislature does not have the final say about the bounds of freedom of speech and of a free press. The First Amendment does. And those bounds are vast. Thus, a reasonable official would have understood that Villarreal asking for and reporting of information from Goodman was protected—and as detailed below, qualified immunity is unavailable for Defendants.

## II.   Texas's Arguments on Qualified Immunity Fail.

Texas maintains "[g]iven that the named defendants had a facially valid warrant to enforce a facially valid law, this case should have been an easy one to apply qualified immunity." Texas Br. 4. The Constitution, Section 1983, and the Supreme Court's qualified immunity framework say otherwise. And so should this Court. At bottom, Texas's claim fails for two reasons. *First*, it was not reasonable to enforce Section 39.06(c) against Villarreal because it was clearly established that arresting Villarreal would violate the First Amendment, no matter if the statute is facially valid. *Second*, the arrest warrant does not shield Defendants

---

*Espionage Act: The Statutory Framework and the Freedom of the Press*, 1 Harv. L. & Pol'y Rev. 219, 234 (2007)). Professor Vladeck focuses on a First Amendment press clause defense to inchoate liability for the press under the Espionage Act, a question of national security secrets and with an elevated *mens rea. E.g., id.* at 222–23 (listing the various rigorous scienter requirements of the Act). Neither is at issue here.

because a reasonable official would have known that probable cause cannot rest on protected speech.

> **A.    It is not objectively reasonable to enforce generally applicable criminal laws against clearly established First Amendment rights.**

Villarreal has explained why qualified immunity does not shield officials, like Defendants, who enforce state statutes despite having fair warning that doing so will violate the Constitution. Appellant's En Banc Br. 30–40. Still, Texas suggests that Defendants have qualified immunity because they were enforcing a generally applicable law. Texas Br. 11, 29. That gets it backwards. The question is not whether a reasonable official thinks expressive activity fits the elements of a generally applicable law. Rather, it is whether a reasonable official could believe the expressive activity lacked First Amendment protection. *Leonard v. Robinson*, <u>477 F.3d 347, 361</u> (6th Cir. 2007); *Mink v. Knox*, <u>613 F.3d 995, 1009</u>–10 (10th Cir. 2010).

Take a standard disorderly conduct statute on the books for decades. Most would agree the statute can be permissibly enforced against a host of conduct. Even so, no reasonable official would believe he could enforce it against protected speech. In fact, the Sixth Circuit made

this clear when it denied qualified immunity for police officer who enforced a local disorderly conduct ordinance against public profanity, noting that Supreme Court decisions "should leave little doubt in the mind of a reasonable officer that the mere words and gesture 'f—k you' are constitutionally protected speech." *Sandul v. Larion*, 119 F.3d 1250, 1256–57 (6th Cir. 1997). The inquiry there was not whether the disorderly conduct statute is unconstitutional; it was whether the First Amendment protected the citizen's expression. *Id.* at 1256.

The same holds true here. This Court is not being asked (at least by Villarreal) to pass upon the constitutionality of Section 39.06(c), just as Sandul did not ask the Sixth Circuit opine on Livonia, Michigan's disorderly conduct ordinance. There may be "plausible interpretations of § 39.06(c) that pass constitutional muster." *Villarreal v. City of Laredo*, 44 F.4th 363, 380 (2022) (Ho, J., concurring), *reh'g granted and vacated*, 52 F.4th 265 (5th Cir. Oct. 28, 2022). But enforcing it against routine reporting that a reasonable official would understand the First Amendment protects is not one of them. And for that reason, Defendants cannot hide behind a "generally applicable statute" to avoid Villarreal's well-pled claims.

**B.    Arrest warrants do not shield officials like Defendants who base their probable cause determination on clearly established First Amendment rights.**

Defendants did not "lawfully obtain" a "facially valid arrest warrant." *See* Texas Br. 1. They assembled arrest warrant affidavits based on what a reasonable official would know is protected speech. *See supra* Section I; Appellant's En Banc Br. 26–30. Probable cause cannot rest on protected speech. *Mink*, <u>613 F.3d at 1003</u>–04 (citing *Wayte v. United States*, <u>470 U.S. 598, 608</u> (1985)). Texas ignores this core constitutional principle, and why it shows that Defendants do not deserve qualified immunity because they should not have even asked for an arrest warrant. *E.g. Snider v. City of Cape Girardeau,* <u>752 F.3d 1149, 1156</u>–57 (8th Cir. 2014) (denying qualified immunity for officer who obtained arrest warrant for a man who desecrated the American flag); *Mink*, <u>613 F.3d at 1011</u>–12 (denying qualified immunity on Fourth Amendment claim for prosecutor who reviewed and approved search warrant based on protected parody); *see also* Appellants' En Banc Br. 33–34, 40–42 (discussing those cases).

