# United States Court of Appeals for the Fifth Circuit

————————

No. 20-40359

————————

Priscilla Villarreal,

*Plaintiff—Appellant*,

*versus*

The City of Laredo, Texas; Webb County, Texas; Isidro
R. Alaniz; Marisela Jacaman; Claudio Trevino, Jr.; Juan
L. Ruiz; Deyanria Villarreal; Enedina Martinez;
Alfredo Guerrero; Laura Montemayor; Does 1-2,

*Defendants—Appellees*.

————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 5:19-CV-48

————————————————————

## ON REMAND FROM
## THE SUPREME COURT OF THE UNITED STATES

Before Elrod, *Chief Judge*, and Jones, Smith, Stewart, Richman,
Southwick, Haynes, Graves, Higginson, Willett,

United States Court of Appeals
Fifth Circuit

**FILED**

April 8, 2025

Lyle W. Cayce
Clerk

No. 20-40359

DUNCAN, ENGELHARDT, OLDHAM, WILSON, and DOUGLAS, *Circuit Judges*.[*]

EDITH H. JONES, *Circuit Judge*, joined by SMITH, STEWART, RICHMAN, SOUTHWICK, HAYNES, DUNCAN, ENGELHARDT, OLDHAM, and WILSON, *Circuit Judges*:

This appeal was remanded from the Supreme Court with instructions that we reconsider in light of *Gonzalez v. Trevino*, 602 U.S. 653, 144 S. Ct. 1663 (2024). We infer that the Supreme Court's ruling on First Amendment retaliation in that *per curiam* opinion means that is the sole claim this en banc court ought to reconsider.[1] Having done so, we conclude that whether or not Appellant Villarreal stated a plausible claim for unconstitutional retaliation based on her "speech" obtained from backchannel police sources in order to benefit herself in violation of Tex. Admin. Code Section 39.06(c), these Defendants-Appellees properly claim qualified immunity from liability. *See Reichle v. Howards*, 566 U.S. 658, 664, 132 S. Ct. 2088, 2093 (2012) (qualified immunity applies unless officials "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct").

Their entitlement is easily shown. First, the events here in dispute occurred in 2017 and therefore predated the Supreme Court's opinion in *Nieves v. Bartlett*, 587 U.S. 391, 139 S. Ct. 1715 (2019), by two years. Second, before *Nieves* carved out a "narrow qualification" to avoid a no-probable-cause requirement if retaliation arose out of a person's First Amendment-

---

[*] JUDGE HO was recused in this matter. JUDGE RAMIREZ was not a member of the court when this case was submitted to the court en banc and did not participate in the original en banc decision or in this decision.

[1] The Supreme Court vacated our judgment and remanded to this court "for further consideration in light of *Gonzalez v. Trevino*, 602 U.S. 653, 144 S. Ct. 1663 (2024) (per curiam)." *Villarreal v. Alaniz*, 145 S. Ct. 368 (2024). The dissent clearly overreads this single sentence to embrace issues decided, or rejected, by this court's en banc decision, but never mentioned by the Supreme Court's narrow remand.

No. 20-40359

protected conduct, the Supreme Court had most recently held that, "[t]his Court has never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause . . . ." *Reichle*, 566 U.S. at 664–65, 132 S. Ct. at 2093 (2012).[2]  Accordingly, at the time Villarreal submitted herself to the police based on arrest warrants, "every reasonable officer" could have believed that what he or she was doing was perfectly legal, or put otherwise, none of the defendants, including the police and attorneys who drafted the warrant affidavits, "knowingly violate[d]" Villarreal's constitutional rights. *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038 (1987) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986)).

Because the second prong of qualified immunity analysis shields the defendants from Section 1983 liability for actions that were plainly objectively reasonable in 2017, we are not called upon to consider the constitutional implications of Villarreal's claim for *Gonzalez*'s applying the *Nieves* exception to her. *Saucier v. Katz*, 533 U.S. 194, 203–04, 121 S. Ct. 2151, 2155–56 (2001) (first prong of qualified immunity analysis is whether defendants' challenged conduct was unconstitutional; second prong is whether the unconstitutionality was clearly established; courts may decide either prong). Confirming this approach, after *Nieves*, this court has issued other opinions that granted qualified immunity to law enforcement officers from retaliatory conduct claims. *See, e.g.*, *Degenhardt v. Bintliff*, 117 F.4th 747, 760 (5th Cir. 2024) (qualified immunity against First Amendment retaliation claim); *Guerra v. Castillo*, 82 F.4th 278, 289 (5th Cir. 2023) (Higginson, J.) (granting

---

[2] The dissent avoids this salient and decisive chronology. Based on *Reichle*, the only "clearly established" Supreme Court precedent at the time of Villarreal's arrest, it was "non-obvious" that her probable violation of Texas law would risk the officers' personal liability.