Indeed, because Defendants' probable cause determination rested on Villarreal's exercise of First Amendment rights, the panel majority

was right to apply *Malley v. Briggs* and not the independent intermediary doctrine. *Villarreal v. City of Laredo*, 44 F.4th at 375. *Malley* holds that if "a reasonably well-trained officer in [Defendants'] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant . . . the officer's application for a warrant was not objectively reasonable, because it created the unnecessary danger of an unlawful arrest." 475 U.S. 335, 345 (1986). And that "unnecessary danger" is especially high when an officer applies for a warrant based on the exercise of familiar and oft-exercised First Amendment rights. That's what Defendants did here.

While Texas argues the panel majority "erred in discarding the independent intermediary doctrine,"[4] consider that doctrine's core basis—proving causation. *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988) ("An independent intermediary breaks the chain of causation unless it can be shown that the deliberations of that intermediary were in some way tainted by the actions of the defendant.") Thus, if an official acts mistakenly in seeking a warrant—or a magistrate acts mistakenly

---

[4] Texas Br. 39.

14

in issuing one—but does so "within the range of professional competence," the causation issues arguably are thornier. *See Malley*, <u>475 U.S. at 344</u> n.7, 346 n.9.

But when an officer asks for a warrant over the exercise of a clearly established constitutional right, the causation is clear: An arrest made under the warrant resulted from the requesting officer's failure to "exercise reasonable professional judgment." *Malley*, <u>475 U.S. at 346</u>. So when a magistrate issues a warrant in those situations, "his action is not just a reasonable mistake, but an unacceptable error indicating gross incompetence or neglect of duty. The officer then cannot excuse his own default by pointing to the greater incompetence of the magistrate." *Id.* at 346 n. 9; *see also Snider*, <u>752 F.3d at 1157</u> ("Although it is unfortunate and fairly inexplicable that the error was not corrected by the county prosecutor or the magistrate judge, no warrant should have been sought in the first place.") In short, Texas cannot justify Villarreal's arrest by pointing to an arrest warrant Defendants had no business seeking.

## C.    Texas Overlooks a Key Point: Defendants' Acts Were Deliberate.

It takes Texas over half-a-page to set out (at least) nine distinct matters that it contends make up "the appropriate question" Villarreal

must answer to defeat qualified immunity. Texas Br. 27. Not even Theseus could navigate that labyrinth—and the Supreme Court has made clear that Villarreal does not need to. Simply put, Texas's "question" ignores a key principle: Objective reasonableness and "fair warning," not onerous specificity, govern the qualified immunity inquiry, particularly where officials do not face split-second decisions involving danger or exigencies. *See Hope v. Pelzer*, 536 U.S. 730, 740 (2002) (affirming the "fair warning" standard); *c.f.*, *Mullenix v. Luna,* 577 U.S. 7, 12 (2015). (reversing denial of qualified immunity for officer who fatally shot suspect during a high-speed chase, a use-of-force context where "specificity is especially important. . . .")

In fact, the *Wood v. Moss* decision Texas relies on highlights the distinction between split-second decisions and more deliberate ones in the objective reasonableness inquiry. Texas Br. 26–27 (citing *Wood v. Moss*, 572 U.S. 744, 756–57 (2014)). *Wood* centered on Secret Service agents moving protesters farther away from the President's impromptu dining spot, while not moving his supporters to a similar distance. *Wood*, 572 U.S. at 748. Finding the agents had qualified immunity on the protestors' First Amendment *Bivins* claim, the Supreme Court noted how

"[f]aced with the President's sudden decision to stop for dinner, the Secret Service agents had to cope with a security situation not earlier anticipated." *Id.* The Supreme Court emphasized the "on-the-spot" action of the agents in finding that "no decision of this Court so much as hinted" that the agents violated a clearly established right. *Id.*

But imagine if the agents in *Wood* had instead known of the President's dinner plans and determined over hours or days to criminally trespass any peaceful protestor within earshot. Surely, that time would have allowed "fair warning" that it is "uncontested and uncontestable that government officials may not exclude from public places persons engaged in peaceful expressive activity solely because the government actor fears, dislikes, or disagrees with the views those persons express." *Id.* at 756–57. And that is the point here. Having months to consider the settled First Amendment principles limiting their authority, a reasonable official would have known that arresting Villarreal violated the Constitution. Appellant's En Banc Br. 42–45.

The months Defendants had to deliberate also negates Texas's protest that the "cases identified by the panel majority do not show an obvious constitutional violation." Texas Br. 28. The principles in the cases

identified by the panel majority—core expressive activity "unquestionably" falling within the liberties recited in the First Amendment, the right to curse at public officials, and the right to publish information from the government[5]—would have applied with "obvious clarity" for an official having months to recognize that arresting Villarreal for routine news reporting would violate the Constitution. *See Hope*, 536 U.S. at 741.