No. 20-40359

qualified immunity from First Amendment retaliation claim); *Roy v. City of Monroe*, 950 F.3d 245, 254–56 (5th Cir. 2020) (granting qualified immunity from First Amendment retaliation claim); *Trevino v. Iden*, 79 F.4th 524, 530–35 (5th Cir. 2023) (Higginson, J.) (granting qualified immunity for arrest where probable cause uncertain). And in two cases with similar facts, other circuits have readily held that qualified immunity shielded the conduct of arresting officers from a pre-*Nieves*, post-*Reichle* First Amendment retaliation claim. *Lund v. City of Rockford*, 956 F.3d 938, 948–49 (7th Cir. 2022); *Novak v. City of Parma*, 33 F.4th 296, 303–05 (6th Cir. 2022).[3]

Our previous en banc majority opinion is superseded only to this extent, and on this revised basis, the judgment dismissing Villarreal's First Amendment retaliation claim is AFFIRMED.

---

[3] The dissent fails to grapple with these consistent precedents affirming qualified immunity for retaliation claims that arose pre-*Nieves*. That our court misconstrued *Nieves*, leading to the Supreme Court's decision in *Gonzalez*, does not remove the shield of qualified immunity for the conduct here that occurred pre-*Nieves*.

No. 20-40359

Andrew S. Oldham, *Circuit Judge*, concurring:

I join the majority's opinion because *Reichle v. Howards*, 566 U.S. 658 (2012), controls this case. *Reichle* explained that as of 2012 no "right . . . to be free from a retaliatory arrest that is supported by probable cause" had been "clearly established" by Supreme Court precedent. *Id.* at 664–65. So at that time, officers sued for a retaliatory arrest supported by probable cause were entitled to qualified immunity. *Ibid.* Nothing even arguably changed until 2018 when the Supreme Court decided *Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018). But the events here took place before *Lozman*. So the officers are entitled to qualified immunity. *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (explaining that qualified immunity turns on "the legal rules that were 'clearly established' at the time [the official action] was taken" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))).

The law has changed, though, since the events of this case. Two changes bear emphasis.

The first rests on the distinction between rights and remedies. In the years after *Reichle*, the Court has made clear that its probable-cause bar inheres in the *remedy* afforded by § 1983 and not the First Amendment *right* against retaliatory arrest. *See, e.g.*, *Nieves v. Bartlett*, 587 U.S. 391 (2019). Why does that distinction matter? Because an officer can invoke qualified immunity only when the constitutional *right* is unclear at the time of his actions. Thus, it would appear to follow, an officer cannot invoke qualified immunity where the probable-cause aspect of the *remedy* is unclear.

My second point is broader: It is increasingly unclear whether the rationale for qualified immunity makes sense in a case like this one. I understand the need for qualified immunity when officers are forced to make split-second decisions, often with imperfect information and under potentially deadly or dangerous circumstances. But "[t]hose who arrested,

No. 20-40359

handcuffed, jailed, mocked, and prosecuted Priscilla Villarreal . . . spent *several months* plotting Villarreal's takedown." *Villarreal v. City of Laredo*, 94 F.4th 374, 406–07 (Willett, J., dissenting). When an officer has the time to make such plans, to consult counsel, and to investigate all the facts, it is unclear whether and to what extent qualified immunity should apply.

I

First, the probable-cause bar. The Supreme Court has held that probable cause bars a First Amendment retaliatory-arrest claim. Or put differently, one element of the retaliatory-arrest plaintiff's claim is to show that no probable cause existed for her arrest. That is *not* because of the plaintiff's First Amendment *rights*. Rather, the Court has held in the years after *Reichle* that it is because of § 1983's *remedies*. I (A) explain the rights-remedies distinction. Then I (B) explain that no-probable-cause is an element to establish certain § 1983 remedies—not part of the plaintiff's First Amendment rights. Finally, I (C) explain why this matters for qualified immunity.