## III. Texas's Concessions About Section 39.06(c)'s Scope Underscore Why Defendants Do Not Deserve Qualified Immunity.

If one accepts Texas's view of Section 39.06's plain scope, no reasonable official could have believed the statute covered Villarreal's routine reporting—just one more reason to deny qualified immunity. Indeed, Texas argues that "solicit" is narrower than merely asking questions, instead being "more akin to incitement," or "counseling, enticing, or inducing another to commit a crime." Texas Br. 16–18. If that's so, then no reasonable officer could have believed the statute reached Villarreal's routine news reporting. Under Texas's construction,

---

[5] *Villarreal*, 44 F.4th at 370–71 (citing cases).

not only was probable cause lacking because Defendants based it on protected speech, but it also lacked because there was no evidence of intent to induce or encourage Officer Goodman to violate the law. ROA.170–71 [¶¶ 88–94].

Likewise, if "receipt" plainly requires knowledge that one lacks "official consent" to possess information, as Texas claims, then no reasonable officer could have believed Villarreal's reporting met this requirement. Again, the arrest warrant affidavits said nothing of it. *Id.* Nor did the affidavits specify any Texas Public Information Act (TPIA) exception covering the information Goodman volunteered—let alone that Villarreal knew any of the dozens of TPIA exceptions applied—despite those exceptions being part of the statute's "nonpublic" element. *See Texas v. Ford,* 179 S.W.3d 117, 123 (Tex. App.—San Antonio 2005, no pet.) ("prohibited from disclosure" under § 39.06(d) means "the set of exceptions to disclosure listed in Subchapter C" of the TPIA).

While Texas points to several appellate decisions over Section 39.06, none of those decisions cast any doubt over the objective unreasonableness of orchestrating Villarreal's arrest under the statute. Texas Br. 20–21. In fact, those decisions do the opposite. In each of those

decisions, the person prosecuted or accused under the statute was a *government official* who misused information. *Tidwell v. State,* No. 08-11-00322-CR, 2013 WL 6405498, at *2–3, *6–7, *11 (Tex. App.—El Paso Dec. 4, 2013, pet. ref'd) (not designated for publication); *Patel v. Trevino*, No. 01-20-00445-CV, 2022 WL 3720135, at *2–3 (Tex. App.—Houston [1st Dist.] Aug. 30, 2022, no pet.) (mem. op.); *State v. Martinez*, 116 S.W.3d 385, 387 (Tex. App.—El Paso 2003, no pet.). Thus, these decisions would have confirmed to a reasonable official that Section 39.06(c) covers abuses of office, like bid-rigging and misusing government information to target opponents—not arresting a citizen asking for information while reporting the news.

These decisions also harmonize with the TPIA placing the consequences of mishandling information on the "officer or employee" of the government body, not the citizen who asks for it. Tex. Gov. Code § 552.352. And as Texas acknowledges, "[f]or decades, it has been 'the policy of [Texas] that each person is entitled, unless otherwise expressly provided by law, at all times to complete information about the affairs of government and the official acts of public officials and employees.'" Texas Br. 2 (quoting Tex. Gov't Code § 552.001). So even though this essential

question here is not about a constitutional right to access, the TPIA would have given even more reason for an official to know that he had no basis to enforce § 39.06(c) against Villarreal.

## IV. The Historical Importance of a Free Press and an Informed Public Also Underscores Why Defendants Do Not Deserve Qualified Immunity.

Though Texas argues the Constitution's text and history supports Defendants' attempt to dodge constitutional accountability, they do not. Texas declares the text of the "First Amendment says nothing about gathering news" and that "'[r]outine newsgathering' is not a term in the Constitution." Texas Br. 7, 10. That's true. But neither is "prayer" found in the First Amendment. And as the panel majority pointed out, that did not stop the Supreme Court from affirming "[t]here can be no doubt that the First Amendment protects the right to pray," and that "[p]rayer unquestionably constitutes the 'exercise' of religion." *Villarreal*, 44 F.4th at 370 (quoting *Sause v. Bauer*, 138 S. Ct. 2561, 2562 (2018) (per curiam). In the same way, lawful newsgathering "unquestionably constitutes" freedom of speech and of the press.

The historical importance of the freedom to find the truth— bolstered by a free press—supports that denial. Even though Texas cites

21

*Grosjean v. American Press Co.* to advocate a First Amendment that scantly protects newsgathering (Texas Br. 8), the Supreme Court in that decision *struck down* a tax on large-circulation newspapers because it "abridge[d] the freedom of the press." 297 U.S. 233, 250–51 (1936). Even though the Supreme Court emphasized the founders' aversion to prior restraints on the press, it also emphasized other aspects of press freedom—including the press's role "as a vital source of public information." *Id.* at 250. That historic role reveals another reason no reasonable official would have believed it lawful to throw Villarreal in jail for trying to inform the public by asking a public servant questions.