A

The rights-remedies distinction is an old one. In *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), for example, Chief Justice Marshall invoked the venerable maxim *ubi jus ibi remedium*: Or as he put it, "every right, when withheld, must have a remedy." *Id.* at 147. But in that very same case, the Supreme Court held that Marbury's legal *right* to his commission did not entitle him to the judicial *remedy* of mandamus. *See* William Baude et al., Hart & Wechsler's The Federal Courts and the Federal System 89 n.6 (8th ed. 2025) (emphasizing that not only could the Supreme Court not provide a remedy in *Marbury*, but perhaps no court could).

No. 20-40359

So too with litigation under 42 U.S.C. § 1983. Although by its plain text § 1983 "purports to create a damages remedy against every state official for the violation of any person's federal constitutional or statutory rights," *Kalina v. Fletcher*, 522 U.S. 118, 123 (1997), the Supreme Court has rejected such an expansive reading. According to the Court, "Congress intended the statute to be construed in the light of common-law principles that were well settled at the time of its enactment." *Ibid.* Those common-law principles will often make a remedy unavailable under § 1983—even where individual rights have indisputably been violated.

The most famous example of this is qualified immunity. The Court has purported to pull qualified immunity out of the background common-law principles governing at the time § 1983 was enacted. *See Filarsky v. Delia*, 566 U.S. 377, 383–84 (2012). So day after day in courts across the country, federal judges extend immunity from civil liability—even when executive officers have violated citizens' constitutional rights. Indeed, as the Supreme Court has put it, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 335 (1986).[4] The whole logic of qualified immunity is to create a gap between rights and remedies. As Learned Hand explained, for better or worse, qualified immunity is grounded in the belief that it is "better to leave unredressed the wrongs done by dishonest officers than to subject

---

[4] In reality, qualified immunity sweeps even wider than that. It shields officials from liability unless they violate rights so clearly established "that every reasonable official would have understood that what he is doing violates" the law. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quotation and citation omitted). Because that test is objective, qualified immunity shields even an official who acts in bad faith, knowingly and flagrantly violating constitutional rights so long as a different official might have reasonably taken the same action.

No. 20-40359

those who try to do their duty to the constant dread of retaliation." *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949).

The Court has imposed other restrictions on relief under § 1983, too. For instance, the Court has "examined common-law doctrine" to supply additional "elements" to "the cause[s] of action" § 1983 makes available. *Kalina*, 522 U.S. at 123; *see, e.g.*, *Wilson v. Midland County*, 116 F.4th 384, 390–91 (5th Cir. 2024) (en banc) (plurality opinion) (noting the Supreme Court's doctrine under *Heck v. Humphrey*, 512 U.S. 477 (1994), imposes an additional, favorable-termination element in certain § 1983 cases). By their very nature, additional elements—elements not already internal to the Constitution—create a gap between rights and remedies. After all, some litigants will be able to establish a constitutional deprivation without being able to establish the additional elements imposed under § 1983. *See Nieves*, 587 U.S. at 413 (Gorsuch, J., concurring in part and dissenting in part).

B

No-probable-cause is one of those additional elements found in the common law of torts that applies to a claim of retaliatory arrest under § 1983. True, at the time of *Reichle* and the events of this case, it remained unclear whether a no-probable-cause rule was "best read as defining the scope of the First Amendment right or as simply establishing a prerequisite for recovery." *Reichle*, 566 U.S. at 669 n.6. But the Supreme Court has since clarified that the no-probable-cause rule concerns only remedies, not rights.

1

*Lozman* provided the first piece of the puzzle. *Lozman* explained that "the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." 585 U.S. at 90. But "if there is probable cause to believe the person has committed a criminal offense[,] there is often no *recourse* for the deprivation." *Ibid.* (emphasis

No. 20-40359

added).  So *Lozman*'s teaching was clear: Individuals have a right to be free from a retaliatory arrest, but the no-probable-cause rule may keep courts from providing a remedy.