The freedom to seek and share information is not confined to the press—it is a deep-rooted essential freedom for all citizens. Madison explained the need for this freedom well: "[a] popular Government, without popular information, or the means of acquiring it, is but a prologue to a Farce or a Tragedy; or, perhaps, both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives." *Letter from James Madison to W.T. Barry* (August 4, 1822). Echoing that sentiment, Justice Brandeis later stressed how the First Amendment

embodies the Founders' belief "that public discussion is a political duty; and that this should be a fundamental principle of the American government." *Whitney v. California*, <u>274 U.S. 357, 375</u> (1927) (Brandeis, J. concurring), overruled on other grounds by *Brandenburg v. Ohio,* <u>395 U.S. 444</u> (1969). And there is no more fundamental way for Americans to meet that duty and "arm themselves with the power which knowledge gives" than by asking public officials questions.

## V.    Texas Is Right to Invoke Common Sense, But Wrong That It Justified Arresting Villarreal.

No reasonable official would have needed to comb through the Federal Reporter or Madison's correspondence to understand the Constitution protects asking officials questions and gathering what they volunteer. As one *amicus* puts it, reasonable officials "passing familiarity with the phrase 'abridging the freedom of speech, or of the press' (see Amendment I) and our national culture should have sufficed." Amicus Br. of Institute for Justice 10. And what better exemplifies pure "freedom of speech" than a peaceful question to a government official?

To that end, Texas is right that the Defendants should have considered the totality of circumstances—including "common sense conclusions about human behavior." Texas Br. 38 (quoting *United States*

*v. Cortez*, 449 U.S. 411, 418 (1981). But no reasonable officer would draw the "common sense conclusions" Texas pushes, like Villarreal "ensuring her reporting was accurate" could support a felony arrest just because it led to increased popularity, benefits, and because Villarreal "occasionally receives fees for promoting a local business." Texas Br. 37–38. News outlets gain trust for their reporting, that trust brings in viewers, and viewers are what enable news outlets to pay the bills through advertisements. Any reasonable official would be familiar with commercials during the nightly news or product ads popping up while visiting a news website.

Rather, the common-sense conclusion is the one the panel majority offered: "[Villarreal] only wanted further confirmation before publication—what a purely economically motivated actor wouldn't need, but precisely what a good journalist would require." *Villarreal*, 44 F.4th at 372–73. Likewise, no reasonable officer exercising good sense could believe Villarreal's *only* way to get information from Laredo police was submitting a public record request and waiting on a process that often takes months. *See* Texas Br. 20. Imagine if Woodward and Bernstein were limited to gathering only information the White House approved.

The people's ability to hold the government accountable would look much different—and for the worse.

Summing up why Villarreal's arrest was an obvious constitutional violation, the panel majority invoked *Die Hard 2*: "Now personally, I'd like to lock every [expletive] reporter out of the airport. But then they'd just pull that 'freedom of speech' [expletive] on us and the ACLU would be all over us." *Villarreal*, 44 F.4th at 373 (quoting *Die Hard 2* (1990)). It's not often that two learned federal judges invoke a blockbuster to drive home a point. But that makes the point even more compelling: If *Hollywood*, of all places, understood 30 years ago that the government cannot lock up reporters for doing their job, then so should have the Laredo and Webb County officials sworn to uphold the Constitution. *Id.* Qualified immunity does not shield those officials for so brazenly failing to uphold their oath.

## CONCLUSION

Qualified immunity does not shield Defendants for violating the Constitution. And neither do Texas's arguments. The Court should reverse and remand.

Dated: January 17, 2023

Respectfully,

/s/ JT Morris
JT Morris
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION
700 Pennsylvania Ave., S.E., Ste. 230
Washington, D.C. 20003
Tel: (215) 717-3473
jt.morris@thefire.org

Darpana Sheth
Conor T. Fitzpatrick
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION
510 Walnut Street, Ste. 1250
Philadelphia, PA 19106
Tel:   (215) 717-3473
darpana.sheth@thefire.org
conor.fitzpatrick@thefire.org

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

This certifies that on January 17, 2023 in compliance with Rules 25(b) and (c) of the Federal Rules of Appellate Procedure, the undersigned served the foregoing via the Court's ECF filing system on all registered counsel of record.


*/s/ JT Morris*
JT Morris

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because it contains 5,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Century Schoolbook font.

*/s/ JT Morris*
JT Morris