The logic of the Court's opinion reinforces this teaching.  The Court in *Lozman* held that individuals did not need to prove the absence of probable cause when suing a municipality for retaliatory arrest.  *See id.* at 101.  But whether an individual has a First Amendment right to be free from being arrested purely as retaliation for, say, his political or religious beliefs would not seem to turn on which government actor retaliates against him.  It is a deprivation either way.

Moreover, *Lozman* justified its rejection of the no-probable-cause rule by focusing on the need for a remedy.  *Lozman* assumed throughout that adopting the no-probable-cause rule would leave some rights without vindication.  For instance, the Court concluded there was no "practical recourse" outside a claim under § 1983, so there was "a compelling need for adequate avenues of *redress*."  *Id.* at 100 (emphasis added).  Since at least *Marbury*, of course, the Court has tolerated gaps between rights and remedies.  But the Court emphasized that leaving a gap in *Lozman* would have been intolerable because the underlying right was "one of the most precious of the liberties safeguarded by the Bill of Rights."  *Id.* at 101 (quotation and citation omitted).  So the whole of the Court's reasoning assumed a retaliatory arrest was unconstitutional, and it instead focused on whether § 1983 should provide a remedy.

Justice Thomas, the author of *Reichle*, also recognized this in dissent.  The no-probable-cause rule, Justice Thomas agreed, was about "the contours and prerequisites of a § 1983 claim"—not about the First Amendment itself. *Id.* at 104 (Thomas, J., dissenting) (quotation and citation omitted).  Thus, Justice Thomas looked to "the common law of torts," as it

No. 20-40359

existed "[w]hen § 1983 was enacted" to provide the contours of a retaliatory-arrest claim under § 1983. *Id.* at 104–06 (quotation omitted) . Justice Thomas disagreed with the majority simply because he believed the no-probable-cause rule should have applied. *Id.* at 102.

2

The very next term in *Nieves*, the Court picked up where *Lozman* left off. The Court held that a plaintiff pressing a retaliatory-arrest claim must generally "plead and prove the absence of probable cause." 587 U.S. at 401. But the Court crafted an exception: Probable cause would not bar a retaliatory-arrest claim if the plaintiff could point to objective evidence that the officers "typically exercise their discretion not to" make arrests in similar circumstances. *Id.* at 406–07.

The logic of the *Nieves* exception to the no-probable-cause rule shows that it too does not turn on the First Amendment itself. If the no-probable-cause rule were about First Amendment rights, that would mean an individual has no First Amendment right to be free from a retaliatory arrest if the police had probable cause. But somehow that same individual's First Amendment right to be free from a retaliatory arrest would spring back to life if it turns out the police do not arrest other people? That makes little sense.

In case some confusion remained about the source of the no-probable-cause rule, the Court reduced or eliminated it by looking to the common law of torts as of 1871—the year of § 1983's enactment. *See id.* at 405–06. That shows that the no-probable-cause rule concerns "the contours of a claim under § 1983," not the scope of First Amendment rights. *Id.* at 405. The Court's analysis in *Nieves*, then, was self-consciously about filling in elements of the cause of action provided by § 1983. *Ibid.*; *see also id.* at 413 (Gorsuch, J., concurring in part and dissenting in part) (explaining that *Nieves* turned on the following: "[I]f probable cause can't erase a First Amendment violation,

No. 20-40359

the question becomes whether its presence at least forecloses a civil claim for damages as a statutory matter under § 1983"); *see also Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 179 n.6 (2023) (noting that *Nieves* concerned only the "contours of a [§ 1983] claim" (quotation omitted)).

C

Because the no-probable-cause rule is an element of the cause of action, rather than part of the underlying constitutional right, query how or why qualified immunity should be relevant.

The qualified immunity inquiry asks whether an officer "violate[d] clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. Or in other words, the inquiry is "whether the officer had fair notice that her *conduct* was unlawful." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (emphasis added). It is irrelevant whether an officer should have known about the existence and nature of a cause of action to remedy that unlawful conduct.

That makes sense. The point of qualified immunity is to shield officials from liability unless "[t]he contours of the right" are "sufficiently clear" such that "a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. Otherwise, the threat of lawsuits would "dampen the ardor of all but the most resolute, or the most irresponsible," in performing their duties. *Harlow*, 457 U.S. at 814 (quoting *Gregoire*, 177 F.2d at 581). "Again and again the public interest calls for action which may turn out to be founded on a mistake." *Gregoire*, 177 F.2d at 581. Officers must often determine in the blink of an eye whether to take actions that involve the most sensitive public duties but may impinge on constitutional principles. Qualified immunity protects officers from liability so that "those who try to do their duty" faithfully can do so to the best of their ability, not distracted by "the constant dread of retaliation," *ibid.*, or

No. 20-40359

the fear that courts will later judge their conduct to conflict with vague and generalized constitutional principles.

So here again, the rights-remedies distinction is important. When *rights* are unclear, there is risk of subjecting a faithful public official to liability simply because he took an action "call[ed] for" by the "public interest" but "founded on a mistake[n]" understanding of the Constitution. *Ibid.* But when rights are clear and *remedies* unclear, that is not so. A faithful public official does not violate the clear commands of the Constitution. Full stop. So there is no risk of "dampen[ing] the ardor" of faithful public officials by denying qualified immunity when rights are clearly established but remedies are not. *Harlow*, 457 U.S. at 814 (quotation omitted).

An example might illustrate the point. More than 50 years ago, six unknown named agents from the Federal Bureau of Narcotics stormed Webster Bivens's home, "manacled" him "in front of his wife and children," "threatened to arrest the entire family," including his children, and then searched his home "from stem to stem." *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 389 (1971). The Supreme Court famously implied a cause of action for Bivens to sue the narcotics officers for damages. But in the subsequent five decades, it has become increasingly unclear whether anyone else can ever invoke the same remedy. *See Egbert v. Boule*, 596 U.S. 482 (2022). The potential unavailability of *remedies* to anyone not named Webster Bivens, of course, does *not* mean the rest of us have to wonder about our constitutional *rights*. All of us have equal *rights* under the Fourth Amendment. It is just that Webster Bivens has a cause of action for damages against federal officers— that is, an implied remedy—that others might not enjoy today. If federal officers violated the Fourth Amendment in 2024 and Congress created a cause of action to vindicate that wrong in 2025, the officers surely could not invoke qualified immunity by saying: "Yes, we knowingly violated the

No. 20-40359

commands of the Constitution, but it was unclear to us at the time whether we could be sued for it." Simply put, these officers undoubtedly "had fair notice that [their] conduct was unlawful." *Brosseau*, 543 U.S. at 198.

\*

*Lozman* and *Nieves* have clarified that the no-probable-cause rule is simply about the availability of relief under § 1983, not the scope of the First Amendment. So query if it matters whether the contours of the no-probable-cause rule have been clearly established.

## II

Even if the no-probable-cause rule is somehow internal to the First Amendment, I still wonder about applying qualified immunity in cases like this. Here, I (A) explain that the rationales for qualified immunity bear little weight outside the context of split-second decision-making. Then, I (B) argue that Supreme Court precedent supports drawing a distinction between split-second decisions and other official action.

## A

Although many have treated qualified immunity as a "one-size-fits-all doctrine," *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2421 (2021) (Thomas, J., respecting denial of certiorari), Justice Thomas has recently questioned whether the logic undergirding qualified immunity is equally implicated in all cases involving official conduct. Officers "exercise a wide range of responsibilities and functions." *Ibid.* And courts "have never offered a satisfactory explanation" for why qualified immunity should apply the same way across the board. *Id.* at 2422. I share Justice Thomas's concerns.

### 1

Consider the "archetypal qualified immunity case": one involving excessive police force. Andrew S. Oldham, *Official Immunity at the Founding*,

No. 20-40359

46 Harv. J.L. & Pub. Pol'y 105, 107 (2023).  Officers are often forced to decide, in the blink of an eye, if using deadly force is necessary to save or protect themselves or the innocent public.  Those officers generally are not lawyers.  And (I hope) they are not spending their days reading Fourth Amendment cases and going to CLE presentations.  So what should the law do when the officer makes a reasonable, good-faith, split-second decision in such circumstances—and he turns out to be wrong?

The answer is qualified immunity.  From the comfort of our judicial robes in the confines of our chambers surrounded by U.S. Marshals, judges are not well positioned to condemn an officer for acting unreasonably and erroneously in making a split-second judgment except in the most egregious of circumstances.  So instead, we do not rely on "the 20/20 vision of hindsight" in judging an officer's decision. *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).[5] And we instead use qualified immunity to provide some breathing room for mistakes—even deadly ones—that are made in the fog of darkness and danger.

––––––––––––––––––––––––––

[5] That is an increasingly ironic aphorism in an age of ubiquitous body-worn cameras, dash cameras, cell-phone cameras, doorbell cameras, and others.  Today, deciding a qualified immunity case is often evocative of the "movie days" the Supreme Court reportedly held in the 1960s and 1970s—during which law clerks and judges gathered around a screen to review footage together, sometimes frame-by-frame.  *See* Bob Woodward & Scott Armstrong, The Brethren 198 (1979).  It is equally dispiriting that the legal standards for both types of movie days are similar: "I am increasingly concerned that our excessive-force cases are governed by Justice Stewart's unsatisfying standard of 'I know it when I see it.'" *Boyd v. McNamara*, 74 F.4th 662, 672 (5th Cir. 2023) (Oldham, J., concurring in part and dissenting in part) (quoting *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring)).

No. 20-40359

2

Compare that with the case of university administrators who infringe a student's rights of conscience by expelling him for his religious beliefs. Or perhaps this case. "This was no fast-moving, high-pressure, life-and-death situation." *Villarreal*, 94 F.4th at 406 (Willett, J., dissenting). Villarreal has long been a well-known critic of the Laredo Police Department ("LPD"). *Id.* at 382 (majority opinion). In response, she alleges, several LPD officials "conspired to suppress her speech" by "arrest[ing] her." *Ibid.* First, an LPD investigator drummed up an investigation by "assign[ing] Officer Juan Ruiz to investigate" Villarreal, *id.* at 383, despite LPD "never" having "arrested, detained, or prosecuted any person before under the Statute" at issue, *id.* at 404 (Higginson, J., dissenting) (quotation omitted). Then, Ruiz secured a subpoena for phone records from Villarreal's cellphone. *Id.* at 383 (majority opinion). Finally, after reviewing the records, Ruiz prepared two affidavits to arrest Villarreal for conversations she had with another officer. *See ibid.* The whole conspiracy unfolded over "several months." *Id.* at 407 (Willett, J., dissenting) (emphasis removed).

It is not immediately obvious what purpose qualified immunity should serve in such circumstances. These officials had sufficient "time to make calculated choices." *Hoggard*, 141 S. Ct. at 2422. So the officials cannot complain that they were compelled to take "action which . . . turn[ed] out to be founded on a mistake." *Gregoire*, 177 F.2d at 581. Before acting, the officials could have read Supreme Court precedent, studied the history of the First Amendment, or even consulted counsel. They thus had or should have had ample "fair notice" of the lawfulness *vel non* of their conduct. *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (citation omitted). So an *ex post* judicial determination that the officials violated the First Amendment is no more untoward than an *ex post* judicial determination that an insurer breached a contract. Nor do we risk stepping out of our realm of competence

in making such a determination. And to the extent qualified immunity hinges on "dampen[ing]" the "ardor" of such officials, *Harlow*, 457 U.S. at 814 (citation omitted), when it comes to at least some retaliatory-arrest defendants, perhaps that ardor *should* be dampened. *See Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024) (per curiam).

## B

There is some support for this line in the Supreme Court's precedents.

When plaintiffs raise claims alleging that an officer acted unreasonably in making a split-second decision, the Court has consistently emphasized that "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quotation omitted). Consistent with that granularity requirement, the Supreme Court has consistently summarily reversed or vacated lower courts in cases involving excessive force—a classic example of split-second decision-making—for defining clearly established law at too high a level of generality. *See, e.g.*, *Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2021) (per curiam); *City of Tahlequah v. Bond*, 595 U.S. 9 (2021) (per curiam); *City of Escondido v. Emmons*, 586 U.S. 38 (2019) (per curiam); *Kisela*, 584 U.S. 100; *White v. Pauly*, 580 U.S. 73 (2017) (per curiam); *Mullenix*, 577 U.S. 7; *Brosseau*, 543 U.S. 194.

In other cases, though, the standard has been more lenient. For instance, in *Taylor v. Riojas*, 592 U.S. 7 (2020) (per curiam), "correctional officers confined" Trent Taylor "in a pair of shockingly unsanitary cells" for "six full days." *Id.* at 7. Taylor brought a claim under § 1983, alleging that the "conditions of [his] confinement violate[d] the Eighth Amendment's prohibitions on cruel and unusual punishment." *Id.* at 8. A Fifth Circuit panel held the conditions unconstitutional but nonetheless granted qualified

No. 20-40359

immunity. The Supreme Court reversed. It did not matter that no factually similar case could be found. Instead, it held that "under the extreme circumstances of this case," the law was sufficiently clear. *Ibid.* And instead of relying on factual dissimilarities in precedent to *support* qualified immunity, the Court held factual dissimilarities in precedent *defeated* qualified immunity. *See id.* at 9 n.2 (explaining that the cases the Fifth Circuit relied on to find "ambiguity in the caselaw" were "too dissimilar . . . to create any doubt about the obviousness of Taylor's right").

At the risk of overreading *Taylor*, its approach to the level-of-granularity problem might be explained by the absence of split-second decision-making.[6] *See also* Hart & Wechsler, *supra*, at 1325 (suggesting *Taylor* might have been distinct because it did not "call for an assessment of split-second decisions"). *Taylor* itself suggested as much when it emphasized that the officers were faced with no "exigency." 592 U.S. at 9. Instead, the correctional officers had plenty of time to assess their horrific conduct and recognize that it obviously violated the law. So it was of no moment that precedent had only clearly established a general prohibition on "inhumane" conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Nor did it matter that the Court previously said that a "filthy, overcrowded cell . . . might be tolerable for a few days." *Hutto v. Finney*, 437 U.S. 678, 686–87 (1978).

---

[6] True, prior cases involving split-second decision-making had also recognized that the obviousness of a constitutional violation alone, even without a factually similar precedent, might defeat qualified immunity. *See, e.g.*, *Emmons*, 586 U.S. at 44. But the Court had apparently "never—until *Taylor*—actually used" the obviousness standard "to decide a case." Comment, *Taylor v. Riojas*, 135 Harv. L. Rev. 421, 429 (2021).

No. 20-40359

\*      \*      \*

This case is plainly controlled by *Reichle*. But future cases involving similar facts will arise. In those cases, I trust that our court will attend carefully to the way qualified immunity should operate. And it very well might operate differently.

No. 20-40359

Stephen A. Higginson, *Circuit Judge*, joined by Elrod, *Chief Judge*, and Graves, Willett, and Douglas, *Circuit Judges*, dissenting:

The Supreme Court entered judgment in this case on October 15, 2024, vacating our court's decision that affirmed dismissal of Petitioner Priscilla Villarreal's First Amendment retaliation claim. *See Villarreal v. Alaniz*, 145 S. Ct. 368 (2024). The Supreme Court awarded costs to Ms. Villarreal. And the Court remanded her reinstated lawsuit for further consideration in light of *Gonzalez v. Trevino*, 602 U.S. 653 (2024) (per curiam) (vacating *Gonzalez v. Trevino*, 42 F.4th 487 (5th Cir. 2022)).

Now, a majority of our en banc court summarily decides that Ms. Villarreal loses again, despite nearly six years of tenacious First Amendment litigation that culminated successfully in the High Court. Because the parties disagree comprehensively and cogently about the impact of *Gonzalez* on Ms. Villarreal's reinstated lawsuit, I would remand to the district court to permit full adversarial briefing and argument. *Compare* Appellant's Suppl. Letter Br., *Villarreal v. City of Laredo*, (5th Cir. Dec. 11, 2024), *with* Appellees' Suppl. Letter Br., *Villarreal v. City of Laredo*, (5th Cir. Dec. 11, 2024). Remand is a cautionary approach that avoids a Pyrrhic victory for Ms. Villarreal.

Importantly, remand would allow the district court to consider the points raised in several of the opinions dissenting from our court's prior, now-vacated en banc decision. These dissenting opinions elaborated that police arrests of journalist-critics for routine newsgathering *obviously* violate the First Amendment. *See Villarreal v. City of Laredo*, 94 F.4th 374, 400 (5th

No. 20-40359

Cir. 2024) (Graves, J., dissenting), *judgment vacated*, 145 S. Ct. 368; *id.* at 407-08 (Willett, J., dissenting); *id.* at 411 (Ho, J., dissenting).[7]

Remand is also appropriate so that the district court can consider, in the first instance, the applicability of qualified immunity to Ms. Villarreal's retaliation claim. Our now-vacated majority opinion never addressed that issue because it concluded that Ms. Villarreal failed to state a retaliation claim under our circuit's binding interpretation of the *Nieves* exception. *See id.* at 397-98 (majority opinion). But that interpretation has now been rejected by the Supreme Court as "overly cramped." *Gonzalez*, 602 U.S. at 658. Whether Ms. Villarreal's retaliation claim nevertheless fails on qualified immunity grounds is a question that our en banc court did not answer. Yet today's majority, with minimal briefing on the issue, summarily decides that qualified immunity for the retaliation claim "is easily shown." *See ante*, at 2. Notably, this argument that qualified immunity must attach, regardless of the merits of Ms. Villarreal's First Amendment retaliation claim, was presented to the Supreme Court, but the Court still vacated and remanded for further proceedings.[8] I would therefore remand to the district court so that it can carefully consider the parties' arguments.

---

[7] My original dissenting opinion, which questioned our court's truncation of *Nieves v. Bartlett*, 587 U.S. 391 (2019), in *Gonzalez*, is consistent with the Supreme Court's reinstatement of Ms. Villarreal's First Amendment retaliation claim and remand. *See Villarreal*, 94 F.4th at 406 n.5 (Higginson, J., dissenting).

[8] *See* Pet. for Writ of Cert., *Villarreal*, 145 S. Ct. 368 (No. 23-1155), at 21 ("Here, a reasonable officer would have known throwing Americans in jail for basic journalism violates the First Amendment. Yet Laredo officials plotted Villarreal's arrest despite 'obvious clarity' from settled precedent and basic constitutional principles that arresting Villarreal would violate the Constitution.") (internal citation omitted); Br. for City of Laredo in Opp'n to Pet. for Writ of Cert. at 14-15, 2024 WL 4122025, at *14-15 ("[E]ven if arresting Petitioner did violate the First Amendment, the law at the time of the arrest did not clearly establish that First Amendment right."); *id.* at *24 ("To make matters worse, resolving the First Amendment issue will not affect the outcome of this case because

No. 20-40359

Last, I think summarily deciding that qualified immunity applies to the retaliation claim is inadvisable for another reason which, if assessed as meritorious, would avoid further constitutional First Amendment "obviousness" litigation. Specifically, Ms. Villarreal's retaliation claim cannot be dismissed without confirming that the police had probable cause to arrest her in the first place. Not only did Ms. Villarreal allege objective evidence of retaliation, making probable cause irrelevant under *Gonzalez* and *Nieves*, but she also alleged that taint negated *any* probable cause basis for the officers' warrant defense. *See Villarreal*, 94 F.4th at 401-04 (Higginson, J., dissenting). No probable cause and bad probable cause are inextricable. Based on *Gonzalez*, we should implement the Supreme Court's instruction that Ms. Villarreal is entitled to pursue the latter, and, I would add, that by prevailing, she did not somehow lose opportunity to pursue the former.

Let me emphasize that none of these observations is outcome-determinative. Each might rise or fall on reasoned assessment, in dialogue with counsel, about the scope of the Supreme Court's remand. I list them because Ms. Villarreal prevailed, not lost, in the Supreme Court. I do not think it is a proper answer to the High Court to reinstate what we mistakenly said before, just in different packaging. And certainly, we shouldn't do so summarily, without any opportunity for counsel to offer oral argument before our court, a panel thereof, or on remand to the district court, as to the scope of the Supreme Court's remand, including both the majority's application of a qualified immunity bar and also Ms. Villarreal's threshold allegation that her arresting officers misled the judiciary to secure her arrest.

---

Respondents will be entitled to qualified immunity even if their conduct did violate the First Amendment.").

No. 20-40359

For these reasons, I would vacate the judgment of the district court and remand to that court for further proceedings consistent with the decision of the Supreme Court